# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of Minnesota, by its
Attorney General Lori Swanson,

               Plaintiff,

     v.

Accretive Health, Inc.,

               Defendant.

Civil File No._____

**COMPLAINT**

The State of Minnesota, by its Attorney General Lori Swanson, brings this action against Defendant Accretive Health, Inc. ("Accretive" or "Accretive Health") for violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health ("HITECH") Act, Pub. L. No. 111-5, 123 Stat. 226, and Department of Health and Human Services Regulations at 45 C.F.R. § 160 *et seq.*; the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*; Minnesota's debt collection statutes, Minn. Stat. Ch. 332; and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.* & 325F.68 *et seq.*, as follows:

## INTRODUCTION

1.    Accretive is a portfolio company of the New York private equity fund Accretive, LLC, which has a controversial history in Minnesota relating to the arbitration and collection of consumer debts. Accretive wears a number of hats as it relates to the

SCANNED
JAN 1 9 2012
U.S. DISTRICT COURT ST. PAUL

patients of two Minnesota hospital systems and, for one of the hospital systems, is at once both a debt collector and treatment coordinator.

2.      Accretive is licensed as a debt collection agency in Minnesota. Accretive has largely assumed control of the management and operations of the so-called "revenue cycles" of both Fairview Health Services ("Fairview") and North Memorial Health Care ("North Memorial"), including their scheduling, registration, admissions, billing, collection, and payment functions. Accretive assumes managerial responsibility for the hospital employees who perform these functions and has "infused" its own employees into the staff of the hospitals. Accretive engages in "data mining" and "consumer behavior modeling" on patients, as described below.

3.      Fairview is the only hospital system in the country to also hire Accretive to deliver services under a so-called "Quality and Total Cost of Care" ("QTCC") contract. Under this contract, Accretive helps Fairview negotiate contracts with HMOs and insurance companies through which the hospital receives incentive pay to cut patient costs. Accretive then receives a share of the hospital's incentive pay. Under the QTCC contract, Accretive develops "risk scores" on individual patients and manages health risk assessments, automated care plans, case and pharmacy management, and duration of hospital stays. Accretive tells its Wall Street investors that it identifies patients who are deemed "outliers" and tracks utilization and profit and loss by patient. Fairview has called Accretive its "strategic partner." Their relationship is so extensive that Fairview accounted for over 13 percent of Accretive's service revenue for the first three quarters of

2011 (over $75 million).   The financial projections indicate that this financial entanglement will grow once a new contract, discussed below, is fully implemented.

4.   Through these extensive relationships, Accretive has compiled a high volume of extremely sensitive and personal medical, financial, and other records involving tens of thousands of Minnesota patients of the two hospital systems.  Some of the data was stored on an unencrypted laptop computer.  The laptop was left by an Accretive employee in a rental car outside the bar and restaurant area of the Seven Corners area of Minneapolis.  The computer was stolen and, with it, data on at least 23,531 Fairview and North Memorial patients.  In response to one patient's request, Fairview provided the patient with a "screen shot" of the data about the patient that it says was on the laptop.  The screen shot (attached as paragraph 46) sent to the patient by Fairview includes a "medical score" to predict the likelihood that the patient would be admitted to the hospital, a "medical score" to predict the "complexity" of the patient, a description of the "frailty" of the patient, and the dollar amount allocated to the patient's health care provider.  In addition, the data disclosed personal identifying information about the patient, including the patient's name, address, phone number and Social Security number.  The screen also included an itemization of whether the patient had 22 listed conditions, including bipolar disorder, schizophrenia, depression, high blood pressure, asthma, and even low back pain.  Accretive violated privacy laws by failing to keep private patient data secure.

5.     Acting as a licensed debt collector, Accretive has at times masked its true identity with Minnesota patients and has failed to comply with the disclosure and registration requirements of Minnesota's debt collection laws.

6.     Through this Complaint, the State of Minnesota seeks to hold Accretive accountable for its violations of health privacy laws, state debt collection laws, and state consumer protection laws.  The State also seeks through this action to determine and disclose to patients the extent of Accretive's access to data and the manner in which it utilizes such data.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction pursuant to 42 U.S.C. § 1320d-5(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

8.     Plaintiff has provided notice of this action to the Secretary of Health and Human Services as required under 42 U.S.C. § 1320d-5(d)(4).

9.     Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

10.     Lori Swanson, the Attorney General of the State of Minnesota, is authorized under HIPAA, Minn. Stat. Ch. 8, Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection statutes, and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens.

11.     Accretive is a Delaware corporation with its principal executive offices located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois.  Its chief executive

officer is Mary A. Tolan, and its Chairman of the Board is J. Michael Cline.  Accretive

was incorporated under the name Healthcare Services, Inc. in 2003 and changed its name

to Accretive Health, Inc. in 2009.  Its shares trade under the symbol "AH" on the New

York Stock Exchange.  Accretive has been registered as a foreign corporation with the

Minnesota Secretary of State since December 20, 2010 and, on that same date, registered

"Medical Financial Solutions" as an assumed name with the Minnesota Secretary of

State.  Accretive became licensed with the Minnesota Department of Commerce as a debt

collection agency on January 20, 2011, listing "Medical Financial Solutions" as an

assumed name with that agency, and is currently licensed as a debt collector with that

agency.  Accretive lists Steve Walters as its sole individual collector.  Accretive transacts

business in the State of Minnesota, including on behalf of both Fairview and North

Memorial.

        12.    At all times relevant hereto, Fairview has been a health care provider that

operates certain affiliated entities under common ownership or control, which are treated

as a covered entity for purposes of HIPAA.  45 C.F.R. § 160.103.  At all times relevant

hereto, North Memorial has been a health care provider within the meaning of HIPAA.

