UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of Minnesota, by its  
Attorney General Lori Swanson,

Civil File No. 12-145 RHK/JJK

Plaintiff,

v.

**AFFIDAVIT OF
JOANN LARSON-THOMPSON**

Accretive Health, Inc.,

Defendant.

JoAnn Larson-Thompson, being first duly sworn on oath, states as follows:

1. My name is JoAnn Larson-Thompson. I live in Elko with my husband, Kyle Thompson. I grew up in South Dakota, got married, and had three children. I have a son who is deaf, and I spent much of my time in South Dakota advocating for people with hearing issues. After I went through a divorce, my three kids and I moved to Minnesota. I now have five grandchildren. Kyle and I have been married since 2001. I work for a contracting company in Lakeville. The company does road construction work. I wear many hats for the company, including payroll, project support, and permitting.

2. On September 20, 2011, I got home from work very late at night. When I got home, Kyle told me that he had been having chest pains throughout the day, and that they kept getting worse. We thought he was having a heart attack. I was so scared and concerned for Kyle. I rushed Kyle to the car in a hurry, and drove him to the Fairview

Ridges Emergency Room. We were in such a hurry that Kyle didn't even grab his billfold.

3. When we got to the ER, we checked in at the front desk, and Kyle sat down. I checked Kyle in. His blood pressure was checked, and we were taken to a curtained area. Nurses were rushing in and out, but I was the only one who was staying with Kyle. While we were waiting to see a doctor (and before we saw one), a woman came into the room and started talking to Kyle. The woman told Kyle that he had a balance on an old bill that needed to be taken care of. The woman said that it needed to be taken care of that night. The woman said that the balance was a few hundred dollars. I spoke up. I told the woman that Kyle was having chest pains, and he didn't have anything with him. We were so scared and rushed when we left the house, and I told the woman that Kyle didn't even grab his billfold. The woman asked me if I was Kyle's wife. I said that I was. She asked me if I could take care of balance. I said that I didn't have anything either. My purse was in the car. The woman told me that she could wait for me to go to my car to get something to pay the balance. She said that we really needed to take care of the balance. The impression that the woman gave me was that Kyle wouldn't be treated unless I paid the balance first.

4. At this point, I had never been so frightened in my life. Kyle was possibly having a heart attack, and I had to leave him to go to our car to look for something to pay with. Because I was concerned that they wouldn't treat Kyle if I didn't have enough money, on my way to the car I was trying to think of the next closest emergency room to take Kyle to if I didn't have enough money. I found a cash card in the car, and returned

to Kyle's room. Kyle was all alone. The same woman came into the room again, and walked me to a payment area. I told the woman that I didn't know if I had enough money on my cash card and she said she would try it. The woman swiped my card, and gave me something to sign. I returned to Kyle's room and was very upset. I can't believe that we were treated this way while we were in the emergency room.

*Ann Larson-Thompson*
JOANN LARSON-THOMPSON

Subscribed and sworn to before me
this 7th day of June,
2012.

*June M Walsh*
Notary Public

JUNE M. WALSH
NOTARY PUBLIC MINNESOTA
MY COMMISSION
EXPIRES JAN. 31 2014