## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of Minnesota, by its                                         Civil File No. 12-145 RHK/JJK
Attorney General Lori Swanson,

               Plaintiff,

        v.                                                  **FIRST AMENDED COMPLAINT**

Accretive Health, Inc.,

               Defendant.


The State of Minnesota, by its Attorney General Lori Swanson, brings this action against Defendant Accretive Health, Inc. ("Accretive" or "Accretive Health") for violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health ("HITECH") Act, Pub. L. No. 111-5, 123 Stat. 226, and Department of Health and Human Services Regulations at 45 C.F.R. § 160 *et seq.*; the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*; Minnesota's debt collection statutes, Minn. Stat. Ch. 332; and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.* & 325F.68 *et seq.*, as follows:

### INTRODUCTION

1.      Accretive is a portfolio company of the New York private equity fund Accretive, LLC, which has a controversial history in Minnesota relating to the arbitration and collection of consumer debts.  Accretive wears a number of hats as it relates to the

patients of two Minnesota hospital systems and, for one of the hospital systems, is at once both a debt collector and treatment coordinator.

2.      Accretive is licensed as a debt collection agency in Minnesota.  Accretive has largely assumed control of the management and operations of the so-called "revenue cycles" of both Fairview Health Services ("Fairview") and North Memorial Health Care ("North Memorial"), including their scheduling, registration, admissions, billing, collection, and payment functions.  Accretive assumes managerial responsibility for the hospital employees who perform these functions and has "infused" its own employees into the staff of the hospitals.  Accretive engages in "data mining" and "consumer behavior modeling" on patients, as described below.

3.      Fairview was the first hospital system in the country to also hire Accretive to deliver services under a so-called "Quality and Total Cost of Care" ("QTCC") contract.  Under this contract, Accretive helps Fairview negotiate contracts with HMOs and insurance companies through which the hospital receives incentive pay to cut patient costs.  Accretive then receives a share of the hospital's incentive pay.  Under the QTCC contract, Accretive develops "risk scores" on individual patients and manages health risk assessments, automated care plans, case and pharmacy management, and duration of hospital stays.  Accretive tells its Wall Street investors that it identifies patients who are deemed "outliers" and tracks utilization and profit and loss by patient.  Fairview has called Accretive its "strategic partner."  Their relationship is so extensive that Fairview accounted for over 13 percent of Accretive's service revenue for the first three quarters of

2

2011 (over $75 million).    The financial projections indicate that this financial entanglement will grow once a new contract, discussed below, is fully implemented.

4.    Through these extensive relationships, Accretive has compiled a high volume of extremely sensitive and personal medical, financial, and other records involving tens of thousands of Minnesota patients of the two hospital systems.  Some of the data was stored on an unencrypted laptop computer.  The laptop was left by an Accretive employee in a rental car outside the bar and restaurant area of the Seven Corners area of Minneapolis.  The computer was stolen and, with it, data on at least 23,531 Fairview and North Memorial patients.  In response to one patient's request, Fairview provided the patient with a "screen shot" of the data about the patient that it says was on the laptop.  The screen shot (attached as paragraph 46) sent to the patient by Fairview includes a "medical score" to predict the likelihood that the patient would be admitted to the hospital, a "medical score" to predict the "complexity" of the patient, a description of the "frailty" of the patient, and the dollar amount allocated to the patient's health care provider.  In addition, the data disclosed personal identifying information about the patient, including the patient's name, address, phone number and Social Security number.  The screen also included an itemization of whether the patient had 22 listed conditions, including bipolar disorder, schizophrenia, depression, high blood pressure, asthma, and even low back pain.  Accretive violated privacy laws by failing to keep private patient data secure.

5.      Acting as a licensed debt collector, Accretive has at times masked its true identity with Minnesota patients and has failed to comply with the disclosure and registration requirements of Minnesota's debt collection laws.

6.      Through this Complaint, the State of Minnesota seeks to hold Accretive accountable for its violations of health privacy laws, state debt collection laws, and state consumer protection laws.  The State also seeks through this action to determine and disclose to patients the extent of Accretive's access to data and the manner in which it utilizes such data.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction pursuant to 42 U.S.C. § 1320d-5(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

8.      Plaintiff has provided notice of this action to the Secretary of Health and Human Services as required under 42 U.S.C. § 1320d-5(d)(4).

9.      Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

10.     Lori Swanson, the Attorney General of the State of Minnesota, is authorized under HIPAA, Minn. Stat. Ch. 8, Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection statutes, and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens.

11.     Accretive is a Delaware corporation with its principal executive offices located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois.  Its chief executive

4

officer is Mary A. Tolan, and its Chairman of the Board is J. Michael Cline.  Accretive

was incorporated under the name Healthcare Services, Inc. in 2003 and changed its name

to Accretive Health, Inc. in 2009.  Its shares trade under the symbol "AH" on the New

York Stock Exchange.  Accretive has been registered as a foreign corporation with the

Minnesota Secretary of State since December 20, 2010 and, on that same date, registered

"Medical Financial Solutions" as an assumed name with the Minnesota Secretary of

State.  Accretive became licensed with the Minnesota Department of Commerce as a debt

collection agency on January 20, 2011, listing "Medical Financial Solutions" as an

assumed name with that agency, and is currently licensed as a debt collector with that

agency.  As of the filing of the Complaint, Accretive listed Steve Walters as its sole

individual collector.  Accretive transacts business in the State of Minnesota, including on

behalf of both Fairview and North Memorial.

12.    At all times relevant hereto, Fairview has been a health care provider that

operates certain affiliated entities under common ownership or control, which are treated

as a covered entity for purposes of HIPAA.  45 C.F.R. § 160.103.  At all times relevant

hereto, North Memorial has been a health care provider within the meaning of HIPAA.

*Id.*  As health care providers, Fairview and North Memorial are covered entities within

the meaning of HIPAA, and thus are required to comply with the HIPAA federal

standards that govern the security and privacy of protected health information.  *See* 42

U.S.C. § 1320d-1(a); 45 C.F.R. § 160.103.

13.    At all times relevant hereto, Accretive has acted as a "business associate" of

North Memorial and as such, has obtained access to protected health information on

5

North Memorial's patients.  45 C.F.R. § 160.103.  As a "business associate," Accretive was required to, and did, enter into a business associate agreement with North Memorial, which required it to comply with the HIPAA federal standards that govern the security and privacy of protected health information.  *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2).  This agreement is intended to safeguard the protected health information of North Memorial patients and other persons protected by HIPAA.  As a "business associate," Accretive is also required to comply with HIPAA's security and privacy standards as a matter of law.  *See, e.g.,* 42 U.S.C. §§ 17931-34.

14.     With respect to Fairview's patients, Accretive has acted as a "health care provider" at all times relevant hereto.  *See* 42 U.S.C. § 1320d(3); 45 C.F.R. § 160.103. Because Accretive is a "health care provider" who transmits health information in electronic form in connection with a transaction referred to in 42 U.S.C. § 1320d-2(a)(1), Accretive is a "covered entity" for purposes of HIPAA.  *See* 42 U.S.C. § 1320d-1(a); 45 C.F.R. § 160.103.  Thus, as a "covered entity" within the meaning of HIPAA, Accretive is required to fully comply with the HIPAA federal standards that govern the security, breach notification, and privacy of protected health information, as amended by HITECH.  *Id.*

15.     In the alternative, with respect to Fairview's patients, Accretive has acted as a "business associate" at all times relevant hereto, and as such, has obtained access to protected health information on Fairview's patients.  45 C.F.R. § 160.103.  As a "business associate," Accretive was required to, and did, enter into a business associate agreement with Fairview, which required it to comply with the HIPAA federal standards

6

that govern the security and privacy of protected health information. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2).   This agreement is intended to safeguard the protected health information of Fairview patients and other persons protected by HIPAA.   As a "business associate," Accretive is also required to comply with HIPAA's security and privacy standards as a matter of law. *See, e.g.,* 42 U.S.C. §§ 17931-34.

## FACTUAL ALLEGATIONS

1. **Accretive, LLC's Prior Debt Collection Activity.**

   a. **Accretive, LLC's Relationship with the National Arbitration Forum.**

16.   Accretive was incorporated in 2003 as a "portfolio company" of Accretive, LLC, a New York City private equity fund founded in 1999 by Wall Street investment manager J. Michael Cline.   In court filings, Accretive, LLC has described itself this way: "Accretive manages private equity funds which invest largely in companies that manage back-office administrative processes."

17.   Cline is the Chairman of the Board of Accretive.   As of April 20, 2011, Cline and Accretive Investors SBIC, L.P., of which Cline is managing member, each owned 19.4 percent of Accretive, for a combined 38.8 percent ownership.   In 2010, Accretive, LLC arranged a public offering for Accretive Health, netting over $100 million in proceeds.

18.     Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011.  It sometimes performs debt collection activities in Minnesota under the assumed name "Medical Financial Solutions."

19.     Accretive, LLC has a controversial history in the debt collection business in Minnesota and nationwide.   By 2009, through a series of acquisitions, corporate formations, management contracts, and asset transactions engineered by Accretive, LLC, the equity fund simultaneously took control of the nation's largest debt collection enterprise and became affiliated through ownership and governance interests with the nation's largest consumer debt collection arbitration company.  This occurred through a series of transactions engineered by Accretive, LLC involving three major companies: National Arbitration Forum (an arbitration company based in Minnesota), Axiant, LLC (a debt collection agency), and Mann Bracken (at the time, the nation's largest collection law firm).  The transactions can be summarized as follows:

a.      Accretive, LLC formed a series of private equity funds under the name "Agora" (Greek for "Forum"), which in turn acquired a $42 million, 40 percent financial interest and governance rights in the Minnesota-based National Arbitration Forum.  The Forum was the nation's largest arbitration firm for consumer credit card collections, handling over 200,000 consumer arbitrations each year.

b.      Accretive formed and funded a large national debt collection agency called Axiant, LLC, which became a debt collector for the credit card industry and debt buyers.  Accretive, LLC owned over 68 percent of Axiant.

8

c.     Axiant then acquired the assets and collections operations of the Mann Bracken law firm, the nation's largest collection law firm (which had previously acquired two other large national collection law firms).  Of the 214,000 consumer arbitrations processed by the National Arbitration Forum in 2006, 125,000, or almost 60 percent, were filed by Mann Bracken and its predecessors.

20.     Through these transactions, Accretive, LLC essentially took control of the entire "revenue cycle" (e.g., the collection agency, the prosecuting law firm, and the neutral arbitrator) for consumer credit card collections in the United States.  Accretive, LLC wanted to form a "broad arbitration ecosystem" which would pay huge financial dividends for the equity fund.  Prior to this scheme, law firms were generally owned by individual lawyers due to professional regulations that prohibit for-profit corporations or non-lawyers from owning law firms, such that Wall Street could not profit from law firm revenues.  Through these transactions, Accretive, LLC essentially sought to "monetize" for Wall Street investors the profits to be made from debt collection law firms. According to Accretive, LLC's internal documents, the executives wanted their debt collection and arbitration system to expand to "become a comprehensive, alternative legal system."

21.     In July, 2009, the Minnesota Attorney General filed a lawsuit against the National Arbitration Forum and its affiliates in Hennepin County District Court in Minnesota.  The lawsuit alleged, in part, that the National Arbitration Forum—which held itself out as an independent and neutral arbitration company—misled consumers,

courts, and the public about the extensive financial and governance cross-ties with Accretive, LLC, which constituted an irreconcilable conflict of interest.

22.     As a result of the litigation, the National Arbitration Forum (the arbitration company) exited the consumer arbitration business.  Shortly thereafter, in November, 2009, Axiant (the debt collector) filed for bankruptcy in United States Bankruptcy Court in Delaware.  In or about January, 2010, Mann Bracken (the collection law firm) closed its doors and was placed into judicial receivership in Montgomery County Circuit Court in Maryland.  At the time of their closure, all three entities had been the subject of many consumer complaints alleging heavy-handed collection conduct.

### b.     Accretive Health and the National Arbitration Forum.

23.     Before the three companies shut their doors, Accretive, LLC angled to profit even more by joining the Forum's operations with those of Accretive Health. Accretive, LLC wanted to "launch" the Forum into the arbitration of health care disputes between patients and hospitals using Accretive Health and stated that it had spoken with Accretive Health CEO Mary Tolan about placing arbitration clauses in hospital-patient agreements.  Accretive, LLC told the Forum that one of Accretive Health's clients—the largest non-profit hospital in the country (Ascension Health of Missouri)—had provided it with access to "$1Bn of dormant receivables to attempt collection, as a sideline to the core relationship."  Accretive, LLC told the Forum that, if they did business together, "[w]e believe our deep expertise and relationships in healthcare should enable us to jump-start NAF's expansion into an extraordinary market opportunity: the use of arbitration in consumer healthcare disputes and payments."  Accretive, LLC told the

Forum that it wanted to "leverage [the] Accretive network" and set forth a plan in which: "In new industries, such as healthcare, NAF Procedures are used early and consistently as the standard method for resolving payment disputes.  By playing a prominent role, NAF fundamentally shapes the collections players and tactics that emerge in these industries."

> ### 2.  Accretive Returns to Minnesota with Accretive Health.
>
> #### a.  Accretive Health Has Taken Over Management of the "Revenue Cycles" of Fairview and North Memorial.

24.     Accretive makes most of its money by entering into "Revenue Cycle Operations" contracts with hospitals.  Through these contracts, Accretive largely takes control of the scheduling, eligibility verification, registration, admissions, coding and clinical documentation, dealing with third party payors, billing, and collection and payment functions at its client hospitals.  According to its "Revenue Cycle Operations" contracts with Fairview and North Memorial, this includes acting as a processing agent for the hospitals and submitting medical claims to third party payors.  Accretive assumes managerial responsibility for hospital employees who perform these functions and "infuses" its own employees into the staffs of the hospitals.  Accretive receives both base fees and incentive payments for working with hospitals to boost their revenue and/or cut their costs.

25.     On its website, Accretive, LLC describes its portfolio company, Accretive Health, this way:  "Accretive Health takes over responsibility for the people, process and technology associated with the entire revenue cycle process."  It told Wall Street investors on January 12, 2011 that it has "no direct competitors" who perform these

11

broad functions.  In its 2010 Annual Report, Accretive estimated that up to $50 billion could be made through these services nationwide (calculated at five percent of about $1 trillion in annual revenue at the nation's hospitals and large physician organizations).

26.     Accretive entered into a Revenue Cycle Operations contract with Fairview in March, 2010, which became effective on May 1, 2010.  Fairview is a large health care system that operates seven hospitals and numerous primary, specialty, and urgent care clinics.  Fairview accounted for 10.7 percent (or over $64 million) of Accretive's net service revenue of $606 million in 2010, according to Accretive's 2010 Annual Report. For the nine months ending September 30, 2011, Fairview accounted for 13.3 percent (or over $75 million) of Accretive's net service revenue of $566 million.  Fairview has called Accretive its "strategic partner."

27.     Accretive entered into a Revenue Cycle Operations agreement with North Memorial in March, 2011.  North Memorial operates one hospital and numerous clinics in Minnesota.

28.     Accretive assumes responsibility for a client hospital's "revenue cycle" functions.  It controls and directs the work of hospital employees who are engaged in "revenue cycle" activities.  It also places Accretive employees—who it calls "infused management"—inside the hospitals and "connect[s] [its] proprietary technology and analytical applications to the hospital's existing technology systems."  Accretive has summed up this contract this way:  "We embed our technology, personnel, know-how and culture within each customer's revenue cycle activities and serve as the customer's on-site operational partner."

29.    Accretive describes the breadth of its revenue cycle management services like this:  "For our purposes, the revenue cycle starts when a patient registers for future service or arrives at a hospital or clinic for unscheduled service and ends when the hospital has collected all the appropriate revenue from all possible sources."

30.    In its 2010 Annual Report, Accretive states:  "[W]e identify patient accounts with financial risk by applying data mining techniques to the data we have collected."  Accretive also "increase[s] the collection rate on patient-owed obligations" in part by using "consumer behavior modeling."  Proprietary algorithms assess a patient's "propensity to pay."

