| | |
|---|---|
| **From:** | Pierce, Colin T <CPIERCE1@Fairview.org> |
| **To:** | Ahmed, Ifrah I <iahmed4@Fairview.org>;Andor, Cristina" <CANDOR2@Fairview.org>;Babini, Diego A <dbabini1@Fairview.org>;Bjorkman, Megan N <mbjorkm2@Fairview.org>;Casey, Nathan A" <NCASEY1@Fairview.org>;Cotton, Willie <WCOTTON1@Fairview.org>;Ellens, Joshua <jellens1@Fairview.org>;Gayden, Aria C <agayden1@Fairview.org>;Humfeld, Carolin E <cmammas1@Fairview.org>;Jackson, Diontrae M" <djackso5@Fairview.org>;Krieser, Katherine <kkriese1@Fairview.org>;Roeller, Roxanne M <RROELLE1@Fairview.org>;Storbakken, Sara G" <sstorba1@Fairview.org>;Van Asten, Stephanie L <SVANAST1@Fairview.org>;VanGorden, Linzi R <LVangor2@Fairview.org>;Yapp, Mary E" <myapp1@Fairview.org>;Woodard, Angela F <awoodar1@Fairview.org> |
| **CC:** | Hamlin, Kari L <KHAMLIN1@Fairview.org>;Casey, Colleen E" <CCASEY3@Fairview.org> |
| **Sent:** | 11/11/2010 2:03:44 PM |
| **Subject:** | UER Chalk Talks + Collections Goals and Incentives |
| **Attachments:** | University ED Point of Service Goals.docx |

*Cliffs notes: You can receive between $130 - $280 per month by meeting your collections and PFA goals, starting now!*

Hi everyone,

  So some of you have had your first chalk talk, I'm sure others have heard about them, and I wanted to send out some formal communication about the chalk talks and Collection goals/incentives. As most of you know, we will now be holding chalk talks 4x per week, with the intention of catching every staff member at least once per pay period. We will cover overall collections and productivity from the previous week, and will look at how everyone is doing so far in the current week for collections.

  As far as goals go, everyone will have a specific goal per pay period with regards to collections. In talking to folks so far, the consensus seems to be that these goals are pretty realistic and can easily be achieved! Your individual goals are based on the total ER goal set by Accretive, and then divvied up by authorized hours, so that the more hours you typically work, the higher your goal would be. I attached your individual goals, and also put them at the bottom of this e-mail for everyone to see (thanks to Colleen for putting that portion together!).

  Now to the fun part! Every employee that reaches their goal within a pay period will receive a $40 bonus! In addition, the top collector on each campus will be receiving $150! On top of that, there will be a PFA screening incentive of $25 per pay period per employee. So if 100% of your self pay patients are screened correctly using the PFA, you will receive the $25 bonus per pay period.

 **All of this means that the top collector on each campus, assuming they've met all PFA and collections goals in the month, will receive an incentive of $280 per month!!!**

We will be talking more about this within the coming weeks, so if you have questions between now and then, please let me know.  Thanks!
-Colin

AH_MNAG_000096639

Hours per Pay Period Range | Individual Residual Goals – per Pay Period

| Hours per Pay Period Range | |
|---|---|
| 0-10 hours | $125 |
| 11-20 hours | $175 |
| 21-30 hours | $250 |
| 31-40 hours | $375 |
| 41-50 hours | $450 |
| 51-60 hours | $550 |
| 61-70 hours | $625 |
| 71-80 hours | $700 |

| Individual Residual Goals | |
|---|---|
| Angela: | $625 |
| Aria: | $450 |
| Carolin: | $450 |
| Cristina: | $625 |
| Diego: | $700 |
| Josh: | $175 |
| Linzi: | $375 |
| Mary: | $450 |
| Open: | $450 |
| Open: | $550 |
| Roxanne: | $450 |
| Stephanie: | $450 |
| Will: | $325 |

Colin Pierce
*Business Office Supervisor, Trainer*
Acute Care Intake
University of Minnesota Medical Center, Fairview
612-273-4433
612-899-2776
cpierce1@fairview.org

The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, including 'protected health information'. If you are not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please destroy and delete this message from any computer and contact us immediately by return e-mail.

AH_MNAG_000096640

| From: | Christina Decker <cdecker@accretivehealth.com> |
|---|---|
| To: | Erika Persen <epersen@accretivehealth.com>;Bruce Frank <bfrank@accretivehealth.com>;Samuel Johnmeyer <sjohnmeyer@accretivehealth.com>;Joseph Casanova <JCasanova@accretivehealth.com>;Vicky Schmitz <vschmitz@accretivehealth.com>;Matthew Knutson <mknutson@accretivehealth.com>;Garrett Putney <GPutney@accretivehealth.com>;Josiah Blaisdell <JBlaisdell@accretivehealth.com>;William Solinger <WSolinger@accretivehealth.com>;Ross Neubauer <RNeubauer@accretivehealth.com>;Matthew Bergstrom <MBergstrom@accretivehealth.com> |
| Sent: | 7/7/2011 1:13:06 PM |
| Subject: | RE: incentives |

It could always be something like: If you collect_____, I will go in a dunktank, wear a clownsuit to work, etc"

Christina M. Decker
Operations Lead | Revenue Cycle Operations
Accretive Health | 401 N. Michigan Avenue, Suite 2700 | Chicago | IL | 60611 | C:708.932.0539
| W: 952.915.8647 | cdecker@accretivehealth.com<mailto:cdecker@accretivehealth.com> |
www.accretivehealth.com<http://www.accretivehealth.com/>

The information transmitted in this message (including any attachments) is intended only for the person or persons to whom it is addressed, and may contain material that is confidential and/or privileged. Any review, retransmission, dissemination or other use of the information contained herein by persons or entities other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately and delete this message.

From: Erika Persen
Sent: Thursday, July 07, 2011 1:11 PM
To: Bruce Frank; Christina Decker; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

I am ok with that- meaning you shave your head- but I will not shave my head.

From: Bruce Frank
Sent: Thursday, July 07, 2011 1:09 PM
To: Christina Decker; Erika Persen; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

A goofy promise- for instance, if you collect $100,000 I will shave my head, etc.

From: Christina Decker
Sent: Thursday, July 07, 2011 10:55 AM
To: Erika Persen; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Bruce Frank; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: incentives

Hello all,
Per our meeting yesterday, Peter asked us to present a list of incentives, both non-monetary and monetary valued, for next week. I will put together the ideas but please send me your ideas by Tuesday, 7/12/11.

Ideas:
Jeans Day
Candy for a job well done
Movie tickets
Trophies for the winning collecting teams

These are just a few and I'm sure we can all come up with some great ideas!
Thanks,
CD

AH_MNAG_000101454

**From:** Maloney, Barbara <bmalone1@Fairview.org>
**To:** Moen, Sam <smoen@accretivehealth.com>
**Sent:** 10/25/2010 2:23:49 PM
**Subject:** RE: POS/PB Collection Update, 10/11 and Last week

Nice job Sam!

**From:** Samuel Moen [mailto:smoen@accretivehealth.com]
**Sent:** Monday, October 25, 2010 2:14 PM
**To:** Moen, Sam; Arntzen, Jessica M; Bowman, Kimberly A; Caldron, Malonda; Clay, Sonia R; Cook, Kathleen; Crofton, Wendy J; Crusan, Michelle; Culver, David C; Degerstrom, Michelle; Embery, Charles D; Fink, Krisan; Goffin, Byron G; Goffin, Erin G; Goffin, Sean G; Haybe, Fowsiya M; Hill, Johanna M; Himes, Justin A; Huffman, Vickie L; Johnson, Christina M; Johnson, Lacreasha M; Johnson, Wendy S; Kallunki, Helen; Kennedy, Anne M; Kozlovski, Gloria; Krumme, Lisa; Land, Heather; Larsen, Jessica L; Leroy, Kathryn W; Long, Cheryl R; Maloney, Lisa R; Martin, Stella F; Meier, Colleen L; Mendoza, Malina R; Murray, Daniel E; Negrete, Bridget; Olson, Lenora; Reddy, Kogilamba; Sandlin, Heather; Saunders, Donna M; Schusted, Amanda; Short, Michelle; Spuda, Donna K; Staads, Sandra L; Voigt, Mary B; Wackerfuss, Carrie; Waller, Jennifer L; Weese, Myrna R; Wilkins, Tristan; Wisnom, Colleen; Xiong, Bla N; Zirul, Kimberly K
**Cc:** Maloney, Barbara; Chengny Thao; Pierson, Karoline J; Essert, Megan M
**Subject:** RE: POS/PB Collection Update, 10/11 and Last week

Week End 10/22

Great news....... **We successfully achieved our weekly stretch PB goal of $8k!**

With that I promised that you would be able to vote on my costume for Friday. There are ballots next to the printer with three options:

1. Waldo
2. Doug Butabi from Night at the Roxbury.
3. Colonel Sanders (KFC mascot)

You are not required to vote but all are appreciated.

