STATE OF MINNESOTA

COUNTY OF RAMSEY

FILED
Court Administrator

MAY 1 7 2007

By _____ Deputy

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Court File No.   C8-05-4574

In the Matter of North Memorial Medical
Center

**AGREEMENT**

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that a hospital bill should never get in the way of a Minnesotan receiving essential health services, and they want to convey this message to patients and the communities they serve; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that financial aid policies should be consistent with the mission and values of the hospital and take into account each individual's ability to contribute to the cost of his or her care and the hospital's financial ability to provide the care; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that financial aid policies should be clear, understandable, and communicated in a dignified manner; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement believe that debt collection policies -- by both hospital staff and external collection agencies -- should reflect the mission and values of the hospital; and

WHEREAS, the Hospitals and Holding Companies named in this Agreement do not intend that this Agreement be construed to provide an incentive for those who can afford health insurance coverage to voluntarily choose to go without it; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement desire to employ high standards when collecting medical debt from their patients; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement desire to lead reform efforts in the manner in which uninsured patients are charged; and

WHEREAS, the Holding Companies and Hospitals set forth in this Agreement have met with the Attorney General for purposes of memorializing and enforcing this Agreement; and

WHEREAS, the Attorney General will defer enforcement action against a signatory to this Agreement as it relates to the prices charged by the signatory to uninsured patients and its medical debt collection practices while this Agreement is in effect, except to enforce the terms of this Agreement.

NOW, THEREFORE, the Holding Companies and Hospitals named in this Agreement stipulate and agree to the entry of the following Agreement:

## DEFINITIONS

A.     The term "Charity Care" means the provision of free or discounted care to a patient pursuant to financial assistance policies approved by the Hospital Board of Directors.

B.     The term "Holding Company" means the following parent organizations which are signatories to this Agreement: **North Memorial Medical Center** and includes any free standing physician clinics operated by those Holding Companies or their subsidiaries during the term of this Agreement, as well as all hospitals operated by those Holding Companies. Unless

2

otherwise indicated, for purposes of this Agreement, the term "Hospital" is synonymous with the term "Holding Company" and shall include all of the signatories to this Agreement.

C.    The term "Hospital Board of Directors" shall mean the Board of Directors of the particular Holding Company.

## LITIGATION PRACTICES

1.    The Hospital shall not give any debt collection agency or attorney any blanket authorization to take legal action against its patients for the collection of medical debt.  The Hospital shall not file any lawsuit against any particular patient to collect medical debt until a Hospital employee with the appropriate level of authority authorizes the litigation after verifying that:

    a.    There is a reasonable basis to believe that the patient owes the debt;

    b.    All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

    c.    Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

    d.    The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the

patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

2.     The Hospital shall set forth in the policy developed pursuant to Paragraph 37(b) of this Agreement the level of employee (i.e. supervisor, manager, Chief Financial Officer, etc.) who is authorized to make the determinations required in the prior paragraph, which level may vary based upon the amount of the debt.

3.     On at least an annual basis, the Hospital's Chief Executive Officer shall review and determine whether or not to issue to or renew any contract with any third party debt collection attorney.  In determining whether to issue or renew any such contract, the Hospital shall consider whether the debt collection attorney has acted in a manner consistent with this Agreement and with the Hospital's mission and policies and applicable laws.

4.     The Hospital shall enter into a written contract directly with any attorney or law firm utilized by it to collect debt from its patients and shall not subcontract or delegate the selection of any third party debt collection attorney or law firm to its debt collection agency. Any contract between the Hospital and the debt collection attorney or law firm shall require the attorney or law firm to act in accordance with the terms of this Agreement, applicable laws, and the policies described in paragraph 37.

5.     The Hospital shall not pay any debt collection attorney or law firm any performance bonus, contingency bonus, or other similar payment which is calculated on the basis of the amount or percentage of debt collected from two or more patients. This paragraph shall not prohibit the Hospital from paying an attorney a percentage of the debt collected from a particular patient, provided that the Hospital shall establish adequate contractual controls to

4

ensure that the attorney acts in a manner consistent with this Agreement and the Hospital's mission.

6.     The Hospital's General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority shall oversee the conduct of any third party attorney retained by the Hospital to collect medical debt from its patients and shall oversee all debt collection litigation.

7.     The Hospital shall require that its third party debt collection attorneys take the following actions with respect to the collection of medical debt from patients:

      a.     File any lawsuits brought against the Hospital's patients for the collection of medical debt with the applicable court no later than seven (7) days after the lawsuit has been served upon the patient.

      b.     Sign and date all pleadings, including but not limited to all summonses and complaints and garnishment summonses and related documents.

      c.     Ensure that all affidavits of service which purport to document the service of any pleading or legal papers state the following:

            (i)     If the pleading is served by mail, the affidavit of service shall state the address to which it was mailed; and

            (ii)     If the pleading is served personally, the affidavit of service shall state the name of the person to whom the pleading was delivered. Generalized statements, such as that the pleading was delivered to "a person of suitable age," shall not suffice for purposes of this paragraph.

5

d.   Serve along with any summons and complaint the form attached as Exhibit A, or such other form approved in advance by the Attorney General's Office.

e.   List in the case caption of all pleadings the county where the lawsuit is or will be venued.

f.   The Hospital shall instruct its attorneys not to petition any court to have any debtor arrested, or any arrest warrant or body attachment issued, or to cause such an action, as a result of the debtor's failure to appear in court, to complete paperwork, or to otherwise respond to any request or action by the Hospital in connection with its efforts to collect medical debt from the patient.

8.   The Hospital shall not obtain a default judgment against any particular patient without the specific, case-by-case approval of its General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority.   Prior to authorizing a default judgment, the General Counsel's Office or the Hospital employee shall determine whether there is a reasonable basis to believe that: the patient may already believe that he or she has adequately answered the complaint by calling or writing to the Hospital, its debt collection agency, or its attorney; whether the patient is sick, disabled, infirm, or elderly so as to potentially render the patient unable to answer the complaint; or whether the patient may not have received service of the complaint. The Hospital shall serve any motion for default judgment upon the patient at the patient's last known address.

9.   If the Hospital has knowledge of the identity of an attorney representing a patient in connection with the Hospital's debt collection efforts, it shall notify its third party debt

6

collection attorney, law firm, and agency of the identity of any attorney who represents the patient. Neither the Hospital, nor any debt collection agency or attorney retained by it, shall directly contact any patient known to be represented by attorney with regard to the collection of that debt without the permission of the patient's attorney.

**GARNISHMENTS**

10.     The Hospital shall not give any debt collection agency or attorney any blanket authorization to pursue the garnishment of patients' wages or bank accounts. The Hospital shall not authorize its debt collection agencies or attorneys to proceed with the garnishment of a particular patient's bank account or wages until a Hospital employee with the appropriate level of authority authorizes the garnishment for that particular patient after verifying that:

a.     The Hospital has no reasonable basis to believe that the patient's wages or funds at a financial institution are likely to be exempt from garnishment. Such information may include, but is not limited to, such factors as whether the patient is on Social Security, Medical Assistance, or other relief based on need.

b.     There is a reasonable basis to believe that the patient owes the debt;

c.     All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

d.     Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to

7

provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

e.      The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

11.     The Hospital shall set forth in the policy developed pursuant to Paragraph 37 of this Agreement the level of employee (i.e. supervisor, manager, Chief Financial Officer, etc.) who is authorized to make the determinations required in the prior paragraph, which level may vary based upon the amount of the debt.

12.     The Hospital shall not garnish the wages or bank account of any patient unless it has first obtained a judgment against the patient in court for the amount of the debt.

13.     The Hospital shall include with the initial notice it sends to any patient of a garnishment the form attached as Exhibit B, or such other form approved, in advance, by the Attorney General's Office.

14.     If a patient submits a written claim that the patient's account or wages are exempt from garnishment, the Hospital's third party debt collection attorney shall not object to the claim of exemption without receiving the specific, case-by-case approval of the Hospital's General Counsel's Office or, if none exists, a Hospital employee with suitable experience and authority. In deciding whether to grant such approval in a particular case, the General Counsel's Office or Hospital employee shall review all information submitted by the patient in support of the patient's claim of exemption.

8

## COLLECTION AGENCIES

15.    On at least an annual basis, the Hospital's Chief Executive Officer shall review and determine whether or not to issue to or renew any contract with any third party debt collection agency. In determining whether to issue or renew any such contract, the Hospital shall consider whether the debt collection agency has acted in a manner consistent with this Agreement and with the Hospital's mission and policies and applicable laws.

16.    The Hospital shall enter into a written contract with any collection agency utilized by it to collect debt from its patients. The contract shall require the collection agency to act in accordance with the terms of this Agreement, applicable laws, and the policies described in paragraph 37.

