# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of Minnesota, by its                 Civil File No. 12-145 RHK/JJK
Attorney General Lori Swanson,

           Plaintiff,

      v.                       **SECOND AMENDED AND**
                              **SUPPLEMENTAL COMPLAINT**

Accretive Health, Inc.,

           Defendant.

The State of Minnesota, by its Attorney General Lori Swanson, brings this action against Defendant Accretive Health, Inc. ("Accretive" or "Accretive Health") for violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health ("HITECH") Act, Pub. L. No. 111-5, 123 Stat. 226, and Department of Health and Human Services Regulations at 45 C.F.R. § 160 *et seq.*; the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*; Minnesota's debt collection statutes, Minn. Stat. Ch. 332; and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.* & 325F.68 *et seq.*, as follows:

## INTRODUCTION

1.      Accretive is a portfolio company of the New York private equity fund Accretive, LLC, which has a controversial history in Minnesota relating to the arbitration and collection of consumer debts. Accretive wears a number of hats as it relates to the

patients of two Minnesota hospital systems and, for one of the hospital systems, is at once both a debt collector and treatment coordinator.

2.      Accretive is licensed as a debt collection agency in Minnesota.  Accretive largely assumed control of the management and operations of the so-called "revenue cycles" of both Fairview Health Services ("Fairview") and North Memorial Health Care ("North Memorial"), including their scheduling, registration, admissions, billing, collection, and payment functions.  Accretive assumes managerial responsibility for the hospital employees who perform these functions and "infused" its own employees into the staff of the hospitals.  Accretive engages in "data mining" and "consumer behavior modeling" on patients, as described below.

3.      Fairview was the first hospital system in the country to hire Accretive to deliver services under a so-called "Quality and Total Cost of Care" ("QTCC") contract. Under this contract, Accretive helped Fairview negotiate contracts with HMOs and insurance companies through which the hospital receives incentive pay to cut patient costs.  Accretive then receives a share of the hospital's incentive pay.  Under the QTCC contract, Accretive developed "risk scores" on individual patients and managed health risk assessments, automated care plans, case and pharmacy management, and duration of hospital stays.  Accretive tells its Wall Street investors that it identifies patients who are deemed "outliers" and tracks utilization and profit and loss by patient.  Fairview has called Accretive its "strategic partner."  Their relationship was so extensive that Fairview accounted for over 13 percent of Accretive's service revenue for the first three quarters of

2011 (over $75 million).   The financial projections indicated that this financial entanglement would grow once a new contract, discussed below, was fully implemented.

4.   Through these extensive relationships, Accretive has compiled a high volume of extremely sensitive and personal medical, financial, and other records involving at least tens of thousands of Minnesota patients of the two hospital systems. Some of the data was stored on an unencrypted laptop computer.   The laptop was left by an Accretive employee in plain sight in a rental car outside the bar and restaurant area of the Seven Corners area of Minneapolis.   The computer was stolen and, with it, data on at least 23,531 Fairview and North Memorial patients.   In response to one patient's request, Fairview provided the patient with a "screen shot" of the data about the patient that it says was on the laptop.   The screen shot (attached as paragraph 52) sent to the patient by Fairview includes a "medical score" to predict the likelihood that the patient would be admitted to the hospital, a "medical score" to predict the "complexity" of the patient, a description of the "frailty" of the patient, and the dollar amount allocated to the patient's health care provider.   In addition, the data disclosed personal identifying information about the patient, including the patient's name, address, phone number and Social Security number.   The screen also included an itemization of whether the patient had 22 listed conditions, including bipolar disorder, schizophrenia, depression, high blood pressure, asthma, and even low back pain.   Accretive violated privacy laws by failing to keep private patient data secure.

5.   Acting as a licensed debt collector, Accretive has at times masked its true identity with Minnesota patients and has failed to comply with the requirements of

3

Minnesota's debt collection laws. Accretive has orchestrated and implemented practices to collect money from Minnesota patients in hospital emergency rooms, at patient bedsides, and at hospital registration desks in ways and using tactics that violate Minnesota law.

6. Through this Complaint, the State of Minnesota seeks to hold Accretive accountable for its violations of health privacy laws, state debt collection laws, and state consumer protection laws. The State also seeks through this action to determine and disclose to patients the extent of Accretive's access to data and the manner in which it utilizes such data.

## JURISDICTION AND VENUE

7. The Court has jurisdiction pursuant to 42 U.S.C. § 1320d-5(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

8. Plaintiff has provided notice of this action to the Secretary of Health and Human Services as required under 42 U.S.C. § 1320d-5(d)(4).

9. Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

10. Lori Swanson, the Attorney General of the State of Minnesota, is authorized under HIPAA, Minn. Stat. Ch. 8, Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection statutes, and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens.

11.     Accretive is a Delaware corporation with its principal executive offices located at 401 North Michigan Avenue, Suite 2700, Chicago, Illinois.  Its chief executive officer is Mary A. Tolan, and its Chairman of the Board is J. Michael Cline.  Accretive was incorporated under the name Healthcare Services, Inc. in 2003 and changed its name to Accretive Health, Inc. in 2009.  Its shares trade under the symbol "AH" on the New York Stock Exchange.  Accretive has been registered as a foreign corporation with the Minnesota Secretary of State since December 20, 2010 and, on that same date, registered "Medical Financial Solutions" as an assumed name with the Minnesota Secretary of State.  Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial Solutions" as an assumed name with that agency, and is currently licensed as a debt collector with that agency.  As of the filing of the Complaint, Accretive listed Steve Walters as its sole individual collector.  Accretive transacts or transacted business in the State of Minnesota, including on behalf of both Fairview and North Memorial.

12.     At all times relevant hereto, Fairview has been a health care provider that operates certain affiliated entities under common ownership or control, which are treated as a covered entity for purposes of HIPAA.  45 C.F.R. § 160.103.  At all times relevant hereto, North Memorial has been a health care provider within the meaning of HIPAA. *Id.*  As health care providers, Fairview and North Memorial are covered entities within the meaning of HIPAA, and thus are required to comply with the HIPAA federal standards that govern the security and privacy of protected health information.  *See* 42 U.S.C. § 1320d-1(a); 45 C.F.R. § 160.103.

13.     At all times relevant hereto, Accretive has acted as a "business associate" of North Memorial and as such, has obtained access to protected health information on North Memorial's patients. 45 C.F.R. § 160.103. As a "business associate," Accretive was required to enter into a business associate agreement with North Memorial, which required it to comply with the HIPAA federal standards that govern the security and privacy of protected health information. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2). This agreement is intended to safeguard the protected health information of North Memorial patients and other persons protected by HIPAA. As a "business associate," Accretive is also required to comply with HIPAA's security and privacy standards as a matter of law. *See, e.g.,* 42 U.S.C. §§ 17931-34. As set forth below, although it entered into a "revenue cycle" contract with North Memorial in March, 2011, Accretive did not sign a written "business associate agreement" with North Memorial until October, 2011, after the Minnesota Attorney General requested a copy of the agreement.

14.     With respect to Fairview's patients, Accretive has acted as a "health care provider" at all times relevant hereto. *See* 42 U.S.C. § 1320d(3); 45 C.F.R. § 160.103. Because Accretive is a "health care provider" who transmits health information in electronic form in connection with a transaction referred to in 42 U.S.C. § 1320d-2(a)(1), Accretive is a "covered entity" for purposes of HIPAA. *See* 42 U.S.C. § 1320d-1(a); 45 C.F.R. § 160.103. Thus, as a "covered entity" within the meaning of HIPAA, Accretive is required to fully comply with the HIPAA federal standards that govern the security,

breach notification, and privacy of protected health information, as amended by HITECH. *Id.*

15.     In the alternative, with respect to Fairview's patients, Accretive has acted as a "business associate" at all times relevant hereto, and as such, has obtained access to protected health information on Fairview's patients. 45 C.F.R. § 160.103. As a "business associate," Accretive was required to, and did, enter into a business associate agreement with Fairview, which required it to comply with the HIPAA federal standards that govern the security and privacy of protected health information. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2). This agreement is intended to safeguard the protected health information of Fairview patients and other persons protected by HIPAA. As a "business associate," Accretive is also required to comply with HIPAA's security and privacy standards as a matter of law. *See, e.g.,* 42 U.S.C. §§ 17931-34.

## FACTUAL ALLEGATIONS

1.     **Accretive, LLC's Prior Debt Collection Activity.**

   a.     **Accretive, LLC's Relationship with the National Arbitration Forum.**

16.     Accretive was incorporated in 2003 as a "portfolio company" of Accretive, LLC, a New York City private equity fund founded in 1999 by Wall Street investment manager J. Michael Cline. In court filings, Accretive, LLC has described itself this way: "Accretive manages private equity funds which invest largely in companies that manage back-office administrative processes."

17.    Cline is the Chairman of the Board of Accretive.  As of April 20, 2011, Cline and Accretive Investors SBIC, L.P., of which Cline is managing member, each owned 19.4 percent of Accretive, for a combined 38.8 percent ownership.  In 2010, Accretive, LLC arranged a public offering for Accretive Health, netting over $100 million in proceeds.

18.    Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011.  It sometimes performs debt collection activities in Minnesota under the assumed name "Medical Financial Solutions."

19.    Accretive, LLC has a controversial history in the debt collection business in Minnesota and nationwide.  By 2009, through a series of acquisitions, corporate formations, management contracts, and asset transactions engineered by Accretive, LLC, the equity fund simultaneously took control of the nation's largest debt collection enterprise and became affiliated through ownership and governance interests with the nation's largest consumer debt collection arbitration company.  This occurred through a series of transactions engineered by Accretive, LLC involving three major companies: National Arbitration Forum (an arbitration company based in Minnesota), Axiant, LLC (a debt collection agency), and Mann Bracken (at the time, the nation's largest collection law firm).  The transactions can be summarized as follows:

a.    Accretive, LLC formed a series of private equity funds under the name "Agora" (Greek for "Forum"), which in turn acquired a $42 million, 40 percent financial interest and governance rights in the Minnesota-based National Arbitration Forum.  The Forum was the nation's largest arbitration firm

for consumer credit card collections, handling over 200,000 consumer arbitrations each year.

      b.     Accretive formed and funded a large national debt collection agency called Axiant, LLC, which became a debt collector for the credit card industry and debt buyers. Accretive, LLC owned over 68 percent of Axiant.

      c.     Axiant then acquired the assets and collections operations of the Mann Bracken law firm, the nation's largest collection law firm (which had previously acquired two other large national collection law firms). Of the 214,000 consumer arbitrations processed by the National Arbitration Forum in 2006, 125,000, or almost 60 percent, were filed by Mann Bracken and its predecessors.

20.     Through these transactions, Accretive, LLC essentially took control of the entire "revenue cycle" (e.g., the collection agency, the prosecuting law firm, and the neutral arbitrator) for consumer credit card collections in the United States. Accretive, LLC wanted to form a "broad arbitration ecosystem" which would pay huge financial dividends for the equity fund. Prior to this scheme, law firms were generally owned by individual lawyers due to professional regulations that prohibit for-profit corporations or non-lawyers from owning law firms, such that Wall Street could not profit from law firm revenues. Through these transactions, Accretive, LLC essentially sought to "monetize" for Wall Street investors the profits to be made from debt collection law firms. According to Accretive, LLC's internal documents, the executives wanted their debt collection and arbitration system to expand to "become a comprehensive, alternative legal system."

21.     In July, 2009, the Minnesota Attorney General filed a lawsuit against the National Arbitration Forum and its affiliates in Hennepin County District Court in Minnesota.  The lawsuit alleged, in part, that the National Arbitration Forum—which held itself out as an independent and neutral arbitration company—misled consumers, courts, and the public about the extensive financial and governance cross-ties with Accretive, LLC, which constituted an irreconcilable conflict of interest.

22.     As a result of the litigation, the National Arbitration Forum (the arbitration company) exited the consumer arbitration business.  Shortly thereafter, in November, 2009, Axiant (the debt collector) filed for bankruptcy in United States Bankruptcy Court in Delaware.  In or about January, 2010, Mann Bracken (the collection law firm) closed its doors and was placed into judicial receivership in Montgomery County Circuit Court in Maryland.  At the time of their closure, all three entities had been the subject of many consumer complaints alleging heavy-handed collection conduct.

### b.     Accretive Health and the National Arbitration Forum.

23.     Before the three companies shut their doors, Accretive, LLC angled to profit even more by joining the Forum's operations with those of Accretive Health. Accretive, LLC wanted to "launch" the Forum into the arbitration of health care disputes between patients and hospitals using Accretive Health and stated that it had spoken with Accretive Health CEO Mary Tolan about placing arbitration clauses in hospital-patient agreements.  Accretive, LLC told the Forum that one of Accretive Health's clients—the largest non-profit hospital in the country (Ascension Health of Missouri)—had provided it with access to "$1Bn of dormant receivables to attempt collection, as a sideline to the

core relationship." Accretive, LLC told the Forum that, if they did business together, "[w]e believe our deep expertise and relationships in healthcare should enable us to jump-start NAF's expansion into an extraordinary market opportunity: the use of arbitration in consumer healthcare disputes and payments." Accretive, LLC told the Forum that it wanted to "leverage [the] Accretive network" and set forth a plan in which: "In new industries, such as healthcare, NAF Procedures are used early and consistently as the standard method for resolving payment disputes. By playing a prominent role, NAF fundamentally shapes the collections players and tactics that emerge in these industries."