*Id.*  As health care providers, Fairview and North Memorial are covered entities within

the meaning of HIPAA, and thus are required to comply with the HIPAA federal

standards that govern the privacy of individually identifiable health information. *Id.*  At

all times relevant hereto, Accretive, acting as a business associate of both Fairview and

North Memorial, obtained access to individually identifiable health information on those

providers' patients and therefore was subject to HIPAA.  *See, e.g.,* 42 U.S.C. §§ 17931-34.

## FACTUAL ALLEGATIONS

**1.     Accretive, LLC's Prior Debt Collection Activity.**

   **a.     Accretive, LLC's Relationship with the National Arbitration Forum.**

13.     Accretive was incorporated in 2003 as a "portfolio company" of Accretive, LLC, a New York City private equity fund founded in 1999 by Wall Street investment manager J. Michael Cline.  In court filings, Accretive, LLC has described itself this way: "Accretive manages private equity funds which invest largely in companies that manage back-office administrative processes."

14.     Cline is the Chairman of the Board of Accretive.  As of April 20, 2011, Cline and Accretive Investors SBIC, L.P., of which Cline is managing member, each owned 19.4 percent of Accretive, for a combined 38.8 percent ownership.  In 2010, Accretive, LLC arranged a public offering for Accretive Health, netting over $100 million in proceeds.

15.     Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011.  It sometimes performs debt collection activities in Minnesota under the assumed name "Medical Financial Solutions."

16.     Accretive, LLC has a controversial history in the debt collection business in Minnesota and nationwide.  By 2009, through a series of acquisitions, corporate formations, management contracts, and asset transactions engineered by Accretive, LLC,

the equity fund simultaneously took control of the nation's largest debt collection enterprise and became affiliated through ownership and governance interests with the nation's largest consumer debt collection arbitration company. This occurred through a series of transactions engineered by Accretive, LLC involving three major companies: National Arbitration Forum (an arbitration company based in Minnesota), Axiant, LLC (a debt collection agency), and Mann Bracken (at the time, the nation's largest collection law firm). The transactions can be summarized as follows:

a.      Accretive, LLC formed a series of private equity funds under the name "Agora" (Greek for "Forum"), which in turn acquired a $42 million, 40 percent financial interest and governance rights in the Minnesota-based National Arbitration Forum. The Forum was the nation's largest arbitration firm for consumer credit card collections, handling over 200,000 consumer arbitrations each year.

b.      Accretive formed and funded a large national debt collection agency called Axiant, LLC, which became a debt collector for the credit card industry and debt buyers. Accretive, LLC owned over 68 percent of Axiant.

c.      Axiant then acquired the assets and collections operations of the Mann Bracken law firm, the nation's largest collection law firm (which had previously acquired two other large national collection law firms). Of the 214,000 consumer arbitrations processed by the National Arbitration Forum in 2006, 125,000, or almost 60 percent, were filed by Mann Bracken and its predecessors.

17.     Through these transactions, Accretive, LLC essentially took control of the entire "revenue cycle" (e.g., the collection agency, the prosecuting law firm, and the neutral arbitrator) for consumer credit card collections in the United States. Accretive, LLC wanted to form a "broad arbitration ecosystem" which would pay huge financial dividends for the equity fund. Prior to this scheme, law firms were generally owned by individual lawyers due to professional regulations that prohibit for-profit corporations or non-lawyers from owning law firms, such that Wall Street could not profit from law firm revenues. Through these transactions, Accretive, LLC essentially sought to "monetize" for Wall Street investors the profits to be made from debt collection law firms. According to Accretive, LLC's internal documents, the executives wanted their debt collection and arbitration system to expand to "become a comprehensive, alternative legal system."

18.     In July, 2009, the Minnesota Attorney General filed a lawsuit against the National Arbitration Forum and its affiliates in Hennepin County District Court in Minnesota. The lawsuit alleged, in part, that the National Arbitration Forum—which held itself out as an independent and neutral arbitration company—misled consumers, courts, and the public about the extensive financial and governance cross-ties with Accretive, LLC, which constituted an irreconcilable conflict of interest.

19.     As a result of the litigation, the National Arbitration Forum (the arbitration company) exited the consumer arbitration business. Shortly thereafter, in November, 2009, Axiant (the debt collector) filed for bankruptcy in United States Bankruptcy Court in Delaware. In or about January, 2010, Mann Bracken (the collection law firm) closed

its doors and was placed into judicial receivership in Montgomery County Circuit Court in Maryland. At the time of their closure, all three entities had been the subject of many consumer complaints alleging heavy-handed collection conduct.

### b.   Accretive Health and the National Arbitration Forum.

20.   Before the three companies shut their doors, Accretive, LLC angled to profit even more by joining the Forum's operations with those of Accretive Health. Accretive, LLC wanted to "launch" the Forum into the arbitration of health care disputes between patients and hospitals using Accretive Health and stated that it had spoken with Accretive Health CEO Mary Tolan about placing arbitration clauses in hospital-patient agreements. Accretive, LLC told the Forum that one of Accretive Health's clients—the largest non-profit hospital in the country (Ascension Health of Missouri)—had provided it with access to "$1Bn of dormant receivables to attempt collection, as a sideline to the core relationship." Accretive, LLC told the Forum that, if they did business together, "[w]e believe our deep expertise and relationships in healthcare should enable us to jump-start NAF's expansion into an extraordinary market opportunity: the use of arbitration in consumer healthcare disputes and payments." Accretive, LLC told the Forum that it wanted to "leverage [the] Accretive network" and set forth a plan in which: "In new industries, such as healthcare, NAF Procedures are used early and consistently as the standard method for resolving payment disputes. By playing a prominent role, NAF fundamentally shapes the collections players and tactics that emerge in these industries."