31.    Accretive's revenue cycle management contracts "span the entire revenue cycle," including "front office" (scheduling, registration, and admissions), "middle office" (billing), and "back office" (collections).  According to Accretive, when a patient registers at a client hospital, Accretive begins to compile "complete patient information" on the patient, such as the patient's Social Security number and insurance eligibility.  It performs "real-time" checks for insurance coverage upon admission to assess "each patient's ability to pay."  It maintains an "automated electronic scorecard" that tracks each patient, including the patient's payment history, throughout the patient's time as a patient.  It identifies patient accounts with financial risk by applying "data mining techniques," and it performs "skip tracing."  Accretive has also performed collections under the revenue cycle management contracts.  Among other things, after health services have been provided and hospital statements have been issued to a patient, but are unpaid, accounts are forwarded to Accretive's Kalamazoo, Michigan office for collection.  Some

13

collectors in Accretive's Kalamazoo office have access to patients' protected health information and/or access to the hospital's patient records systems, which data is used by Accretive collectors in their collection efforts.

32.     The breadth of Accretive's activities is depicted in the following chart from Accretive's 2010 Annual Report (p. 13):



33.     The breadth of Accretive's involvement at the hospitals is similarly depicted in this chart from Accretive's 2010 Annual Report (p. 22):



b.    **Accretive Contracts with Fairview to Perform Sweeping Functions Relating to the Monetization of Health Treatment.**

34.    Fairview advised the Minnesota Attorney General's office in a letter dated October 14, 2011 that "Accretive Health…assists Fairview in care coordination efforts to help better coordinate and manage patient's health care needs."

35.    Besides the revenue cycle management contract, Accretive and Fairview entered into a five year "Quality and Total Cost of Care" ("QTCC") agreement in November, 2010.  As of the filing of its December 10, 2010 Annual Report, Fairview was the only hospital system in the United States that hired Accretive for QTCC services.  In a conference with Wall Street investors on January 12, 2011, Accretive called the Fairview QTCC agreement its "inaugural" contract.

36.    Under the QTCC agreement, Accretive helps Fairview negotiate contracts with certain insurance companies and HMOs that allow Fairview to earn incentive payments from the insurers and HMOs for cutting health care costs.  In turn, Accretive

15

receives a share of the hospital's incentive payments under the QTCC agreement for cost savings generated through "managing the care coordination process."   Accretive told Wall Street during an investor conference on November 11, 2010 that health care savings would occur in part through an "intense focus" on "reducing avoidable hospital admissions."   It further said that the "sickest and most impactable patients" would be "identified for proactive management."

37.     Accretive states that the QTCC agreement "can help our customers identify the individuals who are most likely to experience an adverse health event and, as a result, incur high healthcare costs in the coming year."   It further states that when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

38.     The following chart from Accretive's 2010 Annual Report (p. 17) depicts the breadth of Accretive's services:

16

Our quality and total cost of care services offering includes management of the following processes:

| Risk Evaluation, Stratification & Coding | Delivery & Access | Care Coordination | Admission Management | Coaching & Education | Analytics & Reporting |
|---|---|---|---|---|---|
| • Health Risk Assessment<br>• Accurate claim / medical record documentation<br>• Medical and Rx claim review<br>• Per patient risk score calculation<br>• Best possible revenue calc<br>• Automated care plans<br>• Patient social service determination | • Physician Incentive Structure<br>• Local PCP leadership and governance structure<br>• Comprehensive referral plans<br>• Clinical protocol determination<br>• Contract sub-specialties<br>• Contract ancillary services<br>• Community resources<br>• Specialist efficiency evaluation | • Post-Discharge follow-up<br>• Authorizations<br>• Case Management<br>• On-boarding<br>• Home assessments<br>• Referrals and Referral links to PCP<br>• Scheduling<br>• Medical necessity review<br>• Pharmacy Management | • Hospitalist program / ED management<br>• Daily census – Acute / Skilled / LTAC<br>• Patient review by facility<br>• Length of stay management<br>• Discharge planning<br>• Delivery System re-entry<br>• Transitional care | • Performance management– Revenue, Cost, Quality, & Service reviews<br>• Population-based opportunity reviews<br>• Training & education on delivery<br>• Benefit / Eligibility<br>• Provider service issues | • Quality scorecard<br>• Pricing / Benefit evaluations<br>• Utilization by all healthcare service types<br>• P/L by Patient, PCP, Group, Network<br>• Peer group analysis<br>• Outlier determinations |

| Payer Relationship Management |
|---|
| People & Technology |

39.    Thus, according to the above table and the QTCC contract, Accretive is responsible for the management of: "risk scores" for each patient, development of automated care plans for patients, case management, length of hospital stay management, and discharge planning, among other things.  It also performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

40.    The breadth of the managed care services to be provided by Accretive to Fairview is also reflected in the various job ads posted by Accretive to staff the Fairview account.  For example, in September, 2011, Accretive posted an ad for an "Analytics Manager" to staff the Fairview contract.  The advertisement states that the person will "aggregat[e] and analyz[e] patient population data and leverag[e] predictive models in order to identify innovative strategies for population management."  As noted above,

17

Accretive told its Wall Street investors that "population-based management" focuses on identifying the "sickest and most impactable patients" for "proactive management."

41.     Accretive employs registered nurses and social workers as "clinical care coordinators" at Fairview clinics to fulfill its services under the QTCC agreement.  These Accretive nurses and social workers collaborate with Fairview's physicians and other Fairview and Accretive personnel to create health care plans for Fairview patients based, in part, on conversations with primary care physicians, patients and families, as well as their review of the patients' charts and other protected health information and data regarding the cost and the utilization of the patient's health care.  Accretive's nurses and social workers also help to execute the health care plans of individual Fairview patients by communicating, counseling, and educating the patients as well as further collaborating with Fairview's primary care physicians and other Fairview and Accretive staff.

42.     The registered nurses and social workers that Accretive employs pursuant to the QTCC agreement and infuses into Fairview's clinics hold themselves out to patients as Fairview employees—going so far as to wear identification badges that suggest or imply they are with Fairview—when in fact, the registered nurses and social workers are embedded Accretive employees.

### 3.     Accretive Loses Sensitive Data on at Least 23,531 Minnesota Patients.

43.     Accretive is licensed as a debt collector with the State of Minnesota and, in fact, collects debts for at least one Minnesota hospital system (Fairview).  At the same time, it also assists Fairview with health care management and medical necessity review.

44.     Accretive also manages the "revenue cycle" of North Memorial.  (North Memorial advised the Attorney General's Office in a letter dated October 17, 2011 that Accretive does not perform debt collection services for it.)

45.     Accretive states that, among other things, it engages in "data mining," "skip tracing," "consumer behavior modeling," and "per patient risk score calculation" on patients.

46.     Through these services and others, Accretive amasses and has access to a high volume of sensitive and personal information, including medical information, about Minnesota patients served by the two hospitals.

47.     Accretive does not limit the access to this protected health information to the persons or classes of persons in its workforce who need access to it to carry out their duties under either the "Revenue Cycle Operations" contracts or the QTCC contract.  In addition, Accretive does not limit the protected health information that it provides to its employees to the "limited data set,"[1] to the extent practicable, as defined in 45 C.F.R. § 164.514(e)(2), or to the "minimum necessary," amount to accomplish the intended purpose of such use or disclosure.  *See* 45 C.F.R. §§ 164.502(b); 164.514(d).  Indeed, in disregard of HIPAA's privacy standards and the terms of its business associate agreements, Accretive has systematically made the protected health information that it

---

[1]  HITECH Section 13405(b) (42 U.S.C. § 17935(b)) provides that until the Secretary of Health and Human Services issues guidance on what constitutes "minimum necessary" under HIPAA, a covered entity or business associate is considered to be in compliance with HIPAA's "minimum necessary" requirement only if it limits such protected health information, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2).  As of the date of filing the First Amended Complaint, the Secretary has not yet issued such guidance.

creates, receives, maintains or transmits readily accessible to many of its employees who
should not have access to it, including to debt collectors.

48.    On or about July 25, 2011, an Accretive employee, Matthew Doyle, left an
unencrypted laptop computer containing extremely sensitive data about Fairview and
North Memorial patients in the back seat of a rental car parked in the Seven Corners bar
and restaurant district of Minneapolis.  The laptop was stolen.

49.    The information on the laptop was not encrypted.  The laptop was only
password protected.  The laptop contained sensitive personal information on at least
23,531 Minnesota patients.

50.    On or about September 20, 2011, Accretive informed Fairview that
protected health information of approximately 14,000 Fairview patients was contained on
the stolen laptop.  Accretive stated that the laptop contained protected health information,
including the names, addresses, dates of birth, Social Security numbers, other identifiers,
clinical information, including diagnosis and conditions, and other financial information
on Fairview patients.  Other information on the laptop about Fairview patients included
their dates of service, account balances, account numbers, and medical record numbers.

51.    Paragraph 46 contains a "screen shot" sent by Fairview to one of its
patients who requested an accounting of the information about the patient that was on the
laptop.  The information on the "screen shot" sent by Fairview to the patient included the
following:

- Patient's full name
- Gender
- Number of dependents

20

- Date of birth
- Social Security number
- Clinic and doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma
  - HIV
  - Metabolism disorder
  - Hypertension
  - Hypothyroidism
  - Immune suppression disorder
  - Ischemic heart disease
  - Osteoporosis
  - Parkinson's Disease
  - Asthma
  - Arthritis
  - Schizophrenia
  - Seizure disorder
  - Renal failure
  - Low back pain

52.    This is a redacted copy of the "screen shot" sent by Fairview to the patient:

| First Name | Last Name | Mid. Initial | HMO ID | Patient ID | Group Number | Subscriber Number | Dependent Code | Gender | Date of Birth |
|---|---|---|---|---|---|---|---|---|---|
| ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | 0 | ▓ | ▓ |

| Age | Months Enrolled | Active Last Day | Address 1 | Address 2 | City | State | Zip Code | Phone Number | Attributed TIN |
|---|---|---|---|---|---|---|---|---|---|
| ▓ | 12 | Yes | | | | | | | |

| Attributed Clinic | Attributed Provider | Provider (Short) | Predicted Complexity | Total Provider Allowed | Probability of IP Stay | Frail Condition | # Hospital Dominant Conditions | # Chronic Conditions | Macular Degeneration |
|---|---|---|---|---|---|---|---|---|---|
| FAIRVIEW ▓ | ▓ | ▓ | 2.287 | $4,984.90 | 0.06 | No | 0 | 4 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | | 1 | 0 | | 1 | 0 | 1 | 0 |

| Ischemic Heart Disease | Osteo-porosis | Parkinsons | Asthma | Arthritis | Schizo-phrenia | Seizure Disorder | COPD | Renal Failure | Low Back Pain |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | | Good | -- | -- | | Good | | Good |

| Ischemic Heart Disease | Osteo-porosis | Parkinsons | Asthma | Arthritis | Schizo-phrenia | Seizure Disorder | Predicted Complexity (SORTED) | Total Provider Allowed | Probability of IP Stay |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | -- | -- | -- | -- | 1600 | 2136 | 1206 |

| # Hospital Dominant Conditions | # Chronic Conditions | Top - Complexity | Top - Allowed Amt | Top - Both Complexity & Allowed Amount | Top - Either Complexity & Allowed Amount |
|---|---|---|---|---|---|
| 243 | 366 | 0 | 0 | 0 | 0 |

53.     Accretive informed North Memorial that data on approximately 2,841 North Memorial patients was contained on the stolen laptop.  Accretive stated that the laptop contained protected health information, including the name and clinical information, including diagnosis, condition, and other treatment information.  Other information on the laptop about North Memorial patients are their full names, dates of service (e.g., admission and discharge dates), medical record number, and encounter numbers.

54.     North Memorial later retained a computer expert on its own initiative to undertake an independent forensic investigation to corroborate the representations of Accretive about the nature, scope, and extent of the lost data as it relates to North Memorial patients.  According to North Memorial, the expert discovered an additional

6,690 patients whose names and data were believed to be on the laptop but who were not revealed to be on the laptop by Accretive. North Memorial sent letters to these patients to notify them of the data breach.

55.    In its 2010 Annual Report, Accretive states: "Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes." This was not the case with the stolen laptop.

56.    Accretive agreed with both Fairview and North Memorial that it would not use or disclose protected health information in violation of HIPAA or HITECH and that it would use "appropriate safeguards" to prevent the misuse or disclosure of protected health information. It also agreed to keep all protected health information "strictly confidential" and require all of its employees and subcontractors and agents to maintain confidentiality of protected health information as required by HIPAA and HITECH. It further agreed to develop, implement, maintain and use appropriate administrative, technical and physical safeguards to preserve the integrity, confidentiality and availability of protected health information and to prevent non-permitted or violating use or disclosure of protected health information, as required by 45 C.F.R. Part 164. Accretive Health violated these provisions.

57.    Upon information and belief, Accretive failed to adequately keep track of the information on the laptop; thus, when the laptop was stolen, Accretive did not know the identity of all the individuals whose data was exposed. In addition, as a "covered entity" with regard to Fairview's patients, Accretive failed to abide by HIPAA's

standards and implementation specifications requiring that certain notifications be made in the event of a breach of unsecured protected health information.

58.     Accretive's contracts indicate that cost savings "will depend on the manner and extent to which [the hospital] elects to utilize the 'Shared Services Blended Shore Centers of Excellence'…."

59.     Accretive operates a shared service center in New Delhi, India.  The New Delhi service center carries out functions at the same time for multiple hospitals. Accretive recently told Wall Street investors that it wanted to increase the use of these shared service centers.  Accretive employees in India have had access to protected health information about Minnesota patients.  It is unknown at the present time whether any such data is encrypted.

> **4.     Accretive Has Tried to Conceal Its Role and Identity With Patients and Has Not Followed Minnesota Debt Collection Laws.**

60.     Even though Accretive amasses so much private data about patients, it goes to great length to conceal its activities, going so far as to "infuse" employees into hospitals, have its employees wear identification badges that suggest or imply they are with the client health care facility, and engage in a recycled payroll system.  As a result, it would be difficult for a patient to understand or even be aware of the role of Accretive in their lives.

61.     Fairview and North Memorial are both registered with the Minnesota Attorney General's Office as charitable organizations under Chapter 309 of the Minnesota statutes, and they are both recognized as 501(c)(3) nonprofit organizations

under the Internal Revenue Code.  They both file IRS Form 990, Return of Organization Exempt from Income Tax, with the Minnesota Attorney General's Office.   Part VII, Section B of Form 990 requires an organization to disclose the five highest compensated independent contractors that received more than $100,000 of compensation for services, whether professional or other services, from the organization in the particular year.  As of the time of filing of the Complaint, Fairview failed to disclose its payments to Accretive on its Form 990s.  Thus, as of the time of filing of the Complaint, a patient or regulatory agency could not read the Form 990 to identify the nature of Accretive's role as it relates to their treatment or payment for that treatment.

62.    Upon information and belief, the hospitals' patient admission and medical authorization forms do not identify Accretive by name or disclose the scope and breadth of information that is shared with it.  Upon information and belief, patients are not aware that Accretive is developing analytical scores to rate the complexity of their medical condition, the likelihood they will be admitted to a hospital, their "frailty," or the likelihood that they will be able to pay for services, among other things.

63.    As noted above, Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial Solutions" as an assumed name.

64.    Minnesota law requires a debt collection agency, when initially contacting a Minnesota debtor by mail, to include a disclosure on the notice stating:  "This collection agency is licensed by the Minnesota Department of Commerce."   Minn. Stat. § 332.37(21) (2010).  In addition, the Minnesota debt collection laws make it unlawful

EXS. TO 6/19/12 KRAUS AFF.        EXHIBIT 1        25

for a collection agency to violate any provision of the federal Fair Debt Collection

Practices Act while attempting to collect on an account.  Minn. Stat. § 332.37(12) (2010).