Below is a graph of how we fared against our stretch goal from last week. It shows we surpassed our goal with a great Friday. It was a combination of a few big collections and steady cash flow to achieve the goal. With every dollar counted we beat our goal by $240!

AH_MNAG_000093971

| | |
|---|---|
| **From:** | Samuel Johnmeyer <sjohnmeyer@accretivehealth.com> |
| **To:** | Christina Decker <cdecker@accretivehealth.com>;Erika Persen <epersen@accretivehealth.com>;Garrett Putney <GPutney@accretivehealth.com>;Bruce Frank <bfrank@accretivehealth.com>;Joseph Casanova <JCasanova@accretivehealth.com>;Vicky Schmitz <vschmitz@accretivehealth.com>;Matthew Knutson <mknutson@accretivehealth.com>;Josiah Blaisdell <JBlaisdell@accretivehealth.com>;William Solinger <WSolinger@accretivehealth.com>;Ross Neubauer <RNeubauer@accretivehealth.com>;Matthew Bergstrom <MBergstrom@accretivehealth.com> |
| **Sent:** | 7/7/2011 1:46:30 PM |
| **Subject:** | RE: incentives |

Monetary, I like food:
Pizza party
Ice cream
Pastries
Or
Raffle for ____

Non-monetary:
I like jeans day
Plaque with a new name added each month/week
"Call-out"
I also like Bruce shaving his head

I don't have much new to add...

Samuel Johnmeyer
Operations Lead
Accretive Health, Inc. | 401 N. Michigan Avenue, Suite 2700 | Chicago, IL 60611 | M:
573/823-9467 | sjohnmeyer@accretivehealth.com<mailto:email@accretivehealth.com> |
http://www.accretivehealth.com<http://www.accretivehealth.com/>

From: Christina Decker
Sent: Thursday, July 07, 2011 1:24 PM
To: Erika Persen; Garrett Putney; Bruce Frank; Samuel Johnmeyer; Joseph Casanova; Vicky
Schmitz; Matthew Knutson; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

No, that's ok. Bruce can shave his head

Christina M. Decker
Operations Lead | Revenue Cycle Operations
Accretive Health | 401 N. Michigan Avenue, Suite 2700 | Chicago | IL | 60611 | C:708.932.0539
| W: 952.915.8647 | cdecker@accretivehealth.com<mailto:cdecker@accretivehealth.com> |
www.accretivehealth.com<http://www.accretivehealth.com/>

The information transmitted in this message (including any attachments) is intended only for
the person or persons to whom it is addressed, and may contain material that is confidential
and/or privileged. Any review, retransmission, dissemination or other use of the information
contained herein by persons or entities other than the intended recipient is prohibited. If
you have received this message in error, please notify the sender immediately and delete this
message.

From: Erika Persen
Sent: Thursday, July 07, 2011 1:21 PM
To: Christina Decker; Garrett Putney; Bruce Frank; Samuel Johnmeyer; Joseph Casanova; Vicky
Schmitz; Matthew Knutson; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

Hmm, why don't we shave your head!

From: Christina Decker
Sent: Thursday, July 07, 2011 1:20 PM
To: Erika Persen; Garrett Putney; Bruce Frank; Samuel Johnmeyer; Joseph Casanova; Vicky

AH_MNAG_000101462

Schmitz; Matthew Knutson; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

But you'd probably look super cute with a shaved head! Give them a crazy, near-impossible goal and if they reach it, then you can shave your head

Christina M. Decker
Operations Lead | Revenue Cycle Operations
Accretive Health | 401 N. Michigan Avenue, Suite 2700 | Chicago | IL | 60611 | C:708.932.0539 | W: 952.915.8647 | cdecker@accretivehealth.com<mailto:cdecker@accretivehealth.com> | www.accretivehealth.com<http://www.accretivehealth.com/>

The information transmitted in this message (including any attachments) is intended only for the person or persons to whom it is addressed, and may contain material that is confidential and/or privileged. Any review, retransmission, dissemination or other use of the information contained herein by persons or entities other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately and delete this message.

From: Erika Persen
Sent: Thursday, July 07, 2011 1:17 PM
To: Garrett Putney; Bruce Frank; Christina Decker; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

I don't think they would like that... maybe Lakes (the union) would.... But no no its not going to happen.

From: Garrett Putney
Sent: Thursday, July 07, 2011 1:13 PM
To: Erika Persen; Bruce Frank; Christina Decker; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

It would mean so much more to the staff if you did though Erika... guess the goal should be bigger than also.

From: Erika Persen
Sent: Thursday, July 07, 2011 1:11 PM
To: Bruce Frank; Christina Decker; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

I am ok with that- meaning you shave your head- but I will not shave my head.

From: Bruce Frank
Sent: Thursday, July 07, 2011 1:09 PM
To: Christina Decker; Erika Persen; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: RE: incentives

A goofy promise- for instance, if you collect $100,000 I will shave my head, etc.

From: Christina Decker
Sent: Thursday, July 07, 2011 10:55 AM
To: Erika Persen; Samuel Johnmeyer; Joseph Casanova; Vicky Schmitz; Matthew Knutson; Bruce Frank; Garrett Putney; Josiah Blaisdell; William Solinger; Ross Neubauer; Matthew Bergstrom
Subject: incentives

Hello all,
Per our meeting yesterday, Peter asked us to present a list of incentives, both non-monetary and monetary valued, for next week. I will put together the ideas but please send me your ideas by Tuesday, 7/12/11.

Ideas:
Jeans Day
Candy for a job well done
Movie tickets

AH_MNAG_000101463

These are just a few and I'm sure we can all come up with some great ideas!
Thanks,
CD

Christina M. Decker
Operations Lead | Revenue Cycle Operations
Accretive Health | 401 N. Michigan Avenue, Suite 2700 | Chicago | IL | 60611 | C:708.932.0539
| W: 952.915.8647 | cdecker@accretivehealth.com<mailto:cdecker@accretivehealth.com> |
www.accretivehealth.com<http://www.accretivehealth.com/>

The information transmitted in this message (including any attachments) is intended only for
the person or persons to whom it is addressed, and may contain material that is confidential
and/or privileged. Any review, retransmission, dissemination or other use of the information
contained herein by persons or entities other than the intended recipient is prohibited. If
you have received this message in error, please notify the sender immediately and delete this
message.

AH_MNAG_000101464

AH_MNAG_000030313

# ACCRETIVE HEALTH
## results providers trust

## Front End Patient Encounter Training 101: Fundamentals of Residuals & Prior Balances

© Copyright 2006-7, Accretive Health, Inc.  All rights reserved.

## ACCRETIVE HEALTH   *Expectations of Your Role*

**Keep in mind that the following action steps are crucial and must be executed every day, with every patient you encounter…**

## Expectations of Your Role

- First, create a rapport. Exceptional customer service is so important!  Help the patient feel welcome and comfortable.

- Second, educate the patient.  Communicate information regarding benefits and insurance verification.  Ask him or her if he/she has any questions.

- Third, remember that every patient must be informed of their estimated Residual Balance as well as any Prior Balances during your initial conversation.

- Last, offer to help the patient take care of his or her balance.  ***Addressing the patient's balance is an imperative part of your role.***  (This is the only way to prevent tomorrow's "Prior Balances"!)

**Confidential & Proprietary**

108

EXHIBIT 28

AH_MNAG_000030347

**From:**     Brandon Webb <bwebb@accretivehealth.com>
**To:**       "Zamora, Kimberli J" <KZAMORA1@Fairview.org>, Bruce
Frank<bfrank@accretivehealth.com>, Stacey Sogard <ssogard@accretivehealth.com>,"Pierson, Karoline
J" <kpierso2@Fairview.org>, "Anderberg, Jena C"<JANDERB1@Fairview.org>, "Bentley, Latoya"
<LBENTLE1@Fairview.org>, "Elke,Joanne R" <jelke1@fairview.org>, "Gisborne, Heather
A"<hgisbor1@Fairview.org>, "Perkins, Missy" <MPERKIN1@Fairview.org>
**Subject:**  RE: Patient Share Collections Tracker_Fairview Southdale.xlsx
**Received(Date):**     Mon, 17 Jan 2011 11:02:45 -0500

POS is still looking good.  I am still concerned that our PB dollars are trending 1/2 of what we did last
month.

I will take a look (maybe before our chalk talk this week) so we can see what we are missing here.  Until
then, let's just try and stay on top of this.

Do we need to look at having all of the PB's that can't pay to start seeing Bruce again?


Brandon Webb | Site Lead | Revenue Cycle Operations
Accretive Health
Fairview Southdale Hospital | Fairview Ridges Hospital
Office: (952) 924-8040
Mobile: (615) 579-2233
_____
From: Zamora, Kimberli J [KZAMORA1@Fairview.org]
Sent: Monday, January 17, 2011 9:59 AM
To: Brandon Webb; Bruce Frank; Stacey Sogard; Pierson, Karoline J; Anderberg, Jena C; Bentley,
Latoya; Elke, Joanne R; Gisborne, Heather A; Perkins, Missy
Subject: Patient Share Collections Tracker_Fairview Southdale.xlsx

Happy Monday!
Disclaimer: There are only 14 surgeries today, so not sure how tomorrow's numbers will look!