17.    The Hospital shall not refer any patient's account to a third party debt collection agency unless the Hospital has confirmed that:

    a.    There is a reasonable basis to believe that the patient owes the debt;

    b.    All known third-party payors have been properly billed by the Hospital, such that any remaining debt is the financial responsibility of the patient and provided that the Hospital shall not bill a patient for any amount that an insurance company is obligated to pay;

    c.    Where the patient has indicated an inability to pay the full amount of the debt in one payment, the Hospital has offered the patient a reasonable payment plan, provided that the Hospital may require the patient to provide reasonable verification of the inability to pay the full amount of the debt in one payment; and

9

d.   The patient has been given a reasonable opportunity to submit an application for Charity Care, if the facts and circumstances suggest that the patient may be eligible for Charity Care, including, for example, if the patient is uninsured or is on MinnesotaCare, Medical Assistance, or other relief based on need.

18.   The Hospital shall set forth in the policy developed pursuant to Paragraph 37 of this Agreement the process for satisfying the criteria required in the prior paragraph and the person(s) accountable for compliance with this agreement.

19.   The Hospital shall not refer any medical debt to a third party debt collection agency or attorney if the patient has made payments on that debt in accordance with the terms of a payment plan previously agreed to by the Hospital.

20.   If a patient has submitted an application for Charity Care after an account has been referred for collection activity, the Hospital shall suspend all collection activity until the patient's Charity Care application has been processed by the Hospital and the Hospital has notified the patient of its decision.

21.   The Hospital shall not pay any debt collection agency any performance bonus, contingency bonus, or other similar payment which is calculated on the basis of the amount or percentage of debt collected from two or more patients.  This paragraph shall not prohibit the Hospital from paying a collection agency a percentage of the debt collected from a particular patient, provided that the Hospital shall establish adequate contractual controls to ensure that the collection agency acts in a manner consistent with this Agreement and the Hospital's mission.

22.   The Hospital shall require any third party debt collection agency and attorney utilized by it to keep a log of all oral and written complaints received by any patient concerning

10

the conduct of the agency. For purposes of this paragraph, a "complaint" is any communication from a patient or patient's representative in which they express concerns about the conduct of the debt collection agency. The Hospital shall obtain a complete copy of the log at least six (6) times per year. The Hospital's contract with the debt collection agency shall state that failure by the agency to log and provide all patient complaints in the manner required by this paragraph may result in termination of the Hospital's contract with the agency.

23.     The Hospital shall require any third party debt collection agency and attorney utilized by it to keep a record of the date, time, and purpose of all communications to or from its patients.

24.     If a patient asks any third party debt collection agency or attorney for the contact information for the Hospital, the Hospital shall instruct the agency or attorney to provide the patient with the phone number and address described in Paragraph 29. The Hospital shall not refuse to supply information to or speak with any of its patients on the basis that the account has been placed with a third party debt collection agency or attorney for collections.

25.     The Hospital shall train its outside debt collection agencies and attorneys about the Hospital's Charity Care policy and how a patient may obtain more information about the Hospital's Charity Care policy or submit an application for Charity Care. The Hospital shall require its debt collection agencies and attorneys to refer patients who may be eligible for Charity Care to the Hospital.

26.     The Hospital shall include the following language on all collection notices sent to patients by it or its third party debt collection agencies or attorneys, and on all cover letters serving all lawsuits and garnishment papers:

> If you feel that your concerns have not been addressed, please contact
> _____ and allow us the opportunity to try and address your concerns.

11

Or, you have the option to address any concerns with the Minnesota Attorney General's Office, which can be reached at 651-296-3353 or 1-800-657-3787.

The Hospital shall print this language with the prominence required for notices under the federal Fair Debt Collection Practices Act.

27.     Neither the Hospital nor its debt collection agencies or attorneys shall report any patient to a credit reporting agency as a result of that patient's failure to pay a medical bill.

## CENTRAL BILLING OFFICE

28.     The Hospital shall develop and implement policies and procedures to ensure the timely and accurate submission of claims to third party payors. If the Hospital timely received from a patient information about the patient's third party payor but does not timely submit a claim to the third party payor, the Hospital shall not bill the patient for any amount in excess of that for which the patient would have been responsible had the third party payor paid the claim. The Hospital shall not refer any bill to a third party collection agency or attorney for collection activity while a claim for payment of the bill is pending with a third party payor with which the Hospital has a contract. The Hospital may refer a bill to a third party collection agency or attorney following an initial denial of the claim by the third party payor. The Hospital shall not refer any bill to a third party collection agency or attorney for collection activity when a claim is denied by a third party payor due to the Hospital's error, and such error results in the patient becoming liable for the debt when they would not otherwise be liable. The parties recognize that, in order for the Hospital to properly bill a patient's insurance company, the Hospital may need the patient's cooperation and that the Hospital may not be able to properly bill the patient's insurance company without the patient's cooperation. In the event that the Hospital believes that a private third party payor has improperly delayed or denied payment of a claim, the Hospital

may file a complaint with the Minnesota Attorney General's Office, which may provide assistance to the Hospital or its patient in attempting to get the claim paid.

29.    The Hospital shall develop a streamlined process for patients to question or dispute bills, including a toll-free phone number patients may call and an address to which they may write.  The phone number and address shall be listed on all patient bills and collection notices sent by the Hospital.  The Hospital shall return telephone calls made by patients to this number as promptly as possible, but in no event later than one business day after the call is received.  The Hospital shall respond to correspondence sent to this address by patients within ten (10) days.

30.    If a patient advises the Hospital, its debt collection agency, or any attorney utilized by the Hospital that:  a) the patient does not owe all or part of a bill, b) a third party payor should pay the bill, or c) the patient needs documentation concerning the bill, the Hospital, the collection agency, and its attorney must cease further collection efforts until the Hospital or the agency provides the patient with documentation establishing that, as applicable, the patient owes the debt or that the applicable third party payor has already paid all amounts for which it is obligated.  The Hospital or the collection agency shall provide such documentation in writing within ten (10) days and shall not pursue further collection activity for a period of thirty (30) days after providing proof that the debt is owed, so as to give the patient further opportunity to pay the bill or to challenge the documentation supplied by the Hospital.  If the Hospital provides the required documentation and the patient does not respond within thirty (30) days, the Hospital may resume collection activity.

31.    The Hospital shall develop a system to record and log all patient complaints received by its billing offices, including at the locations identified in paragraph 29, regarding the

13

collection of medical debt by the Hospital or its third party debt collection attorneys or agencies. The Hospital may maintain such records at more than one location.

## BILLING TO THE UNINSURED

32.     If the Hospital demands that an uninsured patient pay a medical bill, the Hospital shall provide to that patient a detailed, itemized bill as part of the billing process.

33.     The term "most favored insurer" means the nongovernmental third party payor that provided the most revenue to the provider during the previous calendar year. The Hospital shall not charge a patient whose annual household income is less than $125,000 for any uninsured treatment in an amount greater than the amount which the provider would be reimbursed for that service or treatment from its most favored insurer. The total charge for uninsured treatment shall not be more than the provider would be reimbursed directly from its most favored insurer and from that insurer's policyholder under any applicable and allowable copayments, deductibles, or coinsurance. The Hospital shall apply the same percentage discount to its charge description master for uninsured treatment that it would apply to charges incurred by a policyholder of its most favored insurer. Beginning on the date of this Agreement, each year the Hospital and the Attorney General may agree in advance, by a confidential letter agreement, on the percentage discount from the charge description master that the Hospital provides to its most favored insurer and which the Hospital shall provide for uninsured treatment under this paragraph. The Hospital shall provide to the Attorney General, pursuant to paragraph 42, any information requested by the Attorney General for purposes of calculating this discount. The Hospital shall utilize the same initial charge description master prices for uninsured treatment that it utilizes for treatment provided to a policyholder of its most favored insurer.

14

The term "uninsured treatment" means any treatment or services which are not covered by a plan, contract, or policy which provides coverage to the patient through or is issued to the patient by: (1) a "health plan company," as that term is defined in Minn. Stat. § 62Q.01, subd. 4; (2) a self-funded employee benefit plan; (3) any governmental program, including but not limited to MinnesotaCare, the Minnesota Comprehensive Health Association, Medicare, Medicaid, or TriCare; (4) any other type of health insurance, health maintenance, or health plan coverage; (5) any other type of insurance coverage, including but not limited to no-fault automobile coverage, workers' compensation coverage, or liability coverage. In the event that the Hospital inadvertently sends a bill to a patient in excess of that which is allowed by this paragraph 33 because the Hospital is not aware that the treatment or service constitutes uninsured treatment, and the Hospital thereafter learns that the treatment or service constitutes uninsured treatment, the Hospital shall promptly adjust its charges so as not to exceed the amount allowable under this paragraph 33, and the Hospital shall promptly notify the patient of the new amount of the bill.