**2.    Accretive Returns to Minnesota with Accretive Health.**

**a.    Accretive Health Has Taken Over Management of the "Revenue Cycles" of Fairview and North Memorial.**

24.    Accretive makes most of its money by entering into "Revenue Cycle Operations" contracts with hospitals. Through these contracts, Accretive largely takes control of the scheduling, eligibility verification, registration, admissions, coding and clinical documentation, dealing with third party payors, billing, and collection and payment functions at its client hospitals. According to its "Revenue Cycle Operations" contracts with Fairview and North Memorial, this includes acting as a processing agent for the hospitals and submitting medical claims to third party payors. Accretive assumes managerial responsibility for hospital employees who perform these functions and "infuses" its own employees into the staffs of the hospitals. Accretive receives both base fees and incentive payments for working with hospitals to boost their revenue and/or cut their costs.

25.     On its website, Accretive, LLC describes its portfolio company, Accretive Health, this way: "Accretive Health takes over responsibility for the people, process and technology associated with the entire revenue cycle process." It told Wall Street investors on January 12, 2011 that it has "no direct competitors" who perform these broad functions. In its 2010 Annual Report, Accretive estimated that up to $50 billion could be made through these services nationwide (calculated at five percent of about $1 trillion in annual revenue at the nation's hospitals and large physician organizations).

26.     Accretive entered into a Revenue Cycle Operations contract with Fairview in March, 2010, which became effective on May 1, 2010. Fairview is a large health care system that operates seven hospitals and numerous primary, specialty, and urgent care clinics. Fairview accounted for 10.7 percent (or over $64 million) of Accretive's net service revenue of $606 million in 2010, according to Accretive's 2010 Annual Report. For the nine months ending September 30, 2011, Fairview accounted for 13.3 percent (or over $75 million) of Accretive's net service revenue of $566 million. Fairview has called Accretive its "strategic partner."

27.     Accretive entered into a Revenue Cycle Operations agreement with North Memorial in March, 2011. North Memorial operates one hospital and numerous clinics in Minnesota.

28.     Accretive assumes responsibility for a client hospital's "revenue cycle" functions. It controls and directs the work of hospital employees who are engaged in "revenue cycle" activities. It also places Accretive employees—who it calls "infused management"—inside the hospitals and "connect[s] [its] proprietary technology and

12

analytical applications to the hospital's existing technology systems." Accretive has summed up this contract this way: "We embed our technology, personnel, know-how and culture within each customer's revenue cycle activities and serve as the customer's on-site operational partner."

29.    Accretive describes the breadth of its revenue cycle management services like this: "For our purposes, the revenue cycle starts when a patient registers for future service or arrives at a hospital or clinic for unscheduled service and ends when the hospital has collected all the appropriate revenue from all possible sources."

30.    In its 2010 Annual Report, Accretive states: "[W]e identify patient accounts with financial risk by applying data mining techniques to the data we have collected." Accretive also "increase[s] the collection rate on patient-owed obligations" in part by using "consumer behavior modeling." Proprietary algorithms assess a patient's "propensity to pay."

31.    Accretive's revenue cycle management contracts "span the entire revenue cycle," including "front office" (scheduling, registration, and admissions), "middle office" (billing), and "back office" (collections). According to Accretive, when a patient registers at a client hospital, Accretive begins to compile "complete patient information" on the patient, such as the patient's Social Security number and insurance eligibility. It performs "real-time" checks for insurance coverage upon admission to assess "each patient's ability to pay." It maintains an "automated electronic scorecard" that tracks each patient, including the patient's payment history, throughout the patient's time as a patient. It identifies patient accounts with financial risk by applying "data mining

13

techniques," and it performs "skip tracing."   Accretive has also performed collections under the revenue cycle management contracts.  Among other things, after health services have been provided and hospital statements have been issued to a patient, but are unpaid, accounts are forwarded to Accretive's Kalamazoo, Michigan office for collection.  Some collectors in Accretive's Kalamazoo office, as well as some of Accretive's employees who it "infused" into its client hospitals, have access to patients' protected health information and/or access to the hospital's patient records systems, which data is used by Accretive collectors in their collection efforts.  This information exceeds the minimum necessary information needed to perform their jobs.

32.     The breadth of Accretive's activities is depicted in the following chart from Accretive's 2010 Annual Report (p. 13):



33.   The breadth of Accretive's involvement at the hospitals is similarly depicted in this chart from Accretive's 2010 Annual Report (p. 22):



**b.    Accretive Contracts with Fairview to Perform Sweeping Functions Relating to the Monetization of Health Treatment.**

34.   Fairview advised the Minnesota Attorney General's office in a letter dated October 14, 2011 that "Accretive Health…assists Fairview in care coordination efforts to help better coordinate and manage patient's health care needs."

35.   Besides the revenue cycle management contract, Accretive and Fairview entered into a five year "Quality and Total Cost of Care" ("QTCC") agreement in November, 2010. As of the filing of its December 10, 2010 Annual Report, Fairview was the only hospital system in the United States that hired Accretive for QTCC services. In a conference with Wall Street investors on January 12, 2011, Accretive called the Fairview QTCC agreement its "inaugural" contract.

36.   Under the QTCC agreement, Accretive helped Fairview negotiate contracts with certain insurance companies and HMOs that allow Fairview to earn incentive payments from the insurers and HMOs for cutting health care costs.  In turn, Accretive receives a share of the hospital's incentive payments under the QTCC agreement for cost savings generated through "managing the care coordination process."  Accretive told Wall Street during an investor conference on November 11, 2010 that health care savings would occur in part through an "intense focus" on "reducing avoidable hospital admissions."  It further said that the "sickest and most impactable patients" would be "identified for proactive management."

37.   Accretive states that the QTCC agreement "can help our customers identify the individuals who are most likely to experience an adverse health event and, as a result, incur high healthcare costs in the coming year."  It further states that when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

38.   The following chart from Accretive's 2010 Annual Report (p. 17) depicts the breadth of Accretive's services:

Our quality and total cost of care services offering includes management of the following processes:

| Risk Evaluation, Stratification & Coding | Delivery & Access | Care Coordination | Admission Management | Coaching & Education | Analytics & Reporting |
|---|---|---|---|---|---|
| • Health Risk Assessment<br>• Accurate claim / medical record documentation<br>• Medical and Rx claim review<br>• Per patient risk score calculation<br>• Best possible revenue calc<br>• Automated care plans<br>• Patient social service determination | • Physician Incentive Structure<br>• Local PCP leadership and governance structure<br>• Comprehensive referral plans<br>• Clinical protocol determination<br>• Contract sub-specialties<br>• Contract ancillary services<br>• Community resources<br>• Specialist efficiency evaluation | • Post-Discharge follow-up<br>• Authorizations<br>• Case Management<br>• On-boarding<br>• Home assessments<br>• Referrals and Referral links to PCP<br>• Scheduling<br>• Medical necessity review<br>• Pharmacy Management | • Hospitalist program / ED management<br>• Daily census – Acute / Skilled / LTAC<br>• Patient review by facility<br>• Length of stay management<br>• Discharge planning<br>• Delivery System re-entry<br>• Transitional care | • Performance management– Revenue, Cost, Quality, & Service reviews<br>• Population-based opportunity reviews<br>• Training & education on delivery<br>• Benefit / Eligibility<br>• Provider service issues | • Quality scorecard<br>• Pricing / Benefit evaluations<br>• Utilization by all healthcare service types<br>• P/L by Patient, PCP, Group, Network<br>• Peer group analysis<br>• Outlier determinations |
| **Payer Relationship Management** | | | | | |
| **People & Technology** | | | | | |

39.    Thus, according to the above table and the QTCC contract, Accretive is responsible for the management of: "risk scores" for each patient, development of automated care plans for patients, case management, length of hospital stay management, and discharge planning, among other things. It also performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

40.    The breadth of the managed care services to be provided by Accretive to Fairview is also reflected in the various job ads posted by Accretive to staff the Fairview account. For example, in September, 2011, Accretive posted an ad for an "Analytics Manager" to staff the Fairview contract. The advertisement states that the person will "aggregat[e] and analyz[e] patient population data and leverag[e] predictive models in order to identify innovative strategies for population management." As noted above,

Accretive told its Wall Street investors that "population-based management" focuses on identifying the "sickest and most impactable patients" for "proactive management."

41.     Accretive employed registered nurses and social workers as "clinical care coordinators" at Fairview clinics to fulfill its services under the QTCC agreement. These Accretive nurses and social workers collaborated with Fairview's physicians and other Fairview and Accretive personnel to create health care plans for Fairview patients based, in part, on conversations with primary care physicians, patients and families, as well as their review of the patients' charts and other protected health information and data regarding the cost and the utilization of the patient's health care. Accretive's nurses and social workers also helped to execute the health care plans of individual Fairview patients by communicating, counseling, and educating the patients as well as further collaborating with Fairview's primary care physicians and other Fairview and Accretive staff.

42.     The registered nurses and social workers that Accretive employed pursuant to the QTCC agreement and infused into Fairview's clinics held themselves out to patients as Fairview employees—going so far as to wear identification badges that suggest or imply they are with Fairview—when in fact, the registered nurses and social workers are embedded Accretive employees.

**3.     Accretive Loses Sensitive Data on at Least 23,531 Minnesota Patients.**

43.     Accretive is licensed as a debt collector with the State of Minnesota and, in fact, collected debts for at least one Minnesota hospital system (Fairview). At the same time, it also assisted Fairview with health care management and medical necessity review.

44.     Accretive also manages the "revenue cycle" of North Memorial.  (North Memorial advised the Attorney General's Office in a letter dated October 17, 2011 that Accretive does not perform debt collection services for it.)

45.     Accretive states that, among other things, it engages in "data mining," "skip tracing," "consumer behavior modeling," and "per patient risk score calculation" on patients.

46.     Through these services and others, Accretive amasses and has access to a high volume of sensitive and personal information, including medical information, about Minnesota patients served by the two hospitals.

47.     Accretive does not limit the access to this protected health information to the persons or classes of persons in its workforce who need access to it to carry out their duties under either the "Revenue Cycle Operations" contracts or the QTCC contract.  In addition, Accretive does not limit the protected health information that it provides to its employees to the "limited data set,"[1] to the extent practicable, as defined in 45 C.F.R. § 164.514(e)(2), or to the "minimum necessary," amount to accomplish the intended purpose of such use or disclosure.  *See* 45 C.F.R. §§ 164.502(b); 164.514(d).  Indeed, in disregard of HIPAA's privacy standards and the terms of its business associate agreements, Accretive has systematically made the protected health information that it

---

[1]  HITECH Section 13405(b) (42 U.S.C. § 17935(b)) provides that until the Secretary of Health and Human Services issues guidance on what constitutes "minimum necessary" under HIPAA, a covered entity or business associate is considered to be in compliance with HIPAA's "minimum necessary" requirement only if it limits such protected health information, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2).  As of the date of filing the First Amended Complaint, the Secretary has not yet issued such guidance.

creates, receives, maintains or transmits readily accessible to many of its employees who should not have access to it, including to debt collectors. In a May 11, 2012 report to the U.S. Senate, Accretive stated that for the first eight months after entering into the revenue cycle contract with Fairview, until November, 2010, its debt collectors in Kalamazoo, Michigan had full access to Fairview's electronic health record system, called PASS. Fairview's PASS system contains extensive health information about Fairview's patients, including detailed information about their specific medical conditions and treatment. Accretive further stated that in or about November, 2010 it "began implementing" new software so that not every one of its Kalamazoo, Michigan debt collection employees would have access to the PASS system. It further stated, however, that the software was not fully operational until February, 2011 and that some debt collectors continued to have access to the extensive health information in Fairview's PASS system until "early 2012." Accretive debt collection agents also had access to health information about Fairview patients, including their diagnoses, through the "WinCollect" software utilized by Accretive. The health information accessed by Accretive's debt collectors exceeded the information needed by them to perform their collection activity and was used to gain leverage over patients.

48.     On or about July 25, 2011, an Accretive employee, Matthew Doyle, left an unencrypted laptop computer containing extremely sensitive data about Fairview and North Memorial patients in plain sight in the back seat of a rental car parked in the Seven Corners bar and restaurant district of Minneapolis. The laptop was stolen.

49.     The information on the laptop was not encrypted.   The laptop was only password protected.   The laptop contained sensitive personal information on at least 23,531 Minnesota patients.   All told, the laptop contained the names of almost one quarter million Fairview patients.

50.     On or about September 20, 2011, Accretive informed Fairview that protected health information of approximately 14,000 Fairview patients was contained on the stolen laptop.   Accretive stated that the laptop contained protected health information, including the names, addresses, dates of birth, Social Security numbers, other identifiers, clinical information, including diagnosis and conditions, and other financial information on Fairview patients.   Other information on the laptop about Fairview patients included their dates of service, account balances, account numbers, and medical record numbers. All told, upon information and belief, the laptop contained the names of about 242,000 Fairview patients.