2.    **Accretive Returns to Minnesota with Accretive Health.**

a.    **Accretive Health Has Taken Over Management of the "Revenue Cycles" of Fairview and North Memorial.**

21.    Accretive makes most of its money by entering into "Revenue Cycle Operations" contracts with hospitals.  Through these contracts, Accretive largely takes control of the scheduling, registration, admissions, billing, and collection and payment functions at its client hospitals.  Accretive assumes managerial responsibility for hospital employees who perform these functions and "infuses" its own employees into the staffs of the hospitals.  Accretive receives both base fees and incentive payments for working with hospitals to boost their revenue and/or cut their costs.

22.    On its website, Accretive, LLC describes its portfolio company, Accretive Health, this way:  "Accretive Health takes over responsibility for the people, process and technology associated with the entire revenue cycle process."  It told Wall Street investors on January 12, 2011 that it has "no direct competitors" who perform these broad functions.  In its 2010 Annual Report, Accretive estimated that up to $50 billion could be made through these services nationwide (calculated at five percent of about $1 trillion in annual revenue at the nation's hospitals and large physician organizations).

23.    Accretive entered into a Revenue Cycle Operations contract with Fairview in March, 2010, which became effective on May 1, 2010.  Fairview is a large health care system that operates seven hospitals and numerous primary, specialty, and urgent care clinics.  Fairview accounted for 10.7 percent (or over $64 million) of Accretive's net service revenue of $606 million in 2010, according to Accretive's 2010 Annual Report.

For the nine months ending September 30, 2011, Fairview accounted for 13.3 percent (or over $75 million) of Accretive's net service revenue of $566 million. Fairview has called Accretive its "strategic partner."

24.   Accretive entered into a Revenue Cycle Operations agreement with North Memorial in March, 2011. North Memorial operates one hospital and numerous clinics in Minnesota.

25.   Accretive assumes responsibility for a client hospital's "revenue cycle" functions. It controls and directs the work of hospital employees who are engaged in "revenue cycle" activities. It also places Accretive employees—who it calls "infused management"—inside the hospitals and "connect[s] [its] proprietary technology and analytical applications to the hospital's existing technology systems." Accretive has summed up this contract this way: "We embed our technology, personnel, know-how and culture within each customer's revenue cycle activities and serve as the customer's on-site operational partner."

26.   Accretive describes the breadth of its revenue cycle management services like this: "For our purposes, the revenue cycle starts when a patient registers for future service or arrives at a hospital or clinic for unscheduled service and ends when the hospital has collected all the appropriate revenue from all possible sources."

27.   In its 2010 Annual Report, Accretive states: "[W]e identify patient accounts with financial risk by applying data mining techniques to the data we have collected." Accretive also "increase[s] the collection rate on patient-owed obligations" in

part by using "consumer behavior modeling."  Proprietary algorithms assess a patient's "propensity to pay."

28.    Accretive's revenue cycle management contracts "span the entire revenue cycle," including "front office" (scheduling, registration, and admissions), "middle office" (billing), and "back office" (collections).  According to Accretive, when a patient registers at a client hospital, Accretive begins to compile "complete patient information" on the patient, such as the patient's Social Security number and insurance eligibility.  It performs "real-time" checks for insurance coverage upon admission to assess "each patient's ability to pay."  It maintains an "automated electronic scorecard" that tracks each patient, including the patient's payment history, throughout the patient's time as a patient.  It identifies patient accounts with financial risk by applying "data mining techniques," and it performs "skip tracing."  Accretive collects old bills for Fairview.

29.    The breadth of Accretive's activities is depicted in the following chart from Accretive's 2010 Annual Report (p. 13):



30.    The breadth of Accretive's involvement at the hospitals is similarly depicted in this chart from Accretive's 2010 Annual Report (p. 22):



    **b.**    **Accretive Contracts with Fairview to Perform Sweeping Functions Relating to the Monetization of Health Treatment.**

31.    Fairview advised the Minnesota Attorney General's office in a letter dated October 14, 2011 that "Accretive Health…assists Fairview in care coordination efforts to help better coordinate and manage patient's health care needs."

32.    Besides the revenue cycle management contract, Accretive and Fairview entered into a five year "Quality and Total Cost of Care" ("QTCC") agreement in November, 2010. As of the filing of its December 10, 2010 Annual Report, Fairview was the only hospital system in the United States that hired Accretive for QTCC services. In a conference with Wall Street investors on January 12, 2011, Accretive called the Fairview QTCC agreement its "inaugural" contract.

33.    Under the QTCC agreement, Accretive helps Fairview negotiate contracts with certain insurance companies and HMOs that allow Fairview to earn incentive payments from the insurers and HMOs for cutting health care costs. In turn, Accretive receives a share of the hospital's incentive payments under the QTCC agreement for cost savings generated through "managing the care coordination process." Accretive told Wall Street during an investor conference on November 11, 2010 that health care savings would occur in part through an "intense focus" on "reducing avoidable hospital admissions." It further said that the "sickest and most impactable patients" would be "identified for proactive management."