The federal Fair Debt Collection Practices Act at 15 U.S.C. § 1692e(11) makes the

following conduct unlawful:

> The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, . . . .

65.     Accretive has, for example, sent letters to Minnesota Fairview patients that

read:

> You have a balance of [$_____] with Fairview Health Services that is seriously past due and has been assigned to Medical Financial Solutions to determine how this matter can be resolved.  Unfortunately, we have been unable to contact you by phone and our previous attempts to contact you by letter went unanswered.  We encourage you to take advantage of this opportunity to resolve this debt and avoid further collection activity.  We are now reaching the point where your account may be turned over to a collection agency.  We prefer to resolve this matter with you directly.

Such letters fail to disclose that Accretive *is* itself a debt collection agency attempting to

collect a debt.

66.     Although Accretive just entered the Minnesota market, it already has been

sued on a number of occasions in Minnesota by patients who allege that it failed to give

the required disclosures identifying itself as a debt collection agency.

67.     Minnesota law requires licensed debt collection agencies to register with

the State of Minnesota all individuals employed by the agency who perform the duties of

a "collector" under Minn. Stat. Ch. 332.  As of the date of filing of this lawsuit, Accretive

listed Steve Walters as its sole individual collector with the Minnesota Department of Commerce.   Accretive did not, however, identify the other employees who act as "collectors" in Minnesota, according to the Department of Commerce.

### COUNT I:  VIOLATIONS OF HIPAA, AS AMENDED BY HITECH, WITH RESPECT TO NORTH MEMORIAL'S PATIENTS

68.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

69.    Accretive is a business associate[2] of North Memorial as defined in HIPAA. *See, e.g.*, 45 C.F.R. § 160.103.

70.    As a business associate, Accretive was required to, and did, enter into a business associate agreement with North Memorial, which required it to comply with the HIPAA federal standards that govern the security and privacy of the protected health information it creates, receives, maintains, or transmits on behalf of the hospital.  *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2).   This agreement is intended to safeguard the protected health information of North Memorial patients and other persons protected by HIPAA.

71.    Because HITECH Section 13401 (42 U.S.C. § 17931) provides that 45 C.F.R. §§ 164.308, .310, .312 and .316 apply to a business associate of a covered entity in the same manner as they would to a covered entity, Accretive is thus subject to the security provisions contained within HIPAA as well as applicable statutory damages.

---

[2] A business associate is an entity that performs or assists in the performance of activities that involve the use or disclosure of individually identifiable health information or other regulated functions on behalf of a covered entity, but is not a member of the covered entity's workforce.  45 C.F.R. § 160.103.

Accretive violated HIPAA, as amended by HITECH, by failing to comply with these

security provisions, including the following:

      a.     Accretive failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).

      b.     Accretive failed to implement policies and procedures to ensure that all members of its workforce have appropriate access to electronic protected health information and to prevent those workforce members who do not have authorized access from obtaining access to electronic protected health information in violation of 45 C.F.R. § 164.308(a)(3-4).

      c.     Accretive failed to effectively train all members of its workforce, including agents and independent contractors involved in the data breach, on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.308(a)(5).

      d.     Accretive failed to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents that were known to them in violation of 45 C.F.R. § 164.308(a)(6).

      e.     Accretive failed to implement policies and procedures to limit physical access to its electronic information systems in violation of 45 C.F.R. § 164.310(a)(1).

      f.     Accretive failed to implement policies governing the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility in violation of 45 C.F.R. § 164.310(d)(1).

      g.     Accretive failed to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

      h.     Accretive failed to implement reasonable and appropriate policies and procedures to comply with the standards, implementation specifications, or other requirements of Part 164, Subpart C in violation of 45 C.F.R. § 164.316.

72.     HITECH Section 13404 (42 U.S.C. § 17934) provides that business associates of a covered entity are subject to statutory damages for making uses and disclosures of protected health information that do not comply with the privacy terms of their business associate agreements.  *See* 45 C.F.R. § 164.504(e).  Section 13404 also provides that HITECH's enhancement of HIPAA's "minimum necessary" privacy rule requirement, *see* 42 U.S.C. § 17935(b), is applicable to business associates and must be incorporated into the business associate agreement.  *See* 42 U.S.C. § 17934(a).

73.     Accretive's business associate agreement with North Memorial provides that Accretive will not use or disclose protected health information in violation of HIPAA, HITECH, and/or the "minimum necessary" policies and procedures of North Memorial.  Contrary to these promises in its business associate agreement, Accretive violated HIPAA, as amended by HITECH, by failing to comply with its privacy provisions, including the following:

      a.     Accretive impermissibly and improperly used and disclosed protected health information to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*

      b.     Accretive failed to limit the use, disclosure, or request of protected health information, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to limit the use, disclosure, or request of protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.502(b)(1).

      c.     Accretive failed to properly identify persons or classes of persons, as appropriate, in its workforce who need access to protected health information to carry out their duties in violation of 45 C.F.R. § 164.514(d)(2)(i)(A).

d.      Accretive failed to properly identify for each person or class of person the category or categories of protected health information to which access is needed and any conditions appropriate to such access in violation of 45 C.F.R. § 164.514(d)(2)(i)(B).

e.      Accretive failed to make reasonable efforts to limit the access of persons or classes of persons who need access to protected health information, to the extent practicable, to only the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the limited categories of protected health information to which such access was needed in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(2)(ii).

f.      Accretive failed to limit the protected health information that it disclosed, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the minimum amount reasonably necessary to accomplish the purpose of the disclosure in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(3).

g.      Accretive failed to limit its requests for protected health information from North Memorial, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the minimum amount reasonably necessary to accomplish the purpose for which the request was made in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(4).

h.      Accretive failed to reasonably safeguard, through appropriate administrative, technical, and physical safeguards, protected health information from any intentional or unintentional use or disclosure as well as to limit incidental uses or disclosures in violation of 45 C.F.R. § 164.530(c).

74.     The Attorney General has reason to believe that the interests of Minnesota

residents are threatened and have been adversely affected by the above violations.

## COUNT II:  VIOLATIONS OF HIPAA, AS AMENDED BY HITECH, WITH RESPECT TO FAIRVIEW'S PATIENTS

75.     Plaintiff restates and realleges all prior paragraphs of this Complaint.

76.     With respect to Fairview's patients, Accretive has acted as a "health care

provider" at all times relevant hereto.  *See* 42 U.S.C. § 1320d(3); 45 C.F.R. § 160.103.

Because Accretive is a "health care provider" who transmits health information in

electronic form in connection with a transaction referred to in 42 U.S.C. § 1320d-2(a)(1),

Accretive is a "covered entity" for purposes of HIPAA.  *See* 42 U.S.C. § 1320d-1(a); 45

C.F.R. § 160.103.  As a "covered entity," Accretive is required to fully comply with

HIPAA's standards governing the security, breach notification, and privacy of protected

health information, as amended by HITECH.  *Id.*; *see generally* 45 C.F.R. pt. 164, subpts.

A, C, D, & E.

77.    Accretive is thus subject to HIPAA's requirements, as amended by

HITECH, as well as applicable statutory damages.

78.    Accretive violated HIPAA, as amended by HITECH, by failing to comply

with the standards, requirements, and implementation specifications as set forth in

HIPAA and amended by HITECH, including the following:

> a.    Accretive has violated HIPAA's standards, requirements, and
> implementation specifications governing the security of electronic protected health
> information, *see* 45 C.F.R. §§ 164.308, *et seq.*, .310, *et seq.*, .312(a)(1), and .316,
> as alleged above in paragraph 71, subparts (a) through (h).

> b.    Accretive has violated HIPAA's standards and implementation
> specifications requiring that certain notifications be made in the event of a breach
> of unsecured protected health information in violation of 45 C.F.R. §§ 164.404,
> 164.406, and 164.408.

> c.    Accretive has violated HIPAA's standards, requirements, and
> implementation specifications governing the privacy of protected health
> information, *see* 42 U.S.C. § 17935(b); 45 C.F.R. §§ 164.502, *et seq.*, 164.514(d),
> *et seq.*, and 164.530(c), as alleged above in paragraph 73, subparts (a) through (h).

> d.    Accretive failed to effectively train all members of its workforce,
> including agents and independent contractors involved in the data breach, on the
> policies and procedures with respect to protected health information as necessary
> and appropriate for the members of its workforce to carry out their functions and
> to maintain the security and privacy of protected health information in violation of
> 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

31

e.      Accretive failed to apply appropriate sanctions against members of its workforce, including agents and independent contractors, who failed to comply with the standards and requirements of HIPAA's privacy rule, in violation of 45 C.F.R. § 164.530(e)(1).

79.     In the alternative, Accretive is a business associate of Fairview as defined in HIPAA. *See, e.g.*, 45 C.F.R. § 160.103.

80.     As a business associate, Accretive was required to, and did, enter into a business associate agreement with Fairview, which required it to comply with the HIPAA federal standards that govern the security and privacy of the protected health information it creates, receives, maintains, or transmits on behalf of the hospital. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2). This agreement is intended to safeguard the protected health information of Fairview patients and other persons protected by HIPAA.

81.     Because HITECH Section 13401 (42 U.S.C. § 17931) provides that 45 C.F.R. §§ 164.308, .310, .312 and .316 apply to a business associate of a covered entity in the same manner as they would to a covered entity, Accretive is thus subject to the security provisions contained within HIPAA as well as applicable statutory damages. Accretive violated HIPAA, as amended by HITECH, by failing to comply with these security provisions, as alleged above in paragraph 71, subparts (a) through (h).

82.     HITECH Section 13404 (42 U.S.C. § 17934) provides that business associates of a covered entity are subject to statutory damages for making uses and disclosures of protected health information that do not comply with the privacy terms of their business associate agreements. *See* 45 C.F.R. § 164.504(e). Section 13404 also

provides that HITECH's enhancement of HIPAA's "minimum necessary" privacy rule requirement, *see* 42 U.S.C. § 17935(b), is applicable to business associates and must be incorporated into the business associate agreement. *See* 42 U.S.C. § 17934(a).

83.    Accretive's business associate agreement with Fairview provides that Accretive will not use or disclose protected health information in violation of HIPAA, HITECH, and/or the "minimum necessary" policies and procedures of Fairview. Contrary to these promises in its business associate agreement, Accretive violated HIPAA, as amended by HITECH, by failing to comply with its privacy provisions, as alleged above in paragraph 73, subparts (a) through (h).

84.    The Attorney General has reason to believe that the interests of Minnesota residents are threatened and have been adversely affected by the above violations.

## COUNT III:  VIOLATIONS OF THE MINNESOTA HEALTH RECORDS ACT

85.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

86.     The Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, applies to the release of health records in Minnesota.  It prohibits providers or any *person who receives health records from a provider*, from releasing health records unless there is:

> (1) a signed and dated consent from the patient or the patient's legally authorized representative authorizing the release; (2) specific authorization in law; or (3) a representation from the provider that holds a signed and dated consent from the patient authorizing the release.

Minn. Stat. § 144.293, subd. 2 (2010) (emphasis added).  The patient's consent is valid for one year unless a different time period is specified in the consent or is provided by law.  *Id.*, subd. 4.

EXS. TO 6/19/12 KRAUS AFF.        EXHIBIT 1        33

87.     Accretive unlawfully released the health records of at least 23,531 Minnesota patients on or about July 25, 2011, when an Accretive employee left those patients' health records in a car, in an unencrypted laptop, and that laptop was stolen.

88.     Even if Fairview and North Memorial had consent from patients to release medical information to Accretive, Accretive had an obligation to secure the patients' health records from further release.  Minn. Stat. § 144.293, subd. 2.

89.      The State of Minnesota seeks to enjoin Accretive from further violations of Minn. Stat. § 144.291 *et seq*.

## COUNT IV:  VIOLATIONS OF MINNESOTA DEBT COLLECTION LAWS

90.     Plaintiff restates and realleges all prior paragraphs of this Complaint.

91.     Minnesota law contains the following definition of "collection agency":

"Collection agency" means and includes any person engaged in the business of collection for others any account, bill or other indebtedness except as hereinafter provided.  It includes persons who furnish collection systems carrying a name which simulates the name of a collection agency and who supply forms or form letters to be used by the creditor, even though such forms direct the debtor to make payments directly to the creditor rather than to such fictitious agency.

Minn. Stat. § 332.31, subd. 3 (2010).

92.     Accretive is a "collection agency" under Minnesota law.  It became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial Solutions" as an assumed name.

93.     Minn. Stat. § 332.33, subd. 5a (2010) provides that "[a] licensed collection agency, on behalf of an individual collector, must register with the state all individuals in the collection agency's employ who are performing the duties of a collector as defined in

34

sections 332.31 to 332.45" of the Minnesota statutes.  Minn. Stat. § 332.33, subd. 1 (2010) also requires a person acting under the authority of a collection agency, as a collector, to first register with the Minnesota Commissioner of Commerce.

94.    Minn. Stat. § 332.31, subd. 6 (2010) defines a "collector" as follows:

"Collector" is a person acting under the authority of a collection agency under subdivision 3, and on its behalf in the business of collection for others an account, bill, or other indebtedness except as otherwise provided in this chapter.

95.    As of the date of filing of the Complaint, Accretive listed Steve Walters as its sole individual collector with the Minnesota Department Commerce.  Other employees, however, also have acted as collectors in Minnesota.  As a result, Accretive has violated Minn. Stat. § 332.33, subd. 5a (2010).

96.    Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

(3)   use or threaten to use methods of collection which violate Minnesota law.

Through its actions outlined above, Accretive has violated this subdivision of the Minnesota Collection Agency Act.

97.    Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

(16)   when attempting to collect a debt, fail to provide the debtor with the full name of the collection agency as it appears on its license.

Accretive violated this subdivision by failing to disclose its name or identity when it collected debts from Minnesota patients.

98.   Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

> (21)  when initially contacting a Minnesota debtor by mail, fail to include a disclosure on the contact notice, in a type size or font which is equal to or larger than the largest other type of type size or font used in the text of the notice.  The disclosure must state:  "This collection agency is licensed by the Minnesota Department of Commerce."

Accretive sent debt collection notices to Minnesota patients that did not comply with this subdivision.

99.   Minnesota law also prohibits any "collection agency or collector" from violating the prohibitions on specific collection practices set forth in the federal Fair Debt Collection Practices Act ("FDCPA").  Minn. Stat. § 332.37(12) (2010).  Accordingly, a collection agency or collector violates Minnesota law if it engages in practices prohibited by the FDCPA.  *Id.*

100.   Accretive is a collection agency pursuant to Minnesota law, and has engaged in practices that are prohibited by the FDCPA.  For example, 15 U.S.C. § 1692e prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Accretive violated this provision by telling Minnesota patients that, if they do not settle with it, their debt may be referred to a collection agency when Accretive is, itself, a debt collection agency attempting to collect a debt.

101.   15 U.S.C. § 1692e(11) makes the following conduct unlawful:

> The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is

36

attempting to collect a debt and that any information obtained will be used
for that purpose, and the failure to disclose in subsequent communications
that the communication is from a debt collector, . . . .

Accretive failed to make these required disclosures in communications with Minnesota

patients.

102.   Similarly, 15 U.S.C. § 1692e(10) also makes unlawful "[t]he use of any

false representation or deceptive means to collect or attempt to collect any debt or to

obtain information regarding a consumer."  In addition, 15 U.S.C. § 1692f provides that a

collector may not use any "unfair or unconscionable means to collect or attempt to collect

any debt."  Through the above-described course of conduct, Accretive violated these

provisions.

103.   Defendant's conduct described above constitutes multiple, separate

violations of Minn. Stat. Ch. 332.31 *et seq.*

## COUNT V:  VIOLATIONS OF THE
## MINNESOTA PREVENTION OF CONSUMER FRAUD ACT AND
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

104.   Plaintiff restates and realleges all prior paragraphs of this Complaint.

105.   Minnesota Statutes, Section 325F.69, subdivision 1 (2010) (the "CFA")

provides:

The act, use, or employment by any person of any fraud, false pretense,
false promise, misrepresentation, misleading statement or deceptive
practice, with the intent that others rely thereon in connection with the sale
of any merchandise, whether or not any person has in fact been misled,
deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

106.   The term "merchandise" within the meaning of Minn. Stat. § 325F.69 includes services.  *See* Minn. Stat. § 325F.68, subd. 2 (2010).  Health care services are a form of "merchandise."