The information transmitted in this e-mail is intended only for the person or entity to which it is addressed
and may contain confidential and/or privileged material, including 'protected health information'. If you are
not the intended recipient, you are hereby notified that any review, retransmission, dissemination,
distribution, or copying of this message is strictly prohibited. If you have received this communication in
error, please destroy and delete this message from any computer and contact us immediately by return e-
mail.

AH_MNAG_000054818

ACCRETIVE HEALTH
results providers trust

What is Corporate Compliance?
IT/BP Brown Bag
Steve Kelly & Amrita Goel

AH_MNAG_000002496

110

EXHIBIT 30

EXS. TO 6/19/12 KRAUS AFF.

ACCRETIVE HEALTH

# What the BLEEP is Corporate Compliance?

Answers to Some of the Most
Commonly Asked Questions about
Corporate Compliance

1

AH_MNAG_000002497

111

EXHIBIT 30

EXS. TO 6/19/12 KRAUS AFF.

ACCRETIVE HEALTH

# HIPAA Changes

- HITECH Act
  - Breach Notification
    - To Patients, Public, and Government
    - "ASAP, or NLT 60 days"
  - Increased Enforcement Penalties
  - High Profile Cases
  - Advent of Resolution Agreements
  - Common Accretive HIPAA Incidents
    - Laptops, unencrypted emails, too much access

17

AH_MNAG_000002513

112

EXHIBIT 30

EXS. TO 6/19/12 KRAUS AFF.



October 21, 2011

# Identification Of PHI and PII
# On Stolen Laptop Computer

Hogan Marren Ltd.



An Altegrity Company

AH_MNAG_000500224

**1**

## 1. INTRODUCTION

Kroll Associates, Inc. ("Kroll") and its affiliate Kroll Ontrack ("Ontrack") were engaged by the law firm Hogan Marren Ltd. ("Hogan Marren") on behalf of its client, Accretive Health, Inc. ("Accretive"), to assist in assessing the effects of a suspected data breach arising from the theft on or about July 25, 2011 of a laptop personal computer (the "subject laptop") that Accretive had issued to one of its executives, Matthew Doyle ("Doyle").

Accretive advised Kroll that it maintains: (i) a back-up copy of the hard drive of the subject laptop, including work emails (the "subject HD back-up"), that encompasses content that resided on the subject laptop as of July 21, 2011, i.e., four days before the reported theft; and (ii) back-up copies of Doyle's work email account that includes incoming messages from the beginning of the day on July 21, 2011 through the evening of July 25, 2011, when the subject laptop was stolen (the "subject email back-up"). Kroll and Ontrack were tasked with assisting Hogan Marren to analyze the subject HD back-up and to review Accretive's findings with respect to the subject email back-up for the purpose of:

- Identifying files containing protected health information ("PHI") or personal identifying information ("PII") collected by Accretive from its client hospitals (assistance by Kroll and Ontrack);
- Establishing the specific categories of PHI or PII that were recorded on the identified files (assistance by Kroll and Ontrack);
- As to each such file, ascertaining which Accretive client supplied it or the Accretive client(s) from which the PHI or the PII thereon originated (assistance by Kroll);
- Producing copies of each such file to Hogan Marren and as directed by Hogan Marren, to the Accretive clients from which the file of the PHI or the PII thereon originated (assistance by Ontrack);
- Extracting from each such file the names and categories of potentially-exposed PHI or PII, consolidating the extracted data by individual and listing the resulting entries in separate reports, sorted by Accretive client (assistance by Ontrack).

4

AH_MNAG_000500227

## Information Technology Security Incident Report
### CONFIDENTIAL

Notification and Escalation: Notified Lonnie Lawrence (IT) on 6/2/10 at approximately 10 pm.

Sr. Leaders notified: Ken Stoll (supervisor), Paul Cottey (CIO), Joe Weingarz (Director IT)

Preparer: Stephen Kelly

| | |
|---|---|
| Nature of the Incident | Stolen Laptop |
| Description of the Incident | On 6/2/10 at approximately 7 and 9 pm, an AH laptop was stolen out of a locked rental car. The thief broke a window and stole the laptop from the back seat of the car which was parked in the parking lot of Ol' Mexico restaurant. A police report was filed with the Roseville, MN police department. On 6/2/2010 at 10:26 pm, service request 1-16310726 was initiated to AH's data encryption service to mark the laptop stolen. The asset was marked stolen and rendered inoperable at 10:46 pm. The asset was encrypted at the time of the theft. |
| Date and Time of the Incident | 6/2/10 at approx 7p-9p |
| Parties Involved | Brandon Webb |
| Location of the Incident (State of Occurrence AND Associated Client) | 1754 Lexington Avenue North, Roseville, MN 55113-6516 |
| Department(s) | Site Lead—Fairview |
| Systems Involved | AH Laptop |
| Impact/Analysis | The asset was encrypted in accordance with HITECH encryption standards. As such, this incident is not considered a breach as that term is defined by the HITECH Act.  Accordingly, patient notification is not required. In addition, the laptop was rendered inoperable several hours after the theft, so even if there was a breach, the risk of harm to patients whose PHI might have been contained on the laptop would still be considered to be minimal. |
| Root Cause | Mr. Webb left the laptop in plain view on the back seat of his vehicle. |
| Status | Closed |

AH_MNAG_000104688

| | |
|---|---|
| **Remediation** | No further action was taken. |
| | |

**Exhibit A**

AH_MNAG_000104689

# Fairview Health Services
# Accretive Health Partnership Update
# Fairview Perspectives

# [INTERNAL ONLY]

## November 2011

FAIRVIEW

AH_MNAG_000012745

117

EXHIBIT 33

EXS. TO 6/19/12 KRAUS AFF.

# Laptop Theft

## Fairview Perspective

-Accretive Health's treatment of laptop theft was fundamentally different than Fairview's values

-Fairview would have immediately terminated the employee

-Laptop theft continues to cause ripples within the FV community, including anonymous tips regarding the Brandon Webb laptop theft and questioning the value of providing PHI to AH when won't be treated appropriately

-Matt Doyle should not have had access to PHI

## AH Perspective

-Laptop magnified smaller issues

-Press coverage allowed for FV team to raise barriers

## Details

-Fairview recently terminated two line staff employees for PHI/HIPAA related violations

-Brandon Webb laptop was encrypted and was not reported to FV's compliance department because of no threat

## Mitigation/Next Steps

-AH security team has provided documentation of AH compliance policies and full participation by FV team

-All PHI related documents are stored on SharePoints and not on laptops

-All FV team members have personally confirmed encryption on laptops

FAIRVIEW

AH_MNAG_000012754

| From: | 'Dahl, Lois S' <LDAHL3@Fairview.org> |
|---|---|
| To: | Stephen Kelly<SKelly@accretivehealth.com> |
| CC: | Trysla, Trudi N<ttrysla1@Fairview.org>; Morrison, Kevin A" <KMORRIS1@Fairview.org> |
| Sent: | Friday, November 18, 2011 7:54 PM |
| Subject: | RE: Brandon Webb |

Hi Steve,

I haven't had a chance to call you on this.  It is disturbing to learn that there was a stolen laptop that we did not know about.  With the more recent incident, perhaps it could have been prevented if the employees would not leave them in sight in their cars.  Was there any communication to staff about this incident and the need to keep devices secure?  I understand you probably weren't around at the time of this incident but if employees were similarly educated when the Webb incident occurred and were diligent in protecting their computers, Mr. Doyle would not have left his computer out in his vehicle.

I don't recall seeing a copy of the employee communication / education that was going to be delivered to all Accretive employees regarding the July event about their obligations with respect to HIPAA and privacy / security.   Is there a copy we can have for our files?

Thank you.
Lois

**From:** Stephen Kelly [SKelly@accretivehealth.com]
**Sent:** Monday, November 14, 2011 12:01 PM
**To:** Dahl, Lois S
**Subject:** Brandon Webb

Hi Lois,

Attached is the Brandon Webb incident report. It concerns a laptop theft that occurred in June 2010. I was not at AH at the time and I believe my predecessor left just before this occurred. The laptop was encrypted and it was rendered inoperable about 2 hours after the event took place. Please see the attached and let me know when you are available to discuss.

Thanks,

Steve

The information transmitted in this message (including any attachments) is intended only for the person or persons to whom it is addressed, and may contain material that is confidential and/or privileged. Any review, retransmission, dissemination or other use of the information contained herein by persons or entities other than the intended recipient is prohibited. If you have received this message in error, please notify the sender immediately and delete this message.

The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, including 'protected health information'. If you are not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please destroy and delete this message from any computer and contact us immediately by return e-mail.