This paragraph shall only apply to charges by or incurred at a facility defined in Minn. Stat. § 144.50, subd. 2 (2006) or Minn. Stat. § 144.55, subd. 2 (2006), including those of a provider who is employed by the Hospital when providing services to a patient at a facility defined in Minn. Stat. § 144.50, subd. 2 (2006) and Minn. Stat. § 144.55, subd. 2 (2006). This paragraph shall only apply to medically necessary health care treatment and not to cosmetic procedures without any medical necessity.

34.    In recognition that some patients express their financial concerns directly to their treatment providers (i.e. doctors, nurses, etc.), the Hospital shall train its staff responsible for admissions, billing, and providing direct patient treatment, about the existence of the Hospital's

Charity Care policy and how a patient may obtain more information about the Hospital's Charity Care policy or submit an application for Charity Care.

## MISCELLANEOUS PROVISIONS

35.   In the event that the Hospital concludes that any requirement of this Agreement is no longer feasible, that the public may be better served by a modification of this Agreement, or that it has evidence that the terms of this Agreement have caused those who can afford health insurance coverage to voluntarily choose to go without it, the Hospital may request that the Attorney General consent to a modification of the terms of this Agreement.   The Attorney General shall make a good faith evaluation of the then-existing circumstances and, after collecting information the Attorney General deems necessary, make a decision within thirty (30) days as to whether to consent to a modification of this Agreement.

36.   The Hospital and its agents shall not state or imply, directly or indirectly, that the State of Minnesota or the Attorney General's Office has approved of, condones, or agrees with any lawsuit, garnishment, or other attempt by the Hospital to collect debt from a patient.

37.   The Hospital's Board of Directors shall adopt the following policies, which shall not be inconsistent with this Agreement:

    a.    A zero tolerance policy for abusive, harassing, oppressive, false, deceptive, or misleading language or collections conduct by its debt collection attorney and agency, and their agents and employees, and Hospital employees responsible for collecting medical debt from patients.

    b.    A debt collection litigation policy, which shall include a policy permitting the garnishment of patient wages or accounts only after entry of a judgment.

16

    c.       A policy establishing the procedures to be utilized by the Hospital's third party debt collection agencies.

    d.       A policy establishing the procedures to be utilized by the Hospital's employees who participate in the collection of medical debt.

    e.       A Charity Care policy which takes into consideration the financial ability of the patient to pay a medical bill.

38.    The Hospital's Board of Directors shall review, at least one time per year, the Hospital's practices in the following areas:

    a.       The filing of debt collection litigation against Hospital patients, including the garnishment of patient wages or accounts subsequent to entry of a default judgment.

    b.       The debt collection activity of its third party debt collection agencies.

    c.       The debt collection activities of its internal debt collectors.

    d.       The Hospital's compliance with this Agreement and the policies described in Paragraph 37.

    e.       The results of the reviews required by the Chief Executive Officer in Paragraphs 3 and 15 of this Agreement.

    f.       The results of the reviews required by Paragraph 39 of this Agreement.

    g.       The Hospital's Charity Care practices.

39.    The Hospital shall annually review the practices of its third party debt collection agency and debt collection attorney, and its internal medical debt collection practices, at least one (1) time per year. The purpose is to review compliance with this Agreement and the Hospital's policies.

17

40.     This Agreement is not intended to assert, nor shall it be construed as, or deemed to be, an admission or concession or evidence of any liability or wrongdoing whatsoever on the part of Hospital.

41.     This Agreement shall remain in effect for five years after the entry of this Agreement by the Court.

42.     The Hospital shall cooperate with, respond to inquires of, and provide information to the Attorney General in a timely manner as necessary for the enforcement of this Agreement.

43.     The Court shall retain jurisdiction to enforce the provisions of this Agreement.

44.     The Hospital shall comply with all applicable state and federal laws relating to billing and debt collection.


Dated: _2-20-07_                    North Memorial Medical Center

                                    By:   David W. Cress
                                    President & CEO




18

STATE OF MINNESOTA
Office of Attorney General

Dated: _4.6·09_

LORI SWANSON
Attorney General
Atty. Reg. No. 254812

ALAN I. GILBERT
Solicitor General
Atty. Reg. No. 0034678

Suite 1100, BRM Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2131
(651) 297-9717 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR STATE OF MINNESOTA

Based upon the above Stipulation, IT IS SO ORDERED:

Dated: _5/17/07_

BY THE COURT:

Judge of District Court

AG: #1741632-v1

19

**EXHIBIT A**

## [HOSPITAL NAME] Lawsuit Information Sheet

You are receiving this information sheet because you have been served with a Summons and Complaint (lawsuit) by **[HOSPITAL NAME]** ("_____"). **[HOSPITAL NAME]** cannot give you legal advice. Therefore, this document only provides basic information, and you should immediately discuss this matter with an attorney.

- **Start of the Lawsuit.** To start a lawsuit against you, **[HOSPITAL NAME]** has served a Summons and Complaint on you either: (a) by delivering it to you personally or leaving it at your home; or (b) by mail, if you agree in writing to accept "service" of the Summons and Complaint by mail and sign a form that so indicates. The Summons informs you that you must provide a *formal, written legal "answer"* to the complaint within 20 days after you receive the legal documents. The Complaint explains why **[HOSPITAL NAME]** is suing you and asks a court to make you pay money.

The Summons and Complaint may not include a court file number. They are, however, the legal documents that begin the lawsuit. It is very important that you do not ignore the documents, or you will be in "default." No court hearing is required for a default judgment to be entered against you if you do not respond to the Complaint.

- **Answering a Complaint.** The "Answer" is the formal legal name for your response to the Complaint. The Answer must meet certain requirements of the Minnesota Rules of Civil Procedure. *Contacting* **[HOSPITAL NAME]** *or its attorney by telephone or written correspondence is not "answering" the Complaint.* While **[HOSPITAL NAME]** encourages you to call if you have questions regarding the bill that was sent to collections, doing so is not a formal "Answer." Some court clerks have form "Answers" which may be of assistance to you. You must serve a copy of your Answer on **[HOSPITAL NAME]**'s attorney by mail, fax, or hand delivery and complete an Affidavit of Service that explains who was served, how, and on what date. The Affidavit of Service form must be signed in front of a notary public or a court clerk. If you want a judge to hear the dispute, you should file the original Answer and Affidavit of Service with the court in the county in which you are being sued after you have served your Answer on **[HOSPITAL NAME]**. You will be required to pay a court filing fee. (If you meet certain financial guidelines, however, you may not be required to pay the court filing fee. You may obtain more information regarding a waiver of the fee by contacting the clerk of court.)

- **Failure to Answer.** If you do not "answer" the Complaint, **[HOSPITAL NAME]** may get a "default" judgment entered against you requiring you to pay money. By getting a default judgment, **[HOSPITAL NAME]** may be able to initiate a separate garnishment action against you.

EXHIBIT B

## [HOSPITAL NAME] Garnishment Information Sheet

You are receiving this information sheet because **[HOSPITAL NAME]** ("_____") has started a process to get money from you by sending a "garnishment summons" to a "garnishee"--typically your bank or employer. These proceedings are called "garnishment" proceedings. **[HOSPITAL NAME]** cannot provide you with legal advice. Therefore, this document only provides basic information. You should immediately discuss this matter with an attorney.

- **Taking Money From Your Wages.** If **[HOSPITAL NAME]** is trying to take money from your wages, you should receive notice *before* your wages are garnished or taken. Generally, **[HOSPITAL NAME]** cannot garnish more than 25% of your net wages, or any of your net wages if they are less than $206 per week. If you have received public assistance based on need, **[HOSPITAL NAME]** cannot take any of your wages for 6 months after you received the assistance, if you submit the proper paperwork on time. To claim that wages cannot be taken (i.e., are "exempt"), you must promptly return to **[HOSPITAL NAME]**'s attorney the "Debtor's Exemption Claim Notice" that came with the "Garnishment Exemption Notice and Notice of Intent to Garnish Earnings." *Calling* **[HOSPITAL NAME]** *is not sufficient.* If **[HOSPITAL NAME]**'s attorney does not receive this exemption notice within 10 days, [Hospital Name] can seek to get money from your employer. **If [HOSPITAL NAME] does not agree that your wages are exempt, it can still seek to get money from your employer, and you will have to ask the court to decide that your wages cannot be taken.**

- **Taking Money From Your Bank Accounts.** If **[HOSPITAL NAME]** is trying to take money from your bank account, the bank will "freeze" enough money in your account to pay off your debt to **[HOSPITAL NAME]**. *You will not receive notice of the bank garnishment until after your funds are already frozen. You will not have access to your funds while they are frozen. Your checks may "bounce," and you may incur overdraft charges during this time.* You may want to contact your bank immediately.