51.     Paragraph 52 contains a "screen shot" sent by Fairview to one of its patients who requested an accounting of the information about the patient that was on the laptop.   The information on the "screen shot" sent by Fairview to the patient included the following:

- Patient's full name
- Gender
- Number of dependents
- Date of birth
- Social Security number
- Clinic and doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay

- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma
  - HIV
  - Metabolism disorder
  - Hypertension
  - Hypothyroidism
  - Immune suppression disorder
  - Ischemic heart disease
  - Osteoporosis
  - Parkinson's Disease
  - Asthma
  - Arthritis
  - Schizophrenia
  - Seizure disorder
  - Renal failure
  - Low back pain

52.   This is a redacted copy of the "screen shot" sent by Fairview to the patient:

| First Name | Last Name | MID INITIAL | HMU ID | Patient ID | Group Number | Subscriber Number | Dependent Code | Gender | Date of Birth |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0 | ▮ | ▮ |

| Age | Months Enrolled | Active Last Day | Address 1 | Address 2 | City | State | Zip Code | Phone Number | Attributed TIN |
|---|---|---|---|---|---|---|---|---|---|
| ▮ | 12 | Yes | | | | | | | |

| Attributed Clinic | Attributed Provider | Provider (Short) | Predicted Complexity | Total Provider Allowed | Probability of IP Stay | Trail Condition | # Hospital Dominant Conditions | # Chronic Conditions | Macular Degeneration |
|---|---|---|---|---|---|---|---|---|---|
| FAIRVIEW | ▮ | ▮ | 2.287 | $4,984.50 | 0.06 | No | 0 | 4 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | | 1 | 0 | 0 | 1 | 0 | 1 | 0 |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | COPD | Renal Failure | Low Back Pain |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

| Bipolar Disorder | CHF | Depression | Diabetes | Glaucoma | HIV | Lipid Metabolism Disorder | Hypertension | Hypothyroidism | Immune Suppression / Transplant |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | Good | -- | -- | Good | -- | Good | -- |

| Ischemic Heart Disease | Osteoporosis | Parkinsons | Asthma | Arthritis | Schizophrenia | Seizure Disorder | Predicted Complexity (SORTED) | Total Provider Allowed | Probability of IP Stay |
|---|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | -- | -- | -- | -- | 1600 | 2136 | 1206 |

| # Hospital Dominant Conditions | # Chronic Conditions | Top- Complexity | Top- Allowed Amt | Top- Both Complexity & Allowed Amount | Top- Either Complexity & Allowed Amount |
|---|---|---|---|---|---|
| 243 | 366 | 0 | 0 | 0 | 0 |

53.     Accretive informed North Memorial that data on approximately 2,841 North Memorial patients was contained on the stolen laptop. Accretive stated that the laptop contained protected health information, including the name and clinical information, including diagnosis, condition, and other treatment information. Other information on the laptop about North Memorial patients are their full names, dates of service (e.g., admission and discharge dates), medical record number, and encounter numbers.

54.     North Memorial later retained a computer expert on its own initiative to undertake an independent forensic investigation to corroborate the representations of Accretive about the nature, scope, and extent of the lost data as it relates to North Memorial patients. According to North Memorial, the expert discovered an additional

6,690 patients whose names and data were believed to be on the laptop but who were not revealed to be on the laptop by Accretive. North Memorial sent letters to these patients to notify them of the data breach.

55.     In its 2010 Annual Report, Accretive states:   "Data and information regarding our customers' patients is encrypted when transmitted over the internet or traveling off-site on portable media such as laptops or backup tapes." This was not the case with the stolen laptop.

56.     Accretive agreed with both Fairview and North Memorial that it would not use or disclose protected health information in violation of HIPAA or HITECH and that it would use "appropriate safeguards" to prevent the misuse or disclosure of protected health information.   It also agreed to keep all protected health information "strictly confidential" and require all of its employees and subcontractors and agents to maintain confidentiality of protected health information as required by HIPAA and HITECH.   It further agreed to develop, implement, maintain and use appropriate administrative, technical and physical safeguards to preserve the integrity, confidentiality and availability of protected health information and to prevent non-permitted or violating use or disclosure of protected health information, as required by 45 C.F.R. Part 164.   Accretive Health violated these provisions.

57.     Upon information and belief, Accretive failed to adequately keep track of the information on the laptop; thus, when the laptop was stolen, Accretive did not know the identity of all the individuals whose data was exposed.   In addition, as a "covered entity" with regard to Fairview's patients, Accretive failed to abide by HIPAA's

standards and implementation specifications requiring that certain notifications be made in the event of a breach of unsecured protected health information.

58.     Accretive did not sufficiently train its employees to protect patient health information or have adequate controls in place to safeguard such information.   For example, Mr. Doyle was a high-ranking official of the company, serving in the capacity of Vice President.   Yet, despite his high-ranking role with Accretive, Mr. Doyle left the laptop with voluminous and highly sensitive patient data in plain sight in his car.   Mr. Doyle began working for Accretive on August 9, 2010, as Vice President of Operations. He was initially assigned by Accretive to perform services for St. John's Hospital (part of Ascension Health) in Detroit, Michigan.   On or about October 4, 2010, Accretive transferred him to perform services for Fairview under the Revenue Cycle Agreement between Fairview and Accretive, where he remained until on or about April 14, 2011. On April 14, 2011, Accretive transferred him to perform services for North Memorial under the Revenue Cycle Agreement between North Memorial and Accretive, where he remained until on or about October 20, 2011.   On or about October 21, 2011, Mr. Doyle was transferred to Accretive's Chicago headquarters.   Even though he was assigned to perform activities under the "revenue cycle" contract at Fairview and not the QTCC contract, Mr. Doyle had access to, including on the stolen laptop, health data about Fairview patients generated under the Fairview-Accretive QTCC contract, which far exceeded the minimum necessary information needed by Mr. Doyle to carry out his duties at Fairview.   Even though Mr. Doyle was no longer assigned to perform work under the Accretive-Fairview revenue cycle contract in July, 2011, when the laptop was

stolen, Mr. Doyle had information on over 14,000 Fairview patients on his computer, which exceeded the minimum information needed by Mr. Doyle to carry out his duties. Mr. Doyle, a company Vice President, also retained voluminous patient health data on his laptop far after it was unnecessary.   He also had data on his laptop about St. John's Hospital in Michigan, for which he had done no work for about nine months.   Accretive allowed Mr. Doyle to remove the laptop computer from the hospital facilities, even though it contained extensive sensitive patient information.   Upon learning of the facts set forth in this paragraph, Accretive allowed Mr. Doyle to remain an employee of the company.

59.     Accretive did not have sufficient policies that were effectively implemented to detect and contain security violations.   For example, on or about June 2, 2010, Brandon Webb, another Accretive employee assigned to perform "revenue cycle" work at Fairview, left an Accretive laptop in plain view on the back seat of his rental car in the parking lot of an Old Mexico Restaurant in Roseville, Minnesota.   The laptop was stolen from his car.   Accretive did not initially report the stolen laptop to Fairview; rather, Fairview learned of the incident about a year later (after Mr. Doyle's laptop was similarly stolen) through anonymous tips.   This caused Fairview to question whether the loss of Mr. Doyle's laptop could have been prevented if Accretive had taken steps to alert Fairview of the incident and better train its employees not to leave laptops in plain sight in cars.

60.     Accretive further acknowledged in company documents from February, 2011—five months before Mr. Doyle's laptop was stolen—that its laptop computers may

contain "tons of patient health and financial information." Yet, Accretive allowed many of its employees to operate on laptop computers, to store high volumes of sensitive patient data on the laptops, and remove those laptops from hospital premises. Accretive was aware that company laptops containing voluminous patient data were regularly stored in its employees' cars, despite the obvious security risks. Accretive documents show that in the three months prior to February, 2011, for example, the company had experienced four "smash & grab incidents" involving four separate employees whose Accretive laptops were stolen from their cars. In response to a U.S. Senate inquiry, on May 11, 2012, Accretive indicated that nine company laptops containing patient data were stolen in 2011 alone. It further indicated that over 30 company laptops had not been encrypted.

61.    An Accretive company document describes "Common Accretive HIPAA incidents" to include "Laptops, unencrypted emails, too much access." Accretive sometimes sent unencrypted emails containing protected health information. A Fairview Internal Audit from December, 2011, for example, found that when Fairview asked Accretive to supply a sample of customer calls, the company sent an unencrypted email containing protected health information in an unsecure manner. The audit, which substantiated HIPAA violations by Accretive, noted that "there have been other incidents of Privacy and/or Security issues unrelated to this specific audit...." Accretive employees also sometimes accessed protected patient health data using other individuals' passwords.

62.     Accretive's contracts indicate that cost savings "will depend on the manner and extent to which [the hospital] elects to utilize the 'Shared Services Blended Shore Centers of Excellence'...."

63.     Accretive operates a shared service center in New Delhi, India. The New Delhi service center carries out functions at the same time for multiple hospitals. Accretive recently told Wall Street investors that it wanted to increase the use of these shared service centers. Accretive employees in India have had access to protected health information about Minnesota patients. It is unknown at the present time whether any such data is encrypted. One of Accretive's clients discovered a password sharing incident at Accretive's New Delhi, India offices.

64.     On October 10, 2011, the Minnesota Attorney General wrote to North Memorial to request information about the laptop computer stolen from Mr. Doyle's car. Among other things, the Attorney General asked North Memorial to provide copies of all contracts under which Accretive was provided with access to patient data about North Memorial patients, including but not limited to all business associate agreements. Prior to the request from the Attorney General, Accretive had no business associate agreement in place with North Memorial; rather, Accretive obtained access to voluminous protected health data about North Memorial patients—including the information on the laptop computer stolen from Mr. Doyle's car—without a written business associate agreement in place as required by HIPAA.

65.     Upon receipt of the Attorney General's letter on October 10, 2011, Accretive and North Memorial entered into a series of communications designed to create

a business associate agreement that was signed and made to appear, and that was presented to the Attorney General, as if it had been signed on March 21, 2011, the date on which the Accretive-North Memorial revenue cycle agreement was signed. On October 10, 2011, North Memorial forwarded an information request of the Attorney General to Gregory Kazarian, a Senior Vice President of Accretive in Chicago, and asked him to help craft responses to the Attorney General. Mr. Kazarian thereafter drafted and provided to North Memorial several responses, which North Memorial included in its letter to the Attorney General. That same day, Accretive and North Memorial discussed how to respond to the Attorney General's request for a copy of the business associate agreement, since none existed. On October 13, 2011, the Chief Financial Officer of North Memorial sent an email to Mr. Kazarian requesting that Accretive sign a business associate agreement for delivery to the Attorney General. On October 13 and 14, 2011, respectively, North Memorial and Mr. Kazarian signed a business associate agreement, which was made to deceptively and falsely appear to have been in place since March 21, 2011. On October 17, 2011, North Memorial delivered this agreement to the Attorney General as a document that supposedly existed since March 21, 2011 (when the Accretive-North Memorial revenue cycle contract went into effect), when in fact it was not signed until October, 2011. Accretive knew that the document would be deceptively presented to the Attorney General. At no time until the Attorney General uncovered the deception did Accretive or North Memorial advise the Attorney General that the business associate agreement was really signed in October, 2011. Accretive's deception surrounding the lack of a business associate agreement with North Memorial, and its

backdated presentation to the Attorney General, further underscores that (i) Accretive did not honor even the most basic HIPAA requirements and (ii) Accretive failed to provide adequate HIPAA safeguards and effective training of its workforce to carry out its HIPAA obligations.

**4.     Accretive Ignored the Consent Judgment Between Fairview and the Minnesota Attorney General.**

66.     Fairview is a charitable health care organization, and the Minnesota Attorney General regulates charitable organizations in the State of Minnesota. In 2005, the Office of the Minnesota Attorney General undertook a compliance review of Fairview. The compliance review found a number of problems in Fairview's collection activities. Fairview and the Minnesota Attorney General thereafter entered into a two-year remedial agreement, which was filed as a court order with the Ramsey County District Court for the State of Minnesota. In 2007, Fairview and the Minnesota Attorney General renewed the agreement for five years. The renewed agreement was also filed as a court order with the Ramsey County District Court (hereinafter "Consent Judgment"). These agreements required Fairview—and its outside collectors—to adhere to certain collection standards when collecting money from patients. The terms of the agreement are ordered by the court.

67.     The Consent Judgment requires Fairview to enter into a written contract with any collection agency utilized by it to collect debts from patients and for the contract to require the collection agency to act in accordance with the terms of the Consent Judgment and other applicable laws. The revenue cycle agreement between Fairview and

Accretive provided that Accretive would follow the terms of the Consent Judgment. The revenue cycle contract provides that: "Accretive Health shall deliver all Services in accordance with all applicable laws, rules and regulations, including, but not limited to, [Fairview's] agreement with the Minnesota Attorney General...." The Fairview hospitals also expected Accretive to manage their revenue cycles in a manner consistent with the duties, values, and obligations of non-profit charitable hospitals.

68.     The Consent Judgment specifies a variety of standards that Fairview must follow when collecting money from patients.  One of the purposes of the Consent Judgment was to make sure that "debt collection policies—by both hospital staff and external collection agencies—should reflect the mission and values of the hospital." Among other things, the Consent Judgment provides for the following:

- Fairview shall not collect debt from a patient unless the applicable insurance company has first been billed and given an opportunity to pay the claim and there is a reasonable basis to believe the patient owes the bill.

- The hospital shall offer a reasonable payment plan to patients who express an inability to pay the full amount in one payment and shall not pursue collections against a patient who has honored the payment plan terms.

- Patients shall be given a reasonable opportunity to submit an application for charity care (e.g. financial assistance for lower income patients), and third party collection agencies must be trained in and follow the hospital's charity care policies.

- Third party collection agencies must log all complaints made by patients.

- Third party collection agencies must forward patients who object to collections activity to the hospital.

- The hospital and the third party collection agency must advise patients of their right to contact the Attorney General if they encounter any problems with billings or the collection agency.

- Patients may not be reported to a credit reporting agency for failure to pay a bill.