34.    Accretive states that the QTCC agreement "can help our customers identify the individuals who are most likely to experience an adverse health event and, as a result,

incur high healthcare costs in the coming year." It further states that when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

35.    The following chart from Accretive's 2010 Annual Report (p. 17) depicts the breadth of Accretive's services:

Our quality and total cost of care services offering includes management of the following processes:

| Risk Evaluation, Stratification & Coding | Delivery & Access | Care Coordination | Admission Management | Coaching & Education | Analytics & Reporting |
|---|---|---|---|---|---|
| • Health Risk Assessment<br>• Accurate claim / medical record documentation<br>• Medical and Rx claim review<br>• Per patient risk score calculation<br>• Best possible revenue calc<br>• Automated care plans<br>• Patient social service determination | • Physician Incentive Structure<br>• Local PCP leadership and governance structure<br>• Comprehensive referral plans<br>• Clinical protocol determination<br>• Contract sub-specialties<br>• Contract ancillary services<br>• Community resources<br>• Specialist efficiency evaluation | • Post-Discharge follow-up<br>• Authorizations<br>• Case Management<br>• On-boarding<br>• Home assessments<br>• Referrals and Referral links to PCP<br>• Scheduling<br>• Medical necessity review<br>• Pharmacy Management | • Hospitalist program / ED management<br>• Daily census – Acute / Skilled / LTAC<br>• Patient review by facility<br>• Length of stay management<br>• Discharge planning<br>• Delivery System re-entry<br>• Transitional care | • Performance management– Revenue, Cost, Quality, & Service reviews<br>• Population-based opportunity reviews<br>• Training & education on delivery<br>• Benefit / Eligibility<br>• Provider service issues | • Quality scorecard<br>• Pricing / Benefit evaluations<br>• Utilization by all healthcare service types<br>• P/L by Patient, PCP, Group, Network<br>• Benchmarks<br>• Peer group analysis<br>• Outlier determinations |
| Payer Relationship Management | | | | | |
| People & Technology | | | | | |

36.    Thus, according to the above table and the QTCC contract, Accretive is responsible for the management of: "risk scores" for each patient, development of automated care plans for patients, case management, length of hospital stay management, and discharge planning, among other things. It also performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

37.     The breadth of the managed care services to be provided by Accretive to Fairview is also reflected in the various job ads posted by Accretive to staff the Fairview account.  For example, in September, 2011, Accretive posted an ad for an "Analytics Manager" to staff the Fairview contract.  The advertisement states that the person will "aggregat[e] and analyz[e] patient population data and leverag[e] predictive models in order to identify innovative strategies for population management."  As noted above, Accretive told its Wall Street investors that "population-based management" focuses on identifying the "sickest and most impactable patients" for "proactive management."

**3.     Accretive Loses Sensitive Data on at Least 23,531 Minnesota Patients.**

38.     Accretive is licensed as a debt collector with the State of Minnesota and, in fact, collects debts for at least one Minnesota hospital system (Fairview).  At the same time, it also assists Fairview with health care management and medical necessity review.

39.     Accretive also manages the "revenue cycle" of North Memorial.  (North Memorial advised the Attorney General's Office in a letter dated October 17, 2011 that Accretive does not perform debt collection services for it.)

40.     Accretive states that, among other things, it engages in "data mining," "skip tracing," "consumer behavior modeling," and "per patient risk score calculation" on patients.

41.     Through these services and others, Accretive amasses and has access to a high volume of sensitive and personal information, including medical information, about Minnesota patients served by the two hospitals.

42.     On or about July 25, 2011, an Accretive employee, Matthew Doyle, left an unencrypted laptop computer containing extremely sensitive data about Fairview and North Memorial patients in the back seat of a rental car parked in the Seven Corners bar and restaurant district of Minneapolis.  The laptop was stolen.

43.     The information on the laptop was not encrypted.  The laptop was only password protected.  The laptop contained sensitive personal information on at least 23,531 Minnesota patients.

44.     On or about September 20, 2011, Accretive informed Fairview that protected health information of approximately 14,000 Fairview patients was contained on the stolen laptop.  Accretive stated that the laptop contained protected health information, including the names, addresses, dates of birth, Social Security numbers, other identifiers, clinical information, including diagnosis and conditions, and other financial information on Fairview patients.  Other information on the laptop about Fairview patients included their dates of service, account balances, account numbers, and medical record numbers.

45.     Paragraph 46 contains a "screen shot" sent by Fairview to one of its patients who requested an accounting of the information about the patient that was on the laptop.  The information on the "screen shot" sent by Fairview to the patient included the following:

- Patient's full name
- Gender
- Number of dependents
- Date of birth
- Social Security number
- Clinic and doctor

- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
    - Macular degeneration
    - Bipolar disorder
    - Depression
    - Diabetes
    - Glaucoma
    - HIV
    - Metabolism disorder
    - Hypertension
    - Hypothyroidism
    - Immune suppression disorder
    - Ischemic heart disease
    - Osteoporosis
    - Parkinson's Disease
    - Asthma
    - Arthritis
    - Schizophrenia
    - Seizure disorder
    - Renal failure
    - Low back pain