107.   Minn. Stat. § 325D.44, subdivision 1 (2010) provides, in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (1)   passes off goods or services as those of another;
>
> (2)   causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3)   causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another…;
>
> (13)  engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

108.   The doctor-patient relationship is predicated on trust.  Patients have the right to confidentiality of their medical records and to expect that their medical information will not be released without their consent.  Patient confidentiality is important to encourage a full and frank exchange of information between patients and their doctors.  Patients also have the right to make informed choices about their health care (e.g., to give their "informed consent") and to withhold consent following a full and frank exchange of information between the patient and doctor.  Simply put, if patients have to be concerned about the dissemination of their medical information, they will not get treatment.  The consequence of this to both patients and the state as a whole is

obvious as it relates to conditions like communicable diseases, mental health, or management of chronic conditions.

109.    These concepts have been part of the doctor-patient relationship for thousands of years.  Over 2,500 years ago, the early Hippocratic Oath for physicians provided:  "All that may come to my knowledge in the exercise of my profession…I will keep secret and will never reveal."  Today, the modern Code of Ethics of the American Medical Association requires physicians to "maintain your patient's confidentiality" and to "respect your patient's right to choose their doctor freely, to accept or reject advice and to make their own decisions about treatment or procedures."  These concepts are reflected as a matter of state law and policy in the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, *supra*, which restricts the release of health records in Minnesota and which prohibits providers *and persons who receive health records from providers* from releasing health records without the patient's informed consent.  The concepts are also reflected as a matter of state law and policy in the Minnesota Health Care Patient Bill of Rights, Minn. Stat. § 144.651, which gives patients the right to:  (1) have appropriate medical care based on their individual needs; (2) to know the identity of the physician who is responsible for coordination of their care; (3) to know the identity of outside providers; (4) to have complete information regarding diagnosis, treatment, alternatives, risk and prognosis; (5) to be respected; and (6) to have their medical records kept private and confidential.

The Minnesota Supreme Court has said this about the right to privacy:

39

> The right to privacy is an integral part of our humanity; one has a public persona, exposed and active, and a personal persona, guarded and preserved. The heart of our liberty is choosing which part of our lives shall become public and which parts we shall hold close.

*Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998). Most people consider medical and health care records to be among the most personal, private types of information. In order to safeguard their privacy and make informed health care decisions, patients need full, transparent, and accurate information about how their medical information is used. As set out in this Complaint, Accretive impeded those rights.

110.  Accretive goes to great lengths to mask from patients its involvement with Minnesota hospitals, including but not limited to the following:

> a.  Accretive has "infused" its employees into the staff at the hospital. Upon information and belief, patients are not aware who is and is not an Accretive employee at the hospitals.

> b.  The registered nurses and social workers that Accretive infuses into Fairview's clinics hold themselves out as Fairview employees to patients—going so far as to wear identification badges that suggest or imply they are with Fairview—when in fact, they are embedded Accretive employees.

> c.  Even though Accretive has by contract assumed responsibility for managing key functions at the hospitals, as set forth above, Accretive charges the hospitals for the payroll costs of Fairview's employees, and then pays the payroll back to the hospital so that the hospital employees see a hospital check, even though Accretive manages the function.

> d.  Accretive is not listed as a contractor of the hospitals on the Form 990 disclosures filed with the Internal Revenue Service or Minnesota Attorney General.

> e.  Accretive has not disclosed that it acts as a debt collector for Fairview, in some cases going so far to tell patients that "your account may be

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 1          40

turned over to a collection agency"—without disclosing that Accretive *is* itself a debt collection agency attempting to collect a debt.

111.   Accretive has misled, deceived or caused likelihood of confusion or of misunderstanding to patients about the role of Accretive in their health care.   Among other things, Accretive leads patients to believe that, or conceals from patients that, tasks undertaken by Accretive are done by Fairview.

112.   Minnesota patients are not aware of the extent of Accretive's involvement in their health care or the extent to which it amasses data about them.   This includes that:

   a.   Accretive—a licensed debt collector—has access to at least the following information about Minnesota patients:

- Patient's full name
- Gender
- Number of dependents
- Date of birth
- Social Security number
- Clinic and doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma
  - HIV
  - Metabolism disorder
  - Hypertension
  - Hypothyroidism
  - Immune suppression disorder
  - Ischemic heart disease

- Osteoporosis
- Parkinson's Disease
- Asthma
- Arthritis
- Schizophrenia
- Seizure disorder
- Renal failure
- Low back pain

b.      Accretive represents to its investors that it "identif[ies] patient accounts with financial risk by applying data mining techniques to the data [it has] collected."

c.      Accretive represents to its investors that it "increase[s] the collection rate on patient-owed obligations" in part by using "consumer behavior modeling."

d.      Accretive represents to its investors that it uses proprietary algorithms to assess a patient's "propensity to pay."

e.      Under the QTCC agreement with Fairview, Accretive receives a share of the hospital's incentive payments from certain HMOs and insurers for cost savings generated through "managing the care coordination process."

f.      Under the QTCC, Accretive works to achieve health care savings in part through an "intense focus" on "reducing avoidable hospital admissions" and by identifying the "sickest and most impactable patients" "for proactive management."

g.      Accretive helps hospitals identify the individuals who are "most likely to experience an adverse health event and, as a result, incur high health care costs in the coming year."

h.      Accretive tells its investors that, when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

i.      Accretive manages the functions identified on page 17 of its 2010 Annual Report, including that it performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

113.   In sharp contrast to the lack of information provided by Accretive to Minnesota patients, it provides much more detailed information to Wall Street investors about its role in the health and lives of patients.  Minnesota patients are entitled to know the information that Accretive amasses about them and its extensive role in their health care so that they can make informed choices about their health care and medical records.  By withholding such information, Accretive has omitted and failed to make necessary disclosures to Minnesota consumers to enable them to make informed choices about their health care and medical records.  Accretive is responsible to provide such information to patients.  Among other things, it manages, oversees, and controls the hospital employees responsible to provide such information.  *See State of Minnesota v. Fleet Mortgage Corp.*, 158 F.Supp.2d 962, 967 (D. Minn. 2001).

114.   Accretive has violated the above provisions through the acts and practices described in this Complaint, as well as through its material omissions of information to which Minnesota patients are entitled in order to make informed health care decisions.

115.   Defendant's conduct described above constitutes multiple, separate violations of Minn. Stat. § 325F.69, subd. 1 and Minn. Stat. § 325D.44, subdivision 1.  By misrepresenting, failing to disclose, and omitting material facts, Defendant further engaged in deceptive and fraudulent practices in violation of the these acts.  For these violations, the State seeks injunctive relief, civil penalties, costs, and attorneys fees under Minn. Stat. §§ 325F.69 *et seq.*, 325D.43 *et seq.*, and 8.31.  As part of its request for equitable relief, the State also seeks an order requiring Accretive to disclose to Minnesota

patients the data that it has about them and where and how such data is stored, including but not limited to whether it has been sent overseas.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Minnesota respectfully asks this Court to enter judgment against Defendant Accretive, awarding the following relief:

1.      Preliminarily and permanently enjoining Defendant from violations of the federal health privacy laws, 42 U.S.C. § 17935(b); 45 C.F.R. §§ 164.308(a)(1), .308(a)(3-4), .308(a)(5), .308(a)(6), .310(a)(1), .310(d)(1), .312(a)(1), .316, .404, .406, .408, .502, *et seq.*, .514, *et seq.*, .530(b), .530(c), and .530(e) as provided under 42 U.S.C. § 1320d-5(d)(1)(A); and from violations of Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.*, & 325F.68 *et seq.*

2.      Awarding judgment against Defendant for statutory damages for all violations by Defendant as provided under 42 U.S.C. §§ 1320d-5(d)(1)(B), (2) and awarding Plaintiff costs of the action and reasonable attorneys fees as provided under 42 U.S.C. § 1320d-5(d)(3).

3.      Awarding judgment against Defendant for restitution or other relief as provided under Minn. Stat. § 8.31, the *parens patriae* doctrine, the general equitable powers of the Court, and any other authority, including, but not limited to, damages for all violations by Defendant as described in this First Amended Complaint, awarding judgment against Defendant for civil penalties as provided under Minn. Stat. § 8.31, and awarding prejudgment interest and Plaintiff's costs, including the costs of investigation and reasonable attorneys fees as provided under Minn. Stat. § 8.31.

4.      An order requiring Accretive to disclose to Minnesota patients the data that it has about them, where and how such data is stored, including but not limited to whether it has been sent overseas, and how such data is utilized.

5.      Such other and further relief as provided by law and/or as the Court deems just and appropriate.


Dated:  February 29, 2012                    Respectfully submitted,

                                             LORI SWANSON
                                             Attorney General
                                             State of Minnesota

                                             AL GILBERT
                                             Solicitor General

                                             NATHAN BRENNAMAN
                                             Deputy Attorney General

                                             s/ Jacob Kraus
                                             JACOB KRAUS
                                             Assistant Attorney General
                                             Atty. Reg. No. 0346597
                                             jacob.kraus@ag.state.mn.us

                                             445 Minnesota Street, Suite 1100
                                             St. Paul, Minnesota 55101
                                             (651) 757-1454 (Phone)
                                             (651) 282-5832 (Fax)
                                             (651) 296-1410 (TTY)

                                             ATTORNEYS FOR PLAINTIFF
                                             STATE OF MINNESOTA

AG: #2952885-v1

45

Our databases and servers are backed-up in full on a weekly basis and undergo incremental back-ups nightly. Databases are also backed-up frequently by automatically shipping log files with accumulated changes to separate sets of back-up servers. In addition to serving as a back-up, these log files update the data in our online analytical processing engine, enabling the data to be more current than if only refreshed overnight. Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes.

Customer system access requests are load-balanced across multiple application servers, allowing us to handle additional users on a per-customer basis without application changes. System utilization is monitored for capacity planning purposes.

Our software interacts with our customers' software through a series of real-time and batch interfaces. We do not require changes to the customer's core patient care delivery or financial systems. Instead of installing hardware or software in customer locations or data centers, we specify the information that a customer needs to extract from its existing systems in order to interface with our systems. This methodology enables our systems to operate with many combinations of customer systems, including custom and industry-standard implementations. We have successfully integrated our systems with 15 to 20 year old systems, with package and custom systems, and with major industry-standard products.

When these interfaces are in place, we provide a tool suite across the hospital revenue cycle. For our purposes, the revenue cycle starts when a patient registers for future service or arrives at a hospital or clinic for unscheduled service and ends when the hospital has collected all the appropriate revenue from all possible sources. Thus, we provide eligibility, address validation, skip tracing, charge capture, patient and payor follow-up, analytics and tracking, charge master management, contract modeling, contract "what if" analysis, collections and other functions throughout the front office, middle office and back office operations of a customer's revenue cycle.

Because our databases run on industry-standard hardware and software, we are able to use all standard tools to develop, maintain and monitor our solution. Databases for one or more customers can run on a single database server with disk storage configured as a redundant array of inexpensive disks (RAID). In the event of a server failure, we have maintenance contracts in place that require the service provider to have the server back on-line in four hours or less, or we move the customer processing to another server. The RAID configuration protects against disk failures having an impact on our operations.

In the event that a combination of events causes a system failure, we typically can isolate the failure to one or a small number of customers. We believe that no combination of failures by our systems can impact a customer's ability to deliver patient care, nor can any such failures prevent accurate accounting of customer finances because accounting functions are maintained on customer systems. In the past twelve months, our up-time has exceeded 99.45% of planned up-time.

Our data centers were designed to withstand many catastrophic events, such as blizzards and hurricanes. To protect against a catastrophic event in which our primary data center is completely destroyed and service cannot be restored within a few days, we store backups of our systems and databases off-site. In the event that we had to move operations to a different data center, we would re-establish operations by provisioning new servers, restoring data from the off-site backups and re-establishing connectivity with our customers' host systems. Because our systems are web-based, no changes would need to be made on customer workstations, and customers would be able to reconnect as our systems became available again.

We monitor the response time of our application in a number of ways. We monitor the response time of individual transactions by customer and place monitors inside our operations and at key customer sites to run synthetic transactions that demonstrate our systems' end-to-end responsiveness. Our hosting provider reports on responsiveness server-by-server and identifies

AH_MNAG_000020678

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM 8-K

---

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): May 9, 2012**

---

# Accretive Health, Inc.
### (Exact Name of Registrant as Specified in Charter)

---

| | | |
|---|---|---|
| **Delaware** | **001-34746** | **02-0698101** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**401 North Michigan Avenue, Suite 2700,**
**Chicago, Illinois**
**(Address of Principal Executive Offices)**

**60611**
**(Zip Code)**

**Registrant's telephone number, including area code: (312) 324-7820**

---

**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Fiscal Year 2012 Guidance**

Accretive Health is revising its previously issued guidance for fiscal year 2012 in light of the following factors: the decision by the Company and Fairview Health Services to transition revenue cycle operations to Fairview leadership; the Company's receipt of a notice of termination of its Quality and Total Cost of Care contract by Fairview; and the Company's assessment of the current situation and related uncertainties. Accretive Health now estimates that PCARR at year end will be in the range of $960 million to $1,005 million and 2012 net services revenue will be in the range of $960 million to $992 million.

In addition, the Company now estimates that fiscal year 2012 non-GAAP adjusted EBITDA will be in the range of $80 million to $95 million. This range reflects, among other things, the factors cited above and additional expenses relating to the defense of the lawsuit by the Minnesota Attorney General and related matters.

As a result, the Company expects non-GAAP adjusted diluted earnings per share for fiscal 2012 to be in the range of $0.42 to $0.50. The Company continues to actively pursue new business opportunities, and will provide updates as appropriate.

**Conference Call**

Accretive Health's management will host a conference call today at 7:30 a.m. CDT (8:30 a.m. EDT) to discuss its first quarter 2012 results and business outlook for fiscal year 2012. To participate, please dial 800-299-9630 (617-786-2904 outside the U.S. and Canada) using conference code number 50461695, or visit the Investor Relations section of Accretive Health's web site at www.accretivehealth.com to access the live webcast. A replay will be available for one week following the conference call at 888-286-8010 (617-801-6888 outside the U.S. and Canada) using conference code number 31787327. A replay of the conference call will also be available online at www.accretivehealth.com.

**About Accretive Health**

Accretive Health partners with healthcare providers to help them more effectively manage their revenue cycles, strengthen their financial stability, and improve the quality of care they provide while reducing overall healthcare costs. Our people, processes and sophisticated integrated technology complement our clients' existing resources to enhance results for patients, physicians and staff. For more information, please visit www.accretivehealth.com.

**Safe Harbor**

This document contains forward-looking statements, including statements regarding Accretive Health's expectations for future financial and operational performance, expected growth, new services, profitability or business outlook, the allegations made by the Minnesota Attorney General, the lawsuit filed against us by the Minnesota Attorney General and the Company's motion to dismiss the lawsuit, securities-related class action and derivative lawsuits filed against us and certain of our officers and directors, follow-on investigations and inquiries by government authorities, and other litigation matters, all of which involve risks and uncertainties. Our actual results and outcomes could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth in our Annual Report on Form 10-K for the year ended December 31, 2011, as amended, filed with the SEC (File No. 001-34746), under the heading "Risk Factors". The words "strive," "objective," "anticipates,"

## REVENUE CYCLE OPERATIONS AGREEMENT

Revenue Cycle Operations Agreement (the "Services Agreement"), effective March 29, 2010 (the "Effective Date"), between Accretive Health, Inc. ("Accretive Health") and Fairview Health Services on behalf of itself and its subsidiaries and affiliates providing health services and which are considered in-scope as set forth on Exhibit 1 ("Client"). Accretive Health and Client are each sometimes referred to herein as a "Party", or collectively, the "Parties."