AH_MNAG_000104701



# The Do's and Don'ts of Laptop Security:

## How to Avoid the Smash & Grab

AH_MNAG_000002945

120

EXHIBIT 35

EXS. TO 6/19/12 KRAUS AFF.

# Background

- AH has experienced 4 smash & grab incidents in last 3 months

  − Four employees have had their locked cars broken into by thieves who stole nothing but the employees' laptops

  − This caused significant damage to cars, significant time and expense investigating the incidents, and significant inconvenience to the employees

  − The Good News: Laptops were appropriately protected to prevent hacking

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 35          121

AH_MNAG_000002946

# Background

- Laptops may contain:
  - Lots of AH Proprietary Data
  - Tons of Patient Health and Financial Information
  - Information personal to you
- Failure to safeguard them may result in:
  - HIPAA fines and penalties up to $1.5m per incident & significant Loss of Reputation
  - Damage to our Competitive Advantage
  - Compromise or loss of your own data

February 2011

Confidential

2

122

EXS. TO 6/19/12 KRAUS AFF.

EXHIBIT 35

AH_MNAG_000002947

**From:** 'Stephen Kelly' <SKelly@accretivehealth.com>
**To:** Pat Boran<Pat.Boran@NorthMemorial.com>
**Sent:** Thursday, October 13, 2011 8:15 PM
**Subject:** RE: FW: MN Attorney General Request

Ryan Johnson and Amrita have been tinkering with the BAA. I expect it to be signed tomorrow.

**Steve Kelly**
**Vice President, Compliance**
Accretive Health, Inc. | 401 N. Michigan Avenue, Suite 2700 | Chicago, IL  60611 | O: 312/255-7608 | M: 312/898-0450 |
skelly@accretivehealth.com | http://www.accretivehealth.com

**From:** Pat Boran [mailto:Pat.Boran@NorthMemorial.com]
**Sent:** Thursday, October 13, 2011 2:48 PM
**To:** Greg Kazarian
**Cc:** Stephen Kelly; Briar Andresen; Matthew Doyle; Pat Taffe
**Subject:** Re: FW: MN Attorney General Request

Greg, we forwarded the BAA to Steve - apparently he is gone until Tuesday .. could you sign and return so we can include with our AG response?

pat

>>> Greg Kazarian <GKazarian@accretivehealth.com> 10/12/2011 6:16 PM >>>

Pat – Here are our responses to 4, 6 and 7, per your request:

4.  [Presumably North Memorial will be providing its HIPAA and Security Policies]  Copies of North Memorial's HIPAA and data security policies are attached.  Accretive Health's obligation to adhere to North Memorial's HIPAA and data security policies is set forth in paragraph 49 of the Services Agreement between Accretive Health and North Memorial which accompanies these responses.

6.  The name and contact information of the individual who had possession of the lap top at the time of the theft was Mathew Doyle.  Mr. Doyle can be reached at 224/636-3752.  Mr. Doyle's e-mail    address is mdoyle@accretivehealth.com.  His work address is Accretive Health, Attention; Matt Doyle, 401 N. Michigan, 27th Floor, Chicago, IL  60611.

 Additional contacts at Accretive Health with knowledge of the data breach, and Accretive Health's remediation efforts, are:

 Gregory Kazarian, Senior Vice President and Corporate Responsibility Officer:  312/324-7830; gkazarian@accretivehealth.com, 401 N. Michigan, 27th Floor, Chicago, IL  60611

 Stephen Kelly, Vice President of Compliance:  312/255-7608; skelly@accretivehealth.com, 401 N.

AH_MNAG_000104598


**North Memorial**
October 17, 2011

Kelly S. Kemp
Assistant Attorney General
445 Minnesota Street, Suite 900
St. Paul, MN 55101

Pursuant to your letter dated October 10, 2011, please find the following information regarding the recent theft of a laptop that included North Memorial patient data. To clarify a couple of issues at the outset, please note that no Social Security numbers of North Memorial patients were included in the lost data. In addition, in the opening paragraph of the letter we received, there was a question regarding whether the North Memorial data should have been encrypted when it was provided to Accretive Health. The data was provided to Accretive via a secure interface over a secure VPN from the North Memorial data center to the Accretive data center. It was after the data was transferred to Accretive that it was "downloaded" to the laptop, and at that time it was not encrypted.

1.    **Explain how and when North Memorial learned of the data breach involving the stolen laptop containing North Memorial patient data.**

Accretive Health reported to North Memorial on July 29, 2011 that a laptop was stolen from the locked car of an Accretive employee on July 25, 2011. Accretive reported that, although the stolen laptop was password protected with a unique identifier, it was not encrypted. They also indicated they had a backup from the laptop from the morning it was stolen and were contracting with Kroll Ontrack to perform forensics on the laptop image and provide a report of potential breach information to North Memorial as soon as possible. At that time, North Memorial knew that patient information was at risk, and was likely a HIPAA "breach" (as that term is defined under regulation), but could not notify patients because North Memorial did not have information regarding which North Memorial patients had data on the laptop and would need to be notified.

On September 20, 2011, North Memorial received from Accretive a file from which North Memorial was able to identify those patients whose names and limited clinical information were included on the stolen laptop. This resulted in notification letters being sent to 2841 patients on September 27, 2011.

North Memorial pressed Accretive and Kroll to verify that their forensics work was complete and accurate. During this time, North Memorial also had begun to work with ID Experts, a firm that assists with breach investigations and notifications, as well as credit monitoring for affected individuals. Concerns were raised by ID Experts during the patient letter preparation process about the completeness of the data that had been provided to North Memorial, and North Memorial agreed with ID Experts that ID Experts' forensics group, Kivu Consulting, Inc., should review the data files. Kivu Consulting discovered additional patient names and clinical information. Based on the Kivu Consulting review, Kroll Ontrack identified a glitch in their forensics process; Kroll

3300 Oakdale Avenue North • Robbinsdale, MN 55422 • Phone: (763) 520-5200

www.northmemorial.com

then reprocessed the data. The reprocessing led to North Memorial receiving another report from Kroll Ontrack that included additional patient names with limited clinical information on September 30, 2011. Based on these results, North Memorial sent a second batch of notification letters to 6690 patients on October 11, 2011.

**2.     Provide a copy of the contracts under or with respect to which Accretive Health was provided with access to North Memorial patient data, including any business associate contract, addendums, or correspondence.**

The Accretive Health Services Agreement is attached to this letter as Attachment 1. The exhibits for the Accretive Health Services Agreement are attached as Attachment 2. The Business Associate Agreement between Accretive Health and North Memorial is attached as Attachment 3. Documents executed by Matthew Doyle, the Accretive employee whose laptop was stolen, are attached as Attachment 4.

**3.     Please describe fully the business reasons for which Accretive Health had access to this data.**

North Memorial hired Accretive to help streamline its finance processes. (North Memorial does not use Accretive for collection services.) Specifically, Accretive provides North Memorial with analysis and advice related to self pay patients, bad debt, administrative write-offs, underpayments, lost charges, revenue optimization on coding and documentation, clinical appeals and charge capture.

**4.     Provide a copy of the HIPAA policy or any other privacy policies in effect at North Memorial during the time that the contract with Accretive Health was in effect, and state whether Accretive Health agreed to comply with these policies.**

Accretive Health is required (per Paragraph 49 of the Services Agreement) to adhere to North Memorial's corporate responsibility program and related policies, which would include North Memorial's data security policies. The most relevant North Memorial policy is attached as Attachment 5. See also the Business Associate Agreement with Accretive Health, which requires Accretive Health's protection of electronic protected health information by Accretive Health.

**5.     Provide a copy of the most recent risk assessment or risk analysis completed by North Memorial, and describe any safeguards in place at the time that this patient data was provided to Accretive Health.**

Safeguards in place at the time of the data transfer to Accretive included the establishment and use of a secure VPN and secure corporate interface engine. North Memorial's Information Technology department implemented these technologies specifically to provide a means to do secure data interchange with other organizations as required when data transfer was required for business purposes. As long as the requested business connection is within North Memorial's standard secure VPN configuration, and there is a signed Business Associate Agreement in place, North Memorial does not do a discrete and specific risk assessment for each data transfer as we consider the standard

efforts were being put in place to prevent any data breach should a future laptop be stolen or misplaced again. North Memorial made it clear that we find it unacceptable to have any North Memorial data on a laptop, period.

Accretive Health has communicated an action plan that is attached as Attachment 7.

Although no North Memorial computers were involved with this data breach, North Memorial verified that all North Memorial-owned laptops did indeed have our encryption and tracking software loaded and active. Additionally, by way of technology restrictions and policy, North Memorial does not allow local file saving on North Memorial laptops.

North Memorial is providing credit monitoring and related services to affected patients. This is being provided through ID Experts, a leading provider of data breach response solutions. Accretive Health is paying for all costs related to ID Experts services.