If you deposit qualified public assistance checks (or wages if you are on or have received public assistance within the last 6 months) in a bank account, **[HOSPITAL NAME]** cannot garnish your account for 60 days, if you timely fill out the proper paperwork. To claim that funds in your bank account cannot be taken (i.e., are "exempt"), you must sign and return within 14 days to the bank (and **[HOSPITAL NAME]**'s attorney) the "Exemption Notice" (the form your bank sent to you when it received a Garnishment Summons from **[HOSPITAL NAME]**). *Calling* **[HOSPITAL NAME]** *is not sufficient.* You may want to include copies of documents (*i.e.* benefit letters, bank statements, etc.) to show why your funds are exempt. **If you don't claim an exemption within 14 days from the date the bank mailed the exemption notice to you, the bank may turn over your frozen funds to [HOSPITAL NAME].** If you do claim an exemption on time, the bank will "unfreeze" your funds and release them to you in 7 days unless **[HOSPITAL NAME]** "objects" to your "exemption claim." If **[HOSPITAL NAME]** "objects," it must send you a written objection to your exemption claim, along with a form entitled "A Request for Hearing and Notice of Hearing." **If [HOSPITAL NAME] sends you this form, you must fill out and file with the court the "Request for Hearing" form within**

**10 days of receiving the objection, or the bank can release your money to [HOSPITAL NAME].**

EXS. TO 6/19/12 KRAUS AFF.       EXHIBIT 41       175

Printed <date> <time>

**Fairview Health Services**
MFS Partnership Issues Log

| Fairview / MFS Partnership: | Issues Log (4/27/11) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Issue | Original Issue | Estimated Impact | Examples | Date Identified | Identified Sub Issues | Mitigation | Estimated Delivery Date | Notes |
| 1. Metrics/Standard Reports | Fairview hasn't received the metrics and standard reports MFS said they would provide. Fairview mentioned they received a draft report, but haven't seen the regular and ongoing metrics. | Lack of visibility | Thomas Merritt to provide deck of examples | | | Previous deck provided will be put together and delivered. | 4/19/2011 | Collection numbers and KPIs provided to Fairview AH staff on a monthly basis. |
| 2. AG Agreement Verbiage on Statements | MFS statements lack verbiage on Fairview's Financial Assistance and Payment Arrangement programs, as well as the contact information for the Attorney General's Office. | Patient Satisfaction | Examples of Fairview's statements can be provided | | | | | |
| 3. Difference between Pre-Collect and Dormant Statements | When the patient receives the letter from MFS -Pre-Collect they think they have been referred to a collection agency. MFS Pre-Collect and MFS Dormant statements appear to be similar. | Patient Satisfaction | | | Some patients may have accounts at Pre-Collect and Dormant believing that all of their accounts are at a collection agency. | Laura Denul requests that the Fairview name and letterhead be used on MFS statements | 7/1/2011 | |
| 4. Unbroken Payment Arrangements | Patients that are in active payment arrangements with Fairview have received calls and letters from MFS indicating if they didn't pay in full their account would be referred to bad debt. There have also been instances of accounts in active payment arrangements being referred to bad debt. | Account follow-up on accounts perceived to be in active payment arrangements - increase in patient complaints of this nature | Attached on tab "BPA_PA_PTPs" | 2/15/2011 | Potential AG ramifications - No, as each call or letter was sent after clear "breakage" of arrangement. In argument that no continually paying agreement is allowed to go to bad debt (as per AG agreement), none have been identified to this point. | Accounts that are in an active payment arrangement are excluded from letters/calls/bad debt placement. Further, no account will go to bad debt if there has been a payment in the last 60 days. This has been standard since the beginning of the agreement. | 7/1/2011 | Still not using harsh collection practices on the Dormant Side. Is there anything we can add to the statement to make it look like it is not a collection agency? |

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 42

AH_MNAG_000010448

Fairview Health Services
MFS Partnership Issues Log

Printed <date> <time>

AH_MNAG_000010450

| Issue | Description | Detail | 4/19/2011 | | 5/5/2011 | |
|---|---|---|---|---|---|---|
| 9. MFS Data Reconcile | Fairview and MFS to do a data reconciliation once a month | | | | | |
| 10. Files Sent and Receipt Communication | Lack of communication between MFS and Fairview when issues arise in sending and receiving files | 04/26/2011 CLOSE file from MFS was not sent to Fairview | | | Both parties will identify representatives who will communicate with our partners if files are either not sent or received. | |
| 11. Accounts Referred to Bad Debt | MFS referred approximately 6,000 accounts to Bad Debt without ever having sent them a letter or notice that they were going to be moved to Bad Debt. MFS also sent another set of approximately 4,500 accounts to Bad Debt after having sent them a single letter, which happened to be the first letter in the series, the "welcome" letter | Increase in complaints to Fairview stating a lack of communication prior to that of JCC to the patient | Contained in bad debt files transmitted to Fairview via CLOSEG2E file. Line item detail can be provided up on request. | | Accounts are to he held until the full letter series has been exhausted (a total of 5 communications to the patient). These are already in bad debt and have been for over a month. | As per AG agreement, there is no language stating the number of statements that are required to be sent to a patient owing a debt to Fairview. It is only required that certain provisions be communicated to patients appropriately and that balances are timely owed by patients. Held bad debt turnovers for a month to wait for letters. Since then only turned over |
| 12. Accounts 60 Days Patient Liable Not at MFS | Accounts that should be with MFS, but they do not have them in their system. | BUGHTEL, JOLIE J P145007235 BUGHTEL, JOLIE J P149111999 BUGHTEL, JOLIE J P144712861 BUGHTEL, JOLIE J P140545245 | | | | |
| 13. Payment Posting Delay | Fairview had approximately 300 payments held up because MFS did not transmit the payments to Fairview timely as a member of the MFS clerical team was out of the office and didn't appear to have a back up. | Backlog in patient cash - mid month and did not affect month end reporting or cash accumulation - increased single day posting needs at facility. Single back log of ~300 payments – now resolved | 3/23/2011backlog for cash posting. | | Payments did not get posted for a few days and created a | Back MFS cash poster put in place to avoid over in case of future absences. |

This happened during middle of month and did not impact month end and cash.

**FINAL**

# FAIRVIEW HEALTH SERVICES
INTERNAL AUDIT

ATTORNEY GENERAL'S OFFICE 2007 COLLECTION STANDARDS AGREEMENT AUDIT – FAIRVIEW HEALTH SERVICES

REPORT ON AGREEMENT EXPECTATIONS, CONCLUSIONS
AND MANAGEMENT RESPONSES

*Report No. 2011-12*
*May 5, 2011*

*Internal Audit Contacts*

| | |
|---|---|
| A. Douglas Vickers, Vice-President, Chief Audit Executive and Chief Compliance Officer | 612-672-2217 |
| Lorrie Ghose, Internal Audit Director | 612-672-7888 |
| Janet Solorz, Senior Auditor | 612-672-6863 |

**Distribution List**
Mark Eustis, President and Chief Executive Officer, Fairview Health Services
George Chresand, Senior Vice-President and General Counsel, Fairview Health Services
Dan Fromm, Chief Financial Officer, Fairview Health Services
Mark Dixon, Regional President, Fairview Health Services
Laura DeNeui, Vice-President, Revenue Cycle, Fairview Health Services
Scott Roste, Legal Counsel, Fairview Health Services
Andrew Crook, Accretive Project
Bob Aliperto, Director, Hospital Revenue Cycle, Fairview Health Services
Diane Rosenow, Senior Director, Business Operations, Fairview Health Services
Stephanie Kronberg, Director Business Services, Surgical Consultants

AH_MNAG_000010617

# FINAL

## EXECUTIVE SUMMARY

In accordance with Fairview Health Services' 2011 Internal Audit Plan, Fairview Internal Audit conducted this review of compliance with the 2007 Agreement between Fairview Health Services and the Attorney General's Office.

In January 2005, the Minnesota Attorney General's Office issued a report concerning the Office's compliance review of Fairview Health Services (Fairview). While the Attorney General's Office reported on four areas, the focus of the report was on collection practices. This report ultimately led to the Collection Standards Agreement. Shortly thereafter, virtually all other Minnesota hospitals entered into a similar two-year agreement with the Attorney General's Office which was brokered by Minnesota Hospitals Association (MHA). In February 2007, the Attorney General's Office requested that all Minnesota hospitals renew their collection agreements for an additional five years. At this time, Fairview transitioned from its customized agreement to the standard MHA brokered agreement. Due to the required system changes needed for the transition, Fairview signed the new agreement in February 2007, but delayed its implementation until June 2007.

Both the 2005 and 2007 agreements are extremely robust and include accountabilities for Executive Leadership, the General Counsel's Office, Patient Financial Services, third-party collectors, and the third-party collection attorney. In March 2011, Internal Audit conducted a thorough review of Fairview's compliance with the Agreement. Procedures included a detailed review of policy and procedures, interviews with key parties to the Agreement, data analysis and testing of source data.