- The hospital and its agents and employees shall adhere to a "zero tolerance policy for abusive, harassing, oppressive, false, deceptive, or misleading language or collections conduct by its debt collection attorney and agency, and their agents and employees, and Hospital employees responsible for collecting medical debt from patients."

69.     On April 5, 2011, Fairview asked Accretive to have its collectors execute a form attesting that they read and understood the terms of the Consent Judgment.  The next day, however, an Accretive manager told the collectors about the attestation form: "Very little of this will drive collector behavior-it's just so we can all say we have it."

70.     Shortly thereafter, Fairview prepared an "Issues Log" that delineated problems with Accretive's collection activity.  Among other things, the log notes the following problems and violations of the Consent Judgment:

- Accretive sent patients in current payment plan arrangements to collections.

- Accretive sent 6,000 accounts to collections without ever having sent the patients a collection letter.

- Accretive failed to timely process 300 payments made by patients.

- Accretive's notices sent to patients did not include the required contact information for the Attorney General.

- Accretive failed to timely respond to patients' requests for itemized bills.

71.    The Consent Judgment requires Fairview to periodically review the conduct of its collection agencies.  On or about May 5, 2011, Fairview published an internal audit of Accretive's lack of compliance with the Consent Judgment.  A copy was given to Accretive.  The audit found numerous problems and violations of the Consent Judgment by Accretive, including that the company was not familiar with the Consent Judgment and Fairview's charity care policies, did not halt collection efforts when patients asked for more documentation, did not send itemized bills to patients who requested them, and did not maintain a patient complaint log as required by the Consent Judgment.

72.    On September 23, 2011, Fairview again notified Accretive that it was not following the requirements of the Consent Judgment and, as a result, that patients may not have been offered charity care.

73.    On September 30, 2011, Fairview again notified Accretive that its collection activities were not in compliance with the Consent Judgment or Fairview's charity care policies.  Among other things, Fairview again advised Accretive that payments in active payment plans continued to improperly receive collection notices and phone calls.  Fairview told Accretive that its actions were "[r]esulting in numerous

patient complaints and confusion for patients." Fairview told Accretive: "[We] cannot continue this relationship…."

74.    Throughout the fall of 2011, Fairview continued to notify Accretive that it was in violation of the terms of the Consent Judgment, including, among other things, because Accretive subjected patients who were current on their payment arrangements to collection activity. For example, in an email sent by Fairview to Accretive on October 10, 2011, Accretive notified Fairview of "another patient who is in an active payment arrangement who received a letter from [Accretive] requesting payment. I can see no breach or lapse in the payment arrangement which would create a reason for [Accretive] to generate a letter to the patient requesting payment." Also on October 10, 2011, Fairview notified Accretive of another "gentleman who was very upset with [Accretive] and the letter he received this weekend. He found the letter to be 'embarrassing, a slap in the face, and he did not appreciate the letter in the least.' This has been in an active payment arrangement with payments made regularly each month." The next day, on October 11, 2011 Fairview notified Accretive of another patient current on his payment plan who was targeted with collection activity and that Fairview will "have to call this gentleman back and apologize."

75.    On December 30, 2011, Fairview issued another internal audit report of Accretive's collection activity, which found that Accretive continued not to be in compliance with the Consent Judgment. Among other things, Fairview documented problems with Accretive's violation of HIPAA, the FDCPA, the Consent Judgment, and Minn. Stat. § 332.37(21), a state debt collection law which requires a collector to disclose

to patients that it is licensed as a debt collector.  Fairview's internal auditor wrote: "We identified potential violations, on the part of [Accretive], of various regulatory standards including Health Insurance Portability and Accountability Act (HIPAA), Fair Debt Collection Practices Act (FDCPA),…and Minnesota State Statutes."

76.     On or about January 6, 2012, Fairview notified Accretive of the December 31, 2011 audit results, which Accretive conceded were "not favorable."  On January 10, 2012, Fairview notified Accretive that the audit revealed poor customer satisfaction, improper handling of accounts, continued noncompliance with the Consent Judgment, and noncompliance with multiple regulatory standards.  The notice stated that Fairview was transitioning the collection activity at Accretive's Kalamazoo, Michigan office away from Accretive effective January 31, 2012.

**5.     Accretive Orchestrated, Implemented, and Engaged in Aggressive Collections at Minnesota Hospitals.**

**a.     Accretive's Control Over Hospital Registration, Admissions, and Collections Employees.**

77.     As noted above, through its "revenue cycle" contracts, Accretive largely takes control of the scheduling, registration, admissions, billing, and collection and payment functions at its client hospitals.  Accretive both assumes day-to-day managerial responsibility for hospital employees who perform these functions and "infuses" its own employees into the staffs of the hospitals.  The Accretive "infused" employees then supervise and manage the hospital employees engaged in revenue cycle functions.

78.     Under the revenue cycle contracts between Accretive and Fairview and North Memorial, Accretive directs the day-to-day work activities of the hospital

employees engaged in revenue cycle functions, including registration, admissions, billing, and collections.  Accretive has substantial control over the hospital employees engaged in those functions.  For example, under the revenue cycle contract between Accretive and Fairview, Accretive was responsible for developing and implementing revenue cycle staffing structures, the assignment of management and staff within that structure, establishing performance expectations for hospital revenue cycle employees, developing and implementing compensation policies and practices, recruiting new hospital employees, and firing hospital revenue cycle employees (subject to Fairview's veto).  For example, on September 21, 2010, an Accretive executive "infused" at Fairview told his Accretive boss in Chicago that, "We've started firing people that aren't getting with the program."  In another email from November, 2010, an Accretive manager sent an email to Fairview stating that "carrots" were not good enough any longer and that Accretive would need to start using the "stick" by "writing up folks" employed by the hospital.  In the fall of 2010, Accretive similarly noted that it was placing the "Bottom 10" performers among Fairview hospital employees on a watch list.  Accretive developed performance evaluations for Fairview hospital registration staff that measured their job performance in part on their ability to collect money from patients, including, for example, past due balances owed by patients in emergency rooms and acute care settings.

79.     As noted elsewhere herein, Fairview and North Memorial paid Accretive the costs of the hospital's revenue cycle employees' salaries as "round trip" payroll, which Accretive then paid back to the hospitals.

80.    Accretive told North Memorial this about its services:   "[W]e run the money side of the hospital.  They [hospitals] outsource those functions to us and then focus on their core business which is providing care."  Accretive went on to say:  "What we are not - we are not a consulting firm.  We do not sell work or projects.  We will either run your revenue cycle for you, or we won't.  There are tons of firms who believe they can tell you how to do it better, we do it for you, with your people."

81.    Accretive similarly tells its own staff at new employee orientations what it does:  "Short version - we run the financial side" of the hospital.

82.    Accretive's 2011 Annual Report to shareholders is replete with references to Accretive's management of the hospital employees engaged in revenue cycle functions, including the following:

- "To implement our revenue cycle solution, we assume full responsibility for the management and cost of a customer's revenue cycle...." (p. 4);

- "We assume full responsibility for the management and cost of the customer's complete revenue cycle operations in exchange for a base fee and the opportunity to earn incentive fees." (p. 6);

- "We seek to embed our technology, personnel, know-how and culture within each customer's revenue cycle activities with the expectation that we will serve as the customer's on-site operational manager beyond the managed service contract's initial term,...." (p. 6);

- "[W]e assume responsibility for the management and cost of the customer's revenue cycle or population health management operations, including the

payroll and benefit costs associated with the customer's employees conducting activities within our contracted services,...." (p. 14);

- "Under our contracts with customers, we directly manage our customers' employees engaged in the activities we have contracted to manage for our customers." (p. 26);

- "To implement our solutions, we assume full responsibility for the management and cost of the operations we have contracted to manage and supplement the customer's existing staff involved in such operations with seasoned Accretive Health personnel." (p. 40);

- "As of December 31, 2011, we had 2,721 full-time employees and 342 part-time employees, and managed approximately 11,300 of our customers' employees who are involved in patient registration, health management information, procedure coding, billing and collections." (p. 40).

83.     Accretive has similarly stated in its 2010 Annual Report that, "We have the right to control and direct the work activities of [the hospital] staff persons and are responsible for paying their compensation out of the base fees...."

      **b.**     **Accretive's Numbers Driven Culture and the Accretive Secret Sauce.**

84.     Accretive used a variety of tactics to create a "numbers driven" collections culture.  For example, Accretive regularly used "chalk talks" with hospital registration and admissions staff in which they were required to talk about patient collections quotas, including in the emergency room.  Accretive told hospital employees and its own

employees that "Every patient with a prior balance who visits the hospital must be approached about settling their account(s)," including scheduled patients, unscheduled patients (e.g. emergency room), and patients who call the hospital.

85.     As noted above, if Accretive succeeded in collecting more money from patients, it made more money for itself in the form of incentive payments.

86.     Accretive trained Fairview hospital registration staff on how to collect money from patients, including for past due balances and more recent bills.

87.     Accretive induced Fairview emergency room and registration staff with prizes for collecting the most money from patients, including gift cards, cash payments, and other incentives.  Accretive managers held collection contests with hospital employees in which managers would promise to wear clown outfits, Colonel Sanders outfits, Waldo outfits, or shave their heads, or engage in other gimmicks, if hospital employees met certain collection quotas.  The names of top collectors (and poor collectors) were posted by Accretive on a white board in the hospital to spur on hospital registrars who collected money and shame those who did not.

88.     Accretive has orchestrated aggressive collection of past due balances and more current bills in hospital emergency rooms and other treatment areas of hospitals in Minnesota.

89.     A hospital emergency room is and should be a solemn place.  It is a place of medical trauma and emotional suffering, both for patients and their families.  It is a place where patients and their families are especially vulnerable.  It is a place where

husbands lose wives, wives lose husbands, parents lose children, and children lose parents. Many Americans face life-changing events in the emergency room.

90.   Accretive prepared a document called the "Accretive Secret Sauce." The cover states: "You've never seen ASS like ours!" and "Check out our ASS!" The Secret Sauce states that typical hospitals do not collect money in the emergency room but that one of Accretive's Secret Sauce ingredients is to make bedside collections visits in the emergency room to extract money from patients. In the document, Accretive claims that its "Secret Sauce" results in a 15 percent collection rate from patients in the emergency room.

91.   The Emergency Medical Treatment and Active Labor Act, or EMTALA, 42 U.S.C. § 1395dd, requires a hospital emergency room to treat patients in emergency situations regardless of their ability to pay. EMTALA prohibits a hospital from asking for money before a patient has had a medical screening examination and, if an "emergency medical condition" exists, before stabilizing treatment is provided. *See* 42 U.S.C. § 1395dd(a), (b).

92.   Accretive orchestrated and implemented at hospitals in Minnesota a scheme of aggressive collections of past due balances and current bills in the emergency room. Minnesota patients received bedside collection visits—both from Accretive employees and from hospital employees under Accretive's control, supervision, management, training, direction, and oversight—while suffering from serious medical injuries and ailments, including but not limited to chest pain, strokes, blood clots, labored breathing, diabetic attacks, escalated heart rates, elevated blood pressure, kidney stone attacks,

disorientation, and while hemorrhaging blood. Some patients were asked to pay money while in so much pain they thought they might die and/or while in medical distress and under duress. Others were asked to pay money while confused, dazed and disoriented. Some patients were asked to pay money while hooked up on morphine drips, heart monitors, IVs, and/or with tubes down their throat. Some patients were asked to pay money while laying undressed on a gurney in pain. Some patients were asked to pay money in the emergency room before they had seen a doctor. Some patients were asked to pay money in the emergency room before they had been treated. Some patients were forced to haggle in their emergency room bed over their ability or need to pay a bill.

93. Accretive used "bedside collection visits" in other patient hospital rooms besides the emergency room. Accretive also used "stop lists" to ask patients scheduled for medically necessary treatment (including but not limited to important and time-sensitive surgeries) to pay past balances and current bills when checking in at the hospital registration desks in advance of their treatment. Accretive employees sometimes directly asked "stoplisted" Minnesota patients to pay past due balances and more current bills, while in other cases Accretive managed, supervised, directed, oversaw, trained, and controlled the hospital employees who did so. An Accretive document about what it takes to be an "Effective Front End Operator" says Accretive employees must "leverage hospital staff to assist in prior balance collections...." When Fairview hospital employees weren't collecting enough in past balances in January, 2011, Accretive chastised them: "Do we need to look at having all the PB's that can't pay to start seeing Bruce [an Accretive employee] again?"

94.     As a part of its in-hospital collection activities, Accretive, or hospital employees acting at the direction, supervision, training, oversight, and control of Accretive, often demanded payment from patients at or before the time of service. Accretive and the employees under its control often did not offer, state, suggest, or clarify that patients could be invoiced and pay for services later.   To the contrary, scripts developed by Accretive and training provided by Accretive emphasized that patients should be made to feel that they were required to pay "today."  By not providing options for later payment to patients, by training employees to insist on on-the-spot payment by patients, and by creating a boiler-room environment that encouraged and promoted other abusive, aggressive, oppressive, unfair, unconscionable, and harassing collection tactics for in-hospital collections, Accretive implied, suggested, and created the impression to many patients, in the emergency room and elsewhere in the hospital, that the patients would not receive healthcare services if they did not make on-the-spot payments in advance of treatment.