46.    This is a redacted copy of the "screen shot" sent by Fairview to the patient:

| First Name | Last Name | MID (PHI) | HMO ID | Patient ID | Group Number | Subscriber Number | Dependent Code | Gender | Date of Birth |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0 | ▮ | ▮ |

| Age | Months Enrolled | Active Last Day | Address 1 | Address 2 | City | State | Zip Code | Phone Number | Attributed TIN |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | 12 | Yes | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

| Attributed Clinic | Attributed Provider | Provider (Direct) | Predicted Complexity | Total Provider Allowed | Probability of IP Stay | Frail Condition | # Hospital Dominant Condition | # Chronic Conditions | Macula Degeneration |
|---|---|---|---|---|---|---|---|---|---|
| FAIRVIEW | ▮ | ▮ | 2.287 | $4,984.90 | 0.06 | No | 0 | 4 | |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | | 1 | 0 | 0 | 1 | 0 | 1 | 0 |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | COPD | Renal Failure | Low Back Pain |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| | -- | | Good | -- | | Good | | Good | |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | Predicted Complexity (SORTED) | Total Provider Allowed | Probability of IP Stay |
|---|---|---|---|---|---|---|---|---|---|
| | -- | | | | | | 1600 | 2136 | 1206 |

| # Hospital Dominant Conditions | # Chronic Conditions | Top-Complexity | Top-Allowed Amt | Top-5oth Complexity & Allowed Amount | Top-Elizel Complexity & Allowed Amount |
|---|---|---|---|---|---|
| 243 | 366 | 0 | 0 | 0 | 0 |

47.     Accretive informed North Memorial that data on approximately 2,841 North Memorial patients was contained on the stolen laptop.  Accretive stated that the laptop contained protected health information, including the name and clinical information, including diagnosis, condition, and other treatment information.  Other information on the laptop about North Memorial patients are their full names, dates of service (e.g., admission and discharge dates), medical record number, and encounter numbers.

48.     North Memorial later retained a computer expert on its own initiative to undertake an independent forensic investigation to corroborate the representations of Accretive about the nature, scope, and extent of the lost data as it relates to North Memorial patients.  According to North Memorial, the expert discovered an additional

6,690 patients whose names and data were believed to be on the laptop but who were not revealed to be on the laptop by Accretive. North Memorial sent letters to these patients to notify them of the data breach.

49.     It is not known whether Fairview took steps to corroborate the information provided to it by Accretive about the nature, scope, and extent of the lost data as it relates to Fairview patients. Fairview has not informed the Attorney General's Office of any such steps, and it is not presently known whether data about additional Fairview patients not disclosed to it by Accretive may have been on the laptop.

50.     In its 2010 Annual Report, Accretive states: "Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes." This was not the case with the stolen laptop.

51.     Accretive agreed with both Fairview and North Memorial that it would not use or disclose protected health information in violation of HIPAA or HITECH and that it would use "appropriate safeguards" to prevent the misuse or disclosure of protected health information. It also agreed to keep all protected health information "strictly confidential" and require all of its employees and subcontractors and agents to maintain confidentiality of protected health information as required by HIPAA and HITECH. It further agreed to develop, implement, maintain and use appropriate administrative, technical and physical safeguards to preserve the integrity, confidentiality and availability of protected health information and to prevent non-permitted or violating use or

20

disclosure of protected health information, as required by 45 C.F.R. Part 164.  Accretive Health violated these provisions.

52.     Upon information and belief, Accretive failed to adequately keep track of the information on the laptop; thus, when the laptop was stolen, Accretive did not know the identity of all the individuals whose data was exposed.

53.     Accretive's contracts indicate that cost savings "will depend on the manner and extent to which [the hospital] elects to utilize the 'Shared Services Blended Shore Centers of Excellence'...."

54.     Accretive operates a shared service center in New Delhi, India.  The New Delhi service center carries out functions at the same time for multiple hospitals. Accretive recently told Wall Street investors that it wanted to increase the use of these shared service centers.  It is unknown at the present time whether Accretive exported any data about Fairview or North Memorial patients out-of-state or overseas or whether any such data is encrypted.

**4.     Accretive Has Tried to Conceal Its Role and Identity With Patients and Has Not Followed Minnesota Debt Collection Laws.**

55.     Even though Accretive amasses so much private data about patients, it goes to great length to conceal its activities, going so far as to "infuse" employees into hospitals and engage in a recycled payroll system.  As a result, it would be difficult for a patient to understand or even be aware of the role of Accretive in their lives.

56.     Fairview and North Memorial are both registered with the Minnesota Attorney General's Office as charitable organizations under Chapter 309 of the

Minnesota statutes, and they are both recognized as 501(c)(3) nonprofit organizations under the Internal Revenue Code.  They both file IRS Form 990, Return of Organization Exempt from Income Tax, with the Minnesota Attorney General's Office.  Part VII, Section B of Form 990 requires an organization to disclose the five highest compensated independent contractors that received more than $100,000 of compensation for services, whether professional or other services, from the organization in the particular year. Neither Fairview nor North Memorial disclose their payments to Accretive on their Form 990s.  Thus, a patient or regulatory agency could not read the Form 990 to identify the nature of Accretive's role as it relates to their treatment or payment for that treatment.

57.     Upon information and belief, the hospitals' patient admission and medical authorization forms do not identify Accretive by name or disclose the scope and breadth of information that is shared with it.  Upon information and belief, patients are not aware that Accretive is developing analytical scores to rate the complexity of their medical condition, the likelihood they will be admitted to a hospital, their "frailty," or the likelihood that they will be able to pay for services, among other things.

58.     As noted above, Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial Solutions" as an assumed name.

59.     Minnesota law requires a debt collection agency, when initially contacting a Minnesota debtor by mail, to include a disclosure on the notice stating:  "This collection agency is licensed by the Minnesota Department of Commerce."   Minn. Stat. § 332.37(21) (2010).  In addition, the Minnesota debt collection laws make it unlawful

for a collection agency to violate any provision of the federal Fair Debt Collection Practices Act while attempting to collect on an account. Minn. Stat. § 332.37(12) (2010). The federal Fair Debt Collection Practices Act at 15 U.S.C. § 1692e(11) makes the following conduct unlawful:

> The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, . . . .