- 1 -

AH_MNAG_000004144



6.  Accretive Health shall deliver all Services in accordance with all applicable laws, rules and
    regulations, including, but not limited to, Client's agreement with the Minnesota Attorney
    General dated May 22, 2007 ("Minnesota AG Agreement").

- 2 -

AH_MNAG_000004145



15. As of the Start Date, Accretive Health, in collaboration with Client's revenue cycle management, will direct the day-to-day work activities of the "Revenue Cycle Operations Team" (as defined in Section 16 below).

- 4 -

AH_MNAG_000004147



- 5 -

AH_MNAG_000004148

**Exhibit 1**
**In-Scope Services, Departments and Staff – By Hospital and Facility**

The departments and areas of operation for which Accretive Health will assume defined responsibility under this Services Agreement are the following:

- scheduling
- on-site processes of pre-registration
- eligibility verification (including financial securitization and financial counseling)
- registration
- authorization
- admitting
- transcription
- coding and clinical documentation
- medical record retention
- chart analysis and assembly
- billing
- secondary billing
- underpayment review
- denial management
- charge capture
- third party and self pay follow-up (includes internal and collection agency activities)
- cash posting
- collection of Dormant Receivables (as defined in Schedule 5-B)
- retail/outreach lab billing
- credentialing and healthcare provider enrollment with payors

- 1 -

AH_MNAG_000004171



## ACCRETIVE HEALTH SERVICES AGREEMENT

Accretive Health Services Agreement, dated March 21, 2011 (the "Services Agreement"), between Accretive Health, Inc. ("Accretive Health") and North Memorial Health Care ("Client"). Accretive Health and Client are each sometimes referred to herein as a "Party", or collectively, the "Parties."

- 1 -



15. As of the Start Date, in collaboration with the Client's revenue cycle management (i.e., Client's CFO and VP Revenue Cycle, or equivalent) Accretive Health will be responsible for directing the day-to-day work activities of the "Revenue Cycle Operations Team" (as defined in Section 16 below).

- 4 -

AH_MNAG_000004221

**Exhibit 1**
**In-Scope Services, Departments and Staff – By Hospital and Facility**



The departments and areas of operation for which Accretive Health will assume defined responsibility under this Services Agreement are the following:

Initial Scope

- Scheduling
- On-site processes of pre-registration
- Eligibility verification
- Registration
- Authorization
- Admitting
- Medical record retention
- Chart analysis and assembly
- Billing
- Secondary billing
- Underpayment review
- Denial management
- Charge capture
- Third party and self pay follow-up (includes internal and collection agency activities)
- Cash posting

- 1 -

AH_MNAG_000004193

EXS. TO 6/19/12 KRAUS AFF.       EXHIBIT 5        56



# Solution Overview

Options for Unique "branding" of our methodology:

  Accretive Rules
  Accretive Applied Technology
  Proprietary Accretive Technology (PAT)
  Rules Based Technology

  Accretive Decision Support
  Accretive Supporting Technology
  Accretive Work Rules

Accretive Exception Support Enablers (AES-E)

  Accretive Secret Sauce

  "Check out our ASS!"
  "You've never seen ASS like ours!"



**Confidential & Proprietary**

57

AH_MNAG_000001841

ACCRETIVE HEALTH
results providers trust

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 6

# Process Excellence: ER Financial Counseling

**ACCRETIVE HEALTH**
results providers trust

## Accretive Health six sigma metrics to drive improvement:

Weekly ER Financial Counseling Outcomes (Focus on non-emergent patients)



Employee causality

Payment Made   Loan Arrangement   Source of Funding

Approximately 15% of all ER Financial Counseling encounters result in a payment made at time of service; however although Employee 4 is performing well in establishing loans and funding sources, he/she has not collected a payment over the past week which indicates a potential training issue on methods of collection

Financial Counseling Success % Trending



Employee causality

Emp1 — Emp2 — Emp3

5-Mar  12-Mar  19-Mar  26-Mar  2-Apr  9-Apr  16-Apr

Approximately 70% of all ER Financial Counseling encounters conclude successfully. On the other hand, Emp4's individual success rate has been slipping over the past seven weeks pointing out a performance issue

## Example:

### What is reported:

➤ A typical hospital currently performs little or no financial counseling in the Emergency Room and success is measured based on giving self pay patients a Medicaid and charity application to take home and fill out

### Accretive Health:

### What we see:

A small percentage of patients actually fill out applications and send them in, and because no collection attempt is made the overall success is minimal

### Our solution:

All non-emergent self pay patients and their families are interviewed for payment assistance

### ER Financial Counseling Encounter Success Definition:

If any of the following three things occur: A source of funding is identified, A loan program is established, or a payment is made at that time.

**Confidential & Proprietary**

EXS. TO 6/19/12 KRAUS AFF.                    EXHIBIT 6                    58

AH_MNAG_000001891



Fairview Health Services
Revenue Cycle Monthly Site Review
Appendix

March, 2011

FAIRVIEW

AH_MNAG_000068340

59

EXHIBIT 7

EXS. TO 6/19/12 KRAUS AFF.

# Key Objectives for 2011

## Patient Prior Balance Cash Collection

- Increase the current collection rate of 2.7%, to the MFS benchmark of 20% at all points of service.

## Systematic Point-of-Service Re-bill Process

- Initiative underway is to identify rebill opportunities among scheduled patients prior to service and to resolve billing issues with those patients at point of service while also collecting patient prior balances

- To facilitate this process, a "front end denial" stop-list, including not only patient prior balances, but also denials of specific types (e.g., COB issues) is in development and will be put into production at all points of service where Accretive has a presence.

27

FAIRVIEW

EXHIBIT 7

AH_MNAG_000068367



# Fairview Health Services

Prior Balance Collection FAQs

## *Prior Balance Collections: Countering Common Responses from Patients*

1) How should I handle the following scenarios (responses from patients)?

**a)** "I never got a bill"
* Check the address that you have in the host system and re-confirm with the patient, this is the right time to verify the phone number as well.
* Validate the number of statements sent out to the patient.
* Provide a print out of all the accounts with prior balances.
* Refer patient to the Billing Office to explain open balances.

**b)** "Insurance should have paid that"
* Validate if insurance has made a payment
* Example Response: "We have already billed the insurance company and they have paid their portion this is now a true patient balance. Your total bill was $___ and your insurance has already paid $____."

**c)** "I don't have any money on me"
* Example Response: "We do accept credit card and checks, if you have your check book in your car I will be happy to wait for you; if you want to make a call we will accept credit card over the phone."

**d)** "Can you bill me for that"
* Validate the number of statements sent out to the patient
* Example Response "My system is saying that we have already sent you __ (#) statements before and we have never heard back, here is the print out of all your outstanding accounts. I would like to offer the different payment plans we have in this hospital for you."

**e)** "I don't have time to discuss this"
* Reiterate that you are here to help the patient
* Example Response: "I understand that you are running late for your test but this will not take more than 5 minutes, if you want I can come and see you after the test. I would like to reconfirm your phone number and address so that someone from the billing office can contact you later this evening or tomorrow."

**f)** "Go ahead and send me to collections"
* Example Response: "We are here to help all our patients and we do not want our patients to receive letters / calls from collection agency. I hope you understand that once the account is with collection agency that can affect your credit score as well. We have various options here in the hospital that you take advantage of in paying your bills."

CONFIDENTIAL AND PROPRIETARY                                          Saved: 9/2/2010

AH_MNAG_000045513



Fairview Health Services
Patient Access Strategic Roadmap

January 2011

FAIRVIEW

AH_MNAG_000099978

62

EXHIBIT 9

EXS. TO 6/19/12 KRAUS AFF.

# Six Key Patient Access Initiatives for 2011

- **Optimize patient access staffing**
  - Optimize system-wide staff levels according to productivity benchmarks and best-possible job design for each patient access function (e.g., registration, financial counseling) at each entity

- **Optimize conversion performance**
  - Optimize system-wide conversion yield for each sub-type of self pay patients (e.g, disability, out-of-state Medicaid, SELB, etc), including refinement of end-to-end process tracking (screening, finding solutions, and conversion)

- **Reach POS target of 30% of Patient Responsibility Opportunity**
  - Complete system-wide roll-out of POS collections strategy across system, revising all targets to 30% of total identified patient responsibility opportunity

- **Optimize front-end prior balance collections efforts**
  - Complete system-wide roll-out of Prior Balance / Rebill (PBR) collections efforts among patient access teams; setting new targets for collections based on identified opportunity

- **"FSC 2.0"**
  - Transform FSC total performance (including collections and pre-registration / clearance quality) to meet Accretive standards

- **Registration quality improvement**
  - Instill Accretive registration quality standards and performance tracking across all registration entities

**EB FAIRVIEW**

2

AH_MNAG_000099980



North Region Revenue Cycle Update
Minutes
September 22nd, 2011

**I.    CBO Update**
    a.    DENIALS (working)
        i.    Lakes denials decreased to 5.4%
        ii.    Northland denials surpassed the 5% target with a 4.4% denial rate.
    b.    AR
        i.    Lakes AR days decreased in August to 44.6 but increased to 46.2 (9/9/11)
        ii.    Northland AR days decreased in August to 46.3 but increased to 48.1 (9/9/11)
        iii.    Strengthen relationship with commercial Payors to decrease aged AR
        iv.    Lakes and Northland AR > 120 days are improving but are above 10% target
    c.    DNB (not working)
        i.    Lakes DNB increased from $5.9 in July to $6.6 M in August
        ii.    Northland DNB increased from $3.1 in July to $3.3 M in August
    d.    30 Day Plan
        i.    Drive down AR > 120 days by prioritizing high dollar, aged accounts
        ii.    Drive down DNB related to the backend through focused Accretive and Fairview resources
        iii.    Continue to reduce denials through the Lakes and Northland Denial Management task teams
            1.    For next meeting update slides to show: System related, left over from EPIC, left over transition from PASS to EPIC

**II.    HIM Update**
    a.    Clinical Documentation Improvement:
        i.    Dr. Kennedy met with physicians at both FNH and FLH and was well received.
        ii.    Physician Advisors named and introduced to Dr. Kennedy
    b.    Oncology Center Consolidation:  Planning is continuing.  Expected start date for Lakes is November 14th.
    c.    Coding backlogs continue to decrease.  Currently $1.1 M below interim target of 46.2 M.
    d.    Detailed plan developed for notifying and communicating incomplete documentation or queries.  Meeting planned with Dr. Schoen and Dr. Milbrandt to review and receive approval.
    e.    What's not working:
        i.    COHP dx interface not implemented and new automatic HAR creation interface for UMMC affecting North Region COHP accounts, causing the number to triple.
            1.    Waiting on Ticket ID response to push forward
        ii.    Timely response to coding queries needed: $85,457 in accounts waiting for query responses from physicians.
        iii.    Timely physician documentation needed: $577,000 in IP, $201,000 in OP, and $135,000 in ED accounts.
        iv.    Epic IT issues not resolved → decrease in staff productivity.
        v.    Inpatient and ED pro fee charge navigator not consistently being used (causing manual entry of charge).
        vi.    Fairview IT currently working with Epic to develop solutions for APC workflow issues, but current system issues creating upward pressure on outstanding APCs.
    f.    30 Day Plan
        i.    Schedule Physician Advisor Training Sessions and determine next steps including coding education plan and whether to implement concurrent review program.
        ii.    Oncology Center consolidation:  Continue planning.
        iii.    Continue to Recruit for a Hospital OP coder at Lakes
        iv.    Continue coding productivity analysis and standards

AH_MNAG_000084580



      v. Begin training for coding leadership and coders related to learning providers workflows to help support the providers

      vi. Work with site Epic trainers and physician leadership on documentation issues and use of pro fee charge navigators.

      vii. Continued physicians training on E/M level assignment.

      viii. Work with IT on COHP dx interface planning.

## III. Front End Update

a. Uninsured conversions
   i. Uninsured inpatient screenings rates continue to be at 100%
   ii. Uninsured unscreened rate increased at FNH (7% unscreened).
   iii. Overall Solution rates were above target for the month of August for Lakes and Northland (79% and 67% respectively).

b. Patient Share
   i. Non-Monetary Incentives
   ii. FLK Individual POS goals
   iii. A2A in ED and UC Zones
   iv. Formal Chalk Talks at FNH provides visibility to individual collections
   v. Stoplists have been successful, patient stop in to visit the FCs after check in at Main registration. Here the FCs can collect PBs and identify rebills.

c. 30 Day Plan
   i. Meetings in place with Rehab and Therapy managers
   ii. Registration zones to go-live with A2A
   iii. "Improved" Chalk Talks (Best Practices-PB and POS Scripting &A2A review)

AH_MNAG_000084581

## Guidelines to Making you an Effective Front End Operator

1. **Conversions**
   a. 100% IP Screened Daily resulting in 100% IP Solutions (must include non-medicaid solutions as well if applicable)
   b. Scheduled OP's should be worked (T+14) by financial counselor using the SP and SP pending mnemonics.
   c. 100% ED Patients should be screened daily resulting in 85% ED solution rate
   d. Conduct stand up with financial counselors to review accounts daily
   e. Any account without a solution or needs additional review should be personally reviewed by you. Build in escalation communication process.
   f. If FC is unavailable to screen patients, screen patient yourself
   g. Review failed conversions to identify sources of leakage
   h. Review accounts with issues with Site Lead

2. **Prior Balances**
   a. Benchmark Target of $106,000 per month (Accretive Benchmark is $100K for every $100M in revenue)
   b. Operating Metric Target goal monthly Target – August Target cash ($28,864) and flips ($30,409).
   c. Set monthly personal targets achieving goals (cash/installments) and (flips)
      i. Develop personal pipeline to aid in achieving personal goal
      ii. Break down monthly goal into daily goal
      iii. Track daily at-bats/closes each day (shoot to have a minimum of 7 a day)
   d. Pull together PB stop list night before for patients appointments next day
   e. Leverage hospital staff to assist in prior balance collections based on individual strengths training those who can also add $'s
   f. Training/Coaching staff on prior balance conversations
   g. Monitor payment plan processing particular $1^{st}/15^{th}$ of the month and ensure copies are sent to the CBO
   h. Review accounts with issues/questions with Site Lead

3. **Coverage Complete**
   a. Ensure staff are completing coverage tabs in Ahto Access
   b. QA person should be working coverage complete (T-3) daily to ensure insurances are corrected prior to bill dropping
   c. Assist in ensuring coverage complete is 95% or better for PAS
   d. Personally work accounts and turn tabs blue

4. **Residuals**
   a. Work with managers/directors to establish goals for ED, Pre-Reg and Admitting
   b. Track residual collections through FE scorecard and identify opportunities for collections
   c. Train/retrain staff on residual identification and completion of services tab
   d. Help prioritize accounts to aid in boosting residual collections.

AH_MNAG_000092161

**Guidelines to Making you an Effective Front End Operator**

5. **Client Engagement/Involvement**
   a. Daily checkpoint with managers/directors (saying hello, items you might be working on today, keep it short and sweet)
   b. Daily interaction with staff
   c. Weekly meeting with the Director of Patient Access with Site Lead
   d. Bi-Weekly patient access meeting with managers, supervisors, directors
   e. Ensure staff are rewarded for their efforts by saying thank you, good job, reward recognition program, emails etc.
   f. Weekly meeting with Site Lead

6. **Reporting**
   a. PB Stop List
   b. Weekly FE Scorecard
   c. Weekly Prior Balance Collections
      i. Personal
      ii. Site Specific
   d. KPI Document
   e. Bi-Weekly PAS agenda/materials
   f. Monthly Prior Balance Collection Totals – Communication to FE staff/PAS
   g. Prior Balance Payment Plan tracker – ensure all payments have been logged

AH_MNAG_000092162

## Statement of Kathleen Karsko

My name is Kathleen Karsko.  I am 47 years old.  I work as a project manager for a travel software company.  I am married to Bill Wright.  Bill served 20 years in the U.S. Navy with his last position as first class petty officer.  As a retired military veteran, Bill is covered by TriCare.