**8.      Provide this Office with a copy of any and all notifications that were provided to the Secretary of the United States Department of Health and Human Services or other federal authority regarding this data breach, as well as a copy of the notification form sent to patients whose data was on the stolen computer.**

The notification to the HHS Office for Civil Rights was provided electronically. The initial report was submitted September 27, 2011 and is attached as Attachment 8. A follow-up addendum was submitted October 11, 2011 and is attached as Attachment 9. The initial patient notification letter was sent out on September 27, 2011 and a template of that letter is attached as Attachment 10. An updated letter was sent out to newly identified patients on October 11, 2011, and a template of that letter is attached as Attachment 11.

Sincerely,

Loren L. Taylor, CEO

Encl.

cc:     Briar A. Andresen, Esq.

## BUSINESS ASSOCIATE AGREEMENT

EFFECTIVE DATE:   March 21, 2011                     ("Effective Date")

PARTIES:

> North Memorial Health Care                     ("Covered Entity")

> Accretive Health, Inc.                     ("Business Associate")

RECITALS:

A.      Covered Entity and Business Associate have entered into one or more agreements (collectively, the "Agreement") in which Business Associate agreed to provide certain services to Covered Entity, which services may involve Business Associate's receipt, use, disclosure or creation of Protected Health Information on behalf of Covered Entity.

B.      The parties desire to enter into this Business Associate Agreement (the "BAA") to reflect their understandings and obligations with regard to Protected Health Information.

NOW, THEREFORE, in consideration of the mutual covenants and promises made by and between the parties, the receipt and adequacy of which is acknowledged, the parties agree as follows:

AGREEMENTS:

ARTICLE 1.
DEFINITIONS

1.1)   <u>Catch-All Definition</u>.  Terms used, but not otherwise defined, in this BAA shall have the same meaning as those terms in the Privacy Rule and Security Rule.

1.2)   <u>Specific Definitions</u>.

(a)   <u>Breach</u>.  "Breach" shall have the same meaning as the term "breach" in 45 CFR 164.402.

(b)   <u>Designated Record Set</u>.  "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 CFR 164.501.

(c)   <u>Electronic Protected Health Information</u>.  "Electronic Protected Health Information" shall mean individually identifiable health information that is transmitted in or maintained by electronic media.

(d)   <u>Individual</u>.  "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

EXS. TO 6/19/12 KRAUS AFF.      EXHIBIT 37      127

causes of action arising from or relating to Business Associate's breach of this BAA. In the event of a Breach by Business Associate, its agents, employees, or subcontractors, Business Associate will reimburse and indemnify Covered Entity's expenses and costs, including attorney's fees, that are reasonably incurred due to the Breach, including costs associated with the notification of Individuals and the media, as well as credit monitoring and other mitigating actions if determined necessary by Covered Entity.

     6.2)   <u>Injunctive Relief</u>. The parties acknowledge that the remedy at law for any breach of the terms of this BAA are inadequate and that the damages resulting from such breach are not readily susceptible to being measured in monetary terms. Accordingly, in the event of a breach or threatened breach by Business Associate or any of its subcontractors of the terms of this BAA, Covered Entity shall be entitled to immediate injunctive relief and may obtain a temporary order restraining any threatened or further breach.

ARTICLE 7.
MISCELLANEOUS

     7.1)   <u>Regulatory References</u>. A reference in this BAA to a section in the Privacy Rule or Security Rule means the section as in effect or as amended.

     7.2)   <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this BAA from time to time as is necessary for Covered Entity to comply with the requirements of the Privacy Rule and Security Rule.

     7.3)   <u>Survival</u>. Sections 5.3, 6.1 and 6.2 of this BAA shall survive the termination of the Agreement.

     7.4)   <u>Interpretation</u>. Any ambiguity in this BAA shall be resolved to permit Covered Entity to comply with the Privacy Rule or Security Rule.

     IN WITNESS WHEREOF, the parties hereto have executed this BAA in the manner appropriate to each.

**NORTH MEMORIAL HEALTH CARE**

By: _____
Its: _____

**Accretive Health, Inc.**

By: _____
Its: _____

4682762_1.DOC

6

## WinCollect

WinCollect lets us interact with the database containing patient files.  It can be used to obtain numerous types of information about an account, as well as add notes to an account.



1. Auto response codes, set out action date, reminders

2. Demographic information

3. Debt code

4. Patient dob, date of service doctors involved

5. Financial info, balance, payments last payment

6. Acct. Rep - PFC handling account

7. Information from hospital

8.  Debt status - Active/Closed, total balance of linked accounts

9. PFC notes & hospital notes

10. Debt type & Status

11. Dialer menu, additional tab

12. Edit address, insurance, pmt arrangement

1. Auto Response codes [Status accounts, leave notes based on account circumstances]
2. Demographics [Responsible party address and phone number]
3. Debt Code [Facility Prefix + Account Number]
4. Patient Information [Date of Birth, SSN, Date of Service, Doctors Involved]
5. Financials [Balance, INS adjustments, Last Payment Posted]
6. Acct Rep - PFC that "owns" account ["John Monteith" is an open, House account]
7. Comments [Visit Type, Insurance/Self Pay, INS payment/Self Pay Discount, Diagnosis]
8. Debt Status - Active/Closed [Active accounts can be collected on, Closed cannot]
                    -Total Debt Owed [Total of all linked accounts]
9. Notes [PFC and Hospital notes, including INS adjustments, Payment Logs]
10. Debt Type & Status [Debt Type- Dormant/Residual] [Status- last Auto Response Code placed on account]
11. Dialer Menu [Dialer control, and "Additional" [Letter History, Bankruptcy, Attorney, Deceased info]

AH_MNAG_000031613

DRAFT

**FAIRVIEW HEALTH SERVICES**
**INTERNAL AUDIT**

**2011 BACK END COLLECTIONS PROCESS AUDIT**

**REPORT ON FINDINGS, RECOMMENDATIONS**
**AND MANAGEMENT RESPONSES**

*Report No. 2011-29*
*December 30, 2011*

*Internal Audit Contacts*

| | |
|---|---|
| A. Douglas Vickers, Vice-President, Chief Audit Executive & Chief Compliance Officer | 612-672-2217 |
| Lorrie Ghose, Director, Internal Audit | 612-672-7888 |
| Lariza Carlson, Senior Auditor, Internal Audit | 612-672-7902 |

**Distribution List**

Mark Eustis, President & Chief Executive Officer, Fairview Health Services
George Chresand, Senior Vice-President & General Counsel, Fairview Health Services
Dan Fromm, Chief Financial Officer, Fairview Health Services
Laura Deneui, Vice President, Revenue Cycle, Fairview Health Services
Andrew Crook, Vice President, Accretive Health Inc.
Diane Rosenow, Senior Director, Business Operations, Fairview Health Services
Bob Aliperto, Director, Hospital Revenue Cycle, Fairview Health Services
Lois Dahl, Director, Privacy, Fairview Health Services
David Leach, Treasurer, Fairview Health Services
Scott Roste, Legal Counsel, Fairview Health Services

**DRAFT**

capture and collect on accounts, distinguish accounts that need follow up in order to bill and collect accordingly, poor customer satisfaction, and potential regulatory violations.

***Issues as a Result of Not Using Host System (2011-29-04H)***
Because MFS doesn't use the PASS system to review and work accounts, vital information has been missed resulting in the mishandling of accounts. Additionally, some accounts have fallen off of their inventory in the transfers, which results in the accounts not being worked.

Based on our procedures, we believe that the control environment over the Back End Collections Process is *Unsatisfactory*. We believe management preparedness over the areas reviewed is *Aware but Limited Preparedness* (see appendix A for details).

Our review indicates that MFS has been deficient in this process from the perspectives of regulatory compliance, operational efficiency, reimbursement, and customer satisfaction. During this review, an employee of MFS sent PHI and credit card information via the internet in an unsecure manner. As there have been other instances of Privacy and/or Security issues unrelated to this specific audit, we are very concerned about the lack of protection of our patient's private information. Based on our findings, we support the ongoing evaluation of our relationship with MFS as it pertains to these specific processes.

We have documented our findings in the audit report matrix, which is attached.

3

AH_MNAG_000004241

STATE OF MINNESOTA

COUNTY OF RAMSEY

FILED
Court Administrator

MAY 2 2 2007

By _____ Deputy

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Court File No. C7-07-5428

In the Matter of Fairview Health Services

**AGREEMENT**

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that a hospital bill should never get in the way of a Minnesotan receiving essential health services, and they want to convey this message to patients and the communities they serve; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that financial aid policies should be consistent with the mission and values of the hospital and take into account each individual's ability to contribute to the cost of his or her care and the hospital's financial ability to provide the care; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that financial aid policies should be clear, understandable, and communicated in a dignified manner; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that debt collection policies -- by both hospital staff and external collection agencies -- should reflect the mission and values of the hospital; and

**BILLED**

File # C7-07-5428
Date 5-22-07
Fee Amount $ 255.00
County_____ State_____
Deputy JK
Invoice # 000744

AH_MNAG_000012877

WHEREAS, the Hospitals and Holding Companies named in this Agreement do not intend that this Agreement be construed to provide an incentive for those who can afford health insurance coverage to voluntarily choose to go without it; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement desire to employ high standards when collecting medical debt from their patients; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement desire to lead reform efforts in the manner in which uninsured patients are charged; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement have met with the Attorney General for purposes of memorializing and enforcing this Agreement; and

WHEREAS, the Attorney General will defer enforcement action against a signatory to this Agreement as it relates to the prices charged by the signatory to uninsured patients and its medical debt collection practices while this Agreement is in effect, except to enforce the terms of this Agreement.