Our audit procedures were conducted in accordance with the *International Standards for the Professional Practice of Internal Auditing*. Additional procedures were performed at the Central Business Office and the offices of the third-party collectors and collection attorney. Specific procedures included:

- Interviewing instrumental personnel to ensure that key process continue to function as originally designed,
- Reviewing processes designed to ensure that accounts are routed through collection processes appropriately,
- Reviewing policies and procedures,
- Reviewing complaint logs, and
- Reviewing Fairview's and its agents' correspondence with patients.

In 2010, Fairview Health Services engaged Medical Financial Solutions (a division of Accretive Health) to augment internal and third-party collection services. Based on our procedures including discussions with Patient Financial Services' management, we believe that several critical elements of the Agreement were not adequately adopted by, Medical Financial Solutions. Specifically, the following issues were identified:

- Medical Financial Solutions staff, including the Manager, stated that they were not familiar with the Agreement or the Hospital's Charity Care Policy.
- Medical Financial Solutions is not keeping a patient complaint log as required by the Agreement.
- The Agreement requires Fairview and its agents to cease collection efforts in certain instances (e.g. if the patient requests additional documentation). Patient complaints received by Patient Financial Services revealed that Medical Financial Solutions was not complying with this requirement.
- Patient Financial Services identified numerous patient accounts that were referred to bad debt without proper patient notification.
- Medical Financial Solutions 'collection notices lack required language referring patients to the Hospital and the Attorney General's Office.

Other non-compliance issues identified include:

- Fairview Health Services and Surgical Consultants do not receive complaint logs from one collection agency six times per year, as required by the Agreement.
- The Agreement requires Fairview Health Services to respond to complaints received by the Attorney General's Office within ten days. This process was not performed when a Patient Financial Service's employee was on a leave of absence.

Patient Financial Services' leadership has already begun to remedy the weaknesses described above. We are therefore confident that the issues identified are receiving appropriate attention and will be timely resolved.

AH_MNAG_000010618

**FINAL**

**MANAGEMENT COMMITMENT**

As management overseeing these areas of responsibility, we commit to our action plans and completion dates as reported in management's response to the findings as stated in this audit report.

X _____   Date _____ 5/2/11 _____

Laura DeNeui, Vice-President, Revenue Cycle, Fairview Health Services

**INTERNAL AUDIT COMMITMENT**

As management responsible for the results of this examination made by Internal Audit, I commit to reporting management's response to the findings to the Audit and Compliance Committee of the Board of Directors.

X _____   Date 6/5/11 _____

A. Douglas Vickers, Vice-President, Chief Audit Executive and Chief Compliance Officer, Fairview Health Services

EXS. TO 6/19/12 KRAUS AFF.                    EXHIBIT 43                    180

**FINAL**

Minnesota Attorney General's Office Agreement 2007

| Agreement Expectation | Conclusion | Management Responses |
|---|---|---|
| **Litigation Process:** | | |
| 1. Verify that the hospital does not give any collection agency or attorney blanket authorization to take legal action against its patients for the collection of medical debt. | Based on procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 2. The hospital shall not file any lawsuit against any patient to collect medical debt until a Hospital employee with the appropriate level of authority authorizes the litigation after verifying that:<br><br>a. Verify reasonable basis to believe patient owes debt.<br>b. Verify Fairview has billed all third-party payors.<br>c. Verify patient portion.<br>d. Ensure Fairview is billing patient for patient responsibility only.<br>e. Fairview has offered patient a reasonable payment plan.<br>f. Patient has been given an opportunity to submit an application for charity care. | Based on procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 3. The hospital will have a policy pursuant to the above defining the level of employee authorized to make the determination above. This level of authority may vary based upon the amount of the debt. | Based on procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 4. Does CEO review and determine whether or not to renew or issue contract with third party debt collection attorney? | CEO approval will be accomplished prior to the April 2011 Audit and Compliance Committee meeting. | No action required at this time. |

4

AH_MNAG_000010620

## FINAL

| Agreement Expectation | Conclusion | Management Responses |
|---|---|---|
| **Litigation Process (continued):** | | |
| 5. Verify that Fairview does not subcontract or delegate the selection of the third party debt collection attorney or law firm. | The General Counsel's Office was instrumental in drafting contracts with the third parties to ensure compliance with the Agreement. | As compliance is evident, no management response is required. |
| 6. Verify that contract with debt collection attorney does not include provisions for payment of bonus, contingencies or similar payments calculated on the bases of debt collected from two or more patients. This does not prohibit the Hospital from paying an attorney a percentage of the debt collected from a particular patient, provided that the Hospital establishes adequate controls to ensure that the attorney acts in a manner consistent with this agreement. | Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 7. Verify third-party debt collection attorney's contract includes terms to:<br>a. File any lawsuits brought against Fairview patients for the collection of medical debt with the applicable court no later than seven days after the lawsuit has been served.<br>b. Sign and date all pleadings.<br>c. Ensure all affidavits of service state the following:<br> • If the pleading is served by mail, the address to which it was mailed.<br> • If the pleading is served personally, the name of the person to whom the pleading was delivered.<br>d. Serve along with the complaint the form attached as Exhibit A.<br>e. List in the case caption of all pleadings the county where the lawsuit will be venued.<br>f. Not petition any court to have any debtor arrested. | Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 8. Ensure Fairview does not obtain a default judgment against any patient with specific approval of the General Counsel's office or, if none exists, a Hospital employee with suitable experience and authority. | An oral modification was made to the agreement allowing the third-party attorney to proceed with certain actions (including default judgment) for any accounts forwarded to the third-party attorney for further action. | Management is aware of the modification and accepts the associated risk. |

## FINAL

| Agreement Expectation | Conclusion | Management Responses |
|---|---|---|
| **Litigation Process (continued):** | | |
| 9. Verify procedure ensures that, if Fairview knows the identity of the Attorney who represents the patient, Fairview will notify its third party debt collection attorney, law firm and agency of the identity of said attorney. | Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 10. Litigation Process #6 on pg. 5 requires appointment of someone to oversee the third party attorneys, verify this function is being performed? | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| **Agreement Expectation** | **Conclusion** | **Management Responses** |
| **Garnishments:** | | |
| 1. Verify that procedure ensures that Fairview will not garnish the wages or bank account of any patient until a Hospital employee with appropriate level of authority authorizes the garnishment for that particular patient after verifying that:<br>a. Fairview has no basis to believe that the patient's wages or funds at a financial institution are likely to be exempt from garnishment.<br>b. There is reasonable basis to believe that the patient owes the debt.<br>c. Fairview has billed all third-party payors.<br>d. Patient has been offered a payment plan.<br>e. Patient has been given an opportunity to submit an application for charity care. | An oral modification was made to the agreement allowing the third-party attorney to proceed with certain actions (including garnishment) for any accounts forwarded to the third-party attorney for further action. | Management is aware of the modification and accepts the associated risk. |
| 2. The hospital will have a policy pursuant to the above defining the level of employee authorized to make the determination above.  This level of authority may vary based upon the amount of the debt. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 3. Verify that Fairview does not garnish wages or accounts of any patient unless it has obtained a judgment. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |

# FINAL

| Agreement Expectation | Conclusion | Management Responses |
|---|---|---|
| **Garnishments (continued):** | | |
| 4. Verify that Fairview includes Exhibit B with the initial garnishment notice sent to any patient. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 5. Verify the General Counsel's Office or a Hospital employee with appropriate level of authority, in advance of action, approves patient claims of exemption of garnishment if notified by patient in writing. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |

| Agreement Expectation | Conclusion | Management Responses |
|---|---|---|
| **Third Party Debt Collection Agency:** | | |
| 1. Does CEO review and determine whether or not to renew or issue contract with third party debt collection agency? | CEO approval will be accomplished prior to the April 2011 Audit and Compliance Committee meeting. | No action required at this time. |
| 2. Contract shall require the debt collection agency to act in a manner consistent with the Attorney General Agreement and Fairview. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 3. The hospital shall not refer any patient accounts to a third party debt collection agency unless it has confirmed that:<br>a. Verify reasonable basis to believe patient owes debt.<br>b. Verify Fairview has billed all third-party payors.<br>c. Verify patient portion.<br>d. Ensure Fairview is billing patient for patient responsibility only.<br>e. Fairview has offered patient a reasonable payment plan.<br>f. Patient has been given an opportunity to submit an application for charity care. | Certain changes were made to streamline this process therefore; the Legal Review Team is no longer accountable for this. A tier level of approval prior to the accounts referral to collections has been implemented thereby, having the Customer Service Rep or Pre-collect Vendor accountable for accounts with balances of $9,999.99 or less.<br><br>With this, it was identified by Patient Financial Services that MFS was sending letters to patients with active payment arrangements indicating if they didn't pay in full their account would be referred to bad debt. There have also been instances of accounts in active payment arrangements being referred to bad debt.<br><br>Also, Patient Financial Service identified numerous patient accounts that were referred to bad debt without proper patient notification. | **Action Plan:** Programming changes were implemented at MFS to ensure all accounts in an active payment arrangement would be recognized as current as long as a timely payment was made on any account included in the payment arrangement.<br><br>Additionally, process changes were implemented at MFS to ensure all patient accounts with clean addresses would not be referred to bad debt without proper notification.<br><br>**Completion Date:** The MFS programming changes pertaining to payment arrangements was completed April 11, 2011.<br><br>The MFS process change to ensure no account would be referred to bad debt without proper notification was effective with the bad debt placement file dated April 15, 2011.<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |

AH_MNAG_000010623

FINAL

| Agreement Expectation | Conclusion | Management Response |
|---|---|---|
| **Third Party Debt Collection Agency (continued):** | | |
| 4. The hospital will have the above process noted in a policy and procedure as well as the individuals responsible for complying with above. | Per revised policy, draft dated 03-01-11, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 5. Verify Fairview does not refer debt to collection agency or attorney if the patient has made payments on that debt in accordance with the terms of a payment plan. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 6. Verify that third party collection efforts are suspended for patients who submit applications for charity care after the account has been referred for collection. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 7. Verify that contract with debt collection agency does not include provisions for payment of bonus, contingencies or similar payments. This does not prohibit the Hospital from paying an attorney a percentage of the debt collected from a particular patient, provided that the Hospital establishes adequate controls to ensure that the attorney acts in a manner consistent with this agreement. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 8. Verify that contracts with third party attorneys and collection agencies require they log all oral and written complaints of conduct. Verify that Fairview obtains copy of the log at least six times per year. | In our discussions with Colltech, Inc., we learned that they do not provide complaint logs to Surgical Consultant or MN Heart at least six times per year as stated in the Agreement. | **Action Plan:** Colltech has agreed to send complaint logs the required six times a year.<br><br>**Completion Date:** A compliant log pertaining to Surgical Consultants was received from Colltech at the end of March, 2011. A compliant log pertaining to MN Heart will be received from Colltech by the end of May, 2011.<br><br>**Accountable Party(s):**<br>Stephanie Kronberg, Director, Surgical Consultants<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |
| | In our discussions with Medical Financial Solutions (MFS), a division of Accretive Health, Inc., we learned that they do not maintain a complaint log; furthermore, this was not detected by Central Business Office. | **Action Plan:** MFS has agreed to send monthly complaint logs<br><br>**Completion Date:** First log to be received will be in May, 2011<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |

EXS. TO 6/19/12 KRAUS AFF.

EXHIBIT 43

8

AH_MNAG_000010624

FINAL

| Agreement Expectation | Conclusion | Management Response |
|---|---|---|
| **Third Party Debt Collection Agency (continued):**<br>9. Verify that contracts with third party attorneys and collection agencies require them to record date, time and purpose of all communications to and from patients. | The agreement with Accretive Health, Inc. which MFS is a division of, specifically states "Accretive Health hereby agrees to provide the services in accordance with the terms and conditions set forth in the Minnesota AG Agreement, a copy of which Client has provided to Accretive Health...." | As compliance is evident, no management response is required. |
| 10. Verify procedure to ensure that if a patient asks any third-party debt collection agency or attorney for the contact information for Fairview, the agency or attorney shall provide the patient with the phone number and address described in paragraph 26. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 11. The hospital shall train its outside debt collection agencies and attorneys about the Charity Care policy. | In our discussions with MFS, we learned that they were not provided a copy of the Charity Care policy along with the Billing and Collections policy and the AGO Agreement. Internal Audit provided a copy of all three documents, however Patient Financial Services need to follow up and ensure they fully understand each. | **Action Plan:** A joint work group from Fairview Patient Financial Services and MFS was developed to review all Fairview Billing and Collections policies and processes in addition to the AGO agreement.<br><br>In addition all MFS processes are being flowcharted and will be mutually agreed to on how MFS is to handle specific tasks and concerns.<br><br>**Completion Date:** The work group completed its initial work April 29, 2011. Final sign-off on all documented workflows will be completed by the end of May, 2011.<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |
| 12. Verify all collection notices include language referring patient to contact the Hospital and the Attorney General. | Internal Audit identified that letters distributed from MFS do not include the language indicated in the Agreement. | **Action Plan:** MFS has agreed to fully incorporate the required AGO Agreement letter language on all future collection letters.<br><br>**Completion Date:** No later than June 30, 2011<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |
| 13. Neither the hospital nor the agencies or attorneys shall report any patient to a credit reporting agency as a result of the patient's failure to pay a medical bill. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required |

9

FINAL

| Agreement Expectation | Conclusion | Management Response |
|---|---|---|
| **Central Business Office:**<br>1. Verify existence of policy and procedure to ensure the timely and accurate submission of claims to third party payors | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 2. Verify that procedure ensures that account will not be referred to third party collection agent for Fairview errors. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 3. Verify that procedures ensure that accounts will not be referred to third-party collection agent payment of a bill that is pending with a third-party payor | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 4. Verify existence of streamlined process for patient disputes, including toll free number. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 5. Verify process includes return telephone calls to patients no later than one business day after call is received or within ten days of receiving written correspondence. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 6. If a patient advises the Hospital, its debt collection agency, or any attorney that a) the patient does not owe all or part of a bill; B) a third party payor should pay the bill or c) the patient need documentation concerning the bill. The Hospital and its agents must cease collection efforts until the Hospital or its agents provide documentation establishing that the patient owes the debt. Information must be provided within 10 days and collection activity cease for 30 days after proof has been provided. | The Agreement requires Fairview and its agents to cease collection efforts in certain instances (e.g. if the patient requires additional documentation). Patient Financial Services identified that MFS was not ceasing collection efforts when patients requested itemized statements. Also, MFS has at times refused patients requests for itemized statements and some were not receiving itemized statements in a timely manner. | **Action Plan:** Process changes were implemented at MFS to ensure all patients requesting an itemized statement would get one if requested.<br><br>Also, MFS will revise its process to cease collection activity on disputed accounts until 30 days have passed after the dispute has been resolved.<br><br>**Completion Date:** No later than May 31, 2011<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Jon Clark, Director, Accretive Health |
| 7. The Hospital must log all patient complaints received internally or through its agents. | When member of Patient Financial Service was on a leave of absence, the complaint log was not kept up to date. | **Action Plan:** Patient Financial Service's management will ensure the complaint log is maintained in a current status<br><br>**Completion Date:** No later than May 31, 2011<br><br>**Accountable Party(s):**<br>Bob Aliperto, Director, Hospital Revenue Cycle, Fairview<br>Belinda Follestad, Manager, Customer Service, Fairview<br>Jon Clark, Director, Accretive Health |

10

AH_MNAG_000010626

## FINAL

| Agreement Expectation | Conclusion | Management Response |
|---|---|---|
| **Billing to the Uninsured:** | | |
| 1. Verify process exists so that uninsured patients are provided itemized bill. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 2. The Hospital shall not charge a patient whose annual household income is less than $125,000 for any uninsured treatment an amount greater than the amount which the provider would be reimbursed for that service or treatment from its most favored insurer the third party payor that provided the most revenue to the provider during the previous calendar year. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 3. Each year (beginning on the date of this agreement) the hospital and the AG will agree in advance, by a confidential agreement, on the percentage discount from the CDM that the Hospital provides to its most favored insurer and which the hospital shall provide for uninsured treatment. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |
| 4. The hospital shall train physicians, registrars and other staff about its charity care policy. | Based on the procedures performed, Fairview has satisfied this requirement. | As compliance is evident, no management response is required. |

EXS. TO 6/19/12 KRAUS AFF.          EXHIBIT 43          188

11

AH_MNAG_000010627

FINAL

| Agreement Expectation | Conclusion | Management Response |
|---|---|---|
| **Miscellaneous Provisions:** | | |
| 1. Verify in the Board Minutes that the Board of Directors have adopted policies which include:<br>a. Zero tolerance for abusive collection efforts.<br>b. Approval of a debt collection policy.<br>c. Approval of the procedures to be utilized by third party collection agents and attorneys.<br>d. Approval of the procedures to be utilized by Fairview's employees who participate in the collection of medical debt.<br>e. A charity car policy which takes into consideration the financial ability of the patient to pay a medical bill. | Fairview has formally documented the policies set forth in the Attorney General's Office Agreement. | As compliance is evident, no management response is required. |
| 2. Verify that the Board Minutes reflect annual review of:<br>a. The filing of debt collection litigation.<br>b. Debt collection activity (internal and external).<br>c. Fairview's compliance with this agreement.<br>d. The results of the reviews of the CEO.<br>e. The results of hospitals monitoring of its efforts.<br>f. The Hospitals Charity Care practices. | This will be accomplished as part of the overall presentation to the Audit and Compliance Committee April 2011 meeting. | No further action is required at this time. |
| 3. The Hospital shall annually review the practices of its third party debt collection agency, attorney and its internal central business office. | This will be accomplished as part of the overall presentation to the Audit and Compliance Committee April 2011 meeting. | No further action is required at this time. |

AH_MNAG_000010628

# Shared Services Issues

October, 2011

FAIRVIEW

AH_MNAG_000012728

190

EXHIBIT 44

EXS. TO 6/19/12 KRAUS AFF.