95.     Pursuant to its revenue cycle contract with Fairview, Accretive managed the collections and registration functions at Fairview hospitals.   Accretive "infused" approximately 40 of its own employees into Fairview hospitals to carry out these functions, according to information Accretive provided to the U.S. Senate. The Accretive "infused management" managed about 1,200 Fairview revenue cycle employees. Accretive further told the U.S. Senate that about 15-20 Accretive employees directly had "pre-treatment discussions with patients concerning payment...."  In its Form 10-Q for the first quarter of 2012, Accretive stated: "Pursuant to managed service contracts with our

customers, we collect, on behalf of our customers, medical co-pays and other payments that are due our customers from their patients." Accretive employees thus both directly collected money from Fairview patients in hospital emergency rooms and hospital treatment settings, and supervised, managed, directed, trained, oversaw, and controlled hospital employees who did so. An Accretive training document instructs that, "[r]emember that every patient must be informed of their estimated Residual Balance as well as any Prior Balances during your initial conversation" and that "Addressing the patient's balance is an imperative part of your role."

96. Accretive utilized its own software program known as AHtoAccess, or A2A to get money from patients. Under the A2A program, a hospital registration employee could not process a patient electronic record unless he or she processed informational "balls" that popped up on the screen. A2A purportedly determined the financial responsibility of insured patients for co-pays, deductibles, co-insurance, and for past balances, as well as the amount to be asked of uninsured patients for past balances and present bills. Based on the information contained in Accretive's A2A system, patients were asked, either by Accretive or by the hospital revenue cycle employees under its management and control, to pay a certain amount of money to the hospital. Patients were given copies of receipts and invoices generated from Accretive's A2A system. The amount calculated by A2A and presented to patients as the patient's financial obligation often exceeded the amount actually owed by the patient. As a result of A2A, Minnesota patients were often asked to pay, and did pay, more than they owed, amounts that exceeded the cost of services provided, money before it was known what

43

health care services would be needed to treat patients, and/or payment before it was known what portion of the costs were to be covered by insurance or other third-party payors. Emails from Accretive and Fairview and North Memorial concede that A1A sometimes calculates the wrong amount, in part because the hospital employee does not know what treatment will be rendered in advance of services being performed. For example, on March 6, 2011, an Accretive employee sent an email stating, "I think the hardest part of the Co-Pay equation is that A2A doesn't know what the service is unless you tell it…. So it doesn't know how to calculate the co-pay."

97.     Accretive also prepared misleading and high-pressure scripts to be used by hospital patient registration staff. In some cases, Accretive employees directly asked patients for money (including both current bills and past due balances) using misleading scripts and practices designed by it. In other cases, Accretive employees supervised, managed, directed, trained, oversaw, and controlled the hospital employees who carried out Accretive's misleading scripts and practices to ask patients for money (including both current bills and past due balances). In one script, if someone says they don't have a credit card, the employee is choreographed to say: "[I]f you have your check book in your car I will be happy to wait for you…." If the patient says she doesn't have cash, a script says: "[I]f you want to make a call we will accept credit card over the phone." If a patient says he doesn't have time for a collection attempt, a script says: "I understand that you are running late for your test but this will not take more than 5 minutes…." Many of Accretive's scripts included an assumptive close, not asking the patient "if" they wanted to pay but rather "how" they wanted to pay their bill "today." For example, one

Accretive script to be used in the hospital says in part: "Your insurance plan shows you have a co-pay of $____. We accept cash, check, debit, and credit. How would you like to pay for that today?" Another script prompts in part: "We really DO need to collect your co-pay/co-insurance/deductible today. Which method [do] you prefer to pay by? Cash, check, debit or credit card?"

98. The State incorporates herein by reference the facts contained in the patient affidavits filed with its memorandum of law in support of its motion to amend its complaint. These affidavits are illustrative, non-exclusive examples.

### 6. Accretive Has Tried to Conceal Its Role and Identity With Patients and Has Not Followed Minnesota Debt Collection Laws.

99. Even though Accretive amasses so much private data about patients, it goes to great length to conceal its activities, going so far as to "infuse" employees into hospitals, have its employees wear identification badges that suggest or imply they are with the client health care facility, and engage in a recycled payroll system. As a result, it would be difficult for a patient to understand or even be aware of the role of Accretive in their lives.

100. Fairview and North Memorial are both registered with the Minnesota Attorney General's Office as charitable organizations under Chapter 309 of the Minnesota statutes, and they are both recognized as 501(c)(3) nonprofit organizations under the Internal Revenue Code. They both file IRS Form 990, Return of Organization Exempt from Income Tax, with the Minnesota Attorney General's Office. Part VII, Section B of Form 990 requires an organization to disclose the five highest compensated

independent contractors that received more than $100,000 of compensation for services, whether professional or other services, from the organization in the particular year. As of the time of filing of the Complaint, Fairview failed to disclose its payments to Accretive on its Form 990s. Thus, as of the time of filing of the Complaint, a patient or regulatory agency could not read the Form 990 to identify the nature of Accretive's role as it relates to their treatment or payment for that treatment.

101.   Upon information and belief, the hospitals' patient admission and medical authorization forms do not identify Accretive by name or disclose the scope and breadth of information that is shared with it. Patients are not aware that Accretive is developing analytical scores to rate the complexity of their medical condition, the likelihood they will be admitted to a hospital, their "frailty," or the likelihood that they will be able to pay for services, among other things. To the contrary, patients of both Fairview and North Memorial are given assurances that their information will be protected and kept confidential. For example, Fairview had advised patients that, "When we collect personal data, we will endeavor to disclose to you how we will use this information. Fairview will also seek to take all appropriate steps to ensure that any personal information given is protected by secure technology...." Fairview has similarly advised patients that, "Fairview gives access to personal information about consumers only to employees who require it to perform their jobs. We will take every appropriate step to keep your information secure from other employees."

102.   As noted above, Accretive became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial

Solutions" as an assumed name.  Before that date, however, Accretive collected debts on behalf of Fairview from Minnesota patients without proper licensure.

103.   Minnesota law requires a debt collection agency, when initially contacting a Minnesota debtor by mail, to include a disclosure on the notice stating: "This collection agency is licensed by the Minnesota Department of Commerce."   Minn. Stat. § 332.37(21) (2010).  Many letters sent by Accretive to Fairview patients in Minnesota do not disclose that Accretive is a collection agency.  In addition, the Minnesota debt collection laws make it unlawful for a collection agency to violate any provision of the federal Fair Debt Collection Practices Act while attempting to collect on an account. Minn. Stat. § 332.37(12) (2010).  The federal Fair Debt Collection Practices Act at 15 U.S.C. § 1692e(11) makes the following conduct unlawful:

> The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, . . . .

Accretive has not always followed this FDCPA requirement when collecting debts from Fairview patients.

104.   Accretive has sent letters to Minnesota Fairview patients that read:

> You have a balance of [$_____] with Fairview Health Services that is seriously past due and has been assigned to Medical Financial Solutions to determine how this matter can be resolved.  Unfortunately, we have been unable to contact you by phone and our previous attempts to contact you by letter went unanswered.  We encourage you to take advantage of this opportunity to resolve this debt and avoid further collection activity.  We are now reaching the point where your account may be turned over to a collection agency.  We prefer to resolve this matter with you directly.

Such letters fail to disclose that Accretive *is* itself a debt collection agency attempting to collect a debt. Indeed, the letters give Minnesota patients the impression that the sender of the letter wants to counsel or help the patient so as to avoid being referred to a debt collector. One Accretive manager stated the following about these practices: "I could see how it would intentionally make us seem like we aren't one" (a collection agency), and he called the language "deceptive." Although Accretive recently entered the Minnesota market, it already has been sued on a number of occasions in Minnesota by patients who allege that it failed to give the required disclosures identifying itself as a debt collection agency.

105.   Accretive, under its assumed name "Medical Financial Solutions," has sent collection letters to Minnesota patients that are signed by fictitious individuals who do not exist, or at least were not employed by Accretive, for the purpose of collecting debts from Minnesota patients. Accretive identified these fictitious individuals, John Monteith and Anna Wittenhall, as "Patient Financial Advisors" who could "help" patients, when in fact no such individuals were employed by Accretive.

106.   Minnesota law requires licensed debt collection agencies to register with the State of Minnesota all individuals employed by the agency who perform the duties of a "collector" under Minn. Stat. Ch. 332. As of the date of filing of this lawsuit, Accretive listed Steve Walters as its sole individual collector with the Minnesota Department of Commerce. Accretive did not, however, identify the other employees who act as "collectors" in Minnesota, according to the Department of Commerce.

## COUNT I:  VIOLATIONS OF HIPAA, AS AMENDED BY HITECH, WITH RESPECT TO NORTH MEMORIAL'S PATIENTS

107.   Plaintiff restates and realleges all prior paragraphs of this Complaint.

108.   Accretive is a business associate[2] of North Memorial as defined in HIPAA. *See, e.g.*, 45 C.F.R. § 160.103.

109.   As a business associate, Accretive was required to enter into a business associate agreement with North Memorial, which required it to comply with the HIPAA federal standards that govern the security and privacy of the protected health information it creates, receives, maintains, or transmits on behalf of the hospital. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2).   This agreement is intended to safeguard the protected health information of North Memorial patients and other persons protected by HIPAA.  Accretive entered into a business associate agreement with North Memorial in October, 2011 that deceptively purported to become effective in March, 2011.  From March, 2011 to October, 2011, Accretive obtained access to substantial health information about North Memorial patients even though it had no written business associate agreement in place.  Notwithstanding the lack of a written business associate agreement for seven months, Accretive is still accountable for its violations of HIPAA as a business associate of North Memorial.

110.   Because HITECH Section 13401 (42 U.S.C. § 17931) provides that 45 C.F.R. §§ 164.308, .310, .312 and .316 apply to a business associate of a covered entity

---

[2] A business associate is an entity that performs or assists in the performance of activities that involve the use or disclosure of individually identifiable health information or other regulated functions on behalf of a covered entity, but is not a member of the covered entity's workforce.  45 C.F.R. § 160.103.

in the same manner as they would to a covered entity, Accretive is thus subject to the security provisions contained within HIPAA as well as applicable statutory damages. Accretive violated HIPAA, as amended by HITECH, by failing to comply with these security provisions, including the following:

a.      Accretive failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1) by, *inter alia*, failing to prevent, detect, contain and correct the theft of Accretive laptops that contained protected health information, failing to encrypt protected health information on laptops, allowing employees to take laptops with protected health information out of hospital facilities, failing to limit access to protected health information to only those individuals who needed access to such information, failing to prevent employees from downloading protected health information onto laptop computers and/or storage media without adequate safeguards and procedures, and by failing to implement a Business Associate Agreement required by HIPAA.

b.      Accretive violated 45 C.F.R. § 164.308(a)(3-4) by, *inter alia*, failing to encrypt protected health information on laptops, allowing employees to take laptops with protected health information out of hospital facilities, and by failing to implement a Business Associate Agreement as required by HIPAA.

c.      Accretive failed to effectively train all members of its workforce to maintain security of protected health information in violation of 45 C.F.R. § 164.308(a)(5).

d.      Accretive failed to identify and respond to the theft of its laptops containing protected health information and to mitigate the harmful effects of these incidents in violation of 45 C.F.R. § 164.308(a)(6).

e.      Accretive failed to implement policies and procedures to limit physical access to its electronic information systems in violation of 45 C.F.R. § 164.310(a)(1) by, *inter alia*, failing to encrypt protected health information stored on laptop computers, allowing employees to take laptops with protected health information out of hospital facilities, failing to prevent employees from downloading protected health information onto laptop computers and/or storage media, failing to implement adequate safeguards with respect to personal health information downloaded onto laptop computers, and by failing to implement a Business Associate Agreement as required by HIPAA.

f.      Accretive failed to implement policies governing the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility in violation of 45 C.F.R. § 164.310(d)(1) as demonstrated by its failure to prevent the theft of laptop computers containing protected health information, its failure to encrypt protected health information stored on laptop computers, allowing employees to take laptops with protected health information out of hospital facilities, and by its failure to implement a Business Associate Agreement.

g.      Accretive failed to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

h.      Accretive violated 45 C.F.R. § 164.316 by failing to execute a Business Associate Agreement before receiving protected health information, implement security safeguards that could have prevented the theft of protected health information, and allowing employees to take laptops with protected health information out of hospital facilities.

111.   HITECH Section 13404 (42 U.S.C. § 17934) provides that business associates of a covered entity are subject to statutory damages for making uses and disclosures of protected health information that do not comply with the privacy terms of their business associate agreements. *See* 45 C.F.R. § 164.504(e).  Section 13404 also provides that HITECH's enhancement of HIPAA's "minimum necessary" privacy rule requirement, *see* 42 U.S.C. § 17935(b), is applicable to business associates and must be incorporated into the business associate agreement. *See* 42 U.S.C. § 17934(a).