60. In some cases, debt collection letters sent by Accretive to Fairview patients have gone so far as to say, "We are now reaching the point where your account may be turned over to a collection agency"—without disclosing that Accretive *is* itself a debt collection agency attempting to collect a debt.

61. Although Accretive just entered the Minnesota market, it already has been sued on a number of occasions in Minnesota by patients who allege that it failed to give the required disclosures identifying itself as a debt collection agency.

62. Minnesota law requires licensed debt collection agencies to register with the State of Minnesota all individuals employed by the agency who perform the duties of a "collector" under Minn. Stat. Ch. 332. According to the Minnesota Department of Commerce, Accretive lists Steve Walters as its sole individual collector with the Minnesota Department of Commerce. Accretive does not, however, identify the other employees who act as "collectors" in Minnesota, according to the Department of Commerce.

## COUNT I:  VIOLATIONS OF HIPAA

63.     Plaintiff restates and realleges all prior paragraphs of this Complaint.

64.     Accretive is business associate[1] of both Fairview and North Memorial as defined in HIPAA.  *See, e.g.*, 45 C.F.R. § 160.103.  Because HITECH Section 13401 (42 U.S.C. § 17931) provides that 45 C.F.R. §§ 164.308, .310, .312 and .316 apply to a business associate of a covered entity in the same manner as they would to a covered entity, Accretive is thus subject to the security provisions contained within HIPAA as well as applicable civil and criminal penalties.

65.     Accretive violated HIPAA by failing to comply with the standards, requirements, and implementation specifications as set forth in HIPAA, including the following:

> a.      Accretive failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).

> b.      Accretive failed to implement policies and procedures to ensure that all members of its workforce have appropriate access to electronic protected health information and to prevent those workforce members who do not have authorized access from obtaining access to electronic protected health information in violation of 45 C.F.R. § 164.308(a)(3-4).

> c.      Accretive failed to effectively train all members of its workforce, including agents and independent contractors involved in the data breach, on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.308(a)(5).

---

[1] A business associate is an entity that performs or assists in the performance of activities that involve the use or disclosure of individually identifiable health information or other regulated functions on behalf of a covered entity, but is not a member of the covered entity's workforce.  45 C.F.R. § 160.103.

d.      Accretive failed to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents that were known to them in violation of 45 C.F.R. § 164.308(a)(6).

e.      Accretive failed to implement policies and procedures to limit physical access to its electronic information systems in violation of 45 C.F.R. § 164.310(a)(1).

f.      Accretive failed to implement policies governing the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility in violation of 45 C.F.R. § 164.310(d)(1).

g.      Accretive failed to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

h.      Accretive failed to implement reasonable and appropriate policies and procedures to comply with the standards, implementation specifications, or other requirements of Part 164, Subpart C in violation of 45 C.F.R. § 164.316.

66.    The Attorney General has reason to believe that the interests of Minnesota residents are threatened and have been adversely affected by the above violations.

## COUNT II:  VIOLATIONS OF THE MINNESOTA HEALTH RECORDS ACT

67.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

68.    The Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, applies to the release of health records in Minnesota.  It prohibits providers or any *person who receives health records from a provider*, from releasing health records unless there is:

(1) a signed and dated consent from the patient or the patient's legally authorized representative authorizing the release; (2) specific authorization in law; or (3) a representation from the provider that holds a signed and dated consent from the patient authorizing the release.

Minn. Stat. § 144.293, subd. 2 (2010) (emphasis added).  The patient's consent is valid

for one year unless a different time period is specified in the consent or is provided by

law.  *Id.*, subd. 4.

69.    Accretive unlawfully released the health records of at least 23,531

Minnesota patients on or about July 25, 2011, when an Accretive employee left those

patients' health records in a car, in an unencrypted laptop, and that laptop was stolen.

70.    Even if Fairview and North Memorial had consent from patients to release

medical information to Accretive, Accretive had an obligation to secure the patients'

health records from further release.  Minn. Stat. § 144.293, subd. 2.

71.    The State of Minnesota seeks to enjoin Accretive from further violations of

Minn. Stat. § 144.291 *et seq.*

## COUNT III:  VIOLATIONS OF MINNESOTA DEBT COLLECTION LAWS

72.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

73.    Minnesota law contains the following definition of "collection agency":

"Collection agency" means and includes any person engaged in the
business of collection for others any account, bill or other indebtedness
except as hereinafter provided.  It includes persons who furnish collection
systems carrying a name which simulates the name of a collection agency
and who supply forms or form letters to be used by the creditor, even
though such forms direct the debtor to make payments directly to the
creditor rather than to such fictitious agency.

Minn. Stat. § 332.31, subd. 3 (2010).

74.    Accretive is a "collection agency" under Minnesota law.  It became

licensed with the Minnesota Department of Commerce as a debt collection agency on

January 20, 2011, listing "Medical Financial Solutions" as an assumed name.

75.     Minn. Stat. § 332.37 (2010) provides that no agency or collector shall:

(21) when initially contacting a Minnesota debtor by mail, fail to include a disclosure on the contact notice, in a type size or font which is equal to or larger than the largest other type of type size or font used in the text of the notice.  The disclosure must state: "This collection agency is licensed by the Minnesota Department of Commerce."

76.     Accretive sent debt collection notices to Minnesota patients that do not comply with Minn. Stat. § 332.37 (2010).

77.     Minn. Stat. § 332.33, subd. 5a (2010) provides that "[a] licensed collection agency, on behalf of an individual collector, must register with the state all individuals in the collection agency's employ who are performing the duties of a collector as defined in sections 332.31 to 332.45" of the Minnesota statutes.  Minn. Stat. § 332.33, subd. 1 (2010) also requires a person acting under the authority of a collection agency, as a collector, to first register with the Minnesota Commissioner of Commerce.