Bill needed surgery on his arm.  Two days before he received a call from Fairview telling him what he needed to do to physically prepare for the surgery.  The employee told Bill that Fairview would bill him for his co-pay.  On April 6, 2012, Bill had surgery at Fairview Ridges Hospital to remove a plate and screws from his broken arm.  We arrived at 5:00 a.m.  Bill had not eaten or had anything to drink per the doctor's instructions.  I checked him in for surgery.  The surgery involved general anesthesia.  I was told by a registrar that the estimated amount we owed for the surgery would be over $700.  The registrar then stated that we were required to pay $500 right then.  I told her I was surprised by this and thought we would be billed.  It was made clear to us that if I did not make an up-front payment, my husband would not receive his surgery.

I objected and said we were never required to make any up-front payments in the past.  The registrar was firm and adamant that we owed $500 now, and told us that up-front payments were required due to a recent change in policy.  The registrar told us that Fairview required payment to be made up-front before the surgery could be done.  I told the registrar that I didn't have $500 in my bank account and that if I wrote a check for $500, it would bounce.  In response, the registrar asked me how long my husband's surgery would last and told me that I didn't have to be present while he was in surgery.  It

was clear to me that the registrar wanted me to go to the bank while my husband was in surgery and return with sufficient funds to pay the full $500.

After I was unable to convince the registrar to bill me for what I owed for Bill's surgery, I spent the next fifteen minutes or so negotiating the amount I would have to pay up-front. At first, the registrar would not budge from $500. Eventually, I negotiated the amount to $250 up-front, which I paid. Attached is a copy of my check. When we subsequently received our explanation of benefits from our insurance company, it showed that we actually owed $432.69, rather than the over $700 Fairview initially told me. A copy is attached.

It is a stressful and worrisome time when a spouse is in surgery. It is not a good time, either physically or emotionally, to deal with a collections matter. It is troubling that I was made to focus my attention on this collection matter in the hospital when I should have been allowed to focus on Bill's well-being.

Kathleen Karsko

Subscribed and sworn to before me this 30th day of April, 2012.

NOTARY PUBLIC



REBECCA LEE
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2015

AG: #3003313-v1

2





## Check Images

This image contains confidential and personal information. If you print it, please store it in a secure place to prevent unauthorized use or theft of this information. For your safety, we recommend that you shred the document if you choose to discard or destroy the image copy.

Account # : _____   Date Processed:   04/26/12   Check # :   6202   Amount:   $250.00





# TRICARE CLAIM SUMMARY

Administered by: TriWest Healthcare Alliance
This is a statement of the action taken on your
TRICARE claim. Keep this notice for your records.
Page 3 of 4

| Date of Notice | 4/20/2012 |
|---|---|
| Sponsor SSN | XXX-XX█ |
| Sponsor Name | William C Wright |
| Claim Number | MULTIPLE |

WILLIAM WRIGHT
3270 199TH STREET CT
FARMINGTON MN 55024-1751

If you have questions about this notice,
please call toll free: **1-888-TRIWEST**
or visit online at **www.triwest.com**

## THIS IS NOT A BILL

**Claim Number:** ████████     **Patient Name:** William Wright
**Provider #:** ████████
**Provider Name:** Fairview Ridges Hospital

| SERVICES PROVIDED BY | DATE OF SERVICE | APC | SI | AMOUNT BILLED | TRICARE ALLOWED | REMARKS |
|---|---|---|---|---|---|---|
| Fairview Ridges Hospital | 04/06/12 - 04/06/12 | 00000 | N | $2,572.00 | $0.00 | 02C |
| 0710 99420 - 9 MEDICAL OFFICE | | | | | | |
| Total | | | | $9,275.83 | $1,730.74 | |

| CLAIM SUMMARY: | | BENEFICIARY SHARE: | |
|---|---|---|---|
| TRICARE Amount Billed | $9,275.83 | Cost Share/Copay | $432.69 |
| TRICARE Allowed | $1,730.74 | Deductible | $0.00 |
| TRICARE Paid | $1,298.05 | | |
| Other Ins. Paid | $0.00 | | |

**OUT OF POCKET EXPENSE:**

| | Beginning October 1, 2011 | | Beginning October 1, 2010 | | Beginning October 1, 2009 | |
|---|---|---|---|---|---|---|
| | Limit | Met to Date | Limit | Met to Date | Limit | Met to Date |

**Remark Codes:**
02C:   This charge included in a paid service.
03B:   Claim processed under OPPS.
        Payment has been made to the provider of care for claim 2012104 8009017.
        *The Amount You Owe* includes total patient responsibility including payment by Tricare and other payers if applicable.
        Payment has been made to the provider of care for claim 2012106 8000072.
003:   If you disagree with the amount paid, please send correspondence to WPS Customer Service, PO BOX 77029, Madison, WI
53707-7029.
        All TRICARE claims must be filed no later than one year after the date the services were provided or one year from the date of
discharge for an inpatient admission for facility charges billed by the facility. Professional services billed by the facility must be submitted
within one year from the date of service. For additional information please visit www.triwest.com



## ACCRETIVE HEALTH
## RESPONSE TO INQUIRY BY SENATOR AL FRANKEN

### May 11, 2012

Accretive Health strives every day to be a constructive and positive contributor to the American healthcare system.  We take seriously the allegations by the Minnesota Attorney General, and Accretive Health appreciates this opportunity to set the record straight.

### BACKGROUND

Accretive Health has two service offerings at issue: Revenue Cycle Management and Quality and Total Cost of Care.  Both are fundamentally designed to improve outcomes, primarily by eliminating errors, for healthcare providers and patients.  An October 2011 Kauffman Foundation interview of our CEO, Mary Tolan, shows the commitment Accretive Health has to its healthcare provider partners and the admiration and respect we have for our customers' work.

Here is a link to the interview:

http://www.accretivehealth.com/AboutAccretiveHealth/OurPassionFor OurClients/tabid/395/Default.aspx.

### *Revenue Cycle Management*

In our Revenue Cycle Management offering, Accretive Health works with its healthcare provider clients and assists them in improving the quality of their revenue processes, consistent with the providers' individual policies and procedures.  This means, among other things, making sure insurance claim forms and payor reimbursements are accurate.  It also means finding appropriate solutions for the uninsured or, if coverage cannot be identified, charity programs that can assist those who qualify.  And it means educating patients about their financial obligations for their healthcare costs and helping to ensure that they fulfill them.

Specifically, Revenue Cycle Management covers patient registration, insurance and benefit verification, medical treatment documentation and coding, third-party collections, and patient collections.  Through this offering, Accretive Health works with healthcare providers to strengthen their financial stability so that they can, in turn, focus on their mission of providing better care to their local communities.  Accretive Health collaborates with its clients to help

care.  As a result, in December 2011, Fairview was selected as one of 32 pioneer ACOs.

In early 2012, as part of Accretive Health's agreement with the Minnesota Attorney General to resolve the pending litigation (which the Attorney General subsequently violated), Fairview and Accretive Health decided to amend their Revenue Cycle Operations Agreement to transition the management of those operations back to Fairview leadership.  Subsequently, in the face of heightened pressure from the Attorney General, Fairview announced its intent to terminate its QTCC contract with Accretive Health.  This is an unfortunate setback for the people of Minnesota whose care and quality of life was  improved through the QTTC program, and for the approximately 130 individuals whose careers were devoted to the QTTC mission.  Nevertheless, Accretive Health will continue to assist Fairview through transition to preserve the good results that have been achieved and will continue to work with its other provider partners in these areas.

*          *          *          *

What follows are Accretive Health's responses to Senator Franken's questions.  These responses are based on our company's good faith efforts to respond accurately in light of the review that has been possible in the two weeks since receiving the Senator's requests.  In the limited time available to prepare this response, it was impossible to interview each of the thousands of Accretive Health's individual employees or review all of the documents that may be relevant to this matter.  Should our continuing investigation provide reason to supplement these responses in any way, Accretive Health expressly reserves its right to do so.

1. **Did Accretive employees[5] request payment or attempt to collect past debts from Fairview patients *before* they received medical treatment?**

---

[5]  Many of the questions posed by Senator Franken ask about the conduct of Accretive Health employees.  Accretive Health worked in a strategic partnership with Fairview hospitals and clinics to provide the Revenue Cycle Management services described above.  During this time, there were a total of approximately forty Accretive Health employees, along with over twelve hundred Fairview employees, working throughout the entire Fairview system, to manage and improve Fairview's Revenue Cycle processes.  Regarding Question 1 in particular, approximately fifteen to twenty Accretive

7

At Fairview, as at many hospitals, there were two different approaches to assisting patients, depending upon whether they were making a scheduled visit or coming into the emergency room.[6] In addition, there were different procedures depending on whether a patient was insured or uninsured.

### Scheduled Patients with Insurance

Insured patients with scheduled procedures (such as laboratory testing, imaging, rehabilitation therapies, and planned surgeries) were provided information regarding their insurance coverages and estimates of their patient share balances before their appointments.  In most cases, this conversation occurred by telephone as a part of the pre-registration process, seven to ten days in advance of the patient's appointment.  In some cases, if the patient could not be reached by telephone, this conversation occurred during patient registration at the facility on the day of the patient's appointment.

During the pre-registration or registration process, Revenue Cycle employees verified the patient's insurance information in order to obtain any necessary authorization for insurance coverage of the scheduled procedure.  This can be a time-sensitive process.[7]  The next step was to provide the patient with an estimate of his or her share of the treatment cost, including any co-payment or co-insurance obligation.[8]  (The patient's share of the treatment cost is often referred to as the "residual balance.")  This helped patients understand their cost of care well in advance of receiving the first bill and helped them to avoid unnecessary confusion or concern.  A critical part of compassionate care is reducing the patient's anxiety about the potential treatment cost.  Hospitals are one of the few places a consumer will go where the cost of the service is ambiguous.

---

Health employees would have had pre-treatment discussions with patients concerning payment while hundreds of Fairview employees would have had such discussions.

[6]  At Fairview, as with all of our provider clients, Accretive Health only implemented those policies and practices that Fairview chose to enact.

[7]  For example, some insurers require clinical information before they will authorize payment for service.  In some instances, failure to provide correct and complete information can lead to the insurer's refusal to pay some or all of a claim.

[8]  The process of determining the patient share of the treatment cost is described in response to Question 3.

8

7.     **The report states that Accretive debt collection agents were able to access information indicating that a specific Fairview patient suffered from "major depression, alcohol intoxication, migraines, attention deficit disorder and attempted suicide by cutting his wrist."  *See* Swanson Report § 4.7.  Is this accurate?**

   a)     **If so, why does Accretive permit its debt collection agents to access this information?**

The Minnesota Attorney General's report references a screenshot of patient information contained in Fairview's electronic medical records system (called "PASS").   PASS is Fairview's patient accounting system used to streamline patient billing and assist claim submissions.  We understand that Fairview implemented PASS decades before the Accretive Health contract and continues to use the system to bill patients.  As configured by Fairview, PASS did not restrict information contained in patient files.  It is Accretive Health's understanding that the information its employees received from the Fairview PASS system is consistent with what others in the industry received from patient accounting systems used by other hospitals.

For a period of time, PASS was the only source of information to answer patient questions about amounts owed.  In November 2010, only eight months after entering into its Revenue Cycle Management contract with Fairview, Accretive Health began implementing a software technology tool that limited employee access to medical information to the data listed above in response to Question 6.  This software tool became fully operational in February 2011, though some employees continued to have access to Fairview PASS files until early 2012.

   b)     **The report alleges that "patient health information was used to collect debts."  *Ibid* at § 4.7.  Is this accurate, and if so, how exactly was patient health information used to collect debts?**

The use of "patient health information" is described in response to Question 6. As stated above, access to patient health information allowed employees to engage with patients and answer questions about amounts owed.

   c)     **Does Accretive change its collection practices on the basis of a patient's diagnosis or treatment?   Have Accretive employees done so in the past?**

a) **Did Accretive require all patients to meet with a financial counselor before receiving treatment?**

No, all consultations with financial counselors at Fairview were optional.

9. **The report states that Accretive refused to provide documentation verifying a debt when requested by consumers.** *See* **Swanson Report § 5.9.  Is this true?**

a) **Did Accretive continue to seek payment of debts after verification was requested?**

Accretive's policy for dormant accounts is to cease all collection efforts upon receipt of a written validation request as mandated by the Fair Debt Collection Practices Act.  Accretive Health also uses the same practice for precollect accounts as well, although not required to do so by the FDCPA.  Fairview annually reviewed the collection efforts of its hospitals and collection agencies as required by the settlement it had entered into with the Minnesota Attorney General's Office.  One such audit resulted in MFS retraining its representatives handling Fairview accounts on appropriate practices for itemized statement requests.  MFS also implemented a minimum 30-day hold on seeking payment following itemized statement requests on disputed pre-collect (*i.e.* not defaulted) debts.

10. **The report states that Accretive employees lost six laptops to theft in three separate incidents between February and June 2011.** *See* **Swanson Report § 4.6.  Is this accurate?**

According to Accretive Health records, nine company laptops were stolen in 2011.[20]  All but one was encrypted.  Context is important: in 2011, Accretive Health had approximately 1,400 laptop and desktop computers in use by its employees.

a) **How many Fairview patients had medical information that was contained in the lost laptops?**

b) **How many other individuals had medical information that was contained in the lost laptops?**

---

[20] Two of these were recovered within hours.

Safeguards available on all but one of the stolen laptops allowed Accretive Health to take steps to deny any unauthorized user access to the contents. Because of these safeguards, Protected Health Information ("PHI") was not at risk and no further investigation was required as to the particular number or identity of patient files.

A laptop stolen in July 2011 (also discussed below in response to Question 11) was password-protected, but not encrypted. Efforts were made to identify the files containing PHI contained on the laptop and to identify the hospitals associated with these PHI-laden files. Pursuant to its obligations under the Health Insurance Portability and Accountability Act ("HIPAA"), *see* 45 C.F.R. § 164.410, Accretive Health provided information about the identification of individuals and types of PHI in the PHI-laden files – as well as copies of the PHI-laden files themselves – to the appropriate hospitals, who in turn evaluated which patients needed to be notified about the incident because they faced significant risk of financial, reputational or other harm. Accretive Health has been informed by the outside vendor responsible for the notifications, that to date, Fairview has notified 13,922 individuals and North Memorial has notified 9,457 individuals about the incident.

**11.    The report provides a redacted screenshot of a patient's medical data file that was contained on the laptop lost in the Seven Corners neighborhood of Minneapolis on July 25, 2011. That file contains the patient's full name, address, date of birth and a checklist indicating that the patient suffers from bipolar disorder, diabetes, a lipid metabolism disorder, and hyperthyroidism. The file template also permits identification of a range of other conditions and diagnoses, including depression, schizophrenia, Parkinson's disease, and HIV positive status. *See* Swanson Report at § 1.7.**

**a)    How many files like this one were contained in the lost laptops?**

As discussed in response to Question No. 10, only the one unencrypted laptop stolen in July 2011 was examined in detail in order to determine its contents. All other stolen laptops were successfully encrypted. As discussed above, Accretive Health provided copies of the files from the unencrypted laptop to all affected hospitals, and notice was provided as described above to approximately 23,000 individuals.