NOW, THEREFORE, the Holding Companies and Hospitals named in this Agreement stipulate and agree to the entry of the following Agreement:

## DEFINITIONS

A. The term "Charity Care" means the provision of free or discounted care to a patient pursuant to financial assistance policies approved by the Hospital Board of Directors.

B. The term "Holding Company" means the following parent organization which is a signatory to this Agreement: Fairview Health Services, and includes Fairview Clinics and Fairview Oxboro Clinics and any other free standing physician clinics operated by that Holding Company or its subsidiaries during the term of this Agreement, as well as all hospitals operated by that Holding Company, including but not limited to Fairview Southdale Hospital, University

AH_MNAG_000012878

of Minnesota Medical Center, Fairview Ridges Hospital, Fairview Northland Regional Medical Center, and Fairview Lakes Health Services. Unless otherwise indicated, for purposes of this Agreement, the term "Hospital" is synonymous with the term "Holding Company" and shall include all of the signatories to this Agreement.

C.    The term "Hospital Board of Directors" shall mean the Board of Directors of the particular Holding Company.

### LITIGATION PRACTICES

1.    The Hospital shall not give any debt collection agency or attorney any blanket authorization to take legal action against its patients for the collection of medical debt. The Hospital shall not file any lawsuit against any particular patient to collect medical debt until a Hospital employee with the appropriate level of authority authorizes the litigation after verifying that:

    a.    There is a reasonable basis to believe that the patient owes the debt;

    b.    All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

    c.    Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

3

AH_MNAG_000012879

    d.    The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

2.    The Hospital shall set forth in the policy developed pursuant to Paragraph 37(b) of this Agreement the level of employee (i.e. supervisor, manager, Chief Financial Officer, etc.) who is authorized to make the determinations required in the prior paragraph, which level may vary based upon the amount of the debt.

3.    On at least an annual basis, the Hospital's Chief Executive Officer shall review and determine whether or not to issue to or renew any contract with any third party debt collection attorney. In determining whether to issue or renew any such contract, the Hospital shall consider whether the debt collection attorney has acted in a manner consistent with this Agreement and with the Hospital's mission and policies and applicable laws.

4.    The Hospital shall enter into a written contract directly with any attorney or law firm utilized by it to collect debt from its patients and shall not subcontract or delegate the selection of any third party debt collection attorney or law firm to its debt collection agency. Any contract between the Hospital and the debt collection attorney or law firm shall require the attorney or law firm to act in accordance with the terms of this Agreement, applicable laws, and the policies described in paragraph 37.

5.    The Hospital shall not pay any debt collection attorney or law firm any performance bonus, contingency bonus, or other similar payment which is calculated on the basis of the amount or percentage of debt collected from two or more patients. This paragraph shall

4

not prohibit the Hospital from paying an attorney a percentage of the debt collected from a particular patient, provided that the Hospital shall establish adequate contractual controls to ensure that the attorney acts in a manner consistent with this Agreement and the Hospital's mission.

6.      The Hospital's General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority shall oversee the conduct of any third party attorney retained by the Hospital to collect medical debt from its patients and shall oversee all debt collection litigation.

7.      The Hospital shall require that its third party debt collection attorneys take the following actions with respect to the collection of medical debt from patients:

        a.      File any lawsuits brought against the Hospital's patients for the collection of medical debt with the applicable court no later than seven (7) days after the lawsuit has been served upon the patient.

        b.      Sign and date all pleadings, including but not limited to all summonses and complaints and garnishment summonses and related documents.

        c.      Ensure that all affidavits of service which purport to document the service of any pleading or legal papers state the following:

            (i)      If the pleading is served by mail, the affidavit of service shall state the address to which it was mailed; and

            (ii)     If the pleading is served personally, the affidavit of service shall state the name of the person to whom the pleading was delivered. Generalized statements, such as that the pleading was delivered to

5

AH_MNAG_000012881

"a person of suitable age," shall not suffice for purposes of this paragraph.

d.    Serve along with any summons and complaint the form attached as Exhibit A, or such other form approved in advance by the Attorney General's Office.

e.    List in the case caption of all pleadings the county where the lawsuit is or will be venued.

f.    The Hospital shall instruct its attorneys not to petition any court to have any debtor arrested, or any arrest warrant or body attachment issued, or to cause such an action, as a result of the debtor's failure to appear in court, to complete paperwork, or to otherwise respond to any request or action by the Hospital in connection with its efforts to collect medical debt from the patient.

8.    The Hospital shall not obtain a default judgment against any particular patient without the specific, case-by-case approval of its General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority. Prior to authorizing a default judgment, the General Counsel's Office or the Hospital employee shall determine whether there is a reasonable basis to believe that: the patient may already believe that he or she has adequately answered the complaint by calling or writing to the Hospital, its debt collection agency, or its attorney; whether the patient is sick, disabled, infirm, or elderly so as to potentially render the patient unable to answer the complaint; or whether the patient may not have received service of the complaint. The Hospital shall serve any motion for default judgment upon the patient at the patient's last known address.

6

AH_MNAG_000012882

9.     If the Hospital has knowledge of the identity of an attorney representing a patient in connection with the Hospital's debt collection efforts, it shall notify its third party debt collection attorney, law firm, and agency of the identity of any attorney who represents the patient.  Neither the Hospital, nor any debt collection agency or attorney retained by it, shall directly contact any patient known to be represented by attorney with regard to the collection of that debt without the permission of the patient's attorney.

### GARNISHMENTS

10.     The Hospital shall not give any debt collection agency or attorney any blanket authorization to pursue the garnishment of patients' wages or bank accounts.  The Hospital shall not authorize its debt collection agencies or attorneys to proceed with the garnishment of a particular patient's bank account or wages until a Hospital employee with the appropriate level of authority authorizes the garnishment for that particular patient after verifying that:

a.     The Hospital has no reasonable basis to believe that the patient's wages or funds at a financial institution are likely to be exempt from garnishment. Such information may include, but is not limited to, such factors as whether the patient is on Social Security, Medical Assistance, or other relief based on need.

b.     There is a reasonable basis to believe that the patient owes the debt;

c.     All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

7

AH_MNAG_000012883

    d.    Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

    e.    The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

11.    The Hospital shall set forth in the policy developed pursuant to Paragraph 37 of this Agreement the level of employee (i.e. supervisor, manager, Chief Financial Officer, etc.) who is authorized to make the determinations required in the prior paragraph, which level may vary based upon the amount of the debt.

12.    The Hospital shall not garnish the wages or bank account of any patient unless it has first obtained a judgment against the patient in court for the amount of the debt.

13.    The Hospital shall include with the initial notice it sends to any patient of a garnishment the form attached as Exhibit B, or such other form approved, in advance, by the Attorney General's Office.

14.    If a patient submits a written claim that the patient's account or wages are exempt from garnishment, the Hospital's third party debt collection attorney shall not object to the claim of exemption without receiving the specific, case-by-case approval of the Hospital's General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority.

AH_MNAG_000012884

In deciding whether to grant such approval in a particular case, the General Counsel's Office or Hospital employee shall review all information submitted by the patient in support of the patient's claim of exemption.

## COLLECTION AGENCIES

15.    On at least an annual basis, the Hospital's Chief Executive Officer shall review and determine whether or not to issue to or renew any contract with any third party debt collection agency. In determining whether to issue or renew any such contract, the Hospital shall consider whether the debt collection agency has acted in a manner consistent with this Agreement and with the Hospital's mission and policies and applicable laws.

16.    The Hospital shall enter into a written contract with any collection agency utilized by it to collect debt from its patients. The contract shall require the collection agency to act in accordance with the terms of this Agreement, applicable laws, and the policies described in paragraph 37.

17.    The Hospital shall not refer any patient's account to a third party debt collection agency unless the Hospital has confirmed that:

  a.    There is a reasonable basis to believe that the patient owes the debt;

  b.    All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

  c.    Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to

9

AH_MNAG_000012885

provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

d.    The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

18.    The Hospital shall set forth in the policy developed pursuant to Paragraph 37 of this Agreement the process for satisfying the criteria required in the prior paragraph and the person(s) accountable for compliance with this agreement.

19.    The Hospital shall not refer any medical debt to a third party debt collection agency or attorney if the patient has made payments on that debt in accordance with the terms of a payment plan previously agreed to by the Hospital.