# Topics

- MFS
  - Applying the .01 Rule
  - Not following the AG checklist
    - Not checking for open disputes
    - Not checking for Caid eligibility

FAIRVIEW

AH_MNAG_000012729

191

EXHIBIT 44

EXS. TO 6/19/12 KRAUS AFF.

2

# MFS Performance

## Fairview Specific Issues

• Fairview retains a good relationship with a local pre-collect agency that has the capacity to replace MFS in the Hospital Billing pre-collect business
• Patient satisfaction is held in high regard by Fairview leadership, and all staff and vendors are held responsible to uphold the patient experience
• Fairview has spent considerable time an resources to conform to the Attorney General collection guidelines, and any deviation from the guidelines will result in strict sanctions from the Attorney General
• Payment arrangement maintenance is complex and sometimes requires routine and manual intervention from staff

## Relationship Management

• Leadership and staff are very responsive to requests from Fairview an are willing to spend the time to resolve issues. For instance, MFS re-structured the letter series sent to patients in order to conform to the Fairview Specific AG Agreement
• MFS is reactive and only engages Fairview Management after the issue has been exposed, whereas proactive client management could have prevented the issue in the first place
• MFS' pre-collect practices are viewed by Fairview management and patients as mirroring those of a bad debt collection agency, and much attention has been given to MFS staff from Fairview to refine scripting and talk-offs
• Refusal to integrate AG checklist into process or problem solve

## Process

• Attention to detail is lacking. For example, MFS returned accounts to be sent to a social services agency using the incorrect close code, which required manual intervention at Fairview to fix the accounts
• MFS continues to call and sent letters to patients who have active payments arrangements with Fairview.
• Consistent reminders are needed to have MFS notify Fairview of disputes received from patients
• MFS moved from a team designated to work Fairview accounts to a specialty team solely dedicated to work MFS accounts without notifying the client
• MFS was unable to find a viable solution to fulfill all requirements of the AG checklist, and in turn, will require additional resources at Fairview

## Results

• Average collections of $1.6M over the past three months
• Overall MFS engagement yield of 39% ([Payment Amount + Adjustment Amount] / [Placement Amount])
• 2% increase in collections from Q1 to Q2 in 2001 despite 40% decrease in outbound calling in same period
• MFS Dormant collection results are not as strong as advertised with an overall 2% yield on accounts placed, and an average of $64K collected over the past 3 months

FAIRVIEW

AH_MNAG_000012730

3

# MFS - Note From PFS System Director

From: Rosenow, Diane J
Sent: Friday, September 30, 2011 5:31:18 PM
To: Crook, Andrew
Cc: Deneui, Laura A; Aliperto, Robert D
Subject: MFS

Andrew – Besides the many conversations we have had about MFS's performance, listed below are a few bullet points that articulates our ongoing frustration. As you know, we had terminated previous pre-collect vendor for professional billing shortly before our Accretive engagement due to performance issues, just as we are experiencing with MFS, only MFS is actually doing worse. Therefore, Fairview cannot continue this relationship with MFS.

- Did not comply with Fairview's implementation requirements pertaining to the Attorney Generals agreement and Community Care guidelines. After audit was determined that Thomas had not read either the Attorney Generals agreement or Fairview's Community Care Policy.

MFS's working model is that of a third party collection agency, but suppose to be a first party model. Resulting in numerous patient complaints and confusion for patients.

- They are reluctant to change their business practices to support Fairview's needs, but rather want to manage our business the same as they do everyone else.
- Does not work in FV's host system (PASS or EPIC).
- Patients in payment arrangements continue to receive collection notices and phone calls.
- MFS receives patient payment. MFS destroys the patient's original check and reissues a check to Fairview for payment, the dates of the checks do not match causing issues when we try and verify payments. This practice was not approved by Fairview, not even discussed.

Let me know if you have any questions.

Kind regards,

Diane

EXS. TO 6/19/12 KRAUS AFF.       EXHIBIT 44       193

FAIRVIEW

AH_MNAG_000012731

DRAFT

**FAIRVIEW HEALTH SERVICES**
**INTERNAL AUDIT**

**2011 BACK END COLLECTIONS PROCESS AUDIT**

**REPORT ON FINDINGS, RECOMMENDATIONS**
**AND MANAGEMENT RESPONSES**

*Report No. 2011-29*
*December 30, 2011*

*Internal Audit Contacts*

| | |
|---|---|
| A. Douglas Vickers, Vice-President, Chief Audit Executive & Chief Compliance Officer | 612-672-2217 |
| Lorrie Ghose, Director, Internal Audit | 612-672-7888 |
| Lariza Carlson, Senior Auditor, Internal Audit | 612-672-7902 |

**Distribution List**
Mark Eustis, President & Chief Executive Officer, Fairview Health Services
George Chresand, Senior Vice-President & General Counsel, Fairview Health Services
Dan Fromm, Chief Financial Officer, Fairview Health Services
Laura Deneui, Vice President, Revenue Cycle, Fairview Health Services
Andrew Crook, Vice President, Accretive Health Inc.
Diane Rosenow, Senior Director, Business Operations, Fairview Health Services
Bob Aliperto, Director, Hospital Revenue Cycle, Fairview Health Services
Lois Dahl, Director, Privacy, Fairview Health Services
David Leach, Treasurer, Fairview Health Services
Scott Roste, Legal Counsel, Fairview Health Services

AH_MNAG_000004239

DRAFT

## EXECUTIVE SUMMARY

In accordance with Fairview Health Services' 2011 Internal Audit Plan, as approved by the Audit and Compliance Committee of the Board of Directors, Fairview Internal Audit conducted a Back End Collections audit to review and test collection processes as well as validate the corrective action plans for the 2011 Attorney General's Office (AGO) 2007 Collection Standards Agreement Audit – Fairview Health Services.

Fairview Health Services currently uses vendors to augment collection processes.  Specifically, in 2010, Fairview engaged Medical Financial Solutions (MFS), a division of Accretive Health, to perform internal and third party collections services for hospital accounts that existed in the PASS billing system which is now phased out.  Epic accounts in pre-collections status are handled by ProSource, a division of Array Services. J.C. Christensen (JCC), also a division of Array, and D.S. Erickson Associates PLLC perform all collections and legal action activities, respectively, regardless of the system.  The objective of this audit was to ensure that policies, procedures, and regulatory guidelines around collection activities were being followed adequately.

Our audit procedures were conducted in accordance with the *International Standards for the Professional Practice of Internal Auditing*. Limited reliance was placed on audit procedures performed in prior years except for the aforementioned 2011 AGO Agreement Audit.

Audit procedures were performed at the Central Business Office (CBO)/Patient Financial Services (PFS) as well as ProSource.  Additional procedures included interviews and/or testing with other vendors, such as MFS, and JCC as well as key Fairview contacts in IT Security, the Treasurer, and the Director of Privacy.  Audit procedures were performed from mid-November to mid-December and included:

- Interviewing key personnel and performing walkthroughs to ensure that procedures are functioning as designed,
- Reviewing policies, procedures, regulatory standards, and process workflows,
- Reviewing complaint logs and other supporting documentation,
- Reviewing and testing a sample of accounts to ensure that they were handled appropriately, and
- Reviewing vendors' correspondence with patients.

Our review revealed 5 findings, 4 of which we believe are High Priority and warrant the Audit and Compliance Committee's attention:

### *Noncompliance with Multiple Regulatory Standards (2011-29-01H)*

We identified potential violations, on the part of MFS, of various regulatory standards including Health Insurance Portability and Accountability Act (HIPAA), Fair Debt Collections Practices Act (FDPA), Payment Card Industry (PCI), and Minnesota State Statutes.

### *Inadequate Corrective Actions to AGO Review (2011-29-02H)*

Despite reporting corrective actions to remediate the issues found in the 2011 AGO Agreement Audit, IA found that issues continue to exist.

### *Inappropriate Handling of Patient Accounts (2011-29-03H)*

Examples of accounts were found to be inappropriately handled by MFS.  Inappropriate handling of accounts could lead to the inability to

2

AH_MNAG_000004240

**DRAFT**

capture and collect on accounts, distinguish accounts that need follow up in order to bill and collect accordingly, poor customer satisfaction, and potential regulatory violations.