112.   Accretive's obligations to North Memorial as a business associate include the requirements that Accretive will not use or disclose protected health information in violation of HIPAA, HITECH, and/or the "minimum necessary" policies and procedures of North Memorial.   Contrary to these obligations, Accretive violated HIPAA, as

amended by HITECH, by failing to comply with its privacy provisions, including the

following:

a.      Accretive impermissibly and improperly used and disclosed protected health information to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*

b.      Accretive failed to limit the use, disclosure, or request of protected health information, to the extent practicable, to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to limit the use, disclosure, or request of protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.502(b)(1). Instead, Accretive unnecessarily granted unlimited access to protected health information to its employees who did not require such information to do their jobs.

c.      Accretive failed to properly identify persons or classes of persons in its workforce who need access to protected health information to carry out their duties in violation of 45 C.F.R. § 164.514(d)(2)(i)(A).

d.      Accretive failed to properly identify for each person or class of person the category or categories of protected health information to which access is needed and any conditions appropriate to such access in violation of 45 C.F.R. § 164.514(d)(2)(i)(B).

e.      Accretive failed to make reasonable efforts to limit the access of persons or classes of persons who need access to protected health information to only the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the limited categories of protected health information to which such access was needed in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(2)(ii). Instead, Accretive unnecessarily granted unlimited access to protected health information to its employees that did not require such information to do their jobs.

f.      Accretive failed to limit the protected health information that it disclosed to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the minimum amount reasonably necessary to accomplish the purpose of the disclosure in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(3).

g.      Accretive failed to limit its requests for protected health information from North Memorial to the "limited data set" as defined in 45 C.F.R. § 164.514(e)(2) or to the minimum amount reasonably necessary to accomplish the

purpose for which the request was made in violation of 42 U.S.C. §§ 17934(a), 17935(b) and 45 C.F.R. § 164.514(d)(4).

    h.    Accretive violated 45 C.F.R. § 164.530(b)(1) by failing to effectively train all members of its workforce on the policies and procedures with respect to protected health information, as evidenced by, *inter alia*, Accretive's receipt of protected health information without executing a Business Associate Agreement and by a Senior Vice President of Accretive signing a backdated Business Associate Agreement, which deceptively and falsely was made to appear to have been in place since March 21, 2011, as well as by an Accretive Vice President's access to voluminous amounts of protected health information that he did not need to do his job.

    i.    Accretive failed to reasonably safeguard, through appropriate administrative, technical, and physical safeguards, protected health information from any intentional or unintentional use or disclosure as well as to limit incidental uses or disclosures in violation of 45 C.F.R. § 164.530(c).

113.    The Attorney General has reason to believe that the interests of Minnesota residents are threatened and have been adversely affected by the above violations.

## COUNT II:  VIOLATIONS OF HIPAA, AS AMENDED BY HITECH, WITH RESPECT TO FAIRVIEW'S PATIENTS

114.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

115.    With respect to Fairview's patients, Accretive has acted as a "health care provider" at all times relevant hereto. *See* 42 U.S.C. § 1320d(3); 45 C.F.R. § 160.103. Because Accretive is a "health care provider" who transmits health information in electronic form in connection with a transaction referred to in 42 U.S.C. § 1320d-2(a)(1), Accretive is a "covered entity" for purposes of HIPAA. *See* 42 U.S.C. § 1320d-1(a); 45 C.F.R. § 160.103. As a "covered entity," Accretive is required to fully comply with HIPAA's standards governing the security, breach notification, and privacy of protected

health information, as amended by HITECH. *Id.*; *see generally* 45 C.F.R. pt. 164, subpts.

A, C, D, & E.

116.   Accretive is thus subject to HIPAA's requirements, as amended by

HITECH, as well as applicable statutory damages.

117.   Accretive violated HIPAA, as amended by HITECH, by failing to comply

with the standards, requirements, and implementation specifications as set forth in

HIPAA and amended by HITECH, including the following:

> a.   Accretive has violated HIPAA's standards, requirements, and implementation specifications governing the security of electronic protected health information, *see* 45 C.F.R. §§ 164.308, *et seq.*, .310, *et seq.*, .312(a)(1), and .316, as alleged above in paragraph 108, subparts (a) through (h). Accretive has also violated these provisions by, *inter alia*, giving its debt collectors unfettered access to protected health information.

> b.   Accretive has violated HIPAA's standards and implementation specifications requiring that certain notifications be made in the event of a breach of unsecured protected health information in violation of 45 C.F.R. §§ 164.404, 164.406, and 164.408.

> c.   Accretive has violated HIPAA's standards, requirements, and implementation specifications governing the privacy of protected health information, *see* 42 U.S.C. § 17935(b); 45 C.F.R. §§ 164.502, *et seq.*, 164.514(d), *et seq.*, and 164.530(c), as alleged above in paragraph 110, subparts (a) through (i). Accretive has also violated these provisions by, *inter alia*, giving its debt collectors unfettered access to protected health information.

> d.   Accretive failed to effectively train all members of its workforce, including agents and independent contractors involved in the data breach, on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain the security and privacy of protected health information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

> e.   Accretive failed to apply appropriate sanctions against members of its workforce, including agents and independent contractors, who failed to comply

with the standards and requirements of HIPAA's privacy rule, in violation of 45 C.F.R. § 164.530(e)(1).

118.   In the alternative, Accretive is a business associate of Fairview as defined in HIPAA. *See, e.g.*, 45 C.F.R. § 160.103.

119.   As a business associate, Accretive was required to, and did, enter into a business associate agreement with Fairview, which required it to comply with the HIPAA federal standards that govern the security and privacy of the protected health information it creates, receives, maintains, or transmits on behalf of the hospital. *See, e.g.*, 45 C.F.R. §§ 164.314(a)(2)(i); 164.502(e)(2); 164.504(e)(2).   This agreement is intended to safeguard the protected health information of Fairview patients and other persons protected by HIPAA.

120.   Because HITECH Section 13401 (42 U.S.C. § 17931) provides that 45 C.F.R. §§ 164.308, .310, .312 and .316 apply to a business associate of a covered entity in the same manner as they would to a covered entity, Accretive is thus subject to the security provisions contained within HIPAA as well as applicable statutory damages. Accretive violated HIPAA, as amended by HITECH, by failing to comply with these security provisions, as alleged above in paragraph 108, subparts (a) through (h). Accretive also violated HIPAA's security provisions, as amended by HITECH, by, *inter alia*, giving its debt collectors unfettered access to protected health information.

121.   HITECH Section 13404 (42 U.S.C. § 17934) provides that business associates of a covered entity are subject to statutory damages for making uses and disclosures of protected health information that do not comply with the privacy terms of

their business associate agreements. *See* 45 C.F.R. § 164.504(e). Section 13404 also provides that HITECH's enhancement of HIPAA's "minimum necessary" privacy rule requirement, *see* 42 U.S.C. § 17935(b), is applicable to business associates and must be incorporated into the business associate agreement. *See* 42 U.S.C. § 17934(a).

122.   Accretive's business associate agreement with Fairview provides that Accretive will not use or disclose protected health information in violation of HIPAA, HITECH, and/or the "minimum necessary" policies and procedures of Fairview. Contrary to these promises in its business associate agreement, Accretive violated HIPAA, as amended by HITECH, by failing to comply with its privacy provisions, as alleged above in paragraph 110, subparts (a) through (i). Accretive also violated HIPAA's privacy provisions, as amended by HITECH, by, *inter alia*, giving its debt collectors unfettered access to protected health information.

123.   The Attorney General has reason to believe that the interests of Minnesota residents are threatened and have been adversely affected by the above violations.

**COUNT III: VIOLATIONS OF THE MINNESOTA HEALTH RECORDS ACT**

124.   Plaintiff restates and realleges all prior paragraphs of this Complaint.

125.   The Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, applies to the release of health records in Minnesota. It prohibits providers or any *person who receives health records from a provider*, from releasing health records unless there is:

> (1) a signed and dated consent from the patient or the patient's legally authorized representative authorizing the release; (2) specific authorization in law; or (3) a representation from the provider that holds a signed and dated consent from the patient authorizing the release.

Minn. Stat. § 144.293, subd. 2 (2010) (emphasis added).  The patient's consent is valid for one year unless a different time period is specified in the consent or is provided by law.  *Id.*, subd. 4.

126.    Accretive unlawfully released the health records of at least 23,531 Minnesota patients on or about July 25, 2011, when an Accretive employee left those patients' health records in a car, in an unencrypted laptop, and that laptop was stolen.

127.    Even if Fairview and North Memorial had consent from patients to release medical information to Accretive, Accretive had an obligation to secure the patients' health records from further release.  Minn. Stat. § 144.293, subd. 2.

128.    The State of Minnesota seeks to enjoin Accretive from further violations of Minn. Stat. § 144.291 *et seq*.

### COUNT IV:  VIOLATIONS OF MINNESOTA DEBT COLLECTION LAWS

129.    Plaintiff restates and realleges all prior paragraphs of this Complaint.

130.    Minnesota law contains the following definition of "collection agency":

"Collection agency" means and includes any person engaged in the business of collection for others any account, bill or other indebtedness except as hereinafter provided.  It includes persons who furnish collection systems carrying a name which simulates the name of a collection agency and who supply forms or form letters to be used by the creditor, even though such forms direct the debtor to make payments directly to the creditor rather than to such fictitious agency.

Minn. Stat. § 332.31, subd. 3 (2010).

131.    Accretive is a "collection agency" under Minnesota law.   It became licensed with the Minnesota Department of Commerce as a debt collection agency on January 20, 2011, listing "Medical Financial Solutions" as an assumed name.  Minn. Stat.

§ 332.33, subd. 1 provides that no person shall conduct business in Minnesota as a collection agency without first having applied for and obtained a collection agency license.  Accretive unlawfully collected debts in Minnesota for a period of time prior to January 20, 2011, without being licensed as a collection agency.

132.   Minn. Stat. § 332.33, subd. 5a (2010) provides that "[a] licensed collection agency, on behalf of an individual collector, must register with the state all individuals in the collection agency's employ who are performing the duties of a collector as defined in sections 332.31 to 332.45" of the Minnesota statutes.  Minn. Stat. § 332.33, subd. 1 (2010) also requires a person acting under the authority of a collection agency, as a collector, to first register with the Minnesota Commissioner of Commerce.

133.   Minn. Stat. § 332.31, subd. 6 (2010) defines a "collector" as follows:

"Collector" is a person acting under the authority of a collection agency under subdivision 3, and on its behalf in the business of collection for others an account, bill, or other indebtedness except as otherwise provided in this chapter.

134.   As of the date of filing of the Complaint, Accretive listed Steve Walters as its sole individual collector with the Minnesota Department Commerce.   Other employees, however, also have acted as collectors in Minnesota.  As a result, Accretive has violated Minn. Stat. § 332.33, subd. 5a (2010).

135.   For the violations described below, to the extent Accretive used hospital employees for the collection of bills, accounts, or debts, Accretive is liable because under its revenue cycle contracts with the hospitals Accretive assumed management responsibility for the revenue cycles of the hospitals it managed, including the collection

of bills, accounts, and debts, and it also directed, supervised, oversaw, managed, trained, and controlled the hospital employees, as described above.

136.   Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

> (3)  use or threaten to use methods of collection which violate Minnesota law.

Through its actions outlined above, Accretive has violated this subdivision of the Minnesota Collection Agency Act, including, for example, the following:

> a.     The Consent Judgment between Fairview and the Minnesota Attorney General was filed as a court order in Ramsey County District Court in the State of Minnesota and therefore, constitutes a legal requirement to which Fairview must adhere.   The revenue cycle agreement between Fairview and Accretive required Accretive to comply with the terms of the collection standards set forth in the Consent Judgment between Fairview and the Minnesota Attorney General.   Among other things, the hospital and its agents and employees shall adhere to a "zero tolerance policy for abusive, harassing, oppressive, false, deceptive, or misleading language or collections conduct by its debt collection attorney and agency, and their agents and employees, and Hospital employees responsible for collecting medical debt from patients."   As set forth above, Accretive failed to comply with numerous provisions of the Consent Judgment, including through its in-hospital attempts to collect past due balances and bills

from patients in a manner that constitutes abusive, harassing, and oppressive conduct in violation of the Consent Judgment.

      b.    Accretive also used methods of collection which violated Minnesota law in other respects, including, for example, by collecting debts in Minnesota without proper licensure, collecting debts in Minnesota through individual collectors who were not properly registered, violating substantive provisions of the FDCPA when collecting on accounts and bills, implying that health care services will be withheld in an emergency situation, using an A2A software system that sometimes requested patients to pay more than they owed, falsifying its business associate agreement and presenting a deceptive agreement to the Attorney General, using names of fictitious "financial counselors" on letters sent to patients, deceptively holding itself out and failing to reveal itself as a collection agency, and for the fraudulent and deceptive collection practices and activities described elsewhere in this lawsuit. In addition, under Minn. Stat. § 62D.133 it is illegal for a medical provider to charge a patient more than is contracted for under an HMO contract. Accretive violated this provision by charging patients excess amounts as a result of A2A. Accretive was responsible for compliance with this provision because it managed the hospitals' revenue cycles.

137.    Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

(16) when attempting to collect a debt, fail to provide the debtor with the full name of the collection agency as it appears on its license.

Accretive violated this subdivision by failing to disclose its name or identity when it collected debts from Minnesota patients.

138. Minn. Stat. § 332.37 (20) (2010) provides that no collection agency shall "falsify any collection agency documents with intent to deceive a...governmental agency." In October, 2011 Accretive was a licensed debt collection agency in the State of Minnesota. Accretive violated this provision by operating without a valid business associate agreement with North Memorial (which was required in order for Accretive to obtain protected health information under the revenue cycle agreement with North Memorial) and thereafter colluding with North Memorial to present a backdated business associate agreement to the Minnesota Attorney General, which was deceptively made to appear as if it was signed in March, 2011 when it was really signed in October, 2011.

139. Minn. Stat. § 332.37(20) provides that no collection agency or collector shall falsify any collection agency documents with intent to deceive a debtor. Accretive also violated Minn. Stat. § 332.37(20) by sending collection letters to Minnesota patients that purported to be signed by fictional individuals who did not exist. Accretive falsified these collection letters with an intent to deceive patients, who were unable to call the purported signatory to the letter. Accretive also violated Minn. Stat. § 332.37(20) by falsely representing to debtors that it was not a collection agency.