78.     Minn. Stat. § 332.31, subd. 6 (2010) defines a "collector" as follows:

"Collector" is a person acting under the authority of a collection agency under subdivision 3, and on its behalf in the business of collection for others an account, bill, or other indebtedness except as otherwise provided in this chapter.

79.     Accretive lists Steve Walters as its sole individual collector with the Minnesota Department Commerce.  Other employees, however, also act as collectors in Minnesota.  As a result, Accretive has violated Minn. Stat. § 332.33, subd. 5a (2010).

80.     Minn. Stat. § 332.37(12) (2010) provides that no collection agency or collector shall:

27

violate any of the provisions of the Fair Debt Collection Practices Act of 1977, Public Law 95-109, while attempting to collect on any account, bill or other indebtedness[.]

81.     The federal Fair Debt Collection Practices Act contains a number of provisions.  For example, 15 U.S.C. § 1692e provides that, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Accretive violated this provision by telling Minnesota patients that, if they do not settle with it, their debt may be referred to a collection agency when Accretive is, itself, a debt collection agency attempting to collect a debt.

82.     15 U.S.C. § 1692e(11) makes the following conduct unlawful:

The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, . . . ."

83.     15 U.S.C. § 1692e(10) also makes unlawful "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information regarding a consumer."

84.     15 U.S.C. § 1692f also provides that a collector may not use any "unfair or unconscionable means to collect or attempt to collect any debt."

85.     Accretive has not always complied with the prohibitions of the federal Fair Debt Collection Practices Act in violation of Minn. Stat. § 332.37(12).

86.     Defendant's conduct described above constitutes multiple, separate violations of Minn. Stat. Ch. 332.

## COUNT IV:  VIOLATIONS OF THE
## MINNESOTA PREVENTION OF CONSUMER FRAUD ACT AND
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

87.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

88.    Minnesota Statutes, Section 325F.69, subdivision 1 (2010) (the "CFA")

provides:

> The act, use, or employment by any person of any fraud, false pretense,
> false promise, misrepresentation, misleading statement or deceptive
> practice, with the intent that others rely thereon in connection with the sale
> of any merchandise, whether or not any person has in fact been misled,
> deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

89.    The term "merchandise" within the meaning of Minn. Stat. § 325F.69

includes services.  *See* Minn. Stat. § 325F.68, subd. 2 (2010).  Health care services are a

form of "merchandise."

90.    Minn. Stat. § 325D.44, subdivision 1 (2010) provides, in part:

> A person engages in a deceptive trade practice when, in the course of
> business, vocation, or occupation, the person:
>
>> (1)    passes off goods or services as those of another;
>>
>> (2)    causes likelihood of confusion or of misunderstanding as to
>> the source, sponsorship, approval, or certification of goods or
>> services;
>>
>> (3)    causes likelihood of confusion or of misunderstanding as to
>> affiliation, connection, or association with, or certification by,
>> another...;
>>
>> (13)   engages in any other conduct which similarly creates a
>> likelihood of confusion or of misunderstanding.

91.    The doctor-patient relationship is predicated on trust.  Patients have the

right to confidentiality of their medical records and to expect that their medical

information will not be released without their consent.   Patient confidentiality is important to encourage a full and frank exchange of information between patients and their doctors.   Patients also have the right to make informed choices about their health care (e.g., to give their "informed consent") and to withhold consent following a full and frank exchange of information between the patient and doctor.   Simply put, if patients have to be concerned about the dissemination of their medical information, they will not get treatment.   The consequence of this to both patients and the state as a whole is obvious as it relates to conditions like communicable diseases, mental health, or management of chronic conditions.

92.   These concepts have been part of the doctor-patient relationship for thousands of years.   Over 2,500 years ago, the early Hippocratic Oath for physicians provided: "All that may come to my knowledge in the exercise of my profession…I will keep secret and will never reveal."   Today, the modern Code of Ethics of the American Medical Association requires physicians to "maintain your patient's confidentiality" and to "respect your patient's right to choose their doctor freely, to accept or reject advice and to make their own decisions about treatment or procedures."   These concepts are reflected as a matter of state law and policy in the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, *supra*, which restricts the release of health records in Minnesota and which prohibits providers *and persons who receive health records from providers* from releasing health records without the patient's informed consent.   The concepts are also reflected as a matter of state law and policy in the Minnesota Health Care Patient Bill of Rights, Minn. Stat. § 144.651, which gives patients the right to:   (1) have appropriate

medical care based on their individual needs; (2) to know the identity of the physician who is responsible for coordination of their care; (3) to know the identity of outside providers; (4) to have complete information regarding diagnosis, treatment, alternatives, risk and prognosis; (5) to be respected; and (6) to have their medical records kept private and confidential.

> The Minnesota Supreme Court has said this about the right to privacy:

> The right to privacy is an integral part of our humanity; one has a public persona, exposed and active, and a personal persona, guarded and preserved. The heart of our liberty is choosing which part of our lives shall become public and which parts we shall hold close.

*Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998). Most people consider medical and health care records to be among the most personal, private types of information. In order to safeguard their privacy and make informed health care decisions, patients need full, transparent, and accurate information about how their medical information is used. As set out in this Complaint, Accretive impeded those rights.