25

b)   **How many of these files were encrypted?  How were they encrypted?**

c)   **How many of the files were protected in another way (password protection, etc.)?  How were they protected?**

d)   **If any of the files were not encrypted, why were they not encrypted?**

The laptop stolen in July 2011 was password-protected, but its files were not encrypted, due to the oversight of an individual IT employee.  This laptop was one of approximately 30 laptops (out of 1,400 laptop and desktop computers) missing Accretive Health's required encryption software.  When this was discovered, the IT employee was terminated.  Following this incident, Accretive Health added redundancies to its IT practices so that multiple employees work independently to ensure that each Accretive Health laptop is properly encrypted. In addition, Accretive Health conducts reviews at least five days a week to confirm that every laptop remains properly encrypted.

e)   **The report alleges that the user of the laptop was a "revenue cycle" employee.  *Ibid* at § 4.6.  Is this accurate?  If so, what is a "revenue cycle" employee, and why does such an employee require access to these customer records?**

The Revenue Cycle employee is, in this case, an Accretive Health employee who performs Revenue Cycle Management services (described in the Background section above) for Accretive Health's clients.  The employee had worked at Fairview, then transferred to North Memorial Health Care. While at Fairview, the employee, seeking to become better acquainted with Accretive Health's QTCC program, accessed QTCC data including that described in Section 1.7 of the Minnesota Attorney General's report.

12.  **What other patient medical information was contained in the lost laptops?**

a)   **Was that information encrypted or protected in any way?**

Please see the responses to Questions 10 and 11.

b)   **Has Accretive changed its encryption practices since these thefts?  If so, how?  If not, why not?**

26

# ACCRETIVE HEALTH
## results providers trust

## *Front End Patient Encounter Training 101:*
## *Fundamentals of Residuals*
## *& Prior Balances*

© Copyright 2006-7, Accretive Health, Inc.  All rights reserved.

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 14          79

AH_MNAG_000030313

ACCRETIVE HEALTH    *Expectations of Your Role*

## All Front End Employees are key players in making the Team successful and in contributing to the Hospital's goals.

- All insured patients must undergo insurance verification prior to or during registration

- Hospital staff should make all reasonable efforts to collect residual balances prior to or at the time of service

- Every patient with a prior balance who visits the hospital must be approached about settling their account(s).

  - Scheduled patients during Pre-Registration

  - Unscheduled patients during Registration

  - Customer service during inbound calls (account inquiries)

- Ideally, no patient with a prior balance should leave the hospital without a formal plan put in place for how they will settle their outstanding balances.

**Confidential & Proprietary**

EXHIBIT 14

EXS. TO 6/19/12 KRAUS AFF.

AH_MNAG_000030346

## Guidelines to Making you an Effective Front End Operator

1. **Conversions**
    a. 100% IP Screened Daily resulting in 100% IP Solutions (must include non-medicaid solutions as well if applicable)
    b. Scheduled OP's should be worked (T+14) by financial counselor using the SP and SP pending mnemonics.
    c. 100% ED Patients should be screened daily resulting in 85% ED solution rate
    d. Conduct stand up with financial counselors to review accounts daily
    e. Any account without a solution or needs additional review should be personally reviewed by you. Build in escalation communication process.
    f. If FC is unavailable to screen patients, screen patient yourself
    g. Review failed conversions to identify sources of leakage
    h. Review accounts with issues with Site Lead

2. **Prior Balances**
    a. Benchmark Target of $106,000 per month (Accretive Benchmark is $100K for every $100M in revenue)
    b. Operating Metric Target goal monthly Target – August Target cash ($28,864) and flips ($30,409).
    c. Set monthly personal targets achieving goals (cash/installments) and (flips)
        i. Develop personal pipeline to aid in achieving personal goal
        ii. Break down monthly goal into daily goal
        iii. Track daily at-bats/closes each day (shoot to have a minimum of 7 a day)
    d. Pull together PB stop list night before for patients appointments next day
    e. Leverage hospital staff to assist in prior balance collections based on individual strengths training those who can also add $'s
    f. Training/Coaching staff on prior balance conversations
    g. Monitor payment plan processing particular $1^{st}/15^{th}$ of the month and ensure copies are sent to the CBO
    h. Review accounts with issues/questions with Site Lead

3. **Coverage Complete**
    a. Ensure staff are completing coverage tabs in Ahto Access
    b. QA person should be working coverage complete (T-3) daily to ensure insurances are corrected prior to bill dropping
    c. Assist in ensuring coverage complete is 95% or better for PAS
    d. Personally work accounts and turn tabs blue

4. **Residuals**
    a. Work with managers/directors to establish goals for ED, Pre-Reg and Admitting
    b. Track residual collections through FE scorecard and identify opportunities for collections
    c. Train/retrain staff on residual identification and completion of services tab
    d. Help prioritize accounts to aid in boosting residual collections.

AH_MNAG_000092161

<u>Guidelines to Making you an Effective Front End Operator</u>

5. **Client Engagement/Involvement**
    a. Daily checkpoint with managers/directors (saying hello, items you might be working on today, keep it short and sweet)
    b. Daily interaction with staff
    c. Weekly meeting with the Director of Patient Access with Site Lead
    d. Bi-Weekly patient access meeting with managers, supervisors, directors
    e. Ensure staff are rewarded for their efforts by saying thank you, good job, reward recognition program, emails etc.
    f. Weekly meeting with Site Lead

6. **Reporting**
    a. PB Stop List
    b. Weekly FE Scorecard
    c. Weekly Prior Balance Collections
        i. Personal
        ii. Site Specific
    d. KPI Document
    e. Bi-Weekly PAS agenda/materials
    f. Monthly Prior Balance Collection Totals – Communication to FE staff/PAS
    g. Prior Balance Payment Plan tracker – ensure all payments have been logged

AH_MNAG_000092162



What does all this really mean?  Short version, we run the money side of the hospital.  They outsource those functions to us and then focus on their core business which is providing care.  Because we are delivering substantial value to the hospital, they are able to hire better staff, buy better equipment and make healthcare available to more people.

What we are not – we are not a consulting firm.  We do not sell work or projects.  We will either run your revenue cycle for you, or we won't.  There are tons of firms who believe they can tell you how to do it better, we do it for you, with your people.


## ACCRETIVE HEALTH

# Who is Accretive Health?

Short version - we run the financial side.

Client hospital's outsource specific functions to us so they can focus on their core business: providing excellent health care. Because we are delivering substantial value to the hospital, they are able to hire better staff, buy better equipment, and make healthcare available to more people. We are changing the way hospitals operate.

Confidential & Proprietary

5

AH_MHAG_000021102

10-K 1 a201110-kdocument.htm 10-K

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

(Mark One)

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2011

**OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from     to

### Commission file number 001-34746

# Accretive Health, Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **02-0698101** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **401 North Michigan Avenue Suite 2700 Chicago, Illinois** | **60611** |
| *(Address of principal executive offices)* | *(Zip Code)* |

### Registrant's telephone number, including area code
### (312) 324-7820

### Securities registered pursuant to Section 12(b) of the Act:
### Common Stock, $0.01 par value

### Securities registered pursuant to Section 12(g) of the Act:
### None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒     No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☐     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒       Accelerated filer ☐       Non-accelerated filer ☐       Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐     No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, based on the last sale price for such stock on June 30, 2011: $903,536,953

The number of shares outstanding of each of the registrant's classes of common stock, as of February 15, 2012:

| | |
|---|---|
| Common Stock, $0.01 par value | 98,811,931 |

Portions of the registrant's definitive Proxy Statement for its 2012 Annual Meeting of Stockholders are incorporated by reference into Part III of

# PART I

*Unless the context indicates otherwise, references in this Annual Report to "Accretive Health," "Accretive," the "Company," "we," "our," and "us" mean Accretive Health, Inc. and its subsidiaries.*

## Item 1. *Business*

### Overview

Accretive Health is a leading provider of services that help healthcare providers generate sustainable improvements in their operating margins and healthcare quality while also enhancing patient, physician and staff satisfaction across our three offerings - revenue cycle management; quality and total cost of care; and physician advisory services. We deliver these results by implementing our distinctive operating model which leverages our extensive management expertise, innovative technology and process excellence.

Our integrated revenue cycle management service offering helps U.S. healthcare providers to more efficiently manage their revenue cycles, which encompass patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation and collections. Grounded in sophisticated analytics, our revenue cycle offering spans our customers' entire revenue cycle, which helps set us apart from competing service providers that address only partial solutions or cost reductions. We help our revenue cycle customers increase the portion of the maximum potential patient revenue they receive while simultaneously reducing revenue cycle operating costs. Together these benefits generate significant and sustainable revenue cycle improvements. Our service offerings are adaptable to the evolution of the healthcare regulatory environment, technology standards and market trends, and require no up-front cash investment by our customers. To implement our revenue cycle solution, we assume full responsibility for the management and cost of a customer's revenue cycle and supplement the customer's existing staff with seasoned Accretive Health personnel. We collaborate with our customers' employees with the objective of educating and empowering them so that over time they can deliver improved results using the proprietary technology included in our applications. Once implemented, our technology applications, processes and services are deeply embedded in a hospital's day-to-day operations. We and our customers share financial gains resulting from our solutions, which directly aligns our objectives and interests with those of our customers. Both we and our customers benefit, on a contractually agreed-upon basis, from revenue increases and cost savings realized by the customers as a result of our services. We believe that, over time, this alignment of interests fosters greater innovation and incentivizes us to improve our customers' operations.

Our quality and total cost of care service offering, introduced in 2010, enables healthcare providers to effectively manage the health of a defined patient population by identifying those individuals who are most likely to experience an adverse health event and, as a result, incur high healthcare costs in the coming year. This data allows providers to focus greater efforts on managing these patients within and across the delivery system, as well as at home, to create a better care experience while reducing healthcare costs. We assist our customers in retaining a share of the reductions in healthcare costs by helping them negotiate contracts with third-party payors that provide an equitable sharing of the savings in total medical costs among the payor and provider. We then receive a share of the provider community cost savings for our role in providing the technology infrastructure and for helping the providers manage the care coordination process.

Our physician advisory services offering, or AccretivePAS®, introduced in 2009, assists hospitals in navigating the path to compliant revenue by providing concurrent level of care classification reviews as well as retrospective chart audits utilizing highly skilled physicians. Through use of our secure web-based portal and our proprietary clinical guidelines, we provide our customers with concurrent reviews to support the decision of whether to classify a hospital visit as an in-patient or observation case for billing purposes. This proactive case management increases our customers' compliance with CMS and commercial payor policies and reduces their exposure to the risk of having to return previously recorded revenue.

We develop and refine our offerings based in part on information, processes and management experience garnered through working with many of the largest and most prestigious hospitals and healthcare systems in the United States. Our customers typically are multi-hospital systems, including faith-based or community healthcare systems, academic medical centers and independent ambulatory clinics, and their affiliated physician practice groups. We seek to develop strategic, long-term relationships with our customers and focus on providers that we believe understand the value of our operating model and have demonstrated success in both clinical and operational outcomes.

- ***Continuing to Diversify Our Customer Base.***  In October 2004, Ascension Health became our founding customer. While Ascension Health is our largest customer and we expect to continue to expand our presence within Ascension Health's network of affiliated hospitals, we are focusing our marketing efforts primarily on other healthcare providers and expect to continue to diversify our customer base. In the year ended December 31, 2011, the percentage of our total net services revenue attributable to hospitals affiliated with Ascension Health declined to 41% from 89% in the year ended December 31, 2007. In 2011, we successfully expanded our work with new customers, which, among others, included long-term agreements with Intermountain Healthcare, Beaumont Health System, and our first long-term relationship with a government-funded hospital.

- ***Developing Enhanced Service Offerings that Offer Long-Term Opportunities.***  We intend to continue to introduce new services that draw upon our core competencies and that we believe will be attractive to our target customers. In considering new services, we look for market opportunities that we believe present low barriers to entry, require limited incremental cost and present significant growth opportunities. For example, in 2009 we began providing physician advisory services to help hospitals classify emergency room patient admissions to maximize compliant revenue. In 2010, we introduced our quality and total cost of care offering focused on increasing the quality of healthcare through incentive payments to the hospitals and their affiliated physicians. In late 2011, we launched a pilot with an existing customer for intra-stay quality, an offering aimed at reducing length of hospital stay and establishing appropriate care settings. We also plan to selectively pursue acquisitions that will enable us to broaden our service offerings.

## Our Services

Drawing on a combination of our extensive management expertise, innovative technology and process excellence, we seek to deliver measurable economic value to our customers across our three core service offerings - revenue cycle management, quality and total cost of care and physician advisory services.

### Revenue Cycle Management Offering

Our revenue cycle services offering consists of comprehensive, integrated technology and revenue cycle management services, and it is intended to address the full spectrum of revenue cycle operational issues faced by healthcare providers.

We assume full responsibility for the management and cost of the customer's complete revenue cycle operations in exchange for a base fee and the opportunity to earn incentive fees. To implement our solution, we supplement the customer's existing revenue cycle management and staff with seasoned Accretive Health revenue cycle leaders, subject matter experts and staff, and connect our proprietary technology and analytical applications to the hospital's existing technology systems. Our employees that we add to the hospital's revenue cycle team typically have significant experience in healthcare management, revenue cycle operations, technology, quality control and other management disciplines. In addition to implementing revenue enhancement procedures, we help our customers reduce their revenue cycle costs by implementing improved practices, advanced data management technology and more efficient processes, as well as transferring aspects of their revenue cycle operations to our shared service centers which have lower operating costs. We seek to embed our technology, personnel, know-how and culture within each customer's revenue cycle activities with the expectation that we will serve as the customer's on-site operational manager beyond the managed service contract's initial term, which typically ranges from four to five years.

The revenue cycle operations of a typical hospital, physician or other healthcare provider often fail to capture and collect the total amounts contractually owed to it from third-party payors and patients for medical services rendered, leading to significant bad debt write-offs, uncompensated care, payment denials by payors and corresponding administrative write-offs, as well as lost revenue for missed charges. Fitch Ratings estimates that in 2009 and 2010, uncompensated care (including bad debt write-offs, charity care and uninsured discounts) averaged 20% and 21% of net patient revenue at U.S. hospitals, respectively, and that this percentage increased to 22% in the third quarter of 2011.

Through the implementation of our operating model, we generally deliver operating margin improvements to our customers through a combination of improvements in collections, which we refer to as net revenue yield; charge capture, which involves ensuring that all charges for medical treatment are included in the associated bill; and revenue cycle cost reductions. Our customers have historically achieved significant net revenue yield improvements within 18 to 24 months of implementing our operating model, with customers subject to mature managed service contracts typically realizing 400 to 600 basis points in yield improvements in the third or fourth contract year. All of a customer's yield improvements during the period we are providing services are attributed to our

solution because we assume full responsibility for the management of the customer's revenue cycle operations. Our methodology for measuring net revenue yield improvements excludes the impact of external factors such as changes in reimbursement rates from payors, changes in self-pay as a percentage of total payor mix, the

6

- ***Government-Owned Hospitals.*** Based on industry sources, each major metropolitan area in the United States has at least one large municipal or city-owned hospital system. We believe that this market represents approximately $111 billion in annual net patient revenue. We currently have one revenue cycle customer in this market.

- ***Home Services and Medical Equipment.*** In 2010, we began targeting the home healthcare services and medical equipment providers market, which we believe represents $80 billion in annual net patient revenue. This market includes both for-profit and not-for-profit companies which work with hospitals and physicians across the United States. We believe that most companies in this market fail to capture and collect a significant portion of the total amounts contractually owed to them due to their highly decentralized customer service and order entry departments and the differences in payor requirements that occur when goods and services are provided in multiple locations. We do not currently have any customers in this market.

The six hospital market segments noted above are also targets of our quality and total cost of care and physician advisory services offerings. We believe that the diversity of our customer base, ranging from not-for-profit community hospitals to large academic medical centers and healthcare systems, demonstrates our ability to adapt and apply our operating model to many different situations.

### *Customer Agreements*

We provide our revenue cycle and quality and total cost of care service offerings pursuant to managed service contracts with our customers. In rendering our services, we must comply with customer policies and procedures regarding charity care, personnel, compliance and risk management as well as applicable federal, state and local laws and regulations. Generally, we are the exclusive provider of revenue cycle or quality and total cost of care services to our customers.

Our contracts are multi-year agreements and vary in length based on the customer. After the initial term of the agreement, generally our customer contracts automatically renew unless terminated by either party upon prior written notice.