20.    If a patient has submitted an application for Charity Care after an account has been referred for collection activity, the Hospital shall suspend all collection activity until the patient's Charity Care application has been processed by the Hospital and the Hospital has notified the patient of its decision.

21.    The Hospital shall not pay any debt collection agency any performance bonus, contingency bonus, or other similar payment which is calculated on the basis of the amount or percentage of debt collected from two or more patients. This paragraph shall not prohibit the Hospital from paying a collection agency a percentage of the debt collected from a particular patient, provided that the Hospital shall establish adequate contractual controls to ensure that the collection agency acts in a manner consistent with this Agreement and the Hospital's mission.

10

AH_MNAG_000012886

22.    The Hospital shall require any third party debt collection agency and attorney utilized by it to keep a log of all oral and written complaints received by any patient concerning the conduct of the agency.  For purposes of this paragraph, a "complaint" is any communication from a patient or patient's representative in which they express concerns about the conduct of the debt collection agency.  The Hospital shall obtain a complete copy of the log at least six (6) times per year.  The Hospital's contract with the debt collection agency shall state that failure by the agency to log and provide all patient complaints in the manner required by this paragraph may result in termination of the Hospital's contract with the agency.

23.    The Hospital shall require any third party debt collection agency and attorney utilized by it to keep a record of the date, time, and purpose of all communications to or from its patients.

24.    If a patient asks any third party debt collection agency or attorney for the contact information for the Hospital, the Hospital shall instruct the agency or attorney to provide the patient with the phone number and address described in Paragraph 29.  The Hospital shall not refuse to supply information to or speak with any of its patients on the basis that the account has been placed with a third party debt collection agency or attorney for collections.

25.    The Hospital shall train its outside debt collection agencies and attorneys about the Hospital's Charity Care policy and how a patient may obtain more information about the Hospital's Charity Care policy or submit an application for Charity Care.  The Hospital shall require its debt collection agencies and attorneys to refer patients who may be eligible for Charity Care to the Hospital.

11

26.     The Hospital shall include the following language on all collection notices sent to patients by it or its third party debt collection agencies or attorneys, and on all cover letters serving all lawsuits and garnishment papers:

> If you feel that your concerns have not been addressed, please contact _____ and allow us the opportunity to try and address your concerns. Or, you have the option to address any concerns with the Minnesota Attorney General's Office, which can be reached at 651-296-3353 or 1-800-657-3787.

The Hospital shall print this language with the prominence required for notices under the federal Fair Debt Collection Practices Act.

27.     Neither the Hospital nor its debt collection agencies or attorneys shall report any patient to a credit reporting agency as a result of that patient's failure to pay a medical bill.

### CENTRAL BILLING OFFICE

28.     The Hospital shall develop and implement policies and procedures to ensure the timely and accurate submission of claims to third party payors. If the Hospital timely received from a patient information about the patient's third party payor but does not timely submit a claim to the third party payor, the Hospital shall not bill the patient for any amount in excess of that for which the patient would have been responsible had the third party payor paid the claim. The Hospital shall not refer any bill to a third party collection agency or attorney for collection activity while a claim for payment of the bill is pending with a third party payor with which the Hospital has a contract. The Hospital may refer a bill to a third party collection agency or attorney following an initial denial of the claim by the third party payor. The Hospital shall not refer any bill to a third party collection agency or attorney for collection activity when a claim is denied by a third party payor due to the Hospital's error, and such error results in the patient becoming liable for the debt when they would not otherwise be liable. The parties recognize that, in order for the Hospital to properly bill a patient's insurance company, the Hospital may

12

AH_MNAG_000012888

need the patient's cooperation and that the Hospital may not be able to properly bill the patient's insurance company without the patient's cooperation. In the event that the Hospital believes that a private third party payor has improperly delayed or denied payment of a claim, the Hospital may file a complaint with the Minnesota Attorney General's Office, which may provide assistance to the Hospital or its patient in attempting to get the claim paid.

29.     The Hospital shall develop a streamlined process for patients to question or dispute bills, including a toll-free phone number patients may call and an address to which they may write. The phone number and address shall be listed on all patient bills and collection notices sent by the Hospital. The Hospital shall return telephone calls made by patients to this number as promptly as possible, but in no event later than one business day after the call is received. The Hospital shall respond to correspondence sent to this address by patients within ten (10) days.

30.     If a patient advises the Hospital, its debt collection agency, or any attorney utilized by the Hospital that: a) the patient does not owe all or part of a bill, b) a third party payor should pay the bill, or c) the patient needs documentation concerning the bill, the Hospital, the collection agency, and its attorney must cease further collection efforts until the Hospital or the agency provides the patient with documentation establishing that, as applicable, the patient owes the debt or that the applicable third party payor has already paid all amounts for which it is obligated. The Hospital or the collection agency shall provide such documentation in writing within ten (10) days and shall not pursue further collection activity for a period of thirty (30) days after providing proof that the debt is owed, so as to give the patient further opportunity to pay the bill or to challenge the documentation supplied by the Hospital. If the Hospital provides

13

AH_MNAG_000012889

the required documentation and the patient does not respond within thirty (30) days, the Hospital may resume collection activity.

31.     The Hospital shall develop a system to record and log all patient complaints received by its billing offices, including at the locations identified in paragraph 29, regarding the collection of medical debt by the Hospital or its third party debt collection attorneys or agencies. The Hospital may maintain such records at more than one location.

### BILLING TO THE UNINSURED

32.     If the Hospital demands that an uninsured patient pay a medical bill, the Hospital shall provide to that patient a detailed, itemized bill as part of the billing process.

33.     The term "most favored insurer" means the nongovernmental third party payor that provided the most revenue to the provider during the previous calendar year. The Hospital shall not charge a patient whose annual household income is less than $125,000 for any uninsured treatment in an amount greater than the amount which the provider would be reimbursed for that service or treatment from its most favored insurer. The total charge for uninsured treatment shall not be more than the provider would be reimbursed directly from its most favored insurer and from that insurer's policyholder under any applicable and allowable copayments, deductibles, or coinsurance. The Hospital shall apply the same percentage discount to its charge description master for uninsured treatment that it would apply to charges incurred by a policyholder of its most favored insurer. Beginning on the date of this Agreement, each year the Hospital and the Attorney General may agree in advance, by a confidential letter agreement, on the percentage discount from the charge description master that the Hospital provides to its most favored insurer and which the Hospital shall provide for uninsured treatment under this paragraph. The Hospital shall provide to the Attorney General, pursuant to paragraph

14

AH_MNAG_000012890

42, any information requested by the Attorney General for purposes of calculating this discount. The Hospital shall utilize the same initial charge description master prices for uninsured treatment that it utilizes for treatment provided to a policyholder of its most favored insurer.

The term "uninsured treatment" means any treatment or services which are not covered by a plan, contract, or policy which provides coverage to the patient through or is issued to the patient by: (1) a "health plan company," as that term is defined in Minn. Stat. § 62Q.01, subd. 4; (2) a self-funded employee benefit plan; (3) any governmental program, including but not limited to MinnesotaCare, the Minnesota Comprehensive Health Association, Medicare, Medicaid, or TriCare; (4) any other type of health insurance, health maintenance, or health plan coverage; (5) any other type of insurance coverage, including but not limited to no-fault automobile coverage, workers' compensation coverage, or liability coverage. In the event that the Hospital inadvertently sends a bill to a patient in excess of that which is allowed by this paragraph 33 because the Hospital is not aware that the treatment or service constitutes uninsured treatment, and the Hospital thereafter learns that the treatment or service constitutes uninsured treatment, the Hospital shall promptly adjust its charges so as not to exceed the amount allowable under this paragraph 33, and the Hospital shall promptly notify the patient of the new amount of the bill.

This paragraph shall only apply to charges by or incurred at a facility defined in Minn. Stat. § 144.50, subd. 2 (2006) or Minn. Stat. § 144.55, subd. 2 (2006), including those of a provider who is employed by the Hospital when providing services to a patient at a facility defined in Minn. Stat. § 144.50, subd. 2 (2006) and Minn. Stat. § 144.55, subd. 2 (2006). This paragraph shall only apply to medically necessary health care treatment and not to cosmetic procedures without any medical necessity.

15

AH_MNAG_000012891

34.     In recognition that some patients express their financial concerns directly to their treatment providers (i.e. doctors, nurses, etc.), the Hospital shall train its staff responsible for admissions, billing, and providing direct patient treatment, about the existence of the Hospital's Charity Care policy and how a patient may obtain more information about the Hospital's Charity Care policy or submit an application for Charity Care.

## MISCELLANEOUS PROVISIONS

35.     In the event that the Hospital concludes that any requirement of this Agreement is no longer feasible, that the public may be better served by a modification of this Agreement, or that it has evidence that the terms of this Agreement have caused those who can afford health insurance coverage to voluntarily choose to go without it, the Hospital may request that the Attorney General consent to a modification of the terms of this Agreement. The Attorney General shall make a good faith evaluation of the then-existing circumstances and, after collecting information the Attorney General deems necessary, make a decision within thirty (30) days as to whether to consent to a modification of this Agreement.