*Issues as a Result of Not Using Host System (2011-29-04H)*
Because MFS doesn't use the PASS system to review and work accounts, vital information has been missed resulting in the mishandling of accounts. Additionally, some accounts have fallen off of their inventory in the transfers, which results in the accounts not being worked.

Based on our procedures, we believe that the control environment over the Back End Collections Process is *Unsatisfactory*. We believe management preparedness over the areas reviewed is *Aware but Limited Preparedness* (see appendix A for details).

Our review indicates that MFS has been deficient in this process from the perspectives of regulatory compliance, operational efficiency, reimbursement, and customer satisfaction. During this review, an employee of MFS sent PHI and credit card information via the internet in an unsecure manner. As there have been other instances of Privacy and/or Security issues unrelated to this specific audit, we are very concerned about the lack of protection of our patient's private information. Based on our findings, we support the ongoing evaluation of our relationship with MFS as it pertains to these specific processes.

We have documented our findings in the audit report matrix, which is attached.

3

AH_MNAG_000004241

DRAFT

**MANAGEMENT COMMITMENT**

As management overseeing these areas of responsibility, I commit to our action plans and completion dates as reported in management's response to the findings as stated in this audit report.

X_____     Date_____

Laura Deneui, Vice President, Revenue Cycle, Fairview Health Services

**INTERNAL AUDIT COMMITMENT**

As management responsible for the results of this examination made by Internal Audit, I commit to reporting management's response to the findings to the Audit and Compliance Committee of the Board of Directors.

X_____     Date_____

A. Douglas Vickers, Vice-President, Chief Audit Executive & Chief Compliance Officer, Fairview Health Services

4

AH_MNAG_000004242

**DRAFT**

**HIGH PRIORITY**

Our procedures revealed the following High Priority findings which warrant the Audit and Compliance Committee's attention.  A High Priority finding represents breakdowns in the control environment and includes such conditions as risk to patient care, risk of material financial loss, notable risk to reputation, etc.  These findings as well as our recommendations and management's responses, are summarized below:

| FINDING | MANAGEMENT RESPONSE |
|---|---|
| *Noncompliance with Multiple Regulatory Standards (2011-29-01H)* | **Action Plan:** |
| We identified potential violations of various regulatory standards on the part of MFS.  Some examples are:<br>• Patient complaints regarding Fair Debt Collection Practices Act (FDCPA) violations,<br>• Outstanding AGO violations mentioned in *2011-29-2H* below,<br>• When IA requested a file of customer calls to review for this audit, MFS management emailed a file which contained PHI and full credit card information to the auditor in an unsecure manner,<br>• Potential PCI compliance issues were identified including the sending of full credit card information in a spreadsheet to Fairview for posting purposes.  Subsequent to the identification of this issue, Fairview management immediately resolved it.<br>• Despite Fairview's directive, required verbiage is still absent from MFS' collection letters per State Statute 332.37 (21) which requires the disclosure that they are licensed with the Department of Commerce.<br><br>Noncompliance to these standards results in legal, regulatory, operational, reputational, and financial risks to the organization.<br><br>We recommend that strict improvement plans be developed, documented, implemented, and enforced with this vendor. Additionally, both parties should agree to and document consequences to inadequate improvement. | **Completion Date:**<br><br>**Accountable Party(s):** |

5

DRAFT

| *FINDING* | MANAGEMENT RESPONSE |
|-----------|---------------------|
|           |                     |

6

AH_MNAG_000004244

aa

DRAFT

8

AH_MNAG_000004246

DRAFT

| FINDING: | MANAGEMENT RESPONSE: |
|----------|----------------------|
|          |                      |

9

AH_MNAG_000004247

DRAFT

10

Despite being on their inventory for over a year, the a had only | Action Plan

AH_MNAG_000004248

DRAFT

11

AH_MNAG_000004249

DRAFT

| FINDING | MANAGEMENT RESPONSE |
|---|---|
| *Issues as a Result of Not Using Host System (2011-29-04H)* | **Action Plan:** |
| MFS has chosen to utilize their own in-house system for all aspects of Fairview accounts. Unlike ProSource who review account information in Epic and utilize their own system to augment this process, MFS has opted to feed partial notes from PASS into their own in-house system. Part of this decision was made so that they can run an algorithm on the data to determine propensity to pay scoring on guarantors which directly feeds their dialer system. Because MFS doesn't use the PASS system to review and work accounts, key account information has been missed such as situations where the payer has reprocessed the account, or where a portion of the account is pending payment by payer.

Additionally, some accounts have fallen off of their inventory in the transfers, which results in the accounts not being worked. During testing, we found several samples that were not provided notes as MFS stated the accounts were not in their inventory. However, PASS notes state that the files were transferred in 3 out of 5 of these.

Without using our system, MFS is at risk of not having the necessary information to adequately and accurately handle the account.  If accounts are mishandled, Fairview could see financial, regulatory and reputational risks.  Finally, file transfers are always at risk of potential security breaches despite the best of efforts to ensure their protection. Therefore, we recommend that our vendors utilize the home system whenever possible. | **Completion Date:**

**Accountable Party(s):** |

12

AH_MNAG_000004250

DRAFT

**Low Priority Comments**

Low Priority comments cover situations that are not considered High or Moderate Priority. Low Priority comments may include comments on process improvement based on audit observations, matters that came to our attention during the audit where we believe management should be apprised of the situation, yet no financial, operational, or regulatory compliance control has been violated and no recommendations can yet be formulated, or matters outside of our audit scope that may warrant management consideration. Written responses are not required for this category.

**Some Processes Need Improvement**

During testing, it was determined that 7 out of the 50 Epic accounts sampled had deficiencies mostly due to the improper dispositioning of accounts and the inappropriate holding of accounts that should have gone to bad debt. However, none of these accounts were outstanding for over a month. When ProSource was made aware of these issues; they immediately corrected the issues and spoke with staff. Management should establish controls to monitor for these and similar issues.

13

AH_MNAG_000004251

**From:**    "Deneui, Laura A" <LDENEUI1@Fairview.org>
**To:**      'Andrew Crook' <acrook@accretivehealth.com>
**Received(Date):**    Tue, 10 Jan 2012 06:02:19 -0600
**Subject:**  MFS
<u>Mgmt Letter Responses 2011 AG.doc</u>

Andrew,

As you are aware in 2007 Fairview entered into an agreement with the Minnesota Attorney
General around Collection Standards.  As part of this agreement, our Internal Audit department
conducts annual audits of our collection partners.  The audit that was done in April 2011
identified several significant issues with MFS.  The results of this audit were brought to the
Audit and Compliance Committee of the Board.  I have attached a copy of the results of that
audit as well as managements response.

In December 2011, Internal Audit conducted an audit of our collection processes.  Again it was
found that MFS was not meeting the standards of our agreement with the Attorney General.
These findings will be reported to the Audit and Compliance Committee at the end of January.  I
have included a section of the report below:

*Our review revealed 5 findings, 4 of which we believe are High Priority and warrant the Audit and Compliance Committee's attention:*

**Noncompliance with Multiple Regulatory Standards (2011-29-01H)**

*We identified potential violations, on the part of MFS, of various regulatory standards including Health Insurance Portability and
Accountability Act (HIPAA), Fair Debt Collections Practices Act (FDPA), Payment Card Industry (PCI), and Minnesota State Statutes.*

**Inadequate Corrective Actions to AGO Review (2011-29-02H)**

*Despite reporting corrective actions to remediate the issues found in the 2011 AGO Agreement Audit, IA found that issues continue to exist.*

**Inappropriate Handling of Patient Accounts (2011-29-03H)**

*Examples of accounts were found to be inappropriately handled by MFS.  Inappropriate handling of accounts could lead to the inability to
capture and collect on accounts, distinguish accounts that need follow up in order to bill and collect accordingly, poor customer satisfaction,
and potential regulatory violations.*

AH_MNAG_000006272

**Issues as a Result of Not Using Host System (2011-29-04H)**

*Because MFS doesn't use the PASS system to review and work accounts, vital information has been missed resulting in the mishandling of accounts. Additionally, some accounts have fallen off of their inventory in the transfers, which results in the accounts not being worked.*

This will be the second time that these issues will be brought to the Audit and Compliance Committee and this is unacceptable.

As a result, I have asked my team to develop a plan from transitioning this business away from MFS. This needs to be done by January 31, 2012.

If you have any questions, please let me know.

Laura

Laura A. DeNeui

Vice President Revenue Cycle Management

Fairview Health Services

office number: 612-672-6723

ldeneui1@fairview.org

AH_MNAG_000006273

P Please don't print this e-mail unless you really need to. Thank you

The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, including 'protected health information'. If you are not the intended recipient, you are hereby notified that any review, retransmission, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please destroy and delete this message from any computer and contact us immediately by return e-mail.

AH_MNAG_000006274