140. Minn. Stat. § 332.37(19) (2010) provides that no collection agency or collector shall "attempt to collect any amount of money from a debtor or charge a fee to a creditor that is not authorized by agreement with the client." The revenue cycle agreement between Fairview and Accretive required Accretive to comply with the terms

of the collection standards set forth in the Consent Judgment between Fairview and the Minnesota Attorney General in order to collect money from debtors. As set forth above, Accretive failed to comply with numerous provisions of the Consent Judgment. Accretive thereby attempted to collect money from debtors that was not authorized by agreement with its client, Fairview, in violation of Minnesota law.

141.    Minn. Stat. § 332.37(14) (2010) provides that no debt collector shall, in any communication, "imply or suggest that health care services will be withheld in an emergency situation." Accretive gave some patients the impression, through its words, phrasing, implications, tone, omissions, and suggestions, directly or indirectly, that health care services could be withheld in emergencies if the patient did not pay money. This violated Minn. Stat. § 332.37(14) (2010).

142.    Minn. Stat. § 332.37 (2010) provides that no collection agency or collector shall:

> (21) when initially contacting a Minnesota debtor by mail, fail to include a disclosure on the contact notice, in a type size or font which is equal to or larger than the largest other type of type size or font used in the text of the notice. The disclosure must state: "This collection agency is licensed by the Minnesota Department of Commerce."

Accretive sent debt collection notices to Minnesota patients that did not comply with this subdivision. Indeed, in some cases Accretive deceptively held itself out as something other than a collection agency. For example, in some letters sent by Accretive to Minnesota patients, the company said, "We are now reaching the point where your account may be turned over to a collection agency," without revealing that Accretive was in fact itself a collection agency.

143.   Minnesota law also prohibits any "collection agency or collector" from violating the prohibitions on specific collection practices set forth in the federal Fair Debt Collection Practices Act ("FDCPA") while attempting to collect on any account, bill or other indebtedness.  Minn. Stat. § 332.37(12) (2010).  Accordingly, a collection agency or collector violates Minnesota law if it engages in practices prohibited by the FDCPA. *Id.*  In addition, a creditor may violate the FDCPA if it allows a collection agency to deceptively collect debts in its name, as occurred here.

144.   Accretive is a collection agency pursuant to Minnesota law, and has engaged in practices that are prohibited by the FDCPA.  For example, 15 U.S.C. § 1692e prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Accretive violated this provision by telling Minnesota patients that, if they do not settle with it, their debt may be referred to a collection agency when Accretive is, itself, a debt collection agency attempting to collect a debt.   Accretive also engaged in false, deceptive, and misleading representations through its scripts and in-hospital collection activities, including both the conduct of its own employees and the conduct of hospital employees who it supervised, controlled, managed, trained, oversaw, and directed.  Even though federal law requires a hospital emergency room to treat patients in emergency situations regardless of their ability to pay, Accretive gave some patients the impression they may not receive treatment if they did not pay money.  Minn. Stat. § 332.37(12) makes it unlawful for a Minnesota collection agency to violate any of the substantive provisions of the FDCPA "while attempting to collect on any account, bill or other indebtedness."  Accretive violated this

provision of state law by collecting on accounts and bills in the manner described in this paragraph and lawsuit.

145.   15 U.S.C. § 1692e(11) makes the following conduct unlawful:

The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, . . . .

146.   Accretive failed to make these required disclosures in communications with Minnesota patients.   Minn. Stat. § 332.37(12) makes it unlawful for a Minnesota collection agency to violate any of the substantive provisions of the FDCPA "while attempting to collect on any account, bill or other indebtedness."   Accretive violated this provision of state law by collecting on accounts and bills in the manner described in this paragraph and lawsuit.

147.   Similarly, 15 U.S.C. § 1692e(10) also makes unlawful "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information regarding a consumer."   In addition, 15 U.S.C. § 1692f provides that a collector may not use any "unfair or unconscionable means to collect or attempt to collect any debt."   Accretive engaged in deceptive means to collect debts through its in-hospital collection activities, including both by its own employees and by employees who it supervised, controlled, managed, trained, oversaw, and directed.   Even though federal law requires a hospital emergency room to treat patients in emergency room situations regardless of their ability to pay, Accretive gave some patients the impression they may

not receive treatment if they did not pay money.   In addition, it is unfair and unconscionable for a debt collector to attempt to collect money when a patient is in an emergency situation, under duress, in medical distress, and/or in the hospital on the cusp of receiving medically necessary and potentially lifesaving treatment.   15 U.S.C. § 1692d also prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person.   Minn. Stat. § 332.37(12) makes it unlawful for a Minnesota collection agency to violate any of the substantive provisions of the FDCPA "while attempting to collect on any account, bill or other indebtedness." Accretive violated this provision of state law by collecting on accounts and bills in the manner described in this paragraph and lawsuit.

148.   15 U.S.C. § 1692c(a)(1) prohibits a debt collector from collecting debt at an "unusual time or place or a time or place known or which should be known to be inconvenient to the consumer."  Accretive collected past balances and more current bills, both through its own employees and through hospital employees whom it directed, controlled, oversaw, trained, managed and supervised, in hospital emergency rooms, at patient bedsides while in the hospital, and in the hospital on the cusp of patients checking in for medically necessary treatment for serious illnesses and diseases.  These settings are "unusual" and "inconvenient" times and places within the meaning of 15 U.S.C. § 1692c(a)(1).  Minn. Stat. § 332.37(12) makes it unlawful for a Minnesota collection agency to violate any of the substantive provisions of the FDCPA "while attempting to collect on any account, bill or other indebtedness."  Accretive violated this provision of

state law by collecting on accounts and bills in the manner described in this paragraph and lawsuit.

149.    15 U.S.C. § 1692e(5) prohibits debt collectors from "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5).  15 U.S.C. § 1692f(1) prohibits the collection of any amount unless it is expressly authorized by the agreement creating the debt. The Consent Judgment between Fairview and the Minnesota Attorney General was filed as a Court Order in Ramsey County District Court in the State of Minnesota and therefore, constitutes a legal requirement to which Fairview must adhere.   The Consent Judgment is also a legal requirement to which Accretive must adhere.  Accretive was bound to comply with the terms of the Consent Judgment in its revenue cycle contract with Fairview.  Among other things, under the Consent Judgment the hospital and its agents and employees must adhere to a "zero tolerance policy for abusive, harassing, oppressive, false, deceptive, or misleading language or collections conduct by its debt collection attorney and agency, and their agents and employees, and the Hospital employees responsible for collecting medical debt from patients." As set forth in this lawsuit, Accretive failed to comply with numerous provisions of the Consent Judgment, including, but not limited to, its in-hospital attempts to collect money from patients.  As a result, Accretive engaged in conduct and threats to take action that cannot lawfully be undertaken and to collect amounts that could not lawfully be collected under the Consent Judgment.  Minn. Stat. § 332.37(12) makes it unlawful for a Minnesota collection agency to violate any of the substantive provisions of the FDCPA "while attempting to collect on any account, bill or

other indebtedness." Accretive violated this provision in State law by collecting on accounts and bills in the manner described in this paragraph and lawsuit.

150. Through the above-described course of conduct, Accretive violated these provisions.

151. Defendant's conduct described above constitutes multiple, separate violations of Minn. Stat. Ch. 332.31 *et seq.*

## COUNT V:  VIOLATIONS OF THE
## MINNESOTA PREVENTION OF CONSUMER FRAUD ACT AND
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

152. Plaintiff restates and realleges all prior paragraphs of this Complaint.

153. Minnesota Statutes, Section 325F.69, subdivision 1 (2010) (the "CFA") provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

154. The term "merchandise" within the meaning of Minn. Stat. § 325F.69 includes services. *See* Minn. Stat. § 325F.68, subd. 2 (2010). Health care services are a form of "merchandise."

155. Minn. Stat. § 325D.44, subdivision 1 (2010) provides, in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (1)    passes off goods or services as those of another;

(2)     causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3)     causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another…;

(5)     represents that goods or services have sponsorship, approval, [or] characteristics…that they do not have…;

(7)     represents that goods or services are of a particular standard, quality, or grade…if they are of another;

(12)    in attempting to collect delinquent accounts, implies or suggests that health care services will be withheld in an emergency situation;

(13)    engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

156.    The doctor-patient relationship is predicated on trust.  Patients have the right to confidentiality of their medical records and to expect that their medical information will not be released without their consent.   Patient confidentiality is important to encourage a full and frank exchange of information between patients and their doctors.  Patients also have the right to make informed choices about their health care (e.g., to give their "informed consent") and to withhold consent following a full and frank exchange of information between the patient and doctor.  Simply put, if patients have to be concerned about the dissemination of their medical information, they will not get treatment.  The consequence of this to both patients and the state as a whole is obvious as it relates to conditions like communicable diseases, mental health, or management of chronic conditions.

157.    These concepts have been part of the doctor-patient relationship for thousands of years.  Over 2,500 years ago, the early Hippocratic Oath for physicians provided: "All that may come to my knowledge in the exercise of my profession...I will keep secret and will never reveal."  Today, the modern Code of Ethics of the American Medical Association requires physicians to "maintain your patient's confidentiality" and to "respect your patient's right to choose their doctor freely, to accept or reject advice and to make their own decisions about treatment or procedures."  These concepts are reflected as a matter of state law and policy in the Minnesota Health Records Act, Minn. Stat. § 144.291 *et seq.*, *supra*, which restricts the release of health records in Minnesota and which prohibits providers *and persons who receive health records from providers* from releasing health records without the patient's informed consent.  The concepts are also reflected as a matter of state law and policy in the Minnesota Health Care Patient Bill of Rights, Minn. Stat. § 144.651, which gives patients the right to:  (1) have appropriate medical care based on their individual needs; (2) to know the identity of the physician who is responsible for coordination of their care; (3) to know the identity of outside providers; (4) to have complete information regarding diagnosis, treatment, alternatives, risk and prognosis; (5) to be respected; and (6) to have their medical records kept private and confidential.

The Minnesota Supreme Court has said this about the right to privacy:

> The right to privacy is an integral part of our humanity; one has a public persona, exposed and active, and a personal persona, guarded and preserved.  The heart of our liberty is choosing which part of our lives shall become public and which parts we shall hold close.

*Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998).  Most people consider medical and health care records to be among the most personal, private types of information.  In order to safeguard their privacy and make informed health care decisions, patients need full, transparent, and accurate information about how their medical information is used.  As set out in this Complaint, Accretive impeded those rights.

158.   Accretive goes to great lengths to mask from patients its involvement with Minnesota hospitals, including but not limited to the following:

a.   Accretive has "infused" its employees into the staff at the hospital. Upon information and belief, patients are not aware who is and is not an Accretive employee at the hospitals.

b.   The registered nurses and social workers that Accretive infuses into Fairview's clinics hold themselves out as Fairview employees to patients—going so far as to wear identification badges that suggest or imply they are with Fairview—when in fact, they are embedded Accretive employees.

c.   Even though Accretive has by contract assumed responsibility for managing key functions at the hospitals, as set forth above, Accretive charges the hospitals for the payroll costs of Fairview's employees, and then pays the payroll back to the hospital so that the hospital employees see a hospital check, even though Accretive manages the function.

d.   Accretive is not listed as a contractor of the hospitals on the Form 990 disclosures filed with the Internal Revenue Service or Minnesota Attorney General.

e.   Accretive has not disclosed that it acts as a debt collector for Fairview, in some cases going so far to tell patients that "your account may be turned over to a collection agency"—without disclosing that Accretive *is* itself a debt collection agency attempting to collect a debt.

159.   Accretive has misled, deceived or caused likelihood of confusion or of misunderstanding to patients about the role of Accretive in their health care.  Among

other things, Accretive leads patients to believe that, or conceals from patients that, tasks undertaken by Accretive are done by Fairview.

160.   Minnesota patients are not aware of the extent of Accretive's involvement in their health care or the extent to which it amasses data about them.  This includes that:

a.   Accretive—a licensed debt collector—has access to at least the following information about Minnesota patients:

- Patient's full name
- Gender
- Number of dependents
- Date of birth
- Social Security number
- Clinic and doctor
- A numeric score to predict the "complexity" of the patient
- A numeric score to predict the probability of an inpatient hospital stay
- The dollar amount "allowed" to the provider
- Whether the patient is in "frail condition"
- Number of "chronic conditions" the patient has
- Fields to denote whether the patient has:
  - Macular degeneration
  - Bipolar disorder
  - Depression
  - Diabetes
  - Glaucoma
  - HIV
  - Metabolism disorder
  - Hypertension
  - Hypothyroidism
  - Immune suppression disorder
  - Ischemic heart disease
  - Osteoporosis
  - Parkinson's Disease
  - Asthma
  - Arthritis
  - Schizophrenia
  - Seizure disorder
  - Renal failure

    o   Low back pain

b.    Accretive represents to its investors that it "identif[ies] patient accounts with financial risk by applying data mining techniques to the data [it has] collected."

c.    Accretive represents to its investors that it "increase[s] the collection rate on patient-owed obligations" in part by using "consumer behavior modeling."

d.    Accretive represents to its investors that it uses proprietary algorithms to assess a patient's "propensity to pay."

e.    Under the QTCC agreement with Fairview, Accretive receives a share of the hospital's incentive payments from certain HMOs and insurers for cost savings generated through "managing the care coordination process."

f.    Under the QTCC, Accretive works to achieve health care savings in part through an "intense focus" on "reducing avoidable hospital admissions" and by identifying the "sickest and most impactable patients" "for proactive management."

g.    Accretive helps hospitals identify the individuals who are "most likely to experience an adverse health event and, as a result, incur high health care costs in the coming year."

h.    Accretive tells its investors that, when a hospital "adopts both our revenue cycle and quality and total cost of care management solutions, we can leverage the information available in our revenue cycle technology and data platform to enable real-time care management."

i.    Accretive manages the functions identified on page 17 of its 2010 Annual Report, including that it performs "analytics and reporting" to track utilization by patient and physician, to determine profit and loss by patient, and to identify patients who are "outliers."