93.     Accretive goes to great lengths to mask from patients its involvement with Minnesota hospitals, including but not limited to the following:

a.      Accretive has "infused" its employees into the staff at the hospital. Upon information and belief, patients are not aware who is and is not an Accretive employee at the hospitals.

b.      Even though Accretive has by contract assumed responsibility for managing key functions at the hospitals, as set forth above, Accretive charges the hospitals for the payroll costs of Fairview's employees, and then pays the payroll back to the hospital so that the hospital employees see a hospital check, even though Accretive manages the function.

c.     Accretive is not listed as a contractor of the hospitals on the Form 990 disclosures filed with the Internal Revenue Service or Minnesota Attorney General.

d.     Accretive has not disclosed that it acts as a debt collector for Fairview, in some cases going so far to tell patients that "your account may be turned over to a collection agency"—without disclosing that Accretive *is* itself a debt collection agency attempting to collect a debt.

94.     Accretive has misled, deceived or caused likelihood of confusion or of misunderstanding to patients about the role of Accretive in their health care.  Among other things, Accretive leads patients to believe that, or conceals from patients that, tasks undertaken by Accretive are done by Fairview.

95.     Minnesota patients are not aware of the extent of Accretive's involvement in their health care or the extent to which it amasses data about them.  This includes that:

a.     Accretive—a licensed debt collector—has access to at least the following information about Minnesota patients:

- Patient's full name
- Gender
- Number of dependents
- Date of birth
- Social Security number
- Clinic and doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma

- o HIV
- o Metabolism disorder
- o Hypertension
- o Hypothyroidism
- o Immune suppression disorder
- o Ischemic heart disease
- o Osteoporosis
- o Parkinson's Disease
- o Asthma
- o Arthritis
- o Schizophrenia
- o Seizure disorder
- o Renal failure
- o Low back pain

b.      Accretive represents to its investors that it "identif[ies] patient accounts with financial risk by applying data mining techniques to the data [it has] collected."

c.      Accretive represents to its investors that it "increase[s] the collection rate on patient-owed obligations" in part by using "consumer behavior modeling."

d.      Accretive represents to its investors that it uses proprietary algorithms to assess a patient's "propensity to pay."

e.      Under the QTCC agreement with Fairview, Accretive receives a share of the hospital's incentive payments from certain HMOs and insurers for cost savings generated through "managing the care coordination process."

f.      Under the QTCC, Accretive works to achieve health care savings in part through an "intense focus" on "reducing avoidable hospital admissions" and by identifying the "sickest and most impactable patients" "for proactive management."

g.      Accretive helps hospitals identify the individuals who are "most likely to experience an adverse health event and, as a result, incur high healthcare costs in the coming year."

h.      Accretive tells its investors that, when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

i. Accretive manages the functions identified on page 17 of its 2010 Annual Report, including that it performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

96. In sharp contrast to the lack of information provided by Accretive to Minnesota patients, it provides much more detailed information to Wall Street investors about its role in the health and lives of patients. Minnesota patients are entitled to know the information that Accretive amasses about them and its extensive role in their health care so that they can make informed choices about their health care and medical records. By withholding such information, Accretive has omitted and failed to make necessary disclosures to Minnesota consumers to enable them to make informed choices about their health care and medical records. Accretive is responsible to provide such information to patients. Among other things, it manages, oversees, and controls the hospital employees responsible to provide such information. *See State of Minnesota v. Fleet Mortgage Corp.*, 158 F.Supp.2d 962, 967 (D. Minn. 2001).

97. Accretive has violated the above provisions through the acts and practices described in this Complaint, as well as through its material omissions of information to which Minnesota patients are entitled in order to make informed health care decisions.

98. Defendant's conduct described above constitutes multiple, separate violations of Minn. Stat. § 325F.69, subd. 1 and Minn. Stat. § 325D.44, subdivision 1. By failing to disclose and omitting material facts, Defendant further engaged in deceptive and fraudulent practices in violation of the these acts. For these violations, the State seeks injunctive relief, civil penalties, costs, and attorneys fees under Minn. Stat. §§

325F.69 *et seq.*, 325D.43 *et seq.*, and 8.31. As part of its request for equitable relief, the State also seeks an order requiring Accretive to disclose to Minnesota patients the data that it has about them and where and how such data is stored, including but not limited to whether it has been sent overseas.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Minnesota respectfully asks this Court to enter judgment against Defendant Accretive, awarding the following relief:

1.     Preliminarily and permanently enjoining Defendant from violations of the federal health privacy laws, 45 C.F.R. §§ 164.308(a)(1), .308(a)(3-4), .308(a)(5), .308(a)(6), .310(a)(1), .310(d)(1), .312(a)(1), and .316 as provided under 42 U.S.C. § 1320d-5(d)(1)(A); and from violations of Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.*, & 325F.68 *et seq.*

2.     Awarding judgment against Defendant for statutory damages for all violations by Defendant as provided under 42 U.S.C. §§ 1320d-5(d)(1)(B), (2) and for civil penalties pursuant to Minn. Stat. § 8.31.

3.     Awarding Plaintiff costs of the action and reasonable attorneys fees to the State of Minnesota as provided under 42 U.S.C. § 1320d-5(d)(3) and Minn. Stat. § 8.31.

4.     An order requiring Accretive to disclose to Minnesota patients the data that it has about them, where and how such data is stored, including but not limited to whether it has been sent overseas, and how such data is utilized.

5.    Such other and further relief as provided by law and/or as the Court deems just and appropriate.

Dated:  January 19, 2012

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

AL GILBERT
Solicitor General

NATHAN BRENNAMAN
Deputy Attorney General

JACOB KRAUS
Assistant Attorney General
Atty. Reg. No. 0346597
jacob.kraus@ag.state.mn.us

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101
(651) 757-1454 (Phone)
(651) 282-5832 (Fax)
(651) 296-1410 (TTY)

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

AG: #2944942-v1