In general, our managed service contracts provide that:

- we assume responsibility for the management and cost of the customer's revenue cycle or population health management operations, including the payroll and benefit costs associated with the customer's employees conducting activities within our contracted services, and the agreements and costs associated with the related third-party services;

- we are required to staff a sufficient number of our own employees on each customer's premises and the technology necessary to implement and manage our services;

- in general, the customer pays us base fees equal to a specified amount, subject to annual increases under an agreed-upon formula, and incentive fees based on achieving agreed-upon financial benchmarks;

- the parties provide representations and indemnities to each other; and

- the contracts are subject to termination by either party in the event of a material breach which is not cured by the breaching party.

Our contracts for physician advisory services are multi-year arrangements which average in length between one and three years. Generally, the contracts automatically renew unless terminated by either party upon prior written notice. Services rendered are billed either monthly, based on the anticipated volume of cases at each facility or on a case-by-case basis.

### Sales and Marketing

Our new business opportunities have historically been generated through high-level industry contacts of members of our senior management team and board of directors and positive references from existing customers. As we have grown, we have added senior

sales executives to support our revenue cycle and quality and total cost of care offerings, and have adopted a more institutional approach to sales and marketing that relies on systematic relationship building by a team of senior sales executives. Our sales process generally begins by engaging senior executives of the prospective hospital or healthcare system, typically followed by our assessment of the prospect's existing revenue cycle or quality and total cost of care operations, and a review of the findings.

14

## Intellectual Property

We rely upon a combination of patent, trademark, copyright and trade secret laws and contractual terms and conditions to protect our intellectual property rights, and have sought patent protection for aspects of our key innovations.

We have been issued one U.S. patent, which expires in 2028, and filed eight additional U.S. patent applications aimed at protecting the four domains of our AHtoAccess software suite: patient access, improving best possible, follow-up and measurement. See "Business — Technology — Proprietary Software Suite" for more information. Legal standards relating to the validity, enforceability and scope of protection of patents can be uncertain. We do not know whether any of our pending patent applications will result in the issuance of patents or whether the examination process will require us to narrow our claims. Our patent applications may not result in the grant of patents with the scope of the claims that we seek, if at all, or the scope of the granted claims may not be sufficiently broad to protect our products and technology. Our one granted patent or any patents that may be granted in the future from pending or future applications may be opposed, contested, circumvented, designed around by a third party or found to be invalid or unenforceable. Third parties may develop technologies that are similar or superior to our proprietary technologies, duplicate or otherwise obtain and use our proprietary technologies or design around patents owned or licensed by us. If our technology is found to infringe any patent or other intellectual property right held by a third party, we could be prevented from providing our service offerings and subject us to significant damage awards.

We also rely in some circumstances on trade secrets to protect our technology. We control access to and the use of our application capabilities through a combination of internal and external controls, including contractual protections with employees, customers, contractors and business partners. We license some of our software through agreements that impose specific restrictions on customers' ability to use the software, such as prohibiting reverse engineering and limiting the use of copies. We also require employees and contractors to sign non-disclosure agreements and invention assignment agreements to give us ownership of intellectual property developed in the course of working for us.

On occasion, we incorporate third-party commercial or open source software products into our technology platform. Although we prefer to develop our own technology, we periodically employ third-party software in order to simplify our development and maintenance efforts, provide a "commodity" capability, support our own technology infrastructure or test a new capability.

## Employees

As of December 31, 2011, we had 2,721 full-time employees, including 292 engaged in technology development and deployment, as well as 342 part-time employees. None of our employees is represented by a labor union and we consider our current employee relations to be good.

Our revenue cycle operations employees are required to participate in our "operator academy" and "revenue cycle academy", consisting of multiple training sessions each year. Our ongoing training and executive learning programs are modeled after the practices of companies that we believe have reputations for service excellence. In addition, all of our employees are required to undergo mandatory compliance training, including HIPAA compliance training.

As of December 31, 2011, pursuant to managed service contracts, we also managed approximately 11,300 revenue cycle staff persons who are employed by our customers. We have the right to control and direct the work activities of these staff persons and are responsible for paying their compensation out of the base fees paid to us by our customers, but these staff persons are considered employees of our customers for all purposes.

## Corporate Information

We were incorporated in Delaware under the name Healthcare Services, Inc. in July 2003 and changed our name to Accretive Health, Inc. in August 2009. Our principal executive offices are located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois 60611, and our telephone number is (312) 324-7820.

Accretive Health®, the Accretive Health logo, Accretive PAS™, AccretiveQ, AHtoAccess®, AHtoCharge®, AHtoContract®, AHtoLink™, AHtoPost™, AHtoRemit, AHtoScribe™, AHtoScribe Administrator®, AHtoTrac®, A2A®, Charge Integrity Services, Medicaid Eligibility Hub, YBFU®, Yield-Based Follow Up® and other trademarks or service marks of Accretive Health appearing in this Annual Report on Form 10-K are the property of Accretive Health.

***If we lose key personnel or if we are unable to attract, hire, integrate and retain key personnel and other necessary employees, our business would be harmed.***

Our future success depends in part on our ability to attract, hire, integrate and retain key personnel. Our future success also depends on the continued contributions of our executive officers and other key personnel, each of whom may be difficult to replace. In particular, Mary A. Tolan, our founder, president and chief executive officer, is critical to the management of our business and operations and the development of our strategic direction. The loss of services of Ms. Tolan or any of our other executive officers or key personnel or the inability to continue to attract qualified personnel could have a material adverse effect on our business. The replacement of any of these key personnel would involve significant time and expense and may significantly delay or prevent the achievement of our business objectives. Competition for the caliber and number of employees we require is intense. We may face difficulty identifying and hiring qualified personnel at compensation levels consistent with our existing compensation and salary structure. In addition, we invest significant time and expense in training each of our employees, which increases their value to competitors who may seek to recruit them. If we fail to retain our employees, we could incur significant expenses in hiring, integrating and training their replacements and the quality of our services and our ability to serve our customers could diminish, resulting in a material adverse effect on our business.

***The imposition of legal responsibility for obligations related to our employees or our customers' employees could adversely affect our business or subject us to liability.***

Under our contracts with customers, we directly manage our customers' employees engaged in the activities we have contracted to manage for our customers. Our managed service contracts establish the division of responsibilities between us and our customers for various personnel management matters, including compliance with and liability under various employment laws and regulations. We could, nevertheless, be found to have liability with our customers for actions against or by employees of our customers, including under various employment laws and regulations, such as those relating to discrimination, retaliation, wage and hour matters, occupational safety and health, family and medical leave, notice of facility closings and layoffs and labor relations, as well as similar liability with respect to our own employees, and any such liability could result in a material adverse effect on our business.

***If we fail to manage future growth effectively, our business would be harmed.***

We have expanded our operations significantly since inception and anticipate expanding further. For example, our net services revenue increased from $240.7 million in 2007 to $826.3 million in 2011, and the number of our employees increased from 33, all of whom were full-time, as of January 1, 2005 to 2,721 full-time employees and 342 part-time employees as of December 31, 2011. In addition, the number of customer employees whom we manage has increased from approximately 1,600 as of January 1, 2005 to approximately 11,300 as of December 31, 2011. This growth has placed significant demands on our management, infrastructure and other resources. To manage future growth, we will need to hire, integrate and retain highly skilled and motivated employees, and will need to effectively manage a growing number of customer employees engaged in revenue cycle operations. We will also need to continue to improve our financial and management controls, reporting systems and procedures. If we do not effectively manage our growth, we may not be able to execute on our business plan, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality service offerings.

***Disruptions in service or damage to our data centers and shared services centers could adversely affect our business.***

Our data centers and shared services centers are essential to our business. Our operations depend on our ability to operate our shared service centers, and to maintain and protect our applications, which are located in data centers that are operated for us by third parties. We cannot control or assure the continued or uninterrupted availability of these third-party data centers. In addition, our information technologies and systems, as well as our data centers and shared services centers, are vulnerable to damage or interruption from various causes, including (i) acts of God and other natural disasters, war and acts of terrorism and (ii) power losses, computer systems failures, Internet and telecommunications or data network failures, operator error, losses of and corruption of data and similar events. We conduct business continuity planning and maintain insurance against fires, floods, other natural disasters and general business interruptions to mitigate the adverse effects of a disruption, relocation or change in operating environment at one of our data centers or shared services centers, but the situations we plan for and the amount of insurance coverage we maintain may not be adequate in any particular case. In addition, the occurrence of any of these events could result in interruptions, delays or cessations in service to our customers, or in interruptions, delays or cessations in the direct connections we establish between our customers and third-party payors. Any of these events could impair or inhibit our ability to provide our services, reduce the attractiveness of our services to current or potential customers and adversely impact our financial condition and results of operations.



AH_MNAG_000000014

93

EXHIBIT 19

EXS. TO 6/19/12 KRAUS AFF.

ACCRETIVE HEALTH    *High Performance Meetings*

# What is a Chalk Talk?

## A daily operational meeting designed to develop, energize, and engage a work team.

Confidential & Proprietary

2

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 19          94          AH_MNAG_000000015

| | |
|---|---|
| **From:** | Chengny Thao <cthao@accretivehealth.com> |
| **To:** | Samuel Moen <smoen@accretivehealth.com> |
| **Sent:** | 2/9/2011 11:21:20 AM |
| **Subject:** | Auth Suppression Next Steps... |

1. Have Ragani double check the list of 40 services Cara sent over...it should be added to your master list.

2. Email Matt Knudson and Andrew Crook so that we can get on the issues log for next Tuesday's meeting. We will bring it up with the team. Topic "Auth Suppression Impact at the FSC and Entity Zones" --- our intent is disclose the alternatives which are 1) zones work the auth 2) zones do not work the auth resulting in a potential denial/writeoff

3. Pull Jeremy to the side and inquire on the auth process at the zones...are the zone staff working these? There is a system wide assumption that all walk in's and same day services are verified and cleared by the zones – re-confirm w/ Megan. Coordinate a meeting with the following individuals to confirm auth process at the zones: Jeremy, Vicky, Stacy Sogard, Matt, and Johnmeyer.

Also, I really like the idea of a monthly award for one member of the staff that exemplifies exceptional leadership. I will stop by the trophy store to see what options we have. We can make formal announcements regarding the criteria and who the winner is at our Ice Cream party. Prize is possession of the award for the month + $25 gift certificate to choice of Target, Best Buy, Cub Foods, etc. Winner should be decided by mgmt. We can bring this up with Barb, Megan, and Lacreasha. We will need to figure out a name for the award, draft basic criteria, etc.

Lastly, think about an incentive for the FSC exceeding Feb cash collection targets. I am open to anything. We can plan for a Pizza party. See if Vicky has any ideas

I'm working on the Nashville deck and will send to you to add your thoughts/recommendations. Peter told me I didn't have to go to Site Review or the mtg with Karoline on Friday but I want to..we've worked so hard to get where we are at plus it will be good for me to get outside of the home for a couple of hours.

Chengny


Chengny Thao (Chenee Tao) | Manager | Revenue Cycle Operations
Accretive Health
University of Minnesota Medical Center Fairview
Office: 612-672-4248
Mobile: 763-250-3166

AH_MNAG_000100376

**From:** Gaurav Kumar <gkumar@accretivehealth.com>
**To:** Peter Van Riper <pvanriper@accretivehealth.com>
**Sent:** 3/3/2010 2:03:15 PM
**Subject:** Incentive Program - Break Down
**Attachments:** Copy of ADMIT $ INCENTIVE COLLECTIONS (7).xls

Peter,
   Here is the breakdown of the gift cards I need to buy today, you can see the details in the attached spreadsheet. Please let me know if you have any questions.

| $ Value | Quantity | Total Amount |
|---|---|---|
| $   10.00 | 3 | $   30.00 |
| $   20.00 | 5 | $   100.00 |
| $   25.00 | 6 | $   150.00 |
| $   50.00 | 2 | $   100.00 |
| $   75.00 | 5 | $   375.00 |
| $   100.00 | 3 | $   300.00 |
| $   125.00 | 1 | $   125.00 |
| $   150.00 |  | $   - |
| $   175.00 | 2 | $   350.00 |
| $   200.00 | 2 | $   400.00 |
| $   225.00 | 0 | $   - |
| $   250.00 | 0 | $   - |
| $   275.00 | 0 | $   - |
| $   300.00 | 0 | $   - |
| $   325.00 | 0 | $   - |
| $   350.00 | 1 | $   350.00 |

AH_MNAG_000090965

# FSC Incentive Program

August 31st, 2011 | Phase 1 (Testing)

Feedback and additions to the list can be made on page 2.

| Rewards | Daily | Weekly | Monthly | Quarterly |
|---|---|---|---|---|
| Lose the shoes (group reward). Can make employees feel more comfortable. | | | x | |
| Mgmt team takes you out to lunch/brings you lunch | | | x | |
| Extra Break | | | x | |
| Standing Ovation (Really hit the target, all employees give an SO and applaud.) | | x | | |
| Parking space (1st Friday each month) | | | x | |
| Shout Outs! (10 mins to recognize the top employees) | x | x | | |
| Personal recognition at their desk with a "thank you" | | x | | |
| Movie Night (Gift Certificate to the movies) | | | x | x |
| Thank you letter/certificate | | | x | |
| Casual Day | | x | | |
| Dual Monitors (Gain a monitor for your desk) | | | | x |
| Golden Ticket (Fairview currency) | x | | | |
| Manager will start your car in the winter | | x | | |
| Fake flowers | | x | | |
| Name on the board (White board) | x | | | |
| Activities (Entire team must attain a certain lvl) | Daily | Weekly | Monthly | Quarterly |
| Bring in a childhood picture and guess who is who. | | | x | |
| Make over a manager day (Do the managers make-up, straighten their hair, through a pie in their face) | | | x | |
| Favorite recipe day (bring in a recipe on paper and place it on the bulletin board) | | | x | |
| Fake Tattoo on the manager | | | x | |

1

AH_MNAG_000101651

**Feedback**

| Rewards | Feedback |
|---|---|
| Lose the shoes (group reward). Can make employees feel more comfortable. | |
| Mgmt team takes you out to lunch/brings you lunch | |
| Extra Break | |
| Standing Ovation (Really hit the target, all employees give an SO and applaud.) | |
| Parking space (1st Friday each month) | |
| Shout Outs! (10 mins to recognize the top employees) | |
| Personal recognition at their desk with a "thank you" | |
| Movie Night (Gift Certificate to the movies) | |
| Thank you letter/certificate | |
| Casual Day | |
| Dual Monitors (Gain a monitor for your desk) | |
| Golden Ticket (Fairview currency) | |
| Manager will start your car in the winter | |
| Fake flowers | |
| Name on the board (White board) | |
| **Activities (Entire team must attain a certain lvl)** | |
| Bring in a childhood picture and guess who is who. | |
| Make over a manager day (Do the managers make-up, straighten their hair, through a pie in their face) | |
| Favorite recipe day (bring in a recipe on paper and place it on the bulletin board) | |
| Fake Tattoo on the manager | |

**Additions**

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2

AH_MNAG_000101652

# Here We Go Registration, Here We Go!

For all the registration staff out there, the wait is over! Your management team has put together a competition you won't want to miss.

Every year, your Minnesota Gopher football team fights its biggest rivals for coveted trophies such as, Paul Bunyan's Ax and Floyd the Pig. Inspired by this tradition, management created their own trophy, given only to the best collector each week.

## Introducing, the one and only, GOLDY THE GOPHER

This is how it will work:

Every week, your management team will set a collection goal for the ER and Radiology Zones.

For instance:
- Top cash collections, prior balance
- Most rebills found
- Top cash collections, point of service
- Most prior balance ask

At the end of the week, they will tally the results and crown a new champion, one for the ER and one for Radiology. On Monday, the winners will receive the honor of holding on to the Golden Gopher Trophy for a week.

Next week, you will receive your first challenge, so put your game face on! If you have any questions, please contact Vicky Schmitz at 612-672-4249 or vschmitz@accretivehealth.com.



"I am rocking this helmet just like I am going to rock this competition!!"

EXS. TO 6/19/12 KRAUS AFF.       EXHIBIT 23       99

AH_MNAG_000100389