36.     The Hospital and its agents shall not state or imply, directly or indirectly, that the State of Minnesota or the Attorney General's Office has approved of, condones, or agrees with any lawsuit, garnishment, or other attempt by the Hospital to collect debt from a patient.

37.     The Hospital's Board of Directors shall adopt the following policies, which shall not be inconsistent with this Agreement:

          a.     A zero tolerance policy for abusive, harassing, oppressive, false, deceptive, or misleading language or collections conduct by its debt collection attorney and agency, and their agents and employees, and Hospital employees responsible for collecting medical debt from patients.

16

AH_MNAG_000012892

b.   A debt collection litigation policy, which shall include a policy permitting the garnishment of patient wages or accounts only after entry of a judgment.

c.   A policy establishing the procedures to be utilized by the Hospital's third party debt collection agencies.

d.   A policy establishing the procedures to be utilized by the Hospital's employees who participate in the collection of medical debt.

e.   A Charity Care policy which takes into consideration the financial ability of the patient to pay a medical bill.

38.   The Hospital's Board of Directors shall review, at least one time per year, the Hospital's practices in the following areas:

a.   The filing of debt collection litigation against Hospital patients, including the garnishment of patient wages or accounts subsequent to entry of a default judgment.

b.   The debt collection activity of its third party debt collection agencies.

c.   The debt collection activities of its internal debt collectors.

d.   The Hospital's compliance with this Agreement and the policies described in Paragraph 37.

e.   The results of the reviews required by the Chief Executive Officer in Paragraphs 3 and 15 of this Agreement.

f.   The results of the reviews required by Paragraph 39 of this Agreement.

g.   The Hospital's Charity Care practices.

17

AH_MNAG_000012893

39.     The Hospital shall annually review the practices of its third party debt collection agency and debt collection attorney, and its internal medical debt collection practices, at least one (1) time per year.  The purpose is to review compliance with this Agreement and the Hospital's policies.

40.     This Agreement is not intended to assert, nor shall it be construed as, or deemed to be, an admission or concession or evidence of any liability or wrongdoing whatsoever on the part of Hospital.

41.     This Agreement shall remain in effect for five years after the entry of this Agreement by the Court.

42.     The Hospital shall cooperate with, respond to inquires of, and provide information to the Attorney General in a timely manner as necessary for the enforcement of this Agreement.

43.     The Court shall retain jurisdiction to enforce the provisions of this Agreement.

44.     The Hospital shall comply with all applicable state and federal laws relating to billing and debt collection.

Dated:   28 Feb. '07                    Fairview Health Services


By:  David R. Page
President & CEO

18

AH_MNAG_000012894

STATE OF MINNESOTA
Office of Attorney General

Dated: 4·6·07

LORI SWANSON
Attorney General
Atty. Reg. No. 254812

ALAN I. GILBERT
Solicitor General
Atty. Reg. No. 0034678

Suite 1100, BRM Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2131
(651) 297-9717 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR STATE OF MINNESOTA

Based upon the above Stipulation, IT IS SO ORDERED:

Dated: 5-22-07

BY THE COURT:

Judge of District Court

AG:#1741632-v1

19

AH_MNAG_000012895

EXS. TO 6/19/12 KRAUS AFF.    EXHIBIT 40    150

**EXHIBIT A**

### [HOSPITAL NAME] Lawsuit Information Sheet

You are receiving this information sheet because you have been served with a Summons and Complaint (lawsuit) by **[HOSPITAL NAME]** ("_____"). **[HOSPITAL NAME]** cannot give you legal advice. Therefore, this document only provides basic information, and you should immediately discuss this matter with an attorney.

- **Start of the Lawsuit.** To start a lawsuit against you, [HOSPITAL NAME] has served a Summons and Complaint on you either: (a) by delivering it to you personally or leaving it at your home; or (b) by mail, if you agree in writing to accept "service" of the Summons and Complaint by mail and sign a form that so indicates. The Summons informs you that you must provide a *formal, written legal "answer"* to the complaint within 20 days after you receive the legal documents. The Complaint explains why [HOSPITAL NAME] is suing you and asks a court to make you pay money.

The Summons and Complaint may not include a court file number. They are, however, the legal documents that begin the lawsuit. It is very important that you do not ignore the documents, or you will be in "default." No court hearing is required for a default judgment to be entered against you if you do not respond to the Complaint.

- **Answering a Complaint.** The "Answer" is the formal legal name for your response to the Complaint. The Answer must meet certain requirements of the Minnesota Rules of Civil Procedure. *Contacting* [HOSPITAL NAME] *or its attorney by telephone or written correspondence is not "answering" the Complaint.* While [HOSPITAL NAME] encourages you to call if you have questions regarding the bill that was sent to collections, doing so is not a formal "Answer." Some court clerks have form "Answers" which may be of assistance to you. You must serve a copy of your Answer on [HOSPITAL NAME]'s attorney by mail, fax, or hand delivery and complete an Affidavit of Service that explains who was served, how, and on what date. The Affidavit of Service form must be signed in front of a notary public or a court clerk. If you want a judge to hear the dispute, you should file the original Answer and Affidavit of Service with the court in the county in which you are being sued after you have served your Answer on [HOSPITAL NAME]. You will be required to pay a court filing fee. (If you meet certain financial guidelines, however, you may not be required to pay the court filing fee. You may obtain more information regarding a waiver of the fee by contacting the clerk of court.)

- **Failure to Answer.** If you do not "answer" the Complaint, [HOSPITAL NAME] may get a "default" judgment entered against you requiring you to pay money. By getting a default judgment, [HOSPITAL NAME] may be able to initiate a separate garnishment action against you.

20

AH_MNAG_000012896

**EXHIBIT B**

## [HOSPITAL NAME] Garnishment Information Sheet

You are receiving this information sheet because [HOSPITAL NAME] ("_____") has started a process to get money from you by sending a "garnishment summons" to a "garnishee"-- typically your bank or employer. These proceedings are called "garnishment" proceedings. [HOSPITAL NAME] cannot provide you with legal advice. Therefore, this document only provides basic information. You should immediately discuss this matter with an attorney.

• **Taking Money From Your Wages.** If [HOSPITAL NAME] is trying to take money from your wages, you should receive notice *before* your wages are garnished or taken. Generally, [HOSPITAL NAME] cannot garnish more than 25% of your net wages, or any of your net wages if they are less than $206 per week. If you have received public assistance based on need, [HOSPITAL NAME] cannot take any of your wages for 6 months after you received the assistance, if you submit the proper paperwork on time. To claim that wages cannot be taken (i.e., are "exempt"), you must promptly return to [HOSPITAL NAME]'s attorney the "Debtor's Exemption Claim Notice" that came with the "Garnishment Exemption Notice and Notice of Intent to Garnish Earnings." *Calling* [HOSPITAL NAME] *is not sufficient.* If [HOSPITAL NAME]'s attorney does not receive this exemption notice within 10 days, [Hospital Name] can seek to get money from your employer. **If [HOSPITAL NAME] does not agree that your wages are exempt, it can still seek to get money from your employer, and you will have to ask the court to decide that your wages cannot be taken.**

• **Taking Money From Your Bank Accounts.** If [HOSPITAL NAME] is trying to take money from your bank account, the bank will "freeze" enough money in your account to pay off your debt to [HOSPITAL NAME]. *You will not receive notice of the bank garnishment until after your funds are already frozen. You will not have access to your funds while they are frozen. Your checks may "bounce," and you may incur overdraft charges during this time.* You may want to contact your bank immediately.

If you deposit qualified public assistance checks (or wages if you are on or have received public assistance within the last 6 months) in a bank account, [HOSPITAL NAME] cannot garnish your account for 60 days, if you timely fill out the proper paperwork. To claim that funds in your bank account cannot be taken (i.e., are "exempt"), you must sign and return within 14 days to the bank (and [HOSPITAL NAME]'s attorney) the "Exemption Notice" (the form your bank sent to you when it received a Garnishment Summons from [HOSPITAL NAME]). *Calling* [HOSPITAL NAME] *is not sufficient.* You may want to include copies of documents (*i.e.* benefit letters, bank statements, etc.) to show why your funds are exempt. **If you don't claim an exemption within 14 days from the date the bank mailed the exemption notice to you, the bank may turn over your frozen funds to [HOSPITAL NAME].** If you do claim an exemption on time, the bank will "unfreeze" your funds and release them to you in 7 days unless [HOSPITAL NAME] "objects" to your "exemption claim." If [HOSPITAL NAME] "objects," it must send you a written objection to your exemption claim, along with a form entitled "A Request for Hearing and Notice of Hearing." **If [HOSPITAL NAME] sends you this form, you must fill out and file with the court the "Request for Hearing" form within**

21

AH_MNAG_000012897

10 days of receiving the objection, or the bank can release your money to [HOSPITAL NAME].

22

AH_MNAG_000012898