161.    In sharp contrast to the lack of information provided by Accretive to Minnesota patients, it provides much more detailed information to Wall Street investors about its role in the health and lives of patients. The actions and efforts of Accretive to hide its role within the hospitals, and its failure to disclose its identity to Minnesota

patients, are material because it causes Minnesota patients to provide their sensitive personal and healthcare data to Accretive unknowingly.   Accretive then uses that information, among other things, to make decisions that affect Minnesota patients, and to collect debts against Minnesota patients.   Minnesota patients are entitled to know the information that Accretive amasses about them and its extensive role in their health care so that they can make informed choices about their health care and medical records.   By withholding such information, Accretive has omitted and failed to make necessary disclosures to Minnesota consumers to enable them to make informed choices about their health care and medical records.   Accretive is responsible to provide such information to patients.   Among other things, it manages, oversees, and controls the hospital employees responsible to provide such information.   *See State of Minnesota v. Fleet Mortgage Corp.*, 158 F.Supp.2d 962, 967 (D. Minn. 2001).

162.   Accretive hid its role from Fairview's patients with the intent to deceive or mislead Fairview's patients into believing that its employees were actually hospital employees.   Accretive did this because it knew Fairview's patients would be more trusting and responsive if they believed they were interacting with Fairview rather than a debt collector.   In other words, Accretive knew that it would be material to the average consumer of Fairview's services if the consumer knew who Accretive was and what Accretive's role was.   A Fairview patient would have no way of knowing Accretive's role, and would have no occasion to research Accretive or review its SEC filings, because Accretive's employees were deceptively presented as employees of the hospital to patients, and Accretive masked its role at the hospitals and failed to disclose its identity to

patients. Defendant's conduct described above constitutes multiple, separate violations of Minn. Stat. § 325F.69, subd. 1 and Minn. Stat. § 325D.44, subdivision 1. By misrepresenting, failing to disclose, and omitting material facts, Defendant further engaged in deceptive and fraudulent practices in violation of the these acts.

163. As an additional consumer protection claim against Accretive, the State alleges that Accretive violated Minnesota's consumer protection laws when it deceived, misled and falsely promised to Fairview that Accretive would manage Fairview's Revenue Cycle operations in accordance with relevant laws and the State of Minnesota's Hospital Agreement and then did not do so.

164. The Minnesota consumer protection laws apply to deception perpetrated against nonprofit organizations. *See, e.g., Group Health Plan, Inc. v. Philip Morris Inc.,* 621 N.W.2d 2 (Minn. 2001). Here, Fairview, as a charitable institution, was purchasing services from a vendor, Accretive, and was therefore acting in the role of a consumer. It is particularly appropriate and equitable to recognize a consumer claim for wrongs done to Fairview because Fairview is a non-profit hospital that holds charitable assets. The harm done to Fairview by the deception and misrepresentations of Accretive depletes, or at least threatens, the charitable assets held in trust by Fairview for the benefit of the people of Minnesota as a whole.

165. When Fairview purchased the services of Accretive, it was based upon Accretive's representation that Accretive would "deliver all Services in accordance with all applicable laws, rules and regulation, including, but not limited to, [Fairview's] agreement with the Minnesota Attorney General...." The Fairview hospitals also

expected Accretive to manage their revenue cycles in a manner consistent with the duties, values, and obligations of non-profit charitable hospitals.

166.   As set forth above, Accretive violated state and federal law, including HIPAA, the FDCPA and Minnesota debt collection, consumer protection and privacy laws, and also violated numerous provisions of the Consent Judgment.   In many instances, Accretive failed and refused to correct, and continued to violate, these laws and the Consent Judgment, even after Fairview audits showed violations and Accretive was informed of these violations.

167.   Accretive also represented to Fairview that it would keep sensitive health information relating to the hospital's patients safe and secure, by using "appropriate safeguards" to prevent the misuse or disclosure of protected health information, and that it would keep such information "strictly confidential" and require all of its employees and subcontractors and agents to maintain confidentiality of protected health information, as required by federal law.   Accretive made these representations with the intent that the hospitals rely on the statements when agreeing to purchase services from Accretive.   In reality, Accretive failed to protect the patients' sensitive health information.   Employees that did not need access to such information were given unfettered access, and others were allowed to download such information onto laptop computers and remove it from the hospitals, even though Accretive was well-aware that its laptops were frequently stolen from its employees' cars.   In short, Accretive made both affirmative misrepresentations and material omissions to the hospitals regarding the security of patient information entrusted to Accretive, and more generally with respect to Accretive's

compliance with applicable law, such as the legality of Accretive acting as a debt collector in Minnesota (even though it lacked the basic licensure to act in that capacity).

168.   Accretive acted with the intent to deceive Fairview, a Minnesota charitable institution whose assets are held in trust for the benefit of the citizens of Minnesota, in order to land a lucrative contract, among other things.  Its subsequent behavior showed a willful disregard for the laws and agreements it had represented it would comply with, as well as an utter disregard in remedying violations when they were brought to its attention.

169.   Accretive's misrepresentations to Fairview constitute a fraud, false pretense, misrepresentation, misleading statement, and deceptive practice, with the intent that others rely thereon in connection with the sale of merchandise, within the meaning of the Prevention of Consumer Fraud Act.  Accretive's misrepresentations to Fairview are also misrepresentations about the quality and characteristics of its services, which violates § 325D.44, subd. 1, (5) and (7) of the Uniform Deceptive Trade Practices Act.

170.   As an additional consumer protection claim against Accretive, the State alleges that Accretive's demands for money from Minnesota hospital patients prior to knowing the cost to the patients of those healthcare services, or even what healthcare services would be provided, violated Minnesota's consumer protection statutes.  The State pleads this consumer protection claim in the alternative to the debt collection claims stated in Count IV.  If such demands for payment by Accretive from Minnesota patients are determined to not be debt collection under the Minnesota Collection Agency Act, then such demands for money are related to the sale of health care services and are subject to Minnesota's consumer protection laws.

171.   Accretive, or hospital employees acting at the direction and control of Accretive, demanded payments from Minnesota patients that exceed the cost of the services provided, before it was known what the cost of patients' healthcare services would be, and, in many cases, even before it was known what healthcare services were required to treat patients.   Accretive knew that its A2A software and other estimating tools and procedures were not always accurate, and had many problems, resulting in overcharges to patients, but Accretive nevertheless demanded and took money from patients before knowing what the true costs to the patients would be, and in amounts that exceeded what was ultimately owed by patients.

172.   Accretive's demand for payments from Minnesota hospital patients under such conditions is a fraud, false pretense, misrepresentation, misleading statement, and deceptive practice, with the intent that others rely thereon in connection with the sale of merchandise, within the meaning of the Prevention of Consumer Fraud Act.  Accretive's demand for payment under such conditions is a misrepresentation of the health care services' characteristics, namely price, which violates the Uniform Deceptive Trade Practices Act.  In addition, such demands violate Minn. Stat. § 62D.123, under which it is illegal for a medical provider to charge a patient more than is contracted for under an HMO contract.

173.   As an additional consumer protection claim against Accretive, the State alleges that Accretive's representations to Minnesota patients that payments were required to be made at or before the time of service, together with Accretive's implication or suggestion that healthcare services may not be provided if payment was not made,

violated Minnesota's consumer protection statutes.   The State pleads this consumer protection claim in the alternative to the debt collection claims stated in Count IV.   If such demands for payment by Accretive from Minnesota patients are determined not to be debt collection under the Minnesota Collection Agency Act, then such demands for money are related to the sale of health care services and are subject to Minnesota's consumer protection laws.

174.   As a part of its in-hospital collection activities, Accretive, or hospital employees acting at the direction and control of Accretive, often demanded payment from patients at or before the time of service.   Accretive and the employees under its control, direction, and management often did not offer or suggest that patients could be invoiced and pay for services later.   To the contrary, scripts developed by Accretive and training provided by Accretive emphasized that patients should not be given the option to pay later and that patients should be made to feel that they were required to pay "today." By not providing options for later payment to patients, by training staff to repeatedly insist on on-the-spot payment by patients, and by creating a boiler-room environment that encouraged and promoted other abusive, aggressive, and harassing collection tactics for in-hospital collections, Accretive implied, suggested, and created the impression to many patients that the patients would not receive the healthcare services they had come to the hospital for if they did not make the on-the-spot payments that were being demanded.

175.   These demands for immediate payments by Accretive, or hospital employees acting at the direction and control and under the supervision and management of Accretive, were false, fraudulent, misleading and deceptive and caused the likelihood

of confusion and understanding.  For one thing, as Accretive well knew, the hospitals could bill patients after the provision of healthcare services.  Accretive's demands for immediate payment, the failure to outline options for later payment, and the implication that healthcare services would be withheld was often inconsistent with the hospitals' own policies and procedures, which often plainly contemplated and allowed for post-service billing.   Accretive's   demands   for   immediate   payment   thwarted   the   hospital's responsibilities under their Consent Judgments with the State of Minnesota.   For example, under the Consent Judgment, the Hospital is not supposed to collection money from patients for amounts that have been submitted to third party payors, but which claims are pending.  Accretive, and the staff under its supervision, management, and control, routinely ignored the provisions of the Consent Judgment.  Through the scripts it developed, its training, and its control, supervision, management, training, oversight, and direction of hospital staff, and its own "infused" employees, Accretive has given some Minnesota patients the impression that they were required to pay money in the emergency room in emergency situations or that the patient might not get treated if they did not pay money in the emergency room, or other time-sensitive and medically necessary situations.

176.   Accretive's demand for immediate payment at or before the time of service, and its suggestion and implication that healthcare services may not be provided if payment is not made at that time, is a fraud, false pretense, misrepresentation, misleading statement, and deceptive practice, with the intent that others rely thereon in connection with the sale of merchandise, within the meaning of the Prevention of Consumer Fraud

Act. Accretive's demand for immediate payment and implication that healthcare services may be withheld under such conditions is a misrepresentation of the health care services' characteristics, namely price, which violates the Uniform Deceptive Trade Practices Act. These Accretive practices are also a direct violation of Minn. Stat. 325D.44 (12), which makes it a violation for a company that "implies or suggests that healthcare services will be withheld in an emergency situation."

177.   For these violations, the State seeks injunctive relief, civil penalties, costs, and attorneys fees under Minn. Stat. §§ 325F.69 *et seq.*, 325D.43 *et seq.*, and 8.31. As part of its request for equitable relief, the State also seeks an order requiring Accretive to disclose to Minnesota patients the data that it has about them and where and how such data is stored, including but not limited to whether it has been sent overseas.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Minnesota respectfully asks this Court to enter judgment against Defendant Accretive, awarding the following relief:

1.   Preliminarily and permanently enjoining Defendant from violations of the federal health privacy laws, 42 U.S.C. § 17935(b); 45 C.F.R. §§ 164.308(a)(1), .308(a)(3-4), .308(a)(5), .308(a)(6), .310(a)(1), .310(d)(1), .312(a)(1), .316, .404, .406, .408, .502, *et seq.*, .514, *et seq.*, .530(b), .530(c), and .530(e) as provided under 42 U.S.C. § 1320d-5(d)(1)(A); and from violations of Minn. Stat. Ch. 144, Minn. Stat. Ch. 332, and Minnesota's consumer protection laws, Minn. Stat. §§ 325D.43 *et seq.*, & 325F.68 *et seq.*

2.   Awarding judgment against Defendant for statutory damages for all violations by Defendant as provided under 42 U.S.C. §§ 1320d-5(d)(1)(B), (2) and

awarding Plaintiff costs of the action and reasonable attorneys fees as provided under 42 U.S.C. § 1320d-5(d)(3).

3.      Awarding judgment against Defendant for restitution or other relief as provided under Minn. Stat. § 8.31, the *parens patriae* doctrine, the general equitable powers of the Court, and any other authority, including, but not limited to, damages for all violations by Defendant as described in this Second Amended Complaint, awarding judgment against Defendant for civil penalties as provided under Minn. Stat. § 8.31, and awarding prejudgment interest and Plaintiff's costs, including the costs of investigation and reasonable attorneys fees as provided under Minn. Stat. § 8.31.

4.      An order requiring Accretive to disclose to Minnesota patients the data that it has about them, where and how such data is stored, including but not limited to whether it has been sent overseas, and how such data is utilized.

5.    Such other and further relief as provided by law and/or as the Court deems just and appropriate.


Dated:  July 3, 2012

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

AL GILBERT
Solicitor General

NATHAN BRENNAMAN
Deputy Attorney General

s/ Jacob Kraus
JACOB KRAUS
Assistant Attorney General
Atty. Reg. No. 0346597
jacob.kraus@ag.state.mn.us

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101
(651) 757-1454 (Phone)
(651) 282-5832 (Fax)
(651) 296-1410 (TTY)

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

AG: #3030